Warren E. Gluck, Esq.
Richard A. Bixter, Jr., Esq. (*pro hac forthcoming*)
Sheila (Qian) Shen, Esq.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
Phone:  212-513-3200
Fax: 212-385-9010
warren.gluck@hklaw.com
richard.bixter@hkalw.com
qian.shen@hklaw.com
*Counsel for Plaintiff*

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>THE BANKRUPTCY ESTATE OF NORSKE SKOGINDUSTRIER ASA<br><br>        Debtor in a<br>        Foreign Proceeding. | Chapter 15<br><br>Case No. 18-13571 (smb) |
| THE BANKRUPTCY ESTATE OF NORSKE SKOGINDUSTRIER ASA,<br><br>        Plaintiff,<br><br>    vs.<br><br>CYRUS CAPITAL PARTNERS, L.P., CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD., CYRUS OPPORTUNITIES MASTER FUND II, LTD., CRS MASTER FUND, L.P., CRESCENT I, L.P., and JOHN DOES 1-20,<br><br>        Defendants. | Adv. Pro. No. 18-_____<br><br><br><br>**COMPLAINT** |

Tom Hugo Ottesen, duly appointed trustee and foreign representative ("**Petitioner**" or "**Trustee**") of Plaintiff The Bankruptcy Estate of Norske Skogindustrier ASA ("**Norske**

**Skogindustrier Estate**" or "**Plaintiff**"), a bankruptcy estate currently being administered under the supervision of the Oslo County Court (the "**Oslo Court**"), Case No. 17-198212KON-OBYF/1 (the "**Norway Bankruptcy**"), pursuant to the Bankruptcy Act of 8 June 1984 No. 58 (the "**Bankruptcy Act**") by its undersigned United States counsel, Holland & Knight LLP, as and for his Complaint in this adversary proceeding against Defendants Cyrus Capital Partners, L.P., Cyrus Select Opportunities Master Fund, Ltd., Cyrus Opportunities Master Fund II, Ltd., CRS Master Fund, L.P., Crescent 1, L.P., and John Does 1-20 (collectively, "**Defendants**" or "**Cyrus**"), alleges as follows:

## PRELIMINARY STATEMENT

1.      Tom Hugo Ottesen is the Court-appointed Trustee and Foreign Representative of The Bankruptcy Estate of Norske Skogindustrier ASA, with authority pursuant to Orders of the Oslo Court and this Court to liquidate the assets of Norske Skogindustrier ASA ("**Norske Skogindustrier**" or "**Norske**") and bring litigation on behalf of the bankruptcy estate.

2.      This adversary proceeding seeks avoidance and clawback, pursuant to Sections 5-5 and 5-9 of the Norwegian Recovery Act (defined below), of certain June 2016 transfers totaling 31 Million EUR made from Norske Skogindustrier to Cyrus.

3.      The avoidance and clawback statutes set forth in the Norwegian Recovery Act are the equivalent of intentional fraudulent transfer statutes found within the United States, requiring actual intent and knowledge of the detriment to creditors that would result from a transfer.  The facts set forth herein clearly demonstrate that Cyrus used its insider status to knowingly orchestrate a series of transfers that severely deteriorated Norske's financial condition to the detriment of Norske and its creditors.

4.      These transfers were made to Cyrus to pay Norske Skogindustrier's most junior unsecured debt instruments at face value, at a time when Norske Skogindustrier barely had sufficient liquidity to continue operations, let alone make payment on the hundreds of millions of senior debt held by bondholders.

5.      Cyrus orchestrated this payout by way of a series of maneuvers, including a significant purchase of Norske Skogindustrier's equity, followed by the termination of Norske board members and the election of board members sympathetic to Cyrus's interests.

6.      At all times relevant to this Complaint, Cyrus was an insider of Norske Skogindustrier, with significant influence over the Norske Board of Directors.  At the same time, Cyrus was actively betting against the company by way of credit default swaps agreement with third parties.

7.      Due to Cyrus's credit default swap interests, Cyrus would receive a windfall if it received payment on the junior notes in its possession followed by a Norske bankruptcy.  Through Cyrus's undue influence over Norske Skogindustrier, Cyrus was able to produce such an outcome.

8.      The June 2016 payments to Cyrus were improper and detrimental to the creditors of the Norske Skogindustrier estate.  Accordingly, Plaintiff seeks avoidance and clawback of the 31 million EUR improperly transferred to Cyrus under Norwegian law.

## **PARTIES, JURISDICTION AND VENUE**

9.      Plaintiff is a Norwegian bankruptcy estate under the supervision of the Oslo County court, Case no. 17-198212KON-OBYF/1.

10.      Defendant Cyrus Capital Partners, L.P. ("**Cyrus Capital**") is a Foreign Limited Partnership organized under the laws of Delaware, with a registered address and principal place of business at 65 East 55th Street, 35th Floor, New York, New York 10022.

11.     On information and belief, Defendant Cyrus Select Opportunities Master Fund, Ltd. ("**Cyrus Select Fund**") is a Cayman limited company with a registered address at 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands KY1-9009, and a principal place of business at 65 East 55th Street, 35th Floor, New York, New York 10022.

12.     On information and belief, Cyrus Opportunities Master Fund II, Ltd. ("**Cyrus II Fund**") is a Cayman limited company with a registered address at 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands KY1-9009, and a principal place of business at 65 East 55th Street, 35th Floor, New York, New York 10022.

13.     On information and belief, CRS Master Fund, L.P. ("**CRS Fund**") is a Cayman limited partnership with a registered address at 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands KY1-9009, and a principal place of business at 65 East 55th Street, 35th Floor, New York, New York 10022.

14.     On information and belief, Crescent 1, L.P. ("**Crescent Fund**" and collectively with the Cyrus Select Fund, the Cyrus II Fund, CRS Fund and John Does 1-20, the "**Cyrus Funds**") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business at 65 East 55th Street, 35th Floor, New York, New York 10022.

15.     Defendants John Does 1-20 are individual or entities that held debt and/or equity positions in Norske Skogindustrier and were the ultimate recipients of all or part of the Cyrus Transfer (defined below).

16.     Upon information and belief and based upon the Trustee's review of communications between representatives of the Norske Enterprise and the Cyrus entities, Cyrus Capital operates the Cyrus Funds as manager ("**Manager**") pursuant to management agreements, and in the case of CRS Fund and Crescent Fund acts as general partner.

17.     Upon information and belief and based upon the Trustee's review of communications between representatives of the Norske Enterprise and the Defendants, the Cyrus Funds are typical fund entities, which although formed under the laws of Cayman Islands and Delaware, do not have operations, employees, offices, or other indicia of operations in these jurisdictions aside from statutorily prescribed directors, who also maintain dozens if not hundreds of similar roles for similar funds.

18.     Rather, upon information and belief and based upon the Trustee's review of communications between representatives of the Norske Enterprise and the Defendants, all or substantially all actions, correspondence, activity, decision making, contracting, investment, accounting directions and flow of funds directions, correspondence, contact and email and substantially all commercial activity by the Cyrus Funds was executed, directed, effected, ordered and facilitated by Cyrus Capital, from New York.  New York is where Cyrus Capital and the Cyrus Funds are fairly regarded as home.

19.     In addition, upon information and belief and based upon the Trustee's review of communications between representatives of the Norske Enterprise and the Defendants, all or substantially all of Cyrus Capital and the Cyrus Funds' conduct and action concerning the Norske Skogindustrier investments and loans, including interactions with Norske Skogindustrier, board membership of Norske Skogindustrier, their receipt of knowledge concerning the Norske Enterprise's financial condition, and their knowing, insider receipt of fraudulent and preferential payouts under Norwegian law occurred, executed, or was carried out from New York.

20.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

22.    This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

23.    The court has general and specific personal jurisdiction over the Defendants because: (i) the Defendants are authorized to do business in New York and the United States and regularly transacted business in the United States, the place where all Defendants may be fairly regarded as home and have a principal place of business; (ii) the Defendants have transacted business in the United States and in New York with respect to matters at issue in this case; (iii) the Defendants have committed tortious acts or engaged in the conduct requisite for liability under Norwegian law within the United States, including within the State of New York; and (iv) as set forth above , the Cyrus Funds were managed and operated by Cyrus Capital from Cyrus Capital's offices in New York, New York.

### NOTICE PURSUANT TO FED. R. BANKR. P. 9017 AND FED. R. CIV. P. 44.1

24.    Please take notice that Plaintiff intends to raise issues in this adversary proceeding pertaining to foreign law, specifically, the Norwegian Act of 8 June 1984 no. 59 relating to creditors' rights to satisfaction of claims (the "**Norwegian Recovery Act**") and other related statutes. Plaintiff's Adversary Complaint seeks avoidance and clawback, pursuant to Sections 5-5 and 5-9 of the Norwegian Recovery Act, of certain transfers made from Norske Skogindustrier to Cyrus in violation of the Norwegian Recovery Act's analogue to United States intentional fraudulent transfer statutes.

## GENERAL ALLEGATIONS

**A.      The Norske Enterprise and the Norske Liquidity Crisis**

25.      Norske Skogindustrier ASA is a Norwegian limited liability company organized under the laws of Norway, with its registered office at P.O. Box 294 Skoyen, Oslo, Norway and its principal place of business located at Karenslyst Alle 49, 0279, Oslo, Norway.

26.      Norske Skogindustrier was the parent company for various paper production subsidiaries under the Norske brand.  The Norske Enterprise was one of the largest producers of newsprint and magazine paper in the world.

27.      The Norske brand structure consisted of, among others, Norske Treindustrier AS, Norske Skog Holding AS ("**NSH**"), Norske Skog AS ("**NSAS**"), and via local operating companies and ventures throughout the world ("**Norske Business Units**"), Norske Skogindustrier operated paper mills primarily located in Europe and Australia (the "**Norske Enterprise**").

28.      The corporate structure of the Norske Enterprise at the time of the Second Restructuring (defined below) may be illustrated as follows:



29.      Prior to commencement of the Norway Bankruptcy (defined below), all major financing and operational decisions for the Norske Enterprise were made by the board of directors

for Norske Skogindustrier ("**Norske Board**"), including board members personally selected and controlled by Defendants.

30.     From at least 2012 until the date of commencement of the Norway Bankruptcy, the Norske Enterprise faced extraordinarily poor financial performance due in part to depressed publication paper prices and volumes in Europe and depressed export markets in Asia.  Attached as **Exhibit 1** is a copy of the January 5, 2016 Offering Memorandum of Norske Skogindustrier ("**Offering Memorandum**") which sets forth the financial condition of the Norske Enterprise leading up to the Second Restructuring.

31.     The Norske Enterprise had experienced decreasing demand for its products — which the Norske Enterprise expected to continue in the future — as the publication paper industry had "undergone significant fundamental changes" due to the continued growth of the internet and other electronic publications.  Offering Memorandum at p. 30.

32.     By way of the Offering Memorandum, the Norske Board admitted that the Norske Enterprise had "a history of losses" and admitted that it "may not be profitable or generate sufficient cash flow to meet [its] liquidity needs in the future."  Offering Memorandum at p. 30.

33.     Since 2012 until the date of commencement of the Norway Bankruptcy, the Norske Enterprise had suffered significant losses each year while its EBITDA had declined annually. Offering Memorandum at p. 29-30.

34.     As of the date of the January 5, 2016 Offering Memorandum, the Norske Enterprise was substantially overleveraged with virtually no prospect of repaying its debts as they come due. Offering Memorandum at p. 30-31.

**B.**     <u>Cyrus' Debt and Equity Position and CDS Interests in the Norske Enterprise</u>

35.     As of February 2016 and prior to the Second Restructuring, Cyrus had invested more than €80 million in the Norse Enterprise through various debt instruments and equity purchases.

36.     Cyrus was the holder of €31.69 million face value of 2016 unsecured notes (defined as 2016 SUNs below) and €1.05 million face value of 2017 unsecured notes.

37.     Norske Skogindustrier was the primary obligor of these unsecured debt instruments and no other entity affiliated with the Norske Enterprise had guaranteed payment thereof.

38.     In connection with the First Restructuring, Cyrus participated in the Norske Enterprise's issuance of the Senior Secured Notes (defined below) and held €17.9 million face value of the Senior Secured Notes as of February 2016.

39.     In connection with the First Restructuring, Cyrus participated in the Exchange Offer (defined below) and exchanged prior unsecured debt instruments for €30.71 million in unsecured Prior Exchange Notes.

40.     In or about December 2015, Cyrus purchased additional shares of Norske Skogindustrier, resulting in Cyrus holding 6.2 million shares (3.3% of outstanding shares), and becoming the second largest shareholder of Norske Skogindustrier.

41.     As of February 2016, Defendants' holdings in the Norske Enterprise can be summarized as follows:

| Equity in Norske Skogindustrier | 6.2 million shares / 3.3% of outstanding shares |
|---|---|
| 2016 Subordinated Unsecured Notes | €31.69 million face value |
| 2017 Subordinated Unsecured Notes | €1.05 million face value |
| 2019 Senior Secured Notes | €17.9 million face value |
| 2021 unsecured Prior Exchange Notes | €30.71 million face value |

42.     On information and belief, Cyrus was also indirectly invested in the Norske Enterprise through financial instruments known as credit default swaps (the "**CDS Interests**").

43.     On information and belief, Cyrus's CDS Interest resulted in Cyrus effectively betting against the Norske Enterprise, in order to reap a financial windfall upon the Norske Enterprise's eventual bankruptcy, only after full payment of the 2016 SUNs, which it knowingly helped to cause and facilitate via its ownership of Norske Skogindustrier and the Cyrus Board Members (defined below).

44.     Defendants orchestrated the Second Restructuring to avoid a large payout to its CDS counterparties if  the Norske Enterprise did not default on its debt obligations in the short-term, but earn a large pay out from these counterparties if the Norske Enterprise was to eventually file bankruptcy, while at the same time receiving a payout on the restructured debt obligations. Attached as **Exhibit 2** is a March 21, 2016 *New York Times* article discussing the true motivation of Cyrus and other similarly-situated parties that held CDS Interests in the Norske Enterprise.

45.     The CDS Interests resulted in Defendants holding an adverse interest to the long-term survival of the Norske Enterprise.  Attached as **Exhibit 3** is a copy of a November 12, 2015 email exchange initiated from a representative of the holder of Senior Secured Notes, describing Defendants' CDS Interests as a "large steepener [sic] trade which incentivizes [a party holding a CDS Interest] to ensure the company moves along for 2-3 years and then goes bust."

C.      **The First Restructuring**

46.     In or about February 2015, in order to alleviate liquidity and debt maturity concerns, the Norske Enterprise entered into a comprehensive series of refinancing transactions referred to as Carra I (the "**First Restructuring**").

47.     The objective of the First Restructuring, in part, was to (i) swap immediate maturing dates for unsecured debt instruments of similar value with later maturing dates and added guarantees of payment, and (ii) issue new secured debt instruments.

48.     Pursuant to the First Restructuring, a portion of Norske Skogindustrier's unsecured debt instruments maturing in 2015, 2016, 2017, and 2033 ("**Subordinated Unsecured Notes**" or "**SUNs**") were exchanged ("**Exchange Offer**") for new unsecured debt instruments ("**Prior Exchange Notes**" or  "**PENs**") maturing in 2021 and 2023.

49.     Norske Skogindustrier was the sole obligor of the payment obligations under the Subordinated Unsecured Notes which were not exchanged pursuant to the Exchange Offer.

50.     The Prior Exchange Notes were issued by NSH, an intermediary holding company for the Norske Enterprise created contemporaneously with the First Restructuring.

51.     The Prior Exchange Notes were guaranteed by Norske Skogindustrier and certain other companies within the Norske Enterprise.

52.     The holders of Subordinated Unsecured Notes who participated in the Exchange Offer received a combination of Prior Exchange Notes and cash more or less equal to the market value of the respective Subordinated Unsecured Notes offered for exchange, along with a small premium.

53.     As set forth above, Defendants participated in Exchange Offer, exchanging a portion of their Subordinated Unsecured Notes and receiving Prior Exchange Notes with a face value of €30.71 million.

54.     The Defendants did not exchange the entirety of their holdings in the Subordinated Unsecured Notes, however, and in the wake of the First Restructuring, the Defendants held €31.69 million in Subordinated Unsecured Notes due and payable in June 2016 ("**2016 SUNs**").

55.     In addition to the Exchange Offer, the First Restructuring included the issuance of €290 million  in new senior secured notes maturing in 2019 ("**Senior Secured Notes**" or "**SSNs**").

56.     A portion of the funds received in connection with the SSNs was used to satisfy the cash payment obligations for SUNs exchanged for PENs pursuant to the Exchange Offer.

57.     The SSNs were issued by a second new intermediary holding company, NSAS, which acquired – with the remaining cash from the SSNs – Norske Skogindustrier's ownership interests in the Norske Business Units (the "**Drop Down**").

58.     In the wake of the First Restructuring, the company's corporate and debt structured can be synthesized in the diagram below:



59.     The SSNs were secured by, *inter alia*, all issued share capital in the Norske Enterprise's European and Australian operating companies, as well as Norske Skogindustrier's ownership interests in NSH and the assets of NSH and NS AS.

60.    The SSNs were guaranteed by Norske Skogindustrier, NSH and the Norske Business Units.

**D.    Defendants' Influence Over the Norske Board and the Second Restructuring**

61.    The participation of holders of SUNs in the Exchange Offer was low.  This resulted in the Norske Enterprise unable to meet its payment deadlines for certain debt instruments, including (i) Senior Secured Notes maturing in 2019; (ii) Prior Exchange Notes maturing in 2021 and 2023; and (iii) considerable amounts of Subordinated Unsecured Notes maturing in 2016, 2017 and 2033, including  €31.69 million in 2016 SUNs owed to Cyrus.

62.    On information and belief, in the months following the First Restructuring, Defendants sold on the open market the majority of the SSNs it purchased through the First Structuring -- €32.1 million in total – leaving the Defendants holding SSNs with a face value of €17.9 million.

63.    On information and belief, Defendants did not transfer or sell any of its interests in the 2016 SUNs during this same time period.

64.    By the summer of 2015, it was clear that the Norske Enterprise's liquidity would be insufficient to repay the 2016 SUNs, a substantial portion of which were held by Cyrus.

65.    Further, throughout 2015, the Norske Enterprise's financial condition, including its EBITDA, net cash flows from operating activities, and equity, continued to decline.  Offering Memorandum at pp. 8-9, 27-30.

66.    During the summer of 2015, the Norske Board began work on a second refinancing scheme named Carra II ("**Second Restructuring**").

67.     At all relevant times, Defendants were significantly involved in the negotiation process for the Second Restructuring, as they comprised one of the largest creditors of the Norske Enterprise and had significant influence over the Norske Board, as discussed below.

68.     On information and belief, Cyrus had sold credit default swaps with the Norske Enterprise's bonds as reference instruments.

69.     On information and belief, if a credit event had occurred in connection with Defendants' CDS Interests, an auction would have occurred with Cyrus being liable to pay the difference between market value and nominal value on the Subordinated Unsecured Notes due and payable in June 2016.

70.     On information and belief, at all relevant times, Defendants' CDS Interests were substantial and of greater financial importance to Defendants than the direct debt and equity positions held by Defendants.

71.     Thus, Defendants' primary financial interest in connection with the Second Restructuring was full payment of the Subordinated Unsecured Notes due and payable in June 2016, rather than the payment of the Senior Secured Notes or the long-term viability of Norske Skogindustrier.

72.     Against this backdrop, less than a year after the Exchange Offer and the issuance of the Senior Secured Notes in connection with the First Restructuring, the Norske Board engaged in restructuring negotiations with Defendants and their financial and legal advisors.

73.     On October 27, 2015, however, the Norske Board announced that they had halted their discussions with Cyrus without reaching any restructuring agreement.  Attached as **Exhibit 4** is a true and correct copy of the October 27, 2015 Norske Skogindustrier press release announcing the halting of negotiations.

74.     On information and belief, negotiations amongst Defendants and the Norske Board broke down due to Defendants' insistence that the 2016 SUNs be paid in full as part of any restructuring packaging, despite the senior position of the SSNs and PENs.

75.     On November 17, 2015, after ending their initial discussions with Cyrus, and without engaging in any meaningful discussions with the holders of the SSNs, the Norske Board attempted to find a short-term solution to the Norske Enterprise's liquidity issues by offering an exchange of the Subordinated Unsecured Notes for new notes issued by Norske Skogindustrier due in June 2019 and June 2026 (the "**November 2015 Exchange Offer**").  Attached as **Exhibit 5** is a true and correct copy of the Norske Skogindustrier announcement concerning the November 2015 Exchange Offer.

76.     On information and belief, Cyrus refused to support the November 2015 Exchange Offer due to its CDS Interests.

77.     When the November 2015 Exchange Offer did not receive a sufficient level of support from holders of the Subordinated Unsecured Notes, Norske Skogindustrier extended the expiration date of the November 2015 Exchange Offer from December 11, 2015 to January 12, 2016.

78.     While the November 2015 Exchange Offer was pending, Cyrus acquired an additional  0.89% of Norske Skogindustrier's stock and voting rights, becoming, as of December 30, 2015, Norske Skogindustrier's second largest shareholder, holding 3.26% of Norske Skogindustrier's ordinary shares, respectively.  Offering Memorandum at 9, 74.

79.     On December 7, 2015, Cyrus and a similarly-situated creditor sent a letter to Norske Skogindustrier regarding its newly acquired equity interest in Norske Skogindustrier and its

request for an extraordinary general meeting of the Norske Board ("**December 7th Letter**").  A true and correct copy of the December 7th Letter is attached hereto as **Exhibit 6**.

80.    As set forth in the December 7th Letter, the purpose of the extraordinary general meeting would be to terminate certain board members of the Norske Board, to presumably be replaced with board members that would cater to Defendants' interests.

81.    Further, the December 7th Letter states that Cyrus would be submitting its refinancing proposal for the Norske Board's consideration at the extraordinary general meeting.

82.    The Norske Board called for the extraordinary general meeting to be held on January 6, 2016.

83.    Having become one of the largest shareholders of Norske Skogindustrier, Cyrus reinstated restructuring negotiations with the Norske Enterprise and, on December 22, 2015, entered into a restructuring support agreement with Norske Skogindustrier ("**Restructuring Support Agreement**"), pursuant to which Norske Skogindustrier agreed to, among other things, terminate the November 2015 Exchange Offer and launch a new exchange offer ("**January 2016 Exchange Offer**"), which offered materially improved terms to the holders of the 2016 SUNs at the expense of Norske Skogindustrier's secured creditors.  A true and correct copy of the executed term sheet in connection with the Restructuring Support Agreement is attached hereto as **Exhibit 7**.

84.    On January 5, 2016, the Norske Board's election and remuneration committee nominated Ms. Joanne Owen and Mr. Nils Ingemund Hoff (collectively, the "**Cyrus Board Members**") to the Norske Board.  A true and correct copy of the Norske Skogindustrier press release announcing the nomination of the Cyrus Board Members is attached hereto as **Exhibit 8**.

85.     The Cyrus Board Members were proposed as new members of the Norske Board at the urging of Cyrus and similarly-situated holders of CDS Interests. *See* Norske Skogindustrier Notice and Agenda for May 25, 2016 Annual General Meeting, a true and correct copy of which is attached hereto as **Exhibit 9**, at p. 7.

86.     On January 6, 2016, the Norske Board held its extraordinary general meeting, during which the Cyrus Board Members were elected to the Norske Board.  A true and correct copy of the minutes of the January 6, 2016  extraordinary general meeting of the Norske Board is attached hereto as **Exhibit 10**.

87.     On information and belief, Cyrus used its equity position in Norske Skogindustrier to seek the termination of certain Norske Board members and the nomination and election of the Cyrus Board Members, in order to reap the benefits of its CDS Interests to the ultimate detriment of Norske Skogindustrier's creditors.

88.     On January 11, 2016, following the announcement of the January 2016 Exchange Offer, Moody's Investor Service issued a Global Credit Research Report (the "**Moody's Report**"), a true and correct of which is attached hereto as **Exhibit 11**.

89.     The Moody's Report concluded that the January 2016 Exchange Offer would, at best and assuming full participation, "only have a moderate effect" on Norske's leverage and Moody's downgraded its rating on the SSNs from Caa1 to Caa2. Moody's Report at pp. 1-2.

90.     The Restructuring Support Agreement and the Second Restructuring was fiercely objected to by an ad-hoc group of holders of SSNs, secured creditors of the Norske Enterprise holding more than fifty percent of the outstanding SSNs (the "**Secured Ad-Hoc Group**"), who recognized that Cyrus was attempting to obtain a superior position to the SSN holders by, among other things, receiving payments under the 2016 SUNs ahead of the secured creditors.

91.    On February 2, 2016 the Secured Ad-hoc Group, acting through Citibank, N.A., as indenture trustee, filed a complaint for declaratory and injunctive relief against, among others, Norske Skogindustrier in the Supreme Court for the State of New York, subsequently removed to the United States District Court for the Southern District of New York, Case No. 1:16-cv-00850-RJS (the "**Citibank Action**"), seeking to enjoin Norske Skogindustrier from consummating the December 2015 Exchange Offer.

92.    The Citibank Action led the Norske Board, now either controlled or under significant direct influence from Cyrus, to scrap the January 2016 Exchange Offer and propose an amended exchange offer in March 2016 ("**March 2016 Exchange Offer**").  A true and correct copy of the March 2016 Exchange Offer is attached hereto as **Exhibit 12**.

93.    The March 2016 Exchange Offer would eventually be consummated in connection with the Second Restructuring.

94.    In connection with the Second Restructuring, holders of the Subordinated Unsecured Notes maturing in 2017 were offered to exchange their notes into a package approximating the following: (i) 47% Subordinated Unsecured Notes maturing in 2026; (ii) 36% perpetual notes maturing in 2115 (treated as equity for accounting purposes); and (iii) a 17% par-value write off.

95.    In connection with the Second Restructuring, in or about March 2016, a new Norwegian Securitization Facility bond ("**NSF**") was issued to, among others, Cyrus, for 100 Million EUR with NSAS – the direct parent of the Norske Business Units – serving as primary and sole obligor.

96.    The NSF was secured with, *inter alia*, pledges in the inventory receivables and bank accounts of certain of the Norske Enterprise's European Business Units.

97.    Due to the NSF's security package and its placement in the corporate structure – the primary obligor was NSAS – it was senior both to the SSNs and PENs for all practical matters, as well as the SUNs.

98.    The Second Restructuring also included the following transactions, all of which were partially financed/purchased by Defendants:

- The issuance of an additional 10 Million EUR of secured debt in accordance with the Senior Secured Notes indenture to NSAS maturing in 2016 ("**2016 SSNs**");

- The issuance of a 20 Million EUR bridge loan to finance the purchase price the Norske Enterprise would eventually receive in relation to the sale of a New Zealand geothermal power plant; and

- The issuance of share capital in Norske Skogindustrier for 15 Million EUR.

99.    Over the objection of certain of the Secured Ad Hoc Group and other injured creditors, the cash received or generated by NSAS on account of the NSF was upstreamed indirectly to Norske Skogindustrier and used to repay the 2016 SUNs ("**Upstreaming and Transfer**").

100.    By June 30, 2016, a total of approximately 108 Million EUR was used by Norske Skogindustrier to pay off or purchase the Subordinated Unsecured Notes due and payable in June 2016, with full knowledge that such transfers would severely deteriorate Norske's financial condition.

101.    In connection with the Upstreaming and Repayment, the Defendants received approximately 31 Million EUR for full payment of the 2016 SUNs at face value, in preference to and to the detriment of Norske Skogindustrier's other creditors (the "**Cyrus Transfer**").

102.    The diagrams below synthesizes the corporate structure, Second Restructuring and Upstreaming and Transfer:





103.   At the time of the Second Restructuring, Norske Skogindustrier's financial condition had severely deteriorated.

104.   Indeed, as of September 30, 2015, the Norske Enterprise's cash balance was only NOK 220 million, with NOK 200 million being required to allow for daily volatility in working capital.

105.   Norske Skogindustrier's indirect use of the NSF funds to pay Defendants and the other holders of the 2016 SUNs left Norske Skogindustrier and its subsidiaries with insufficient cash to continue operations in the long term.

**E.      The Norway Bankruptcy and Foreign Recognition**

106.   On December 19, 2017 ("**Norwegian Petition Date**"), due to the Norske Enterprise's continuing financial difficulties as the result of the Second Restructuring and the Upstreaming and Transfer, the Norske Board filed a voluntary petition on behalf of Norske Skogindustrier with the Oslo Court. ("**Norway Bankruptcy Petition**").  A translated copy of the Norway Bankruptcy Petition is attached hereto as **Exhibit 13**.

107.   On December 20, 2017, four of Norske Skogindustrier's Norwegian subsidiaries also filed voluntary petitions for liquidation with the Oslo Court: Norske Skog Holding AS, Norske Treindustrier AS, Lysaker Invest AS, and Norske Skog Eiendom AS ("**Norwegian Subsidiaries**").

108.   On December 19, 2017, the Petitioner, Tom Hugo Ottesen, was appointed bankruptcy trustee of the Norske Skogindustrier Estate by the Oslo Court ("**Norway Bankruptcy Order**") and on December 20, 2017 the Petitioner was appointed as trustee for the Norwegian Subsidiaries.  A true and correct copy of the Norway Bankruptcy Order is attached hereto as **Exhibit 14**.

109.   On the Norwegian Petition Date, Norske Skogindustrier's records listed approximately 287 Million EUR in assets and approximately 924 Million EUR in liabilities.

110.   On November 16, 2018, the Trustee filed a verified petition and accompanying declarations in this Court, seeking recognition of the Norway Bankruptcy of Plaintiff as a foreign main proceeding and the Trustee as foreign representative and certain other relief under chapter 15 of the United States Bankruptcy Code, Case No. 18-13571-smb ("**Chapter 15 Bankruptcy**").

111.    On December 18, 2018, this Court entered an order recognizing the Norway Bankruptcy and the Trustee as a foreign main proceeding and as a foreign representative, respectively, pursuant 11 U.S.C. § 1501, *et seq*. ("**Chapter 15 Recognition Order**") [Docket No. 9].

## CAUSES OF ACTION

### First Count: Avoidance Action Under Norwegian Recovery Act § 5-9

112.    Plaintiff repeats and re-alleges paragraphs 1 through 111 as if fully set forth herein.

113.    The Norwegian Act of 8 June 1984 no. 59 relating to creditors' rights to satisfaction of claims (the "**Norwegian Recovery Act**") § 5-9 states:

> "Transactions which improperly give preference to one creditor at the expense of the others, or prevent the debtor's assets from being used to pay off the creditors, or increase the debtor's liabilities in a manner detrimental to the creditors, may be voided if the debtor's financial situation was weak or was seriously weakened by the transaction, and the other party to the transaction knew or should have known of the debtor's financial difficulties and the circumstances that made the transaction improper.
>
> Transactions executed more than ten years prior to the time limit (i.e. the filing of bankruptcy) cannot be voided"

114.    In connection with the Upstreaming and Repayment, the Defendants received approximately 31 Million EUR for full payment of the 2016 SUNs at face value, in preference to and to the detriment of Norske Skogindustrier's other creditors.

115.    The Cyrus Transfer improperly gave preference to Defendants over the interests of Norske Skogindustrier's other creditors.

116.    The Cyrus Transfer was a non-ordinary transfer that severely deteriorated Norske Skogindustrier's ability to continue business or make payments to its other creditors.

117.    The Cyrus Transfer was not a necessary payment required for Norske Skogindustrier to continue business operations, but rather was a payment of unsecured, junior debt

instruments orchestrated by Defendants and the Cyrus Board Members meant to injure Norske's creditors.

118.    The Defendants, by and through the Cyrus Board Members, caused Norske Skogindustrier to intentionally pay 108 Million EUR to holders of Subordinated Unsecured Notes, including by way of the Cyrus Transfer, with full knowledge that such payments would leave Norske Skogindustrier unable to make payments to Norske Skogindustrier's other creditors including, but not limited to, the holders of the SSNs and the PENs.

119.    The Cyrus Transfer prevented Norske Skogindustrier's assets from being used to pay off Norske Skogindustrier's creditors.

120.    At the time of the Cyrus Transfer, Norske Skogindustrier's financial situation was weak and was seriously weakened by the Cyrus Transfer, as Norske Skogindustrier was insolvent or nearing insolvency, with no realistic expectation that Norske Skogindustrier would be able to pay its remaining financial debts at maturity.

121.    The Defendants knew or should have known of Norske Skogindustrier's financial difficulties and the circumstances that made the transaction improper due to their insider and controlling status.

122.    As discussed above, in December 2015/January 2016, Defendants took various steps to purchase equity in Norske Skogindustrier for the purpose of installing the Cyrus Board Members and effectuating the Cyrus Transfer.

123.    The Defendants are related parties to Norske Skogindustrier, due to Defendants comprising the second largest shareholder of Norske Skogindustrier and the election of the Cyrus Board Members to the Norske Board.

124.    The Cyrus Transfer was effectuated through an irregular source of funds, namely, the NSF bonds, which granted the NSF holders, including Cyrus, with senior liens over Norske Skogindustrier's assets in exchange for payment of the 2016 SUNs held by Cyrus.

125.    The Defendants indirectly funded the Cyrus Transfer through the virtually risk free NSF loan to NSAS, and managed, through their close relation with Norske Skogindustrier and the Cyrus Board Members, to leverage Norske Skogindustrier to repay the 2016 SUNs at face value even though there was no realistic chance that bonds with later maturities could be repaid at par. In addition, the repayment of the 2016 SUNs substantially benefitted Defendants' CDS Interests.

126.    The creditors of Norske Skogindustrier were injured by the Cyrus Transfer, since it left Norske Skogindustrier with few remaining funds to pay its other creditors.

127.    By reason of the foregoing, Plaintiff is entitled to a judgment in its favor, avoiding the Cyrus Transfer and ordering payment by Defendants to the Norske Skogindustrier Estate of an amount equal to the Cyrus Transfer, pursuant to the Norwegian Recovery Act § 5-12.

**Second Count: Avoidance Action Under Norwegian Recovery Act § 5-5**

128.    Plaintiff repeats and re-alleges paragraphs 1 through 127 as if fully set forth herein.

129.    The Norwegian Recovery Act § 5-5 states:

"Payment of debt which the debtor has carried out later than three months prior to the date of filing for bankruptcy may be voided if the payment is made with unusual means of payment, before the ordinary time of payment, or with an amount that substantially deteriorated the debtor's ability to meet payments, provided that the payment in light of the circumstances did not appear to be ordinary.

If a payment mentioned in the first paragraph was made to one of the debtor's closely related parties, it may also be voided if it was carried out earlier, but later than two years prior to the date of filing for bankruptcy, unless it can be proven that the debtor was unquestionably solvent when the payment was carried out."

130.   In connection with the Upstreaming and Repayment, the Defendants received approximately 31 Million EUR for full payment of the 2016 SUNs at face value, in preference to and to the detriment of Norske Skogindustrier's other creditors.

131.   The Cyrus Transfer constituted an irregular and non-ordinary payment from Norske Skogindustrier to the Defendants.

132.   In light of the circumstances, namely the December 7th Letter, the multiple exchange offers proposed during the Second Restructuring, the appointment of the Cyrus Board Members at the urging of Defendants and the objections of Norske Skogindustrier's creditors, the Cyrus Transfer was a non-ordinary and irregular transfer of Norske Skogindustrier's assets.

133.   The Cyrus Transfer severely deteriorated Norske Skogindustrier's ability to make payments to other creditors.

134.   The Cyrus Transfer was not a necessary payment required for Norske Skogindustrier to continue business operations, but rather was a payment of unsecured, junior debt instruments orchestrated by Defendants and the Cyrus Board Members.

135.   Norske Skogindustrier was a holding company, and did not conduct any cash-generating operations. If Norske Skogindustrier would have defaulted on the 2016 SUNs, this would not have impeded the Norske Business Units from continuing their day-to-day operations.

136.   The Defendants, by and through the Cyrus Board Members, caused Norske Skogindustrier to pay 108 Million EUR to holders of Subordinated Unsecured Notes, including by way of the Cyrus Transfer, with full knowledge that such payments would leave Norske Skogindustrier unable to make payments to Norske Skogindustrier's other creditors including, but not limited to, the holders of the SSNs and the PENs.

137. The Cyrus Transfer prevented Norske Skogindustrier's assets from being used to pay off Norske Skogindustrier's creditors, and increased Norske Skogindustrier's liabilities in a manner detrimental to Norske Skogindustrier's creditors.

138. The Defendants were a closely related party to Norske Skogindustrier. From December 2015 until the commencement of the Norway Bankruptcy, the Defendants comprised the second largest shareholder of Norske Skogindustrier and had significant influence over the Norske Board by way of the Cyrus Board Members.

139. Defendants used this insider relationship with Norske Skogindustrier to cause the Norske Board to take actions that benefitted Defendants' CDS Interests rather than the interests of Norske Skogindustrier and its creditors.

140. By reason of the foregoing, Plaintiff is entitled to a judgment in its favor, avoiding the Cyrus Transfer and ordering payment by Defendants to the Norske Skogindustrier Estate of an amount equal to the Cyrus Transfer, pursuant to the Norwegian Recovery Act § 5-11.

**WHEREFORE**, based upon the foregoing, The Bankruptcy Estate of Norske Skogindustrier ASA respectfully requests judgment against the Defendants, as follows:

A. On Count I, pursuant to the Norwegian Recovery Act § 5-9, avoidance of the Cyrus Transfer and awarding Plaintiff damages in an amount to be determined at trial;

B. On Count II, pursuant to the Norwegian Recovery Act § 5-5, avoidance of the Cyrus Transfer and awarding Plaintiff damages in an amount to be determined at trial;

C. Granting the Plaintiff's reasonable costs and attorneys' fees; and

D. Awarding such other, further, and different relief as this Court may deem just, equitable, and proper.

Dated:  New York, New York
       December 18, 2018

Respectfully submitted,

_____/s/ Warren E. Gluck, Esq._____

HOLLAND & KNIGHT LLP
Warren E. Gluck, Esq.
Richard A. Bixter, Jr., Esq. (*pro hac forthcoming*)
Sheila (Qian) Shen, Esq.
31 West 52nd Street
New York, New York 10019
Telephone:  (212) 513-3200
Facsimile:  (212) 385-9010

*Counsel for The Bankruptcy Estate of Norske Skogindustrier ASA*