Eric Seiler (eseiler@fklaw.com)
Anne E. Beaumont (abeaumont@fklaw.com)
Andrew M. Englander (aenglander@fklaw.com)
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for the GSO Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                                                                      :
THE BANKRUPTCY ESTATE OF NORSKE                                       :
SKOGINDUSTRIER ASA,                                                   :    Chapter 15
                                                                      :
                                        Plaintiff,                    :    Adv. Proc. No. 18-01846 (smb)
                                                                      :
                      - against -                                     :
                                                                      :
CYRUS CAPITAL PARTNERS, L.P., CYRUS                                   :
SELECT OPPORTUNITIES MASTER FUND, LTD.,                               :
CYRUS OPPORTUNITIES MASTER FUND II, LTD.,                             :
CRS MASTER FUND, L.P., CRESCENT I, L.P., GSO                          :
CAPITAL PARTNERS LP, GSO SPECIAL                                      :
SITUATIONS MASTER FUND LP, GSO AIGUILLE                               :
DES GRANDS MONTETS FUND I LP, GSO                                     :
AIGUILLE DES GRANDS MONTETS FUND II LP,                               :
GSO AIGUILLE DES GRANDS MONTETS FUND III                              :
LP, GSO COASTLINE CREDIT PARTNERS                                     :
(CAYMAN) LP, GSO CREDIT-A PARTNERS                                    :
(CAYMAN) LP, GSO PALMETTO OPPORTUNISTIC                               :
INVESTMENT PARTNERS (CAYMAN) LP, GSO                                  :
CACTUS CREDIT OPPORTUNITIES FUND                                      :
(CAYMAN) LP, GSO OASIS CREDIT PARTNERS                                :
(CAYMAN) LP, STEAMBOAT CREDIT                                         :
OPPORTUNITIES MASTER FUND LP, GSO CREDIT                              :
ALPHA TRADING (CAYMAN) LP, GSO                                        :
CHURCHILL PARTNERS LP and JOHN DOES 1-100,                            :
                                                                      :
                                        Defendants.                   :
                                                                      :
-------------------------------------------------------------------- x

## REPLY MEMORANDUM OF LAW IN SUPPORT
## OF THE GSO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION .......................................................................................1

ARGUMENT ..............................................................................................3

I.    APPLICATION OF NEW YORK'S CHOICE OF LAW RULES
      REQUIRES DISMISSAL OF THE ESTATE'S CLAIMS .................................3

      A.    Norwegian Law Does Not Apply to the Avoidance Claims
            or the Section 17-1 Claim, Which Should Be Dismissed
            Because They Are Brought Only Under Norwegian Law ......................3

      B.    Norwegian Law Applies to the Estate's Unjust Enrichment Claim,
            Which Should Be Dismissed Because There Is No Such
            Cause of Action Under Norwegian Law..................................................6

II.   EVEN IF NORWEGIAN LAW WERE TO APPLY,
      THE ESTATE'S AVOIDANCE CLAIMS SHOULD BE DISMISSED ...........7

      A.    The Avoidance Claims Are Time-Barred ...............................................7

            1.    Section 108(a) Does Not Apply to the Estate's Avoidance Claims.............7

            2.    The Avoidance Claims Are Untimely
                  Under Section 5-15 of the Recovery Act .....................................8

            3.    The Avoidance Claims Do Not
                  Relate Back to the Original Complaint....................................10

                  a.    Rule 15(c)(1)(C) Does Not Save the Estate's Claims...................10

                  b.    Rule 15(c)(1)(A) Does Not Save the Estate's Claims .................11

      B.    The Estate Does Not Satisfy Rule 9(b) or
            Allege the Elements of the Avoidance Claims .....................................12

            1.    The Estate Fails to Satisfy Rule 9(b) .......................................12

            2.    The Estate Fails to State a Claim Under Recovery Act Section 5-5..........15

                  a.    The Three-Month Window Is Not Extended ................................15

                  b.    The "GSO Transfer" Was Neither a
                        "Payment of Debt" Nor "Extraordinary," and
                        the GSO Defendants Received No Enrichment ............................16

Page

       3.     The Estate Also Fails to State an Avoidance
Claim Under Section 5-9 of the Recovery Act ..........................................19

          a.     The "GSO Transfer" Was Not "Improper"....................................19

          b.     The Estate Fails to Allege Economic Loss ...................................21

   C.    Section 546(e) of the U.S. Bankruptcy
Code Also Bars the Avoidance Claims.................................................................22

III.    EVEN IF NORWEGIAN LAW WERE TO APPLY, THE ESTATE'S CLAIM
UNDER SECTION 17-1 OF THE COMPANIES ACT SHOULD BE DISMISSED ......24

   A.    The Section 17-1 Claim Is Time-Barred................................................................24

   B.    The Section 17-1 Claim Is Preempted by the Recovery Act ................................24

   C.    The Estate Fails to State a Claim Under Statutory and Non-Statutory Law..........25

   D.    The Estate Has Not Sufficiently Alleged Damages ..............................................26

IV.    THE ESTATE FAILS TO STATE A VALID UNJUST ENRICHMENT CLAIM..........27

   A.    The Estate Has Not Alleged "Enrichment"
at Norske Skogindustrier's Expense .....................................................................27

   B.    The Unjust Enrichment Claim Is Barred
by the Wagoner Rule and *In Pari Delicto* ...........................................................28

CONCLUSION....................................................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*In re 455 CPW Assocs.*,
   No. 99-5068, 2000 WL 1340569 (2d Cir. Sept. 14, 2000) ....................................................28

*American Pegasus SPC v. Clear Skies Holding Co.*,
   No. 1:13-CV-03035-ELR, 2015 WL 10891937 (N.D. Ga. Sept. 22, 2015) ........................4, 8

*Anastasia Int'l, Inc. v. EM Online Pty Ltd.*,
   No. 13 CIV. 2919 KBF, 2013 WL 5550211 (S.D.N.Y. Oct. 4, 2013) ...................................18

*In re B.C.I. Fin. Pty Ltd.*,
   583 B.R. 288 (Bankr. S.D.N.Y. 2018) ......................................................................................4

*Benefield v. Pfizer Inc.*,
   103 F. Supp. 3d 449 (S.D.N.Y. 2015) ......................................................................................6

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
   No. 13-CV-2581 (PKC) (JLC), 2019 WL 4007361 (S.D.N.Y. Aug. 26, 2019) ...................11

*Ceara v. Deacon*,
   916 F.3d 208 (2d Cir. 2019) ...................................................................................................11

*In re Cinque Terre Fin. Grp. Ltd.*,
   No. 16-11086 (JLG), 2017 WL 4843738 (Bankr. S.D.N.Y. 2017) ..........................................4

*In re Condor Ins. Ltd.*,
   601 F.3d 319 (5th Cir. 2010) .............................................................................................3, 4

*Donovan v. Rothman*,
   302 A.D.2d 238 (1st Dep't 2003) ...........................................................................................30

*In re Enron Corp.*,
   328 B.R. 58 (Bankr. S.D.N.Y. 2005) .....................................................................................23

*Global Crossing Estate Rep. v. Winnick*,
   No. 04 Civ. 2558 (GEL), 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006)...................................8

*In re Granite Partners, L.P.*,
   194 B.R. 318 (Bankr. S.D.N.Y. 1996) ....................................................................................29

*Hahn v. Office & Prof'l Emp. Int'l Union, AFL-CIO*,
   107 F. Supp. 3d 379 (S.D.N.Y. 2015)....................................................................................12

*In re Hellas Telecomm. (Luxembourg) II SCA*,
   524 B.R. 488 (Bankr. S.D.N.Y. 2015) ...............................................................................5, 8

**Page(s)**

*In re Hellas Telecomm. (Luxembourg) II SCA*,
 526 B.R. 499 (Bankr. S.D.N.Y. 2015) ..................................................................30

*Hogan v. Fischer*,
 738 F.3d 509 (2d Cir. 2013).................................................................................11

*Homan v. Societe Generale*,
 93 F.3d 1036 (2d Cir. 1996)...................................................................................5

*In re ICE LIBOR Antitrust Litig.*,
 No. 19 CIV. 439 (GBD), 2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ......................1, 15, 19

*ICP Strategic Income Fund, Ltd.*,
 730 F. App'x 78, 81 (2d Cir. 2018) .....................................................................3, 29

*In re KDI Holdings, Inc.*,
 277 B.R. 493 (Bankr. S.D.N.Y. 1999).....................................................................28

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*,
 No. 01 CIV. 2946 (DLC), 2004 WL 1944457 (S.D.N.Y. Aug. 31, 2004) ..............................7

*Kirschner v. KPMG LLP*,
 15 N.Y.3d 446 (2010) ...................................................................................29, 30

*Kotler v. Charming Shoppes Inc.*,
 No. 11 CIV. 3296 SAS, 2012 WL 291512 (S.D.N.Y. Jan. 31, 2012) ...................................10

*Krupski v. Costa Crociere S.p.A.*,
 560 U.S. 538 (2010).....................................................................................10, 11

*LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*,
 318 F.3d 148 (2d Cir. 2003)................................................................................10

*In re Lehman Bros. Holdings Inc.*,
 469 B.R. 415 (Bankr. S.D.N.Y. 2012) ....................................................................23

*In re Lehman Bros. Holdings Inc.*,
 541 B.R. 551 (S.D.N.Y. 2015).........................................................................28, 29

*Licci v. Lebanese Canadian Bank, SAL*,
 739 F.3d 45 (2d Cir. 2013)...................................................................................5

*In re Lyondell Chem. Co.*,
 543 B.R. 417 (Bankr. S.D.N.Y. 2016) .....................................................................12

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
 138 S. Ct. 883 (2018).................................................................................22, 23

iv

**Page(s)**

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
   458 B.R. 63 (Bankr. S.D.N.Y. 2011) ...................................................................8

*Negri v. Friedman*,
   No. 1:14-CV-10233-GHW, 2017 WL 2389697 (S.D.N.Y. May 31, 2017) ...........6

*Oliver Wyman, Inc. v. Eielson*,
   No. 15 Civ. 5305 (RJS), 2016 WL 5339549 (S.D.N.Y. Sept. 22, 2016)................5

*In re PHS Grp. Inc.*,
   581 B.R. 16 (Bankr. E.D.N.Y. 2018)...................................................................28

*In re Portnoy*,
   201 B.R. 685 (Bankr. S.D.N.Y. 1996) ...................................................................4

*Press v. Chem. Inv. Servs. Corp.*,
   166 F.3d 529 (2d Cir. 1999)................................................................................18

*Reprosystem, B.V. v. SCM Corp.*,
   727 F.2d 257 (2d Cir. 1984)................................................................................28

*In re Richartz, Fliss, Clark & Pope, Inc.*,
   No. 08-13919 MG, 2010 WL 4502038 (Bankr. S.D.N.Y. Nov. 1, 2010) ................1

*Simon Conway v. Marcum & Kliegman LLP*,
   176 A.D.3d 477 (1st Dep't 2019) ........................................................................29

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
   No. 08-01789 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ........30

*In re Sivec SRL*,
   476 B.R. 310 (Bankr. E.D. Okla. 2012)................................................................3

*In re Tribune Fraudulent Conveyance Litig.*,
   946 F.3d 66 (2d Cir. 2019)..................................................................................23

*In re TS Emp't, Inc.*,
   597 B.R. 543 (Bankr. S.D.N.Y. 2019) ...........................................................28, 29

*Vasconcellos v. City of N.Y.*,
   No. 12 CIV. 8445 CM, 2014 WL 4961441 (S.D.N.Y. Oct. 2, 2014) .....................11

*In re Vitamin C Antitrust Litig.*,
   995 F. Supp. 2d 125 (E.D.N.Y. 2014) .................................................................11

*Zhang v. Akami Inc.*,
   No. 15-CV-4946 (VSB), 2017 WL 4329723 (S.D.N.Y. Sept. 26, 2017) ...............26

|                                                                      | Page(s) |
| --- | --- |

## STATUTES AND RULES

11 U.S.C. § 108(a) ............................................................................................7, 8

11 U.S.C. § 546(e) ...............................................................................21, 22, 23, 30

11 U.S.C. § 548(a)(1)(A) ..............................................................................22, 30

11 U.S.C. § 548(a)(1)(B) ....................................................................................22

11 U.S.C. § 1129(a)(10) .....................................................................................28

11 U.S.C. § 1521(a)(7) ..........................................................................................4

Fed. R. Civ. P. 8 ..................................................................................................15

Fed. R. Civ. P. 9(b) .......................................................................................12, 15

Fed. R. Civ. P. 12(b)(6) ................................................................................10, 30

Fed. R. Civ. P. 15(c) .......................................................................................7, 11

Fed. R. Civ. P. 15(c)(1)(A) ...........................................................................11, 12

Fed. R. Civ. P. 15(c)(1)(C) ...........................................................................10, 11

Fed. R. Civ. P. 44.1 .........................................................................................7, 12

Norwegian Dispute Act § 16-5 ......................................................................11, 12

Norwegian Limitations Act § 3.............................................................................24

Norwegian Limitations Act § 9.............................................................................24

Norwegian Public Limited Liability Companies Act § 17-1 ................................. *passim*

Norwegian Recovery Act § 1-5 ............................................................................20

Norwegian Recovery Act § 5-5 ...................................................................... *passim*

Norwegian Recovery Act § 5-9 ...................................................................... *passim*

Norwegian Recovery Act § 5-12 ..........................................................................26

Norwegian Recovery Act § 5-15 ............................................................................8

**Page(s)**

<u>OTHER AUTHORITY</u>

Allan L. Gropper, *The Curious Disappearance of Choice of Law As an Issue in
Chapter 15 Cases,* 9 BROOK. J. CORP. FIN. & COM. L. 152 (2014).........................................3, 4

## INTRODUCTION

The Estate's[1] brief ("Estate Br.") offers numerous arguments in an effort to salvage its claims, but none overcomes the fatal defects identified in the motions to dismiss.[2]

The Estate accuses the GSO Defendants of "whitewashing … the pleaded facts" (Estate Br. at 2) by focusing on what the FAC defines as the "GSO Transfer": Norske Skogindustrier's open-market buy-back of 2016 SUNs from a broker, which allegedly had acquired those bonds from the GSO Defendants through one or more other brokers. The Estate prefers to characterize the Defendants as having "orchestrated" a "global scheme" involving not only the "GSO Transfer," but also the so-called "Second Restructuring," the "NSF," and the "Upstreaming and Transfer." This approach all but concedes the Estate cannot state claims predicated solely on the "GSO Transfer," and fares no better. As detailed herein (*see* Part II.B.1) and in the GSO Defendants' opening brief ("GSO Brief" or "GSO Br."), the FAC does not plausibly allege any such "scheme." Indeed, the FAC itself and its exhibits contradict all of its purported elements. The Court thus need not (and should not) accept as true the Estate's allegations and arguments concerning a "global scheme." *See In re Richartz, Fliss, Clark & Pope, Inc.*, No. 08-13919 MG, 2010 WL 4502038, at *3 (Bankr. S.D.N.Y. Nov. 1, 2010); *see also In re ICE LIBOR Antitrust Litig.*, No. 19 CIV. 439 (GBD), 2020 WL 1467354, at *3-4 (S.D.N.Y. Mar. 26, 2020).

But even assuming (solely for this motion) that a "global scheme" has plausibly been alleged, the Estate still fails to state a claim. As detailed in the GSO Brief, the FAC asserts four claims against the GSO Defendants. The first two are the Avoidance Claims pursuant to

---

[1] Undefined capitalized terms have the same meanings as in the FAC or the GSO Brief, as applicable.
[2] The GSO Defendants incorporate by reference the Cyrus Defendants' arguments in Parts I, II.A, II.C, II.D, III and IV of their opening brief, and, to the extent applicable to the GSO Defendants, the corresponding arguments in their reply brief.

Sections 5-5 and 5-9 of the Recovery Act, in which the Estate seeks to avoid only the "GSO Transfer." The third claim, asserted under Section 17-1 of the Companies Act and "Norwegian non-statutory law," seeks to recover damages, focusing primarily on the "GSO Transfer" on the ground that the GSO Defendants acted negligently or intentionally in their capacity as Norske Skogindustrier shareholders. The fourth claim, for unjust enrichment (under unspecified law), asserts the GSO Defendants were unjustly enriched by the "GSO Transfer."

Choice of law principles require dismissal of all four claims, whether predicated on the "GSO Transfer" only or otherwise. The Estate asks the Court to disregard as "out of context" the Estate's own allegations concerning the location of the conduct that is the subject of its claims – New York. Those allegations, however, require application of New York law to all three claims the Estate purports to bring under Norwegian law. As for the unjust enrichment claim, which New York's choice of law rules dictate is governed by Norwegian law, the Estate concedes Norwegian law does not recognize such a claim. The Estate also fails to overcome the GSO Defendants' demonstration that even under Norwegian law, the Avoidance Claims and the Section 17-1 claim are time-barred and inadequately pled. Nor does the Estate show it has standing to assert its unjust enrichment claim in the face of *in pari delicto* and the *Wagoner* rule. The Estate also fails to demonstrate it has alleged facts showing the GSO Defendants were unjustly enriched at Norske Skogindustrier's expense as to either the "GSO Transfer" or the Second Restructuring as a whole. For these reasons, and as explained in detail in the GSO Brief and below, the Court should dismiss the FAC with prejudice as against the GSO Defendants.

## **ARGUMENT**

## **I.**
## **APPLICATION OF NEW YORK'S CHOICE OF LAW**
## **RULES REQUIRES DISMISSAL OF THE ESTATE'S CLAIMS**

**A.      Norwegian Law Does Not Apply to the Avoidance Claims or the Section 17-1 Claim, Which Should Be Dismissed Because They Are Brought Only Under Norwegian Law**

The Estate does not dispute that (a) if Norwegian law does not apply to the

Avoidance Claims, it also does not apply to the Section 17-1 claim, and (b) if New York law

applies to the two Avoidance Claims and the Section 17-1 claim (which it does), all three claims

must be dismissed.  Rather, the Estate argues the Court should not apply New York choice of

law rules and that, even if applied, those rules warrant application of Norwegian law instead of

New York law.  The Estate is wrong on both points.

The GSO Brief demonstrates that New York choice of law rules apply to the

Avoidance Claims and the Section 17-1 claim.  (GSO Br. at 9-12.)  *See also ICP Strategic*

*Income Fund, Ltd.,* 730 F. App'x 78, 81 (2d Cir. 2018) (applying New York choice of law rules

in Chapter 15 adversary proceeding).  The Estate argues that "federal" choice of law rules apply

instead solely because this is a Chapter 15 case and that they warrant application of Norwegian

law.  The only "federal" choice of law rule the Estate identifies is Chapter 15 itself, which does

not provide a choice of law rule or displace applicable state choice of law rules.  *See In re*

*Condor Ins. Ltd.,* 601 F.3d 319, 326-27 (5th Cir. 2010) (UNCITRAL Working Group on

Insolvency Law, which developed the model law upon which Chapter 15 is based, "purposefully

left open the question of which law the court should apply—in deference to the choice of law

concerns raised by the United States"); *In re Sivec SRL*, 476 B.R. 310, 323 (Bankr. E.D. Okla.

2012) (Chapter 15 "does not address issues such as choice of law"); *see generally* Allan L.

Gropper, *The Curious Disappearance of Choice of Law As an Issue in Chapter 15 Cases,* 9

Brook. J. Corp. Fin. & Com. L. 152, 152 (2014) (Chapter 15 "is silent on the issue of choice of

law").  We are aware of no case decided in this Circuit (and the Estate cites none) in which a

Bankruptcy Court has held that Chapter 15 supplies a choice of law rule or implicates a

significant federal policy such that the forum state's choice of law rules do not apply.  *See In re*

*Cinque Terre Fin. Grp. Ltd.,* No. 16-11086 (JLG), 2017 WL 4843738, at *13 (Bankr. S.D.N.Y.

2017) (no significant federal policy implicated in Chapter 15 case choice of law analysis); *In re*

*B.C.I. Fin. Pty Ltd.,* 583 B.R. 288, 297 (Bankr. S.D.N.Y. 2018) (same).  Nor does the Estate

point to any court in this Circuit that has adopted the rule it urges for Chapter 15 cases of *lex fori*

*concursus* – requiring application of the law of the location of the foreign proceeding.[3]  *See*

*generally* Gropper, *supra,* at 178.[4]

       The Estate also argues that even if New York choice of law rules apply, the GSO

Defendants have misapplied them.[5]  First, the Estate argues that what it calls "comity" requires

deference to foreign insolvency proceedings in Chapter 15, such that the Estate has a "right to

pursue the Avoidance Claims under the Recovery Act," (Estate Br. at 6-7), regardless of whether

New York choice of law rules would lead to that statute's application.  The Estate

mischaracterizes comity.  It is not a choice of law rule, but rather, either a "canon of

construction" that "shorten[s] the reach of a [U.S.] statute" or a "discretionary act of [court]

deference … to decline to" adjudicate a case that should be adjudicated in a foreign court.  *See*

---

[3] The only case the Estate cites is *American Pegasus SPC v. Clear Skies Holding Co.,* No. 1:13-CV-03035-ELR, 2015 WL 10891937 (N.D. Ga. Sept. 22, 2015), which has not been cited by any other court for that proposition. The court's analysis in that case relies almost entirely on the Fifth Circuit's opinion in *In re Condor*.  However, *Condor* did not involve a choice between foreign law and some other law, but rather whether 11 U.S.C. § 1521(a)(7), which precludes a foreign representative from asserting U.S. law avoidance claims, also precluded *foreign* law avoidance claims in a Chapter 15 proceeding. The Fifth Circuit, citing principles of comity, held that it did not; it did not decide whether foreign law applied in the first instance.  601 F.3d at 321-29.

[4] The two cases the Estate cites for the proposition that state choice of law rules apply only if a claim does not implicate federal policy concerns (*see* Estate Br. at 4-5) were not "rel[ied] upon" by GSO, as the Estate asserts (*id.* at 4), nor do they stand for the proposition that the forum state's choice of law rules do not apply in an adversary proceeding under Chapter 15.  (Nor could they, since they predate Chapter 15.)

[5] The Estate does not argue that "federal common law" choice of law rules apply or would yield a different result, and they would not because they are substantially the same as New York's rules.  *See, e.g., In re Portnoy,* 201 B.R. 685, 697 (Bankr. S.D.N.Y. 1996) (collecting cases).

4

*Homan v. Societe Generale*, 93 F.3d 1036, 1047 (2d Cir. 1996). Neither is implicated here,

therefore comity generally is irrelevant. The Estate does not argue comity supports application

of Section 17-1, therefore the comity argument also cannot save the Section 17-1 claim.

        The Estate also exaggerates the "deference" to foreign insolvency proceedings

that a Chapter 15 case involves. It is one thing for a U.S. Bankruptcy Court to "defer" to a

foreign bankruptcy case to the extent of allowing it to allocate a debtor's assets and determine

creditors' claims, and quite another to apply another foreign state's law to entities not alleged to

be located or have acted in that foreign state, as the Estate argues. (Estate Br. at 6.) The Estate

cites no case in which a Bankruptcy Court in this Circuit has applied foreign law in a Chapter 15

case in such circumstances, nor does it provide any support for its argument that Norwegian law

should apply merely because the Bankruptcy Code's avoidance provisions are unavailable.

(Estate Br. at 5.)

        Second, the Estate's description of New York choice of law principles is wrong.

Indeed, its reliance on *Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45 (2d Cir. 2013), is

surprising, given that *Licci* holds that where it is "without question that the [allegedly tortious]

conduct … occurred in New York[,] New York has the greatest interest in regulating conduct

within its borders, and consequently its law applies." *Licci*, 739 F.3d at 49. As the Second

Circuit explained, "it is the place of the allegedly wrongful conduct that generally has superior

'interests in protecting the reasonable expectations of the parties who relied on [the laws of that

place] to govern their primary conduct and in the admonitory effect that applying its law will

have on similar conduct in the future.'" *Id.* at 50-51.[6] Here, according to the Estate, the "place

---

[6] The two cases the Estate cites as purported exceptions to the holding in *Licci* do not contradict the holding in *Hellas* that the wrong underlying an *avoidance* claim "occurs" where the defendant's alleged conduct occurred. (GSO Br. at 11.) Indeed, neither case addresses that question, because both cases involve tort claims other than avoidance claims. *See Oliver Wyman, Inc. v. Eielson,* No. 15 Civ. 5305 (RJS), 2016 WL 5339549, at *4 (S.D.N.Y. Sept. 22, 2016) (New York law applies to fraud-based claims where defendants made misrepresentations at meetings

of the allegedly wrongful conduct" is New York, where it alleges the GSO Defendants acted and have their principal place of business.  (FAC ¶¶ 14-27, 30, 31.)  To evade this principle, the Estate derides the GSO Defendants' citation of what the Estate calls "out-of-context paragraphs from the FAC regarding the locus of *certain* New York-based conduct by Defendants."  (Estate Br. at 9 n.4 (emphasis added).)  But that is not what the FAC says:  the Estate alleges that "all or substantially all" – not merely "certain" – "of the Defendants' conduct … occurred, or was carried out from New York, New York."  (FAC ¶ 31; *see also* ¶ 30.)  The Estate neither alleges nor argues the GSO Defendants were located in Norway or engaged in wrongful conduct there; the Estate specifically alleges only conduct occurring in New York.  Therefore, New York choice of law rules apply to the Avoidance Claims, and as the Estate concedes, they therefore also apply to the Section 17-1 claim, mandating dismissal.

**B.    Norwegian Law Applies to the Estate's Unjust Enrichment Claim, Which Should Be Dismissed Because There Is No Such Cause of Action Under Norwegian Law**

The GSO Brief demonstrates a conflict between New York law and Norwegian law regarding unjust enrichment:  New York law recognizes such a claim, and Norwegian law does not.[7]  (GSO Br. at 12.)  On the question whether an unjust enrichment claim exists under Norwegian law, the Estate's expert agrees with the GSO Defendants' expert that the law is still developing and no such claim has yet been recognized under the circumstances presented here.  (*See* Declaration of Egil Horstad, dated February 21, 2020 ("Horstad Decl.") ¶¶ 80-89; Aasebø Decl. ¶¶ 59-66; Aasebø Reply Decl. ¶¶ 52-56.)  The Estate offers no reason for this Court to create such a claim when Norway's legislature and courts have yet to do so.  *See Kingdom 5-KR-*

---

there and "allegedly intended their actions to cause injury to Plaintiff in New York"); *Benefield v. Pfizer Inc.*, 103 F. Supp. 3d 449, 457-59 (S.D.N.Y. 2015) (Georgia law applies to breach of warranty, fraud, unjust enrichment, negligence, design and manufacturing defect, and failure to warn claims by plaintiff harmed in Georgia).

[7] The Estate does not dispute or even respond to the GSO Defendants' argument that for an unjust enrichment claim, the jurisdiction with the greatest interest is where the alleged loss occurred, nor does the Estate attempt to distinguish the *Negri* case, upon which the GSO Defendants relied.  (GSO Br. at 12.)

6

*41, Ltd. v. Star Cruises PLC,* No. 01 CIV. 2946 (DLC), 2004 WL 1944457, at *3 (S.D.N.Y. Aug.

31, 2004) (granting summary judgment dismissing Norwegian-law unjust enrichment claim,

finding "[t]he best support that can be offered for the recognition of the claim in Norway is that

Norwegian law is evolving and may offer such a cause of action in the future").

        Even if the Court were to conclude – contrary to all three experts' opinions – that

an unjust enrichment claim exists under Norwegian law, the Estate does not plead one.  To the

contrary, it alleges all of its claims *other than* unjust enrichment are brought pursuant to

Norwegian law.  (FAC ¶ 36 (omitting unjust enrichment from Rule 44.1 notice).)  In any event,

neither the Estate nor its expert says what must be alleged to state such a claim, nor does the

Estate argue (or its expert conclude) it has done so.

## II.
## EVEN IF NORWEGIAN LAW WERE TO APPLY, THE ESTATE'S AVOIDANCE CLAIMS SHOULD BE DISMISSED

### A.    The Avoidance Claims Are Time-Barred

        The GSO Brief demonstrates that even if Norwegian law were applied to the

Avoidance Claims, they are time-barred by the Recovery Act's one-year statute of limitations

and do not relate back to the filing of the original complaint against the Cyrus Defendants only.

(GSO Br. at 13-18.)  The Estate offers three responses: (1) Section 108(a) of the Bankruptcy

Code tolled the statute of limitations; (2) the Recovery Act's six-month "discovery" rule applies;

and (3) Rule 15(c) permits relation back.  (Estate Br. at 13-19.)  All three are without merit.

### 1.    Section 108(a) Does Not Apply to the Estate's Avoidance Claims

        The Estate argues the Avoidance Claims are timely because Section 108(a) of the

Bankruptcy Code extends the statute of limitations for two years after the date of this Court's

recognition order.  (Estate Br. at 13-14.)  Section 108(a) tolls the limitations period for only

those claims a debtor could have asserted *before* bankruptcy and which are created by

"nonbankruptcy" law, such as pre-petition tort or contract claims.[8]  *See* 11 U.S.C. § 108(a);

*Global Crossing Estate Rep. v. Winnick*, No. 04 Civ. 2558 (GEL), 2006 WL 2212776, at *6

(S.D.N.Y. Aug. 3, 2006).  The Estate concedes the Recovery Act, under which its Avoidance

Claims are brought, is part of Norway's bankruptcy regime and therefore is not "nonbankruptcy

law."  (Estate Br. at 7; Aasebø Reply Decl. ¶ 3.)  Indeed, Section 108(a) serves no logical

purpose for claims like the Avoidance Claims.  An avoidance claim under the Recovery Act does

not exist – and its one-year limitations period does not begin to run – until the opening of the

Norwegian bankruptcy proceeding.  (Aasebø Decl. ¶ 18.)[9]  Section 108(a) gives a debtor

additional time to bring only those non-bankruptcy law claims on which the statute of limitations

began running and has not expired *before* the bankruptcy filing.  *See* 11 U.S.C. § 108(a).  It

makes no sense to apply it to toll a period which only began to run upon bankruptcy because the

limitations period for such a claim could *never* expire before the bankruptcy filing.

### 2.    The Avoidance Claims Are Untimely Under Section 5-15 of the Recovery Act

The GSO Brief demonstrates that the Recovery Act's six-month "discovery" rule

does not revive the Avoidance Claims because the Estate should have known of GSO's alleged

conduct long before March 2019.  (GSO Br. at 14-16; Aasebø Decl. ¶¶ 22-25.)  The Estate

argues the discovery rule nonetheless saves its claims because (a) until March 2019, when the

Cyrus Defendants produced documents, the Estate lacked *actual* knowledge that certain Cyrus

---

[8] The cases the Estate cites (Estate Br. at 13-14) are not to the contrary.  *See Am. Pegasus*, 2015 WL 10891937, at *24 (Section 108(a) tolled limitations period for state law claims); *In re Hellas Telecomm. (Luxembourg) II SCA*, 524 B.R. 488, 534 (Bankr. S.D.N.Y. 2015) (Section 108(a) tolled limitations period for unjust enrichment claim). The remainder of the Estate's cases stand for the proposition that Section 108(a) may be *available* in a Chapter 15 proceeding, not that it tolls the statute of limitations for bankruptcy claims like the Avoidance Claims. *See, e.g., In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 87 (Bankr. S.D.N.Y. 2011) (foreign representative entitled to confirmation that Section 108(a) is available).

[9] The Estate cites no case in which foreign insolvency law has been held to be "applicable nonbankruptcy law" under Section 108(a).  The Estate argues that a case it cites from the District of Georgia applies "Section 108(a) tolling to Cayman law avoidance claims," (Estate Br. at 13), but that is incorrect.  *See Am. Pegasus*, 2015 WL 10891937, at *24 (considering timeliness of state law fraudulent transfer and tort claims after having already denied summary judgment to defendants on Cayman law insolvency claim).

Defendants had sold their 2016 SUNs to certain GSO Defendants in April 2016, and (b) the

company's knowledge is not "imputed" to the Estate.  (Estate Br. at 14-15.)  Both miss the point.

On the first point, the Estate invokes the wrong standard.  The question is when

the Estate should have known of the circumstances that form the basis of its claims.  (Aasebø

Decl. ¶¶ 22-25.)  The Estate does not dispute that its trustee had a statutory duty under

Norwegian law, upon his December 2017 appointment, to conduct an immediate and thorough

investigation into, among other things, the company's potentially avoidable transactions,

including (a) interviews with officers and directors, (b) reviews of publicly available information

and (c) reviews of the company's emails, books and other records.  (*Id.*; Aasebø Reply Decl.

¶¶ 5-9.)  Given this duty, there can be no serious dispute that the Estate "should have known" of

GSO's alleged conduct well before March 2019.  Indeed, the Estate alleges (albeit in conclusory

fashion) that Norske Skogindustrier knew GSO was the counterparty to the "GSO Transfer,"

(FAC ¶ 136), based not on documents from Cyrus, but on an internal company email from April

2016.  (FAC Ex. 23 (translated at Beaumont Decl. Ex. D).)  Also, in 2015-2016, Norske

Skogindustrier itself publicly reported GSO's involvement in what the FAC calls the "First

Restructuring," the "Exchange Offer," the "Second Restructuring," the "Restructuring Support

Agreement," the "January 2016 Exchange Offer," the "March 2016 Exchange Offer," and the

NSF.  (*See, e.g.*, FAC Exs. 1, 3, 12.)  It is implausible that the Estate could not have known of

the GSO Defendants' alleged conduct or holdings of 2016 SUNs until 2019.  Indeed, given the

Estate's own allegations of a "global scheme" involving the GSO Defendants, that ought to have

been one of the first things the trustee investigated.  (Aasebø Reply Decl. ¶ 6.)

On the second point, whether Norske Skogindustrier's knowledge of GSO's

alleged conduct (FAC ¶ 136) can be "imputed" to the Estate (Estate Br. at 15) is irrelevant.  The

question is not whether the company's knowledge is imputed to the Estate as of the time of the

trustee's appointment, but rather whether, given the Estate's own allegations, a diligent trustee

appointed in December 2017 performing his obligations under Norwegian law (described above)

should have known well before March 2019.  (Aasebø Reply Decl. ¶ 8.)  There can be no serious

question the Estate's trustee ought to have known of the circumstances that form the basis of its

Avoidance Claims no later than early 2018, and they therefore are untimely and should be

dismissed.[10]

### 3.    The Avoidance Claims Do Not Relate Back to the Original Complaint

### a.    Rule 15(c)(1)(C) Does Not Save the Estate's Claims

The GSO Brief demonstrates the Estate's time-barred Avoidance Claims are not

revived by Rule 15(c)(1)(C) because, in this Circuit, lack of knowledge is not a "mistake

concerning the proper party's identity," and there is no relation back where, as here, the plaintiff

initially sued what it believed were the correct parties but failed to sue other parties that also

might be liable.  (GSO Br. at 16-18.)  In response, the Estate argues that relation back *is*

permitted here because it lacked knowledge of the Cyrus Sale.  (Estate Br. at 17.)

The Estate's argument contradicts binding Second Circuit law.  *Krupski v. Costa*

*Crociere S.p.A.*, 560 U.S. 538 (2010), on which the Estate and its authorities rely, is inapposite

because it was not an "additional party" case (as is the case here) but a "wrong party" case.  In

*Krupski*, the plaintiff mistakenly sued the corporate entity that issued the passenger ticket for a

cruise ship on which she was injured, not realizing she should have sued a different, related

corporate entity.  *See Krupski*, 560 U.S. at 541-45.  The Court therefore did not address whether

---

[10] The Estate suggests a statute of limitations defense cannot be resolved on the pleadings.  (Estate Br. at 16.)  But courts grant 12(b)(6) motions on the basis of the statute of limitations where, as here, it is clear from the complaint and the documents integrated therein that the claims are time-barred, even where a discovery rule applies.  *See LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003).  The Estate's request for leave to replead again (Estate Br. at 16) should be denied because further amendment would be futile.  *See Kotler v. Charming Shoppes Inc.*, No. 11 CIV. 3296 SAS, 2012 WL 291512, at *3 (S.D.N.Y. Jan. 31, 2012).

there was a "mistake" within the meaning of Rule 15(c); it assumed there was one and asked if it was covered by the rule. *Id.* at 548-49; *see also In re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125, 130-31 (E.D.N.Y. 2014) (analyzing *Krupski*). The majority of courts in this Circuit have found *Krupski* did not change the Second Circuit rule that lack of knowledge such as that claimed by the Estate here is not a "mistake" under Rule 15(c)(1)(C)(ii). *See, e.g., Ceara v. Deacon*, 916 F.3d 208, 212-13 (2d Cir. 2019); *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013); *Vasconcellos v. City of N.Y.*, No. 12 CIV. 8445 CM, 2014 WL 4961441, at *7 (S.D.N.Y. Oct. 2, 2014); *see also Vitamin C*, 995 F. Supp. 2d at 130-31.[11]

Here, the Estate did not "mistakenly choose to sue" the Cyrus Defendants rather than the GSO Defendants; it intended to sue the Cyrus Defendants and now seeks to add the GSO Defendants, too. In such circumstances, Rule 15(c)(1)(C) does not apply because there is no legally cognizable "mistake."[12] *See Vitamin C*, 995 F. Supp. 2d at 130-31. (*See also* GSO Br. at 16-18.) Accordingly, the Estate's claims against the GSO Defendants do not relate back to the original complaint against the Cyrus Defendants and should be dismissed as untimely.[13]

### b.    Rule 15(c)(1)(A) Does Not Save the Estate's Claims

The Estate also argues that Rule 15(c)(1)(A) is a "wholly distinct basis for relation back" because Section 16-5 of the Norwegian "Dispute Act" provides a "right to rectify defective proceedings." (Estate Br. at 18-19; Horstad Decl. ¶¶ 52-54.) But Rule 15(c)(1)(A)

---

[11] The reasoning in the line of cases the Estate cites (Estate Br. at 17) has been rejected by other courts after *Krupski*. *See, e.g., CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13-CV-2581 (PKC) (JLC), 2019 WL 4007361, at *3-4 (S.D.N.Y. Aug. 26, 2019); *In re Vitamin C*, 995 F. Supp. 2d at 130.

[12] The Estate's attempt to manufacture a dispute about "whether the GSO Defendants knew of the complaint and should have been named as a defendant" (Estate Br. at 18) misses the point. *See Vitamin C*, 995 F. Supp. 2d at 130-31. In any event, the GSO Brief showed the Estate's failure to name the GSO Defendants in the original complaint was not a case of mistaken identity, (GSO Br. at 17-18), particularly given the allegations of multiple transactions, all of them involving the GSO Defendants.

[13] The Estate's attempt to avoid the statute of limitations by naming "John Does" in its original complaint (Estate Br. at 19) also is unavailing. In the Second Circuit, "John Doe" substitutions "cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued," and the normal relation back rules apply. *See Hogan*, 738 F.3d at 517-18.

11

permits relation back only if "the law that provides the applicable statute of limitations allows" it.  *See, e.g., Hahn v. Office & Prof'l Emp. Int'l Union, AFL-CIO*, 107 F. Supp. 3d 379, 384 (S.D.N.Y. 2015) (Rule 15(c)(1)(A) inapplicable in FMLA suit because "the FMLA statute of limitations does not provide for relation back").  Here, the law that provides the statute of limitations is the Recovery Act, which the Estate does not argue allows relation back.  Nor does the Dispute Act revive the Estate's claims.  (*See* Aasebø Reply Decl. ¶¶ 10-11.)  Thus, the Avoidance Claims are time-barred and should be dismissed.[14]

**B.    The Estate Does Not Satisfy Rule 9(b) or Allege the Elements of the Avoidance Claims**

**1.    The Estate Fails to Satisfy Rule 9(b)**

The GSO Brief demonstrated that to the extent the Avoidance Claims are alleged to be analogous to actual fraudulent transfer claims under U.S. law (FAC ¶ 36), the Estate has failed to meet the heightened pleading standard set forth in Rule 9(b).  (GSO Br. at 18.)  The Estate concedes its Avoidance Claims are subject to Rule 9(b), but argues it has satisfied the rule by alleging the GSO Defendants "pushed" or "caused" or "compelled" or "orchestrated" certain actions by Norske Skogindustrier as part of a purported "global scheme" involving not only the "GSO Transfer" but the Second Restructuring, the NSF, the "Upstreaming and Transfer" and more.  (Estate Br. at 24-27.)  These allegations do not satisfy Rule 9(b).

An intentional fraudulent transfer claim is not stated through rhetoric, speculation or conclusory allegations.  Rather, it requires "facts that give rise to a 'strong inference' of fraudulent intent," meaning an inference "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  *In re Lyondell Chem. Co.*, 543 B.R. 417, 423 (Bankr. S.D.N.Y. 2016).  Here, as noted, the FAC itself

---

[14] To the extent the Court concludes there is a conflict between the opinions of the parties' Norwegian law experts, the Court may determine Norwegian law as a matter of law.  *See* Fed. R. Civ. P. 44.1.

contradicts the Estate's allegations of a "global scheme":

- **The FAC and Its Exhibits Demonstrate the GSO Defendants Did Not "Control" the Board**:  The Estate argues the GSO Defendants "controlled" the board through a 25.47% equity interest and because they "installed" two board members.  (Estate Br. at 22, 24-29.)  The pleadings demonstrate this is not correct.  First, at the time the two board members were elected, the GSO Defendants held only 10.59% of the company's outstanding shares.  (FAC ¶¶ 59-61, 103.)  Second, that equity stake gave the Defendants no practical control over the board.  Third, the two board members were not "installed" by the Defendants (Estate Br. at 29), but rather were proposed to and unanimously nominated by a board committee that included no Defendant-nominated members.  (FAC ¶ 103, Ex. 7 at 1, Ex. 16.)  Shareholders, in turn, elected the nominees by a substantial majority of shares present at the meeting (roughly four times the amount then held by the GSO Defendants).  (FAC ¶ 61 & Ex. 9.)  Fourth, those two board members did not constitute a majority of the seven-person board and could not, as a practical matter, control its decisions alone.  (FAC Exs. 16, 18.)

- **The Estate Itself Alleges the "Second Restructuring" Benefited the Company, Was the Product of Arm's-Length Negotiations and Was Approved Unanimously by the Board**: The Estate alleges the GSO Defendants "orchestrated" the Second Restructuring to benefit themselves at the expense of Norske Skogindustrier.  (*See, e.g.*, FAC ¶¶ 124, 201.)  But the facts alleged in the FAC tell a different story, namely that the GSO Defendants provided funds to address the company's financial challenges within the constraints of its existing capital structure.  The FAC alleges that in 2016, Norske Skogindustrier's board, with its own legal and financial advisors, entered into arm's-length negotiations with GSO and Cyrus and their advisors concerning a series of transactions to address the company's challenges.  (FAC ¶¶ 42-43, Ex. 12 at 4-7.)  The resulting "Second Restructuring" was approved unanimously by the board in mid-March 2016 (FAC Exs. 12 & 16), and made it possible for the company to operate until December 2017 (FAC ¶ 146.)  In these transactions, the Defendants agreed, among other things, to (a) loan €100 million to subsidiary NSAS on a secured basis; (b) pay €15 million for newly issued shares in a private placement; (c) loan a subsidiary €20 million to finance the purchase of a New Zealand power plant; and (d) pay €10 million to buy additional SSNs.  (FAC ¶¶ 116-119, Ex. 12 at 6.)

- **The Estate Alleges No Facts to Support Its Conclusory Allegations of the "Upstreaming and Transfer"**: The FAC alleges, with no supporting facts, that (a) the €100 million loaned by the Defendants to the company's operating subsidiary NSAS in the NSF were "upstreamed, either directly or indirectly, to Norske Skogindustrier and used to repay the 2016 SUNs"; and (b) Defendants "orchestrated" this.  (FAC ¶¶ 121, 124.)  That the Estate, which has the company's books and records, does not allege whether such "upstreaming" occurred "directly or indirectly" is telling:  the FAC alleges no facts showing how the alleged "upstreaming" was accomplished or what the Defendants' involvement consisted of.  Indeed, the FAC exhibits contradict these allegations, stating the NSF documents dictated the €100 million proceeds could *not* be used for such purposes.  (FAC Ex. 12 at 6; Ex. 17 at 1.)

13

The Estate alleges no facts suggesting that prohibition was violated.

- **The Estate Alleges No Facts Showing the GSO Defendants "Caused" the "GSO Transfer"**:  The Estate argues the GSO Defendants "caused" Norske Skogindustrier to repurchase its 2016 SUNs in April 2016, which it calls the "GSO Transfer." (Estate Br. at 22, 34.)  This, too, is contradicted by the FAC and its exhibits, which show that (a) on April 11, 2016, the board unanimously authorized the company to buy back 2016 SUNs on the open market (FAC Ex. 16 at 2424); (b) one of the two "Cyrus/GSO Board Members" was not present at that meeting and did not vote (FAC Ex. 18 at 2422); and (c) the €30 million "GSO Transfer" was not a transaction between GSO and Norske Skogindustrier and constituted only a fraction of the €108 million Norske Skogindustrier ultimately paid for buybacks (FAC ¶¶ 123, 134-135.) The allegation that an unidentified broker acting at the GSO Defendants' direction "caused" the company to buy back their 2016 SUNs (FAC ¶ 134) also is contradicted by the facts alleged and the exhibits to the FAC.  The FAC alleges at most an open-market transaction in which Norske Skogindustrier bought 2016 SUNs for less than par from a broker (Fearnley).  (FAC ¶ 135, Ex. 22.)  The Estate does not allege the GSO Defendants sold any 2016 SUNs to the company, to Fearnley, or to anyone else in particular, nor is it plausibly alleged how the GSO Defendants might have "directed" anyone to act, much less how Norske Skogindustrier could have believed it was buying 2016 SUNs from the GSO Defendants.  (*See* GSO Br. at 19-22.)

- **The GSO Defendants' CDS Interests, If Any, Are Irrelevant**: The Estate repeatedly refers to GSO's alleged credit default swap ("CDS") position. (*See* Estate Br. at 1, 2, 22, 23, 25, 26, 27, 29, 32, 34, 35, 39, 44, 45, 47, 49, 51, 54.)  Any CDS transactions, to which Norske Skogindustrier was not a party, are irrelevant to the Estate's claims, which arise solely from transactions involving the company.  That the GSO Defendants might have held CDS that turned out to be beneficial is no more relevant to the Estate's claims than it would be a defense to those claims if the GSO Defendants had held CDS that performed poorly.

- **The Estate Purports to Bring Claims for the Benefit of "Creditors" of Irrelevant Entities**: The Estate argues the alleged "scheme" was intended to "defraud Norske Skogindustrier's other creditors by improperly jumping Defendants' debts to the front of the line." (*See, e.g.*, Estate Br. at 2, 3.) The FAC, however, identifies no unpaid creditor of Norske Skogindustrier holding a debt that was due before June 2016, when the 2016 SUNs matured and were repaid.  (FAC ¶ 77.)  Rather, the Estate's claims rely on alleged harm to holders of so-called "Guarantee Obligations":  SSNs (maturing in 2019) issued by the subsidiary NSAS, and PENs (maturing in 2021 and 2023) issued by the subsidiary NSH, in both cases with unsecured guarantees from Norske Skogindustrier which were not triggered in 2016.  (FAC ¶¶ 69, 76, 80, 106, 120, 123, 158 & Ex. 1 at 87, 112.)  Neither entity is before this Court, and NSAS did not seek bankruptcy protection in Norway; it remains in operation.  (FAC ¶ 147.)

Individually and collectively, the Estate's "conclusory allegations … devoid of any evidence, direct or circumstantial, to support the" inferences it asks the Court to draw are insufficient for

notice pleading under Rule 8, much less the higher standard of Rule 9(b). *See In re ICE LIBOR*, 2020 WL 1467354, at *4. For that reason, the Avoidance Claims fail and should be dismissed.

## 2. <u>The Estate Fails to State a Claim Under Recovery Act Section 5-5</u>

Although the Estate focuses on an alleged "global scheme" of which it argues the "GSO Transfer" was but a part, both Avoidance Claims seek to avoid only the "GSO Transfer." (FAC ¶¶ 167, 180.) The GSO Brief demonstrated the Estate has not stated a claim under Section 5-5 to avoid the "GSO Transfer" because it (a) occurred outside the statutory three-month period, and (b) was neither "extraordinary" nor a "payment of debt" that enriched the GSO Defendants within the meaning of Norwegian law. (GSO Br. at 19-25; Aasebø Decl. ¶¶ 27-40.) In response, the Estate argues (a) the statutory period should be extended because the GSO Defendants are "closely related" to Norske Skogindustrier; and (b) it has otherwise alleged the elements of this claim. (Estate Br. at 27-32.) As set forth below, the Estate is incorrect on both points.

### a. The Three-Month Window Is Not Extended

The GSO Defendants previously demonstrated the Recovery Act's three-month avoidance period is not extended here because the GSO Defendants are not "closely related" to Norske Skogindustrier. (GSO Br. at 22-23; Aasebø Decl. ¶¶ 28-30.) In response, the Estate argues the GSO Defendants are "closely related" to the company because they allegedly used a 25.47% equity position in conjunction with the Cyrus Defendants' equity position to "dominat[e]" the company. (Estate Br. at 28-29.) This is incorrect in multiple respects.

First, as Mr. Aasebø opined, an equity position of at least 50% is typically required to render a shareholder "closely related" under the Recovery Act and applicable case law, and the GSO Defendants therefore were not and are not "closely related" to Norske Skogindustrier. (Aasebø Decl. ¶ 29; Aasebø Reply Decl. ¶ 13.) Nor can their holdings be combined with those of the Cyrus Defendants, who are not alleged to be "closely related" to

15

GSO.  (Aasebø Reply Decl. ¶ 15.)  Moreover, the Estate's attempt to paint the GSO Defendants

as "dominant" holders of "25.47% of all outstanding shares" during the relevant time period

(Estate Br. at 28-29) is misleading and contradicted by the facts alleged in the FAC.  At the time

the Norske Skogindustrier board is alleged to have negotiated and approved the Second

Restructuring and other transactions, and the two "Cyrus/GSO Board Members" were elected,

the FAC alleges the GSO Defendants held only 10.59% of the company's shares.  (FAC ¶¶ 59-

61, 84, 97-98, 103, 127.)[15]  This is insufficient to make them "closely related," even under the

Estate's view of the law.  (Aasebø Reply Decl. ¶ 14.)

Moreover, by Norwegian statute, any shareholder owning at least 5% of a

company's shares can call for an "extraordinary general meeting" ("EGM").  (Aasebø Reply

Decl. ¶ 16.)  The fact that the Defendants allegedly "called for" an EGM to "replace certain

board members with their own" (Estate Br. at 28-29) thus is irrelevant to whether they are

"closely related" (see Aasebø Reply Decl. ¶ 16.)  In addition, the FAC shows that one of the two

"Cyrus/GSO Board Members" – Joanne Owen – was absent from the April 11, 2016 meeting at

which the then-present board members unanimously authorized open-market repurchases of

2016 SUNs.  (FAC ¶ 103 & Ex. 18.)  Accordingly, taking the facts as alleged, the GSO

Defendants do not meet the "closely related" threshold.

### b.    The "GSO Transfer" Was Neither a "Payment of Debt" Nor "Extraordinary," and the GSO Defendants Received No Enrichment

The GSO Brief demonstrates the Estate failed to allege the remaining elements of

its Section 5-5 claim because the "GSO Transfer" (a) was not a "payment of debt," but rather an

open-market buy-back involving at least two brokers; (b) was "ordinary," because it occurred at

---

[15] The FAC alleges the GSO Defendants did not increase their shareholdings to 25.47% until the "end of March 2016," at which point they purchased additional shares as part of a negotiated private placement with Norske Skogindustrier which raised €15 million for the company and which was determined by the board to be "in the best interest of all shareholders."  (FAC ¶ 61 & Ex. 16 at 2410-2411.)

a market price (below par), benefited the company, and was consistent with past company practice; and (c) did not "enrich" the GSO Defendants because the company was obligated to repay the 2016 SUNs at maturity only two months later.  (GSO Br. at 19-25.)  In opposition, the Estate argues that (i) a payment through a broker constitutes a "payment of debt"; (ii) the "GSO Transfer" was "extraordinary" because it was not necessary to continue the "Norske Enterprise's core operations" and the funds allegedly came from the NSF; and (iii) the GSO Defendants were enriched because they received "97.75% of the notional value of the 2016 SUNs."  (Estate Br. at 27, 30-32.)  The Estate is incorrect on all three points.

    *First*, the Estate's argument that "it is recognized under Norwegian law that brokers are not independent parties" (Estate Br. at 27) is unsupported and goes beyond the opinion of its own expert, who states only that one legal theorist has concluded that a payment via a third party *can* "fall within the scope of Section 5-5" if it can be "identified" with one of the parties, such as in a principal/agent relationship.  (Horstad Decl. ¶ 19.)  Even under that standard, the Estate fails to allege a "payment of debt."  There are no facts alleged showing that any broker acted as an "agent" of either Norske Skogindustrier or the GSO Defendants.  Indeed, the FAC and the Estate's brief present conflicting and conclusory allegations, none of them supported by facts.  The Estate alleges both that Fearnley was an "independent broker" (FAC ¶ 135) and that a broker acted "at the direction of the GSO Defendants."  (FAC ¶ 134.)  And now, the Estate argues in its brief (also with no supporting facts) that Fearnley acted at Norske Skogindustrier's direction.  (Estate Br. at 29.)  In any event, the GSO Brief demonstrated that the only plausible inference to be drawn from the facts that are alleged in the FAC is that there were at least two brokers involved – Fearnley *and* another.  (GSO Br. at 19-21.)  Whether one broker or two, however, there is no suggestion that any broker acted as anything other than a principal, purchasing 2016 SUNs from the GSO Defendants for its own account and then selling the debt

on to one or more third parties at a markup price, with no interaction between the original seller

and the ultimate buyer (here, Norske Skogindustrier).  (*See* FAC ¶ 135, Ex. 22 (translated at

Beaumont Decl. Ex. E).)  *See also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 539-40 & n.2

(2d Cir. 1999).  In either case, the Estate has failed to allege any facts supporting an inference of

an agency relationship rather than an ordinary broker-client relationship, in which the broker

owes no fiduciary duty to the purchaser of the security beyond a duty to complete a specific

transaction.  *See Press,* 166 F.3d at 536; *see also Anastasia Int'l, Inc. v. EM Online Pty Ltd.*, No.

13 CIV. 2919 KBF, 2013 WL 5550211, at *2-3 (S.D.N.Y. Oct. 4, 2013).  The "GSO Transfer"

thus was not a "payment of debt."  (*See* Aasebø Decl. ¶ 31; Aasebø Reply Decl. ¶ 17.)

    *Second*, the Estate's argument that the "GSO Transfer" was "extraordinary"

because it was not necessary to the "Norske Enterprise's core operations" of paper production,

(Estate Br. at 30), is wrong.  Norske Skogindustrier, the sole entity before this Court, "was a

holding company, and did not conduct any cash generating operations."  (FAC ¶ 175.)  It did,

however, issue debt and, making payments on and buying that debt back in open-market

transactions were ordinary company operations.  (FAC Ex. 1 at 87.)  The "GSO Transfer" thus

was an ordinary payment for Norske Skogindustrier.  (Aasebø Reply Decl. ¶¶ 19-21.)

    The Estate also attempts to paint the "GSO Transfer" as "extraordinary" by

alleging the funds paid by the company for 2016 SUNs came from its subsidiary NSAS's NSF.

(Estate Br. at 31; FAC ¶ 121.)  This conclusory allegation is unsupported by any facts.[16]  Indeed,

the only facts in the FAC on this point are statements in the exhibits that contradict it, stating the

---

[16] The Estate's brief states the following as a principle of Norwegian law: "*if financial debt items are satisfied with funds provided by the same creditor by way of a liquidity supply which was conditional on the granting of collateral in the assets of the operating companies, there are weighty arguments that debt payment is not ordinary*." (Estate Br. at 31 (citing Horstad Decl. ¶ 21 [sic]).)  This, however, is only a statement by the Estate's expert of what he *assumes* to be the facts here.  The Estate replaces the phrase "*assuming that*" with "*if*" to give the false appearance of a legal rule.  (*See* Horstad Decl. ¶ 22.)

NSF funds were only to be used "for general corporate purposes (*other than the repayment of any public debt*)." (FAC Ex. 12 at 6 (emphasis added); *see also* Ex. 17 at 1.) The Estate cannot concoct a claim by alleging that NSAS's NSF proceeds were *not to be* used to buy back debt and then asking the Court to infer, without support, that they were. *See In re ICE LIBOR*, 2020 WL 1467354, at *4. Thus, on the facts alleged, the "GSO Transfer" was "ordinary."[17]

      *Third*, the Estate does not dispute the GSO Defendants' argument (GSO Br. at 25; Aasebø Decl. ¶ 40) that there can be no "enrichment" from an open-market buyback of debt where, as here, the debt was set to mature shortly thereafter. Instead, the Estate offers a series of counterfactuals: assuming the April 2016 "GSO Transfer" never occurred, there would have been no payment at maturity in June 2016 and Norske Skogindustrier would have defaulted and filed a bankruptcy petition then (instead of in December 2017), and in a bankruptcy distribution, the GSO Defendants "would not have received any recovery on their 2016 SUNs." (Estate Br. at 32.) None of the facts comprising this hypothetical world is found in the FAC. What is alleged, however, is that the GSO Defendants received 97.75% of par in April 2016 for bonds that in June 2016 would have paid 100% of par. That is not "enrichment" as a matter of Norwegian law (or logic). (Aasebø Reply Decl. ¶¶ 22-23.)[18]

    **3.**      **The Estate Also Fails to State an Avoidance Claim Under Section 5-9 of the Recovery Act**

        **a.**      **The "GSO Transfer" Was Not "Improper"**

      The GSO Brief established that the "GSO Transfer" was not "improper" – and therefore not avoidable pursuant to Section 5-9 of the Recovery Act – because it is alleged to

---

[17] This is further established by the fact that, as set forth above, the GSO Defendants are not "closely related" to Norske Skogindustrier. (Aasebø Decl. ¶ 37; Aasebø Reply Decl. ¶ 20.)

[18] To the extent the Estate argues that a payment at maturity is avoidable under Norwegian law (Estate Br. at 30; Horstad Decl. ¶ 24), that is incorrect. Payment at maturity is presumed "ordinary" and only avoidable in circumstances not present here. (*See* Aasebø Reply Decl. ¶ 23.)

have been an open-market transaction, consistent with ordinary company practice, and the company's repurchase of 2016 SUNs from Fearnley benefited the company including by allowing it to retire debt early below par. (GSO Br. at 26-27.) The Estate argues the "Defendants" used "their insider status" to engineer a payment that gave "preference to the GSO Defendants" at the expense of the "community of creditors." (Estate Br. at 32-34.) These contentions are contradicted by the FAC and unsupported by Norwegian law.[19]

As an initial matter, the Estate does not allege facts showing the GSO Defendants were "insiders" with the power to control Norske Skogindustrier. (*See supra* Parts II.B.1, II.B.2.a.) Moreover, the relevant question under Norwegian law is whether the Defendants were improperly given preferential treatment over other creditors of Norske Skogindustrier – the debtor before this Court – with equal or better priority. (Aasebø Reply Decl. ¶¶ 25-26; Horstad Decl. ¶ 28; *see also* Declaration of Knut Ro dated Dec. 13, 2019 ("Ro Decl.") ¶¶ 23-24.) They were not: The Estate alleges Norske Skogindustrier bought back or repaid all of the 2016 SUNs by June 2016, (FAC ¶ 123), so the GSO Defendants, whose 2016 SUNs allegedly were bought back below par (FAC ¶ 135), were treated no better than any other holder of those bonds. Beyond that, the FAC does not identify any other Norske Skogindustrier creditor that had better (or even equal) priority of payment than holders of 2016 SUNs. Moreover, under Norwegian law, the outcome for creditors of other entities within the Norske corporate structure, such as holders of the PENs and SSNs, is irrelevant. (Aasebø Reply Decl. ¶ 26.)[20] The "GSO Transfer"

---

[19] The Estate also argues the "GSO Transfer" was "improper" for Section 5-9 purposes because it was "extraordinary" under Section 5-5. (Estate Br. at 33.) The Estate is wrong. As explained, under Section 5-5, the "GSO Transfer" as alleged was ordinary. (*See* GSO Br. at 23-25.) Second, even if it were "extraordinary," that does not make it "improper," as the Estate's expert agrees. (Aasebø Decl. ¶ 44; Horstad Decl. ¶ 27.)

[20] The Estate argues that whether the payment recipient was "related to the debtor in any particular matter" is a factor that should be considered under Norwegian law. (Estate Br. at 33.) That statement is legally incorrect and unsupported even by the Estate's expert. The relevant question is whether the recipient was "closely related" within the meaning of Section 1-5(3) of the Recovery Act (Aasebø Reply Decl. ¶ 12; Horstad Decl. ¶ 29) and as explained *supra*, that is not sufficiently alleged here.

thus was not "improper" and cannot be avoided under Section 5-9.[21]

**b.      The Estate Fails to Allege Economic Loss**

The GSO Brief established the Estate's Section 5-9 claim fails because it has not alleged Norske Skogindustrier suffered an economic loss caused by the "GSO Transfer." Rather, the FAC alleges facts showing the "GSO Transfer" benefited the company, and that market conditions rather the "GSO Transfer" caused its ultimate failure. (GSO Br. at 27-28 (citing FAC ¶¶ 42, 43-45, 138, 140).) In response, the Estate ignores the statute's causation requirement (Aasebø Decl. ¶ 48; Aasebø Reply Decl. ¶ 31) and instead argues the relevant "economic loss" is that of the "body of creditors," which the Estate argues includes holders of PENs and SSNs issued by the company's subsidiaries NSH and NSAS, respectively, and guaranteed by the company. (Estate Br. at 20-24.)

This is incorrect. To state a Section 5-9 claim, there must be an allegation of economic harm to *the company*, not subset(s) of its creditors, and certainly not creditors of other entities.[22] (Aasebø Decl. ¶ 47; Aasebø Reply Decl. ¶ 29; Ro Decl. ¶ 23.) Because the company's buy-back of 2016 SUNs from Fearnley improved rather than harmed its balance sheet, there was no economic harm within the meaning of the Recovery Act. (Aasebø Reply Decl. ¶ 30.)[23]

**C.      Section 546(e) of the U.S. Bankruptcy Code Also Bars the Avoidance Claims**

As detailed in the GSO Brief, Section 546(e) of the Code bars avoidance claims

---

[21] To the extent the Estate argues the "GSO Transfer," which allegedly occurred more than a year before the bankruptcy filing, was improper because it was part of a "global scheme," that, too, is contradicted by the FAC and its exhibits. (*See* Part II.B.1.)

[22] The Estate's attempt to change the focus to the "body of creditors" instead of the "debtor" does not help, as this is merely a semantic difference. (Aasebø Reply Decl. ¶ 29.)

[23] The Estate's failure to address causation is telling, since it would require the Estate to allege the "GSO Transfer" alone, not the €78 million paid to buy back or repay the remaining 2016 SUNs (FAC ¶ 123) or the financial distress the company faced (FAC ¶¶ 42-46), caused the economic harm to the company. The Estate does not allege that, nor could it.

21

that seek to undo certain enumerated types of securities transactions, of which the "GSO Transfer" is one. (GSO Br. at 28-30.) The Estate does not dispute that Section 546(e) applies in this proceeding. Rather, the Estate argues its Avoidance Claims are outside Section 546(e)'s ambit, because they involve "intentional" fraudulent transfers. This is incorrect. With respect to the Section 5-5 claim, the Estate's own expert states that it "is an objective avoidance provision," (Horstad Decl. ¶ 14), that is, a *constructive* avoidance provision which does not require intent. Accordingly, Section 546(e) bars the Section 5-5 claim.

Section 546(e) also bars the Section 5-9 claim. Section 546(e) excludes from its safe harbor only a claim "under section 548(a)(1)(A)," that is, an *actual* fraudulent transfer claim under the Bankruptcy Code. A claim under Section 5-9 of the Recovery Act is not brought "under section 548(a)(1)(A)," and the Estate cites no authority for the proposition that a foreign-law avoidance claim can be treated as if it were.[24] Moreover, the Estate does not rely on allegations of "actual intent to hinder, delay, or defraud any entity," to which Section 548(a)(1)(A) could apply, but rather on alleged "badges of fraud." (Estate Br. at 37-38.) But such a claim, if brought pursuant to Section 548, would be governed not by Section 548(a)(1)(A) but rather Section 548(a)(1)(B), which Section 546(e) does not carve out from its safe harbor.

Apparently recognizing the "GSO Transfer," standing alone, falls within the safe harbor, the Estate falls back on its claim that the "GSO Transfer" should be considered together with other transactions, citing *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018). But that is not what the Estate has alleged, and it is not what *Merit* requires.

The Estate argues the Court should focus on the "gravamen" of the FAC, which the Estate argues is that the Avoidance Claims target "a larger scheme." (Estate Br. at 39.) But

---

[24] The Estate concedes it cannot bring avoidance claims under Section 548. (Estate Br. at 49.)

what matters here is not the "gravamen" of the FAC, but what the Estate actually alleges, namely Avoidance Claims targeting only the "GSO Transfer." (FAC ¶¶ 167, 180.) Even if those claims could be construed to include other transactions, the Estate cites no authority for collapsing them for the purposes of Section 546(e) where the complaint does not allege that. *Merit,* on which the Estate relies, confirms that what matters is the "transfer that the [Estate] seeks to avoid." *Merit,* 138 S. Ct. at 892-93, 897. In *Merit,* the trustee sued to avoid an overarching transaction with multiple components, and the defendants argued that if Section 546(e) applied to one of the components, the avoidance claim should fail. The Court sustained the avoidance claim, noting "FTI, the trustee, sought to avoid the [overarching] $16.5 million transfer. FTI did not seek to avoid the component transactions by which that overarching transfer was executed." *Id.* at 897. Here, the Estate seeks to avoid only the "GSO Transfer," (FAC ¶¶ 167, 180), to which Section 546(e) applies, not any other transactions or "scheme."

        The Estate also argues dismissal is not appropriate because the Defendants have "merely invok[ed]" the safe harbor and have not met their burden of proving that defense. (Estate Br. at 39-40.) If such mere denials were sufficient at the pleadings stage, there would be no decisions granting motions to dismiss on that basis, yet there are, including cases the Estate cites.[25] *See, e.g., In re Tribune Fraudulent Conveyance Litig.,* 946 F.3d 66, 97 (2d Cir. 2019)[26]; *In re Lehman Bros. Holdings Inc.,* 469 B.R. 415, 440 (Bankr. S.D.N.Y. 2012).

---

[25] The Estate cites one case in which a court denied a motion to dismiss based on Section 546(e) because of a factual issue, but in that case, both parties presented *evidence*. *See In re Enron Corp.,* 328 B.R. 58, 71 (Bankr. S.D.N.Y. 2005). Here, by contrast, the GSO Defendants' Section 546(e) defense relies solely on the Estate's allegations.

[26] This decision in the *Tribune* case was issued on December 19, 2019, after the GSO Defendants filed this motion. The prior decision, which the GSO Defendants cited in the GSO Brief (GSO Br. at 29), was vacated and withdrawn, but the Court of Appeals did not change its decision on the point for which it was cited, namely that an avoidance claim may be dismissed on a motion to dismiss based Section 546(e). *See In re Tribune,* 946 F.3d at 97.

23

### III.

### EVEN IF NORWEGIAN LAW WERE TO APPLY, THE ESTATE'S CLAIM UNDER SECTION 17-1 OF THE COMPANIES ACT SHOULD BE DISMISSED

**A.**    **The Section 17-1 Claim Is Time-Barred**

The Estate does not dispute that by April 2016, Norske Skogindustrier possessed all the information that is the basis for the Estate's claim under Section 17-1 of the Companies Act (or under related non-statutory law).[27]  As the GSO Defendants showed, this means the claim is time-barred, regardless of whether Section 3 or Section 9 of the Limitations Act applies. (GSO Br. at 30-32.)  The Estate argues that its Section 17-1 claim is brought on behalf of not Norske Skogindustrier but creditors, such that the statute of limitations began to run in December 2017, when its bankruptcy petition was filed.  (Estate Br. at 40-41.)

The Estate misstates Norwegian law.  A plaintiff pursuing a Section 17-1 claim may seek damages only for its own loss; a bankruptcy trustee does not have standing to assert such a claim on behalf of a creditor group, as the Estate seeks to do here.  (Aasebø Reply Decl. ¶¶ 34-39.)  In any event, this Court has authorized the Estate to assert only "claims of the Norske Skogindustrier Estate," (ECF No. 12 at 4), which could have asserted (but did not) a Section 17-1 claim before its bankruptcy filing, so it is time-barred.[28]  (Aasebø Reply Decl. ¶ 36.)

**B.**    **The Section 17-1 Claim Is Preempted by the Recovery Act**

The Estate concedes Norwegian law – specifically, the "preparatory works" constituting the authoritative legislative history for the Recovery Act – "support[s] the argument that Section 17-1 claims are preempted" by the Recovery Act.  (Estate Br. at 41.)  The Estate nonetheless argues there is no preemption because the preparatory works have "not been

---

[27] For the sake of brevity, we refer to both claims together as the "Section 17-1 claim," except where the difference between the statutory and non-statutory formulations is relevant.

[28] The Estate does not argue that its Section 17-1 claim against the GSO Defendants relates back to date of the filing of the original complaint against the Cyrus Defendants.

24

endorsed [by] legal scholars" and preemption is not expressed in the statute. (Estate Br. at 41 (citing one legal scholar).) That is irrelevant. Under Norwegian law, preparatory works are authoritative statements of the Norwegian legislature's intent regardless of what legal scholars say, second only to the statute itself. (Aasebø Decl. ¶¶ 10-11; Aasebø Reply Decl. ¶ 41; Horstad Decl. ¶ 11.) No legislative statement or scholarly endorsement of preemption is necessary, and, in any event, legal scholars *have* endorsed it.[29] (Aasebø Reply Decl. ¶ 41.)

## C.    The Estate Fails to State a Claim Under Statutory and Non-Statutory Law

The GSO Brief demonstrated that a shareholder rarely is liable under Section 17-1 for negligent or intentional conduct "in said capacity," because a shareholder rarely acts in "said capacity" except when voting. Here, the Estate seeks to hold the GSO Defendants liable for conduct in their capacity as *creditors*, which Section 17-1 does not cover. (GSO Br. at 33.) In response, the Estate argues: (a) the "Defendants" acted culpably by using "their position as shareholders to influence the Norske Board"; (b) the Section 17-1 claim includes a non-statutory claim that is not limited by the capacity requirement; and (c) it also includes an "aiding and abetting" claim under the statute's second paragraph. (Estate Br. at 41-42.) Each argument fails.

*First*, even if the "Defendants" are alleged to have used their positions as shareholders to "influence" the Norske Skogindustrier board, that does not suffice to allege the requisite negligent or intentionally wrongful conduct. (Aasebø Reply Decl. ¶¶ 45-46.) And, as the Estate concedes, the transactions it challenges were approved by the board, and a shareholder cannot be liable under Section 17-1 for board-approved conduct. (Aasebø Reply Decl. ¶ 47.)[30]

---

[29] As the GSO Defendants also pointed out, the same would be true with respect to the Estate's unjust enrichment claim under Norwegian law if such a claim existed. (Aasebø Decl. ¶ 64.) Further, the fact that the Estate cannot state a viable Avoidance Claim under Section 5-9 is irrelevant to whether the Recovery Act preempts the Estate's 17-1 or unjust enrichment claims. (Aasebø Reply Decl. ¶ 44.)

[30] The Estate's expert opines the Defendants acted "intentionally or negligently" because they had "in-depth knowledge of Norske Skogindustrier's financial situation" and could "assess the consequences" of the subject transactions. (Horstad Decl. ¶ 76.) If true, this would subject any knowledgeable investor to potential liability under Section 17-1, which is not the case. (Aasebø Reply Decl. ¶ 49.)

*Second*, the Estate has not pled a non-statutory claim, which would have to be directed at the GSO Defendants as creditors, not shareholders.  The standard for alleging a creditor acted culpably under Norwegian law is extremely high since a creditor can act in its own self-interest, including to the debtor's detriment.  (Aasebø Reply Decl. ¶¶ 48-49.)  The Estate does not identify any allegations showing the requisite level of culpability here, arguing that it "need merely allege that the Defendants intentionally or even negligently influenced the board." (Estate Br. at 42.)  As noted above, that is insufficient to allege shareholder liability, and perforce is insufficient to satisfy the higher standard for creditor liability (regardless of whether the focus is on the "GSO Transfer" alone or an alleged "global scheme").  (Aasebø Reply Decl. ¶ 48.)

*Third*, the FAC cannot reasonably be construed as asserting a claim under Section 17-1(2), under which a shareholder could in limited circumstances be liable for "contribut[ing]" to damages caused by a corporate insider.  (Aasebø Reply Decl. ¶ 50.)  Indeed, the FAC does not even mention a claim under this paragraph, other than to quote its language (FAC ¶ 198), which does not suffice to state a claim.  *See Zhang v. Akami Inc.*, No. 15-CV-4946 (VSB), 2017 WL 4329723, at *5 (S.D.N.Y. Sept. 26, 2017).  Even so, the Estate has failed to allege any breach of an obligation owed by a statutorily covered individual or entity (*i.e.*, the CEO or board) that caused an economic loss to the company, as it was required to do.  (Aasebø Reply Decl. ¶ 50.)[31]

**D.    <u>The Estate Has Not Sufficiently Alleged Damages</u>**

As the Estate concedes, damages for liability under Section 17-1 are to be analyzed in the same manner as Recovery Act Sections 5-9 and 5-12.  (Estate Br. at 20-24.)  In other words, the Estate can seek recovery only for economic loss suffered by Norske Skogindustrier (which as noted, is co-extensive with its "body of creditors").  As explained (Part

---

[31] To the extent the Estate asserts such a breach was committed by the board or CEO, any Section 17-1(2) claim, as with its unjust enrichment claim, would be precluded by *Wagoner/in pari delicto*. (See *infra* and GSO Br. at 35-37.)

II.B.3), the Estate expressly (and improperly) seeks recovery on behalf of groups of creditors (and not even creditors of the company before the Court). Thus, for the same reasons the Estate cannot avoid the "GSO Transfer" under Section 5-9, it also cannot recover under Section 17-1.

## IV.
## THE ESTATE FAILS TO STATE A VALID UNJUST ENRICHMENT CLAIM

The GSO Brief demonstrates that even if New York law were to apply to the unjust enrichment claim, it still would fail because the Estate has not stated a claim, and any such claim is barred by the *Wagoner* rule and *in pari delicto*. (GSO Br. at 35-40.) The Estate does not respond to or dispute the GSO Defendants' arguments that: (a) unjust enrichment is reserved for limited situations where, unlike here, a defendant receives a benefit without adequately compensating the plaintiff; (b) bare allegations that "equity and good conscience" require restitution are inadequate; and (c) there is no unjust enrichment where the pleadings do not allege a relationship that could have caused reliance or inducement. (*See* GSO Br. at 38-40.) In opposition, the Estate argues only that (a) the "Defendants" were enriched at the expense of other creditors because they received payment on the 2016 SUNs, and (b) exceptions to the *Wagoner* rule and *in pari delicto* apply. (Estate Br. at 43-54.) Both arguments miss the mark.

## A.    The Estate Has Not Alleged "Enrichment" at Norske Skogindustrier's Expense

In addition to the reasons in the GSO Brief, the unjust enrichment claim also fails because the Estate seeks to recover for losses suffered, if at all, by select creditors of the Estate's operating subsidiaries, not of the Estate itself or its creditors as a whole. The Estate argues the "Defendants" (without specifying which ones) engaged in various transactions with Norske Skogindustrier, the combined effect of which was that they received value for their 2016 SUNs, while other "Norske Enterprise" creditors – *not* creditors of Norske Skogindustrier – allegedly were "left to bear the entirety of economic loss." (Estate Br. at 43-45.) In other words, the

27

Estate concedes any unjust enrichment claim would inure to the benefit of creditors of entities

not before this Court, but the Estate cannot assert those creditors' claims.  (Aasebø Reply Decl.

¶ 35.)  Moreover, the Estate does not allege any "enrichment" that must be recouped as a matter

of equity, much less any enrichment at the expense of Norske Skogindustrier itself.  *See*

*Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 263 (2d Cir. 1984) (plaintiff asserting unjust

enrichment claim under New York law must "show that as between the two parties enrichment

of the defendant was unjust").  Dismissal is warranted on this basis alone.

**B.**    **The Unjust Enrichment Claim Is Barred by the *Wagoner* Rule and *In Pari Delicto***

The Estate next argues dismissal on *Wagoner*/*in pari delicto* grounds is precluded

by the "insider" and "adverse interest" exceptions.  (Estate Br. at 49-54.)  Neither applies here.

The "insider" exception allows a claim barred by *Wagoner*/*in pari delicto* to

proceed if asserted against an insider that controlled the corporation, most commonly an officer

or director.  *See In re TS Emp't, Inc.*, 597 B.R. 543, 550 (Bankr. S.D.N.Y. 2019).  But as the

Estate's own cases show, where a defendant is neither a director nor management, it is presumed

not to be an "insider."  *See In re PHS Grp. Inc.*, 581 B.R. 16, 33 (Bankr. E.D.N.Y. 2018).  Where

the defendant is a creditor, the threshold for overcoming this presumption is high:  the defendant

must, "in every case, exercise dominion and control sufficient to create a 'merger of identity' to

the point where the 'creditor has become, in effect, the *alter ego* of the debtor.'"  *In re Lehman*

*Bros. Holdings Inc.*, 541 B.R. 551, 582 (S.D.N.Y. 2015).[32]  The Estate argues the "insider"

---

[32] In *Lehman*, the meaning of "insider" was considered in the context of equitable subordination under the Code.
That court faced the same question facing this Court: "whether the creditor acted as a[n] insider or an ordinary
creditor."  541 B.R. at 582.  As the Estate's own cases show, Bankruptcy Courts draw from "many and varying
contexts," including equitable subordination, when determining "insider" status for the "insider exception."  *See In*
*re PHS Grp.*, 581 B.R. at 31-32 (citing *In re KDI Holdings, Inc.*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999) for the
proposition that "[a] creditor will be held to an insider standard where it is found that it dominated and controlled the
debtor").  The Estate's own formulation of "control" (Estate Br. at 50) comes from an unpublished Second Circuit
opinion which considered whether a debtor's vice president was an "insider," such that his vote on plan
confirmation could not be counted under Section 1129(a)(10).  *See In re 455 CPW Assocs.*, No. 99-5068, 2000 WL

exception applies because the "Defendants" were "pushing" for repayment of the 2016 SUNs "ahead of all other claims against the Norske Enterprise" by "calling for an extraordinary meeting" and "replacing" two board members.  (Estate Br. at 51.)  Even if true, this does not establish the "merger of identity" or dominion and control necessary to overcome *Wagoner*/*in pari delicto*.  *See In re Lehman Bros.*, 541 B.R. at 582-83; *In re Granite Partners, L.P.*, 194 B.R. 318, 323, 332 (Bankr. S.D.N.Y. 1996), *corrected* (Apr. 16, 1996).  (*See also supra* Part II.B.1.)

The "adverse interest" exception permits a claim against a corporate agent who abandons the corporation's interest entirely and acts solely to advance his or her own personal interest.  *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466-67 (2010).  It is derived from agency law and applies only in the narrowest of circumstances such as theft, looting or embezzlement, where the agent's conduct is adverse to the interests of, and does not in any way benefit, the corporation.  *See In re TS Emp't*, 597 B.R. at 552-53.  It does not apply where the agent's conduct "enables the corporation to survive," even where it "can be said to have caused the company's ultimate bankruptcy."  *Kirschner*, 15 N.Y.3d at 468; *see also In re ICP,* 730 F. App'x at 82.[33]  Here, the GSO Defendants are not alleged to have acted as Norske Skogindustrier's agents, and this exception therefore does not apply.  Moreover, far from involving theft, looting or embezzlement, the FAC alleges that the board-approved transactions at issue provided substantial benefits to Norske Skogindustrier.  (*See, e.g.*, FAC ¶¶ 119, 135 & Ex. 12.)

The Estate also argues the Court should not dismiss its unjust enrichment claim on *in pari delicto* grounds because the relative fault between the GSO Defendants and Norske Skogindustrier is not "equal."  (Estate Br. at 46-48.)  However, courts can and do dismiss claims

---

1340569 (Table), at *5 (2d Cir. Sept. 14, 2000).  The court noted that "[f]lexibility notwithstanding, courts have required evidence of extensive control before finding insider status…."  *Id.*

[33] *Simon Conway v. Marcum & Kliegman LLP*, 176 A.D.3d 477 (1st Dep't 2019), cited by the Estate (Estate Br. at 52-54), turned on "speculation" about "hypothetical" benefits to the corporation from the agent's conduct.  There is no such speculation here.

under Rule 12(b)(6) when the complaint establishes itself an *in pari delicto* defense.  *See Kirschner*, 15 N.Y.3d at 459 n.3.  Here, the Estate alleges Norske Skogindustrier and its board were active, voluntary participants in the transactions at issue.  The company or its board is alleged to have, among other things, negotiated and entered into a restructuring support agreement with Defendants, nominated the "Cyrus/GSO Board Members," negotiated and approved the Second Restructuring and the NSF, and authorized buybacks of 2016 SUNs on the open market.  (*See, e.g.*, FAC ¶¶ 101, 103, 116 & Exs. 16, 18.)  If the GSO Defendants are culpable for these activities, Norske Skogindustrier is equally at fault and *in pari delicto* therefore applies.  *See Donovan v. Rothman*, 302 A.D.2d 238, 239 (1st Dep't 2003).

Finally, the Estate argues *Wagoner/in pari delicto* does not apply where an unjust enrichment claim "shares identical facts" with a fraudulent conveyance claim, as the Estate argues is the case here.  (Estate Br. at 48-49.)  The Estate cites no authority that supports this argument and it should be rejected.[34]  The Estate also argues that courts "refuse to apply" *Wagoner/in pari delicto* to statutory "fraudulent transfer claims asserted by a trustee."  (Estate Br. at 48.)  That is beside the point.  As the Estate's cases show, this is because *Wagoner/in pari delicto* does not apply to causes of action a trustee is specifically permitted to bring under the Bankruptcy Code, none of which is at issue here.  *See, e.g.*, *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (SMB), 2016 WL 1695296, at *4 (Bankr. S.D.N.Y. Apr. 25, 2016).

---

[34] The Estate's argument relies on *In re Hellas Telecomm. (Luxembourg) II SCA*, 526 B.R. 499, 509-13 (Bankr. S.D.N.Y. 2015), in which the court analyzed whether Section 546(e) barred an unjust enrichment claim that was substantially identical to a fraudulent transfer claim under Section 548(a)(1)(A).  That is not the issue here, and the Estate's argument is nonsensical.  An avoidance claim under Section 548(a)(1)(A) turns on the intent of the *transferor*, and only in limited circumstances do courts impute the transferee's intent to the transferor.  *See id.* at 511.  To the extent the Estate argues it has alleged facts showing the GSO Defendants had fraudulent intent that should be imputed to the Estate, that would be an additional reason that *Wagoner/in pari delicto* applies.

## CONCLUSION

For all the foregoing reasons as well as those set forth in the GSO Brief, the Court should dismiss the First Amended Complaint as against the GSO Defendants with prejudice, along with such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         April 21, 2020

Respectfully Submitted,

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP


s/ Eric Seiler
Eric Seiler (eseiler@fklaw.com)
Anne E. Beaumont (abeaumont@fklaw.com)
Andrew M. Englander (aenglander@fklaw.com)
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for the GSO Defendants*

31