Duane L. Loft (dloft@bsfllp.com)
Anastasia Cembrovska (acembrovska@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Tel: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for the Cyrus Defendants*

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>THE BANKRUPTCY ESTATE OF NORSKE SKOGINDUSTRIER ASA<br><br>        Debtor in a<br>        Foreign Proceeding. | Chapter 15<br><br>Case No. 18-13571 (smb) |
| THE BANKRUPTCY ESTATE OF NORSKE SKOGINDUSTRIER ASA,<br><br>        Plaintiff,<br><br>vs.<br><br>CYRUS CAPITAL PARTNERS, L.P., CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD., CYRUS OPPORTUNITIES MASTER FUND II, LTD., CRS MASTER FUND, L.P., CRESCENT I, L.P., GSO CAPITAL PARTNERS LP, GSO SPECIAL SITUATIONS MASTER FUND LP, GSO AIGUILLE DES GRANDS MONTETS FUND I LP, GSO AIGUILLE DES GRANDS MONTETS FUND II LP, GSO AIGUILLE DES GRANDS MONTETS FUND III LP, GSO COASTLINE CREDIT PARTNERS (CAYMAN) LP, GSO CREDIT-A PARTNERS (CAYMAN) LP, GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS (CAYMAN) LP, GSO CACSTUS CREDIT OPPORTUNITIES FUND (CAYMAN) LP, GSO OASIS CREDIT PARTNERS (CAYMAN) LP, STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP, GSO | Adv. Pro. No. 18-01846 (smb)<br><br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF THE CYRUS DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

CREDIT ALPHA TRADING (CAYMAN) LP, GSO
CHURCHILL PARTNERS LP and JOHN DOES 1-1000,

   Defendants.

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

RELEVANT BACKGROUND ............................................................................ 3

    A.    Norske .................................................................................................. 3

    B.    Cyrus .................................................................................................. 4

    C.    The Alleged "Second Restructuring".................................................. 6

        1.    The Norske Board's Approval of the Second Restructuring ..................... 8

        2.    Allegations of Cyrus's "Control" and "Influence" Over the Second Restructuring ...................................................................... 9

    D.    The Cyrus Sale .................................................................................. 11

    E.    The Upstreaming................................................................................ 11

    F.    The Transfer ...................................................................................... 12

    G.    The Norske Bankruptcy .................................................................... 12

PROCEDURAL BACKGROUND...................................................................... 13

LEGAL STANDARD......................................................................................... 14

ARGUMENT ...................................................................................................... 15

I.    A CHOICE OF LAW ANALYSIS REQUIRES DISMISSAL OF PLAINTIFF'S INTENTIONAL FRAUDULENT TRANSFER CLAIM................................................. 15

II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM OF INTENTIONAL FRAUDULENT TRANSFER. ...................................................................... 17

    A.    The Amended Complaint Fails to Plead Intent.................................... 19

    B.    The Amended Complaint Fails to State a Fraudulent Transfer Claim Based on the Cyrus Sale. ..................................................................... 21

    C.    The Amended Complaint Fails to State a Fraudulent Transfer Claim Based on the Upstreaming....................................................................... 22

    D.    Amended Complaint Fails to State a Fraudulent Transfer Claim Based on the Transfer. ....................................................................................... 23

    E.    The Cyrus Sale, the Upstreaming, and the Transfer Cannot Be Collapsed. ......... 24

III.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER § 17-1 OF
NORWAY'S PUBLIC LIMITED LIABILITY COMPANIES ACT. ............................ 25

    A.    The Amended Complaint Fails to State a Claim Under § 17-1(1). ...................... 26

    B.    The Amended Complaint Fails to State a Claim Under § 17-1(2). ...................... 28

    C.    Any Claim Under § 17-1 Fails for the Additional Reason that the Debtor Is Not
Alleged to Have Suffered Any Harm.................................................................... 30

IV.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST
ENRICHMENT. ............................................................................................................. 31

CONCLUSION.................................................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*AP Servs. LLP v. Silva,*
 483 B.R. 63 (S.D.N.Y. 2012) ................................................................ 33

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ............................................................................. 14

*Bell Atl. Corp. v. Towmbly,*
 550 U.S. 544 (2007) ............................................................................. 14

*DigitAlb, Sh.a v. Setplex, LLC,*
 284 F. Supp. 3d 547 (S.D.N.Y. 2018) ................................................... 14

*Drenis v. Haligannis,*
 452 F.Supp.2d 418 (S.D.N.Y.2006) ...................................................... 15

*Geron v. Seyfarth Shaw LLP (In re Thelen LLP),*
 736 F.3d 213 (2d Cir.2013) ................................................................... 15

*In re Actrade Fin. Techs. Ltd.,*
 337 B.R. 791 (Bankr. S.D.N.Y. 2005) ................................................... 20

*In re Churchill Mortg. Inv. Corp.,*
 256 B.R. 664 (Bankr. S.D.N.Y. 2000) ............................................. 21, 23

*In re Glitnir banki hf.,*
 No. 08-14757 (SMB), 2011 WL 3652764 (Bankr. S.D.N.Y. Aug. 19, 2011) .......................... 17

*In re Grumman Olson Industries, Inc.,*
 329 B.R. 411 (Bankr. S.D.N.Y. 2005) ................................................... 28

*In re Hellas Telecommunications (Luxembourg) II SCA,*
 524 B.R. 488 (Bankr. S.D.N.Y.) ............................................................ 16

*In re Hydrogen, L.L.C.,*
 431 B.R. 337 (Bankr. S.D.N.Y. 2010) ................................................... 15

*In re King Ctr. Corp.,*
 573 B.R. 384 (Bankr. E.D.N.Y. 2017) ................................................... 21

*In re Lancelot Inv'rs Fund, L.P.,*
 467 B.R. 643 (Bankr. N.D. Ill. 2012) .................................................... 18

v

*In re Mediators, Inc.*,
   105 F.3d 822 (2d Cir. 1997) ................................................................ 29

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
   559 B.R. 563 (Bankr. S.D.N.Y. 2016) ............................................ 32, 33

*In re Sunbeam Corp.*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002) ............................................ 24, 25

*In re Trace Int'l Holdings, Inc.*,
   301 B.R. 801 (Bankr. S.D.N.Y. 2003) ................................................ 21

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   818 F.3d 98 (2d Cir. 2016) ................................................................ 18

*In re Trinsum Grp., Inc.*,
   460 B.R. 379 (Bankr. S.D.N.Y. 2011) ............................................ 14, 32

*In re Tronox Inc.*,
   429 B.R. 73 (Bankr. S.D.N.Y. 2010) .................................................. 33

*Kolbeck v. LIT Am., Inc.*,
   939 F. Supp. 240 (S.D.N.Y. 1996) ............................................ 26, 28, 30

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   739 F.3d 45 (2d Cir.2013) ................................................................ 16

*Lyman Commerce Solutions, Inc. v. Lung*,
   No. 12–cv–4398 (TPG), 2014 WL 476307 (S.D.N.Y. Feb. 6, 2014) ....................... 16

*Margel v. E.G.L. Gem Lab Ltd.*,
   No. 04 CIV.1514 (PACHBP), 2010 WL 445192 (S.D.N.Y. Feb. 8, 2010) ................. 31

*Ray v. Ray*,
   No. 18 CIV 7035 (GBD), 2019 WL 1649981 (S.D.N.Y. Mar. 28, 2019) ................... 18

*Roselink Inv'rs, L.L.C. v. Shenkman*,
   386 F. Supp. 2d 209 (S.D.N.Y. 2004) .................................................. 22

*Sager Spuck Statewide Supply Co. Inc. v. Meyer*,
   710 N.Y.S.2d 429 (2000) .................................................................. 28

*Sharp Int'l Corp. v. State St. Bank & Trust Co.*,
   403 F.3d 43 (2d Cir. 2005) ................................................................ 19

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ................................................................................... 19

*U.S. Bank Nat'l As'n v. PHL Variable Ins. Co.*,
   No. 12 Civ. 6811 (CM) (JCF), 2014 U.S. Dist. LEXIS 35616 (S.D.N.Y. Mar. 14, 2014) ....... 15

*Villoldo v. BNP Paribas S.A.*,
   2015 WL 13145807 (S.D.N.Y. July 21, 2015) ................................................. 22, 23

**Statutes**

11 U.S.C. § 546 ....................................................................................................... 18, 34

**Rules**

Fed. R. Bankr. P. 7009 ................................................................................................. 20

Fed. R. Bankr. P. 7012 ................................................................................................... 1

Fed. R. Civ. P. 12 ........................................................................................................... 1

Fed. R. Civ. P. 9 ........................................................................................................... 20

**Other Authorities**

N.Y. Debt. & Cred. L. § 276 ........................................................................................ 18

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable hereto by Rule 7012 of the Federal Rules of Bankruptcy Procedure, the Cyrus Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint (the "Amended Complaint") filed by Tom Hugo Ottesen, the Chapter 15 foreign representative ("Trustee") of Plaintiff, the Bankruptcy Estate of Norske Skogindustrier ASA ("Plaintiff" or "Debtor").

## INTRODUCTION

This case began in December 2018 as an avoidance action against the Cyrus Defendants, who stood accused of receiving repayment of the Debtor's June 2016 unsecured bonds at maturity. Plaintiff alleged that this repayment at maturity violated the Norwegian Recovery Act § 5-9, the alleged "analogue to United States intentional fraudulent transfer statutes." Putting aside the legal problems with this theory, basic discovery established that it was not true: Cyrus did not hold the relevant bonds at maturity and therefore did not receive any alleged improper transfer.

Nine months later, the Trustee filed an Amended Complaint. The Amended Complaint names a different alleged holder of the Debtor's June 2016 unsecured bonds, GSO Capital Partners LP and related funds ("GSO" or "GSO Defendants"), and reasserts claims under the Norwegian Recovery Act based on an alleged "GSO Transfer." But inexplicably, the Amended Complaint continues to name the Cyrus Defendants. The Amended Complaint continues to assert an avoidance claim against the Cyrus Defendants under Norway's "intentional fraudulent transfer" law, even though the Cyrus Defendants are not alleged to have received anything from the Debtor,

---

[1] Cyrus Capital Partners, L.P., Cyrus Select Opportunities Master Fund, Ltd., Cyrus Opportunities Master Fund II, Ltd., CRS Master Fund, L.P., and Crescent 1, L.P., hereinafter collectively referred to as the "Cyrus Defendants" or "Cyrus."

let alone any "transfer."  Indeed, the Amended Complaint admits that Cyrus sold its holdings in the June 2016 unsecured bonds to GSO two months before their repayment at maturity.

The Amended Complaint tries to claim that Cyrus's sale of these bonds to GSO was a fraudulent transfer, but this claim makes no sense.  As the Amended Complaint admits, the "Cyrus Sale" was a third-party transaction between Cyrus and GSO, two creditors, and had nothing to do with the Debtor.  The Amended Complaint then tries to claim that an internal "Upstreaming" of funds to the Debtor from a subsidiary was a fraudulent transfer.  But this makes no sense either: the "Upstreaming" was allegedly a transfer *to*, not from, the Debtor, and it certainly is not alleged to have transferred anything to any Cyrus Defendant.  These fundamental defects foreclose any possible "fraudulent transfer" claim against Cyrus.

Undeterred, the Amended Complaint has added claims based on a Norwegian statute that creates liability for shareholder actions taken at a general meeting and for aiding and abetting a breach of fiduciary duty.  But these claims fail as well.  There is no allegation that Cyrus took any action as a shareholder that harmed the Company, let alone some action at a general meeting.  Nor could there be:  Cyrus is alleged to have held, at most, 9.96% of the Company's shares.  As a *creditor*, Cyrus is alleged to have supported a restructuring that allowed Norske to address the upcoming maturities on its unsecured notes.  However, the Amended Complaint admits that it was the Norske Board that negotiated and approved this restructuring, and there is no allegation that the board of directors breached any fiduciary duty.  In the absence of any alleged breach of fiduciary duty, the Cyrus Defendants cannot be liable for aiding and abetting.

Lastly, the Amended Complaint asserts a claim of "unjust enrichment," but this is not a legal theory that exists under Norwegian law.  Even if it did, the Amended Complaint fails to allege any enrichment at all, let alone something "unjust."  Cyrus is alleged to have sold out of the 2016

2

bonds at 68% of par value plus accrued interest.  There is no allegation that this price was somehow higher than the prevailing market price or otherwise an "enrichment."

In short, despite having taken discovery of the Cyrus Defendants and having over nine months to formulate a claim, the Trustee has come nowhere close to stating a cognizable claim against the Cyrus Defendants.  Accordingly, the Cyrus Defendants respectfully request dismissal of the Trustee's claims against the Cyrus Defendants with prejudice.

## RELEVANT BACKGROUND

### A.    Norske

Debtor Norske Skogindustrier ASA ("Norske ASA") is a Norwegian limited liability company that serves as the "parent company for various paper production subsidiaries under the Norske brand."  Am. Compl. ¶¶ 37-38.  Norske ASA's subsidiaries include Norske Skog AS ("NSAS"), which along with certain intermediate holding companies acts as a holding company for the "Norske Business Units," a group of paper mills operating under the Norske brand in Europe and Australia.  Am. Compl. ¶ 39.  This corporate structure is illustrated below:



3

The Amended Complaint refers to these entities collectively as the "Norske Enterprise," Am. Compl. ¶ 39, but each is a separate corporate entity, and this action is brought exclusively on behalf of the estate of Norske ASA, the corporate parent.  Am. Compl. ¶ 7.

In early 2015, Norske faced "liquidity and debt maturity concerns," causing it to enter into a series of refinancing transactions that the Amended Complaint terms the "First Restructuring." Am. Compl. ¶ 66.  Following the First Restructuring, the capital structure of Norske ASA included the following classes of indebtedness:

- €150 million 11.75% Senior Unsecured Notes due in June 2016 ("2016 SUNs"),

- €500 million 7% Senior Unsecured Notes due in June 2017 ("2017 SUNs"), and

- €200 million 7.125% Senior Unsecured Notes due in October 2033 ("2033 SUNs").

Am. Compl. Ex. 1 at 358 of 364.  As alleged, Norske ASA was the primary obligor of these debt instruments, and "no other entity affiliated with the Norske Enterprise had guaranteed payment thereof."  Am. Compl. ¶ 49.

The Amended Complaint also alleges that NSAS, the Norske subsidiary holding company, had outstanding €290 million in 11.75% Senior Secured Notes ("SSNs") maturing in 2019, and that Norske Skog Holding AS ("NSH"), the intermediate Norske holding company, had outstanding €220 million in 8% Prior Exchange Notes ("PENs") maturing in 2021 and 2023.  Am. Compl. ¶ 77 & Ex. 1 at 358 of 364.  Payment obligations for the PENs and SSNs were guaranteed by, *inter alia*, Norske ASA.  Am. Compl. ¶ 80.  The Amended Complaint defines these parent guaranties as the "Guarantee Obligations."  *Id.*

### B.    Cyrus

Cyrus Capital Partners, L.P. ("Cyrus Capital") is a limited partnership organized under the laws of Delaware, with a registered office and principal place of business in New York.  Am.

Compl. ¶ 8. Cyrus Capital serves as an investment manager for the funds identified in the Amended Complaint as operated by Cyrus Capital: Cyrus Select Opportunities Master Fund, Ltd., Cyrus Opportunities Master Fund II, Ltd., CRS Master Fund, L.P., and Crescent 1, L.P., (collectively "Cyrus" or the "Cyrus Defendants"). Am. Compl. ¶¶ 8-13. As summarized below, following the First Restructuring, Cyrus was invested across the capital structure of the Norske Enterprise:

| Security | Cyrus Holdings |
|---|---|
| Equity in Norske ASA | 6.2 million shares (3.3% of outstanding shares) |
| 2016 SUNs | €31.69 million |
| 2017 SUNs | €1.05 million |
| 2019 SSNs | €17.9 million |
| 2021 PENs | €30.71 million |

Am. Compl. ¶ 53.

Based on its equity holdings and investment across multiple levels of the capital structure, Cyrus had a substantial interest in the long-term success of the Norske Enterprise. The exhibits to the Amended Complaint also make clear that Cyrus's investments reflected its "belief in the potential of the business and . . . conviction that the current share price does not reflect the Company's intrinsic value." Am. Compl. Ex. 5 at 1. The Amended Complaint adds spurious allegations about alleged Credit Default Swap Interests ("CDS Interests"), Am. Compl. ¶¶ 62-65, but provides no factual allegations to support these assertions, and they are lacking in any substance. The only purported evidence of any alleged CDS Interests is an email concerning GSO, which does not even mention Cyrus. Am. Compl. ¶ 65 & Ex. 2. At all relevant times, Cyrus

viewed its total holdings in Norske as long-term investments and had every incentive to see it continue operations and grow.

### C.    The Alleged "Second Restructuring"

Throughout the second half of 2015 and into early 2016, Norske experienced ongoing liquidity issues and a growing need to address the upcoming maturities of the 2016 and 2017 SUNs.  Am. Compl. ¶¶ 82-83.  If it could address these maturities, Norske believed that it would have an opportunity to "improve its profitability and cash flow generation."  Am. Compl. Ex. 1 at 26 of 364 ("[W]e have streamlined our business through a broad range of operational initiatives and investments, which we believe have positioned our business to improve its profitability and cash flow generation . . . .  We expect our past investments, when coupled with our renewed focus on key customer geographies, in Europe . . . and in Australasia . . . will enable us to benefit from anticipated improvements in the market for our products."); *id.* at 6 ("We will continue to invest in improvements to reduce costs and improve efficiency and quality.").

To help alleviate Norske's liquidity challenges and address the near-term maturities on its unsecured notes, the Company engaged in a series of transactions referred to in the Amended Complaint as the "Second Restructuring."  Am. Compl. ¶¶ 82, 84.  To address the maturity on its 2017 SUNs, Norske ASA offered holders of those notes an exchange "into a package approximating the following: (1) 47% Subordinated Unsecured Notes maturing in 2026; (ii) 36% perpetual notes maturing in 2115 . . . ; and (iii) a 17% par-value write off."  Am. Compl. ¶ 114. There is no allegation that this "March 2016 Exchange Offer" resulted in any financial detriment to Norske ASA or its creditors.  Am. Compl. ¶ 113.  As part of the alleged Second Restructuring, Norske ASA also entered into a financing agreement with Cyrus and GSO on March 18, 2016. Am. Compl. Ex. 12 at 6.  Under the terms of the agreement, Cyrus and GSO agreed to:

6

- Provide NSAS with a €100 million credit facility (the "Norwegian Securitization Facility" or "NSF"), the proceeds of which would be used to replace the SpareBank 1 Gruppen Finans AS Factoring Agreements and "for general corporate purposes (other than the repayment of any public debt)," Am. Compl. Ex. 12 at 6;[2]

- Purchase an additional €10 million in SSNs maturing in 2019 issued by NSAS;

- Issue a €20 million bridge loan to Norske ASA for the purchase of a power plant in New Zealand; and

- Purchase €15 million of Norske ASA's newly issued shares.

Am. Compl. ¶¶ 116-119 & Ex. 16 at 2410-12.

The Amended Complaint alleges that the NSF provided Defendants "a secured position in the Norske Enterprise while providing sufficient liquidity to pay the 2016 SUNs in their possession, to the detriment of" Norske ASA and its creditors. Am. Compl. ¶ 120. As an initial matter, this allegation is contradicted by the Amended Complaint's own exhibits, which make clear that any proceeds of the NSF were "*not* to be used [for] debt repayments." Am. Compl. Ex. 17 at 2 (emphasis added). To the contrary, the exhibits establish that "the proceeds of [the NSF] will be used . . . for general corporate purposes (*other than the repayment of any public debt*)." Am. Compl. Ex. 12 at 6 (emphasis added). In any event, the Amended Complaint does not allege any facts to support the conclusory allegation that the NSF was "to the detriment" of Norske ASA or any of its creditors. The NSF was a loan to NSAS, not to the parent, and granted security interests only in NSAS. Am. Compl. ¶ 116. If any NSF proceeds were used to pay the creditors of Norske ASA, then this would be to their *benefit*, not their "detriment."

---

[2] As established in the exhibits to the Amended Complaint, the new credit facility would "not [be] secured by . . . the assets that secure the Senior Secured Notes." Am. Compl. Ex. 1 at 42.

1.    *The Norske Board's Approval of the Second Restructuring*

The Amended Complaint does not and cannot allege that Norske's board of directors (the "Norske Board") failed to act in the best interest of the Company or otherwise breached any fiduciary duties when it engaged in the Second Restructuring.   To the contrary, the factual allegations show that the Norske Board believed the Second Restructuring was in the best interest of the Company because it provided the liquidity needed to continue operations and take advantage of expected improvements in growth.   Am. Compl. Ex. 16 at 2411 ("The Board considers it to be unrealistic to raise the required equity amount by end of Q1 2016 through a rights issue, and considers the Private Placement to be in the best interest of all shareholders."); Am. Compl. Ex. 12 at 5 ("We believe that the successful completion of the Exchange Offer and Consent Solicitations will protect value for all of our stakeholders and position us to take advantage of a cyclical improvement in the publication paper industry cycle.   The completion will also provide protection of the position of holders of the 2016 Notes and 2017 Notes."); *id.* at 7 ("A successful completion of the proposed equity and liquidity initiatives and the exchange offer to 2017 note holders would significantly improve cash balances and equity level for the group.   The contemplated transactions, if completed, would also directly enhance liquidity through reduced cash interest payments.").

There is no allegation that any member of the Norske Board engaged in self-dealing or was under any conflict of interest.   The Amended Complaint also establishes that, at all relevant times, the Norske Board relied in good faith on the advice of highly sophisticated and independent advisors, including Linklaters LLP, an international law firm, Advokatfirmaet Wiersholm AS, one of the largest law firms in Norway, and Houlihan Lokey, the international restructuring advisory firm.   Am. Compl. Ex. 1 at 363 of 364 & Ex. 2.

2.    *Allegations of Cyrus's "Control" and "Influence" Over the Second Restructuring*

The Amended Complaint contains vague, conclusory allegations that Defendants had "effective control over Norske" and had "significant influence over the Norske Board." Am. Compl. ¶¶ 4, 85. Plaintiff also asserts, again in conclusory fashion, that Defendants used their "position of influence and/or control over the Norske Board" to "push[] through the Second Restructuring." Am. Compl. ¶ 208. However, the Amended Complaint fails to provide any factual allegations to support these conclusory assertions. And the facts that the Amended Complaint does allege all establish the opposite: that Cyrus had no control over Norske ("effective" or otherwise); that the relevant transactions between Cyrus and the Company, including the Second Restructuring, were always at arms-length; and that the Norske Board acted independently at all times.

As the Amended Complaint admits, the Second Restructuring resulted from a "negotiation." Am. Compl. ¶ 85 ("At all relevant times, Defendants were significantly involved in the *negotiation* process [with Norske] . . . ."); *id.* ¶ 90 ("[T]he Norske Board engaged in restructuring *negotiations* with Defendants . . . ."); *id.* ¶ 101 ("reinstated restructuring *negotiations*"). Negotiations do not take place if one party has "control" over the other. Am. Compl. ¶ 5. Indeed, as the Amended Complaint and its exhibits establish, the Norske Board "halt[ed] . . . negotiations" with Defendants, considered "alternative proposals" from other creditors, and even attempted to pursue its own alternative exchange offer to address the nearing maturities on Norske ASA's unsecured notes. Am. Compl. ¶¶ 91, 95 & Ex. 1 at 34 of 364 & Ex. 9 at 2 (discussing "alternative proposal of the ad-hoc group."). These allegations foreclose any inference of "control" by Cyrus.

In any event, the factual allegations in the Amended Complaint show that Cyrus did not have holdings in Norske sufficient to control the Norske Board. There is also no allegation that Cyrus was, or ever became, a majority shareholder. When the Second Restructuring was approved by the Norske Board, Cyrus's holdings in the Company totaled only 3.3% of the outstanding shares. Am. Compl. ¶¶ 53, 127. Even when combined with GSO's holdings, the Defendants held only 13.89% of the Company's outstanding shares at this time. Am. Compl. ¶¶ 53, 60. And even after the Second Restructuring, Cyrus still held only 9.96% of the total outstanding shares. Am. Compl. ¶ 54.

Although Plaintiff contends that Cyrus "controlled" the Norske Board via directors it had "personally selected," these conclusory allegations are contradicted by the facts alleged in the Amended Complaint. Am. Compl. ¶ 41, 112. The Amended Complaint alleges that Cyrus proposed two board members, Ms. Joanne Owen and Mr. Nils Ingemud Hoff, to Norske's election and remuneration committee. Am. Compl. ¶ 98, 103-04. However, the exhibits to the Amended Complaint make clear that these directors were "unanimously" nominated by the election and remuneration committee of the *Norske* Board. Am. Compl. Ex. 7 at 1. Upon the committee's recommendation, a majority of the shares present at the January 6, 2016 general shareholder meeting duly elected the two directors to the Norske Board. Am. Compl. Ex. 9. Again, Cyrus was not a majority shareholder, and its alleged shareholding was insufficient to have elected these directors, even when combined with GSO's holdings at the time.[3]

---

[3] There were 93,988,214 shares present at the meeting and 84,982,686 shares voted in favor of appointing the two directors. Am. Compl. Ex. 9. To have a majority of shares present at the meeting, Cyrus would have to hold more than 46,994,107 shares (93,988,214 x .50). And, it would have to hold more than 42,491,343 shares (84,982,686 x .50) to have a majority of shares voting in favor of the new directors. But, according to the Amended Complaint, as of January 2016 Cyrus held only 6,200,000 shares, which constitutes a mere 7% of the shares voting in favor of the new directors. Am. Compl. ¶¶ 52-53. Even combined with GSO's shares, who

The Amended Complaint also admits that these directors were independent. Neither candidate was an employee of Cyrus or GSO: Owen was a partner at Proskauer Rose LLP, a law firm not retained by Cyrus or GSO, and Ingemund Hoff served as the chairman of the board of various companies, none of which are alleged to have any connection to the Defendants. Am. Compl. Ex. 8 at 7. And of course, even if they were "GSO/Cyrus Board Members," there were only two of them, on a six-person board. Am. Compl. Ex. 16 at 1. They had no ability to control any decisions of the Norske Board.

### D.    The Cyrus Sale

On March 18, 2016, Cyrus and GSO entered into an agreement, pursuant to which Cyrus sold all of its holdings in the 2016 SUNs to GSO at 68% of par value plus accrued interest. Am. Compl. ¶ 125. The Amended Complaint does not allege that this significant discount against face value was anything other than the prevailing market price at the time. This so-called "Cyrus Sale" between the Cyrus Defendants and the GSO Defendants is alleged to be just that: a sale of bonds between two creditors. There is no allegation that any Norske entity was party to the Cyrus Sale, that the transaction was contingent on Norske ASA taking any action, or that the Cyrus Sale affected the assets or liabilities of Norske ASA in any way.

### E.    The Upstreaming

The Amended Complaint focuses on an alleged "Upstreaming," which is defined as the alleged transfer of the NSF proceeds from NSAS to its parent, Norske ASA, sometime after the end of March 2016 and before June 2016. Am. Compl. ¶¶ 121-23. The Amended Complaint asserts that Cyrus and GSO "orchestrated the terms of the Second Restructuring, including the

---

allegedly also participated in "personally selecting" the directors, the Defendants did not have enough shares. As of January 2016, GSO held only 20,100,000 shares, bringing the total for both Defendants to 26,300,000 shares (20,100,000 + 6,200,000). Am. Compl. ¶¶ 59-60.

Upstreaming and Transfer, to benefit themselves to the detriment of [Norske ASA's] other creditors." Am. Compl. ¶ 124. However, the Amended Complaint admits that by the time of the alleged Upstreaming, Cyrus had already sold all of its 2016 SUNs to GSO. Am. Compl. ¶¶ 125, 134. The Amended Complaint fails to allege any facts suggesting that Cyrus participated in the transfer or that it controlled any decision to conduct the alleged transfer. The "Upstreaming" is alleged to have been a transfer solely between NSAS and Norske ASA. Am. Compl. ¶¶ 121-23.

### F.    The Transfer

According to the Amended Complaint, Norske ASA subsequently used the "upstreamed" funds to repay the 2016 SUNs at maturity in June 2016 (the "Transfer"). Am. Compl. ¶¶ 121, 123, 134. The Amended Complaint also alleges that Norske ASA repurchased GSO's 2016 SUNs in April 2016, prior to their maturity in June 2016 (the "GSO Transfer"). Am. Compl. ¶ 134. As admitted in the Amended Complaint, by the time of both the GSO Transfer and the Transfer, Cyrus had already sold all of its 2016 SUNs to GSO and was not involved in those transactions in any way. Am. Compl. ¶¶ 125, 134. Thus, there can be no plausible allegation that Cyrus received or otherwise "benefitted" from either the Transfer or the GSO Transfer.

### G.    The Norske Bankruptcy

On December 19, 2017, almost eighteen months after the events at issue in the Amended Complaint, Norske ASA filed for bankruptcy in a Norwegian court. Am. Compl. ¶ 146. There is no allegation that, at the time of the relevant transactions, this filing was anticipated. To the contrary, the Amended Complaint alleges a "Third Restructuring," and claims that "the failure of the Third Restructuring led to bankruptcy proceedings." Am. Compl. ¶ 143. There is also no allegation that NSAS, Norske ASA's subsidiary, ever filed for bankruptcy. The Amended Complaint admits that all outstanding shares of NSAS were sold prior to the Norske ASA bankruptcy, Am. Compl. ¶ 143, and it continues operating to this day.

On December 19, Tom Hugo Ottesen was appointed bankruptcy trustee (the "Trustee") of the Norske ASA estate.  Am. Compl. ¶ 148.  Mr. Ottesen was also appointed as trustee for Norske Skog Holding AS, Norske Treindustrier AS, Lysaker Invest AS, and Norske Skog Eiendom AS (the "Norwegian Subsidiaries"), which had also filed voluntary petitions in Norway.  Am. Compl. ¶¶ 147-48.

## PROCEDURAL BACKGROUND

On November 16, 2018, the Trustee filed a petition under Chapter 15 (the "Petition").  *See* Chapter 15 Petition for Recognition of a Foreign Proceeding, *In re Bankr. Estate of Norske Skogindustrier ASA*, No. 18-13571-smb (Nov. 16, 2018), ECF No. 1.  The Petition sought recognition of only the Norske ASA bankruptcy, not the voluntary petitions filed by any of the Norwegian Subsidiaries, and the Trustee purported to represent only the estate of Norske ASA. *See id.*  The Petition was premised on the Trustee's apparent belief that "Cyrus received approximately 31 Million EUR" from the repayment of the 2016 SUNs.  *Id.* at ¶¶ 34, 68.

On December 18, 2018, recognition was granted.  *See* Order Granting Recognition and Relief in Aid of a Foreign Main Proceeding, *In re Bankr. Estate of Norske Skogindustrier ASA*, No. 18-13571-smb (Dec. 12, 2018), ECF No. 12.  The same day, the Trustee filed a Complaint against Cyrus seeking avoidance under §§ 5-5 and 5-9 of the Norwegian Recovery Act.  ECF No. 1.  Like the Petition, the Complaint alleged that Cyrus "received approximately 31 Million EUR for full payment of the 2016 SUNs at face value."  Compl. ¶ 101.  Cyrus answered the Complaint, denying this allegation (among others), and the parties agreed to engage in limited discovery in order to determine whether any Cyrus Defendant owned the 2016 SUNs at maturity.  ECF No. 7. This first phase of discovery established that Cyrus did not hold any 2016 SUNs at maturity, that the Cyrus Defendants had sold their holdings in the 2016 SUNs to GSO in March 2016, and that Cyrus did not receive any payment from Norske ASA in connection with the 2016 SUNs.  *See*

13

Declaration of Duane L. Loft in Support of the Cyrus Defendants' Motion to Dismiss ("Loft Decl."), Ex. 1.

On September 6, 2019, nine months after filing the initial Complaint, Plaintiff filed its Amended Complaint.[4]  In the Amended Complaint, Plaintiff asserts claims under the Norwegian "analogue to United States intentional fraudulent transfer statutes," Am. Compl. ¶ 36, this time against both Cyrus and GSO, in addition to claims against both Defendants for violation of § 17-1 of the Public Liability Companies Act and for "unjust enrichment," Am. Compl. ¶¶ 197-214. Cyrus now moves to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012(b), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," in order to survive a motion to dismiss. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal citation omitted); *In re Trinsum Grp., Inc.*, 460 B.R. 379, 387 (Bankr. S.D.N.Y. 2011) (applying *Iqbal*).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Although the Court is required to accept Plaintiff's factual allegations as true, it is not "bound to accept as true legal conclusions couched as factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 554 (S.D.N.Y. 2018) ("[A] pleading that merely recites conclusory allegations . . . fails to state a claim.") (citing *Iqbal*, 556 U.S. at 678)).

---

[4] In these nine months, Plaintiff requested multiple extensions of its deadline to file an Amended Complaint.  *See* Stipulation and Order June 5, 2019 (ECF No. 9); Stipulation and Order, June 19, 2019 (ECF No. 11); Stipulation and Order, July 13, 2019 (ECF No. 12).

On a motion to dismiss, a court may consider documents referenced in the complaint and documents that the plaintiff relied on in bringing suit. *In re Hydrogen, L.L.C.*, 431 B.R. 337, 345 (Bankr. S.D.N.Y. 2010). Where the complaint cites or quotes excerpts of a document, the court may consider other parts of the same document on a motion to dismiss. *U.S. Bank Nat'l As'n v. PHL Variable Ins. Co.*, No. 12 Civ. 6811 (CM) (JCF), 2014 U.S. Dist. LEXIS 35616, at *9 (S.D.N.Y. Mar. 14, 2014).

## ARGUMENT

### I.   A CHOICE OF LAW ANALYSIS REQUIRES DISMISSAL OF PLAINTIFF'S INTENTIONAL FRAUDULENT TRANSFER CLAIM.

Count Three of the Amended Complaint asserts an avoidance claim against Cyrus under § 5-9 of the Norwegian Recovery Act. This provision of foreign law is alleged to be the "analogue to United States intentional fraudulent transfer statutes." Am. Compl. ¶ 36. However, the claim is not asserted under any law of the United States. It is asserted only under Norwegian law, and this is fatal to Count Three of the Amended Complaint. Based on the allegations in the Amended Complaint, New York law would apply to Plaintiff's fraudulent transfer claim, and Plaintiff does not (because it cannot) assert such a claim.

As the law of the forum state, New York's choice of law rules determine which substantive law applies to Plaintiff's claims. *See Geron v. Seyfarth Shaw LLP (In re Thelen LLP),* 736 F.3d 213, 219 (2d Cir.2013) ("[W]here no significant federal policy, calling for the imposition of a federal conflicts rule, exists, a bankruptcy court must apply the choice of law rules of the forum state." (alteration in original) (citations and internal quotation marks omitted)). For fraudulent transfer claims, New York courts apply the "interest" test, which applies the law of the jurisdiction that has the "greatest interest in regulating the behavior." *Drenis v. Haligannis,* 452 F.Supp.2d 418, 427 (S.D.N.Y.2006) (characterizing fraudulent conveyance laws as conduct-regulating laws

subject to New York's choice of law rules' "interest analysis").  As the Second Circuit has recognized, "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectation of the parties who relied [on the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'"  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 739 F.3d 45, 50–51 (2d Cir.2013).  Thus, for fraudulent conveyance claims, "the location of injury does not control; instead, it is the location of the defendant's conduct that controls."  *Lyman Commerce Solutions, Inc. v. Lung,* No. 12–cv–4398 (TPG), 2014 WL 476307, at *3 (S.D.N.Y. Feb. 6, 2014).

Here, the location of Cyrus's conduct is explicitly alleged to be New York:

" . . . all or substantially all actions, correspondence, activity, decision making, contracting, investment, accounting directions and flow of funds directions, correspondence, contact and email and substantially all commercial activity by the Cyrus Funds and GSO Funds was executed, directed, effected, ordered and facilitated by their investment managers, *from New York.* . . all or substantially all of the Defendants' conduct and action concerning the Norske Skogindustrier investments and loans, including interactions with Norske Skogindustrier, their receipt of knowledge concerning the Norske Enterprise's financial condition, and their knowing, insider receipt of fraudulent and preferential payouts under Norwegian law occurred, or was *carried out from New York, New York.*"  Am. Compl. ¶¶ 30-31 (emphasis added).

These allegations, which must be accepted as true for present purposes, conclusively establish that New York would have a superior interest in regulating conduct alleged to have taken place within its borders.

Because the choice of law analysis would necessarily result in the application of New York law, Plaintiff's fraudulent transfer claim must be dismissed.  If a complaint pleads a claim under a substantive law that does not apply to the case, then that claim must be dismissed.  *In re Hellas Telecommunications (Luxembourg) II SCA*, 524 B.R. 488, 521 (Bankr. S.D.N.Y.) (dismissing fraudulent transfer claims asserted under a law that the court found did not apply upon a choice of law analysis).  The Amended Complaint has not asserted an intentional fraudulent transfer claim

under New York law. Accordingly, Plaintiff's attempt to assert that claim under foreign law must

be dismissed. And even if the Chapter 15 representative were to assert a fraudulent transfer claim

under New York law, that attempt would fail because "[u]nlike a bankruptcy trustee, the Foreign

Representative cannot bring avoidance claims on behalf of other creditors under bankruptcy or

state fraudulent transfer laws." *See In re Glitnir banki hf.*, No. 08-14757 (SMB), 2011 WL

3652764, at *7 n.17 (Bankr. S.D.N.Y. Aug. 19, 2011).

## II. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM OF INTENTIONAL FRAUDULENT TRANSFER.

 Even if Plaintiff's fraudulent transfer claim were considered on the merits, the Amended

Complaint would fail to state a claim. Accompanying this Motion is the declaration of Knut Ro

("Ro Declaration"), a partner at Ro Sommernes Advokatfirma DA in Oslo, Norway, a former

deputy judge, and member of the Falkanger Committee, which revised the Norwegian Bankruptcy

Act in 1993. Ro Decl. ¶¶ 1-2. As explained in the Ro Declaration, Norwegian law permits a court

to set aside certain pre-bankruptcy transactions entered into by a debtor that harmed the debtor's

estate or its creditors. Ro Decl. ¶¶ 18-26. One such provision is § 5-9 of the Norwegian Recovery

Act, which provides as follows:

> "[t]ransactions that in an improper way favor one creditor at the expense of
> others, or prevent the debtor's assets from being used to pay creditors, or
> increase the debtor's debt to their detriment, can be avoided if the debtor's
> financial position was weak or was seriously weakened by the transaction, and
> the other party knew or should have known of the debtor's difficult financial
> situation and the circumstances that made the transaction improper."

Ro Decl. ¶ 19.

 Like United States intentional fraudulent transfer claims, to which § 5-9 is alleged to be an

"analogue," Norwegian law requires evidence of bad faith. Ro Decl. ¶¶ 18-19 (by focusing on

transactions that "improperly gave preference," § 5-9 requires evidence of the subjective bad faith

of the defendant) *id.* at ¶ 29; *see* N.Y. DCL § 276; *Ray v. Ray*, No. 18 CIV 7035 (GBD), 2019 WL

1649981, at *11 (S.D.N.Y. Mar. 28, 2019) (granting motion to dismiss § 276 claim because plaintiff "failed to allege actual intent to defraud").[5] Section 5-9 is also similar to U.S. law in other important respects. *First*, under Norwegian law, "the 'debtor' is the company under insolvency proceedings, not any of its parents, subsidiaries, or affiliates." Ro Decl. ¶ 23. Allegations that a debtor's subsidiary or affiliate was injured as a result of the challenged transaction are insufficient to state a claim under § 5-9. Ro Decl. ¶¶ 23-24. *Second*, because § 5-9 requires loss to the estate, the transfer or sale of bonds between creditors "cannot constitute a violation of § 5-9, since transfer of claims from one creditor to another creditor will not inflict any loss on the estate." Ro Decl. ¶ 25. *Third*, a debtor may claw back the proceeds of an allegedly improper transaction only from a defendant that was party to that transaction. Ro Decl. ¶ 26 ("This follows from the language of § 5-9, which permits the bankruptcy estate to avoid the transaction and claw back the proceeds from the 'other party.'")

Against these basic legal principles, the Amended Complaint fails to state a claim. In its claims against Cyrus, Plaintiff alleges that the following three transactions violated § 5-9:

---

[5] If Plaintiff were to disavow its express allegation of "intentional fraudulent transfer," and argue that it need not plead intent, then Plaintiff's claim would be preempted by 11 U.S.C. § 546(e), which precludes claims of constructive fraudulent transfer based on "a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial participant . . . in connection with a securities contract." 11 U.S.C. § 546(e); *see also In re Tribune Co. Fraudulent Conveyance Litig*., 818 F.3d 98, 124 (2d Cir. 2016) (holding that 546(e) barred trustee from asserting constructive fraudulent conveyance claims); *In re Lancelot Inv'rs Fund, L.P*., 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012), *aff'd sub nom. Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013) (granting summary judgment in favor of financial participant defendants where plaintiffs' constructive fraudulent claims were barred by 546(e)). Here, the transfer Plaintiff seeks to avoid is the Cyrus Sale, in which one financial participant, Cyrus, made a settlement payment to another financial participant, GSO, in connection with a securities contract, namely the sale of the 2016 SUNs. This is precisely the type of transfer covered by § 546(e)'s safe harbor provision and Plaintiff is not permitted to seek avoidance, except on a theory of intentional fraudulent transfer.

1.   The "Cyrus Sale," which the Amended Complaint defines as a March 18, 2016 transaction in which the Cyrus Defendants "sold substantially all of their interests in the 2016 SUNs" to the GSO Defendants, Am. Compl. ¶ 125;

2.   The "Upstreaming," which the Amended Complaint defines as a transaction in which NSAS allegedly transferred, "directly or indirectly," €100 million to its parent, Norske ASA, Am. Compl. ¶¶ 116, 121; and

3.   The "Transfer," which the Amended Complaint defines as the June 2016 repayment of Norske's obligation on the 2016 SUNs,  Am. Compl. ¶ 123.

As established below, the Amended Complaint does not and cannot possibly state a claim based on these alleged transactions under any applicable law.

**A.    The Amended Complaint Fails to Plead Intent.**

The Amended Complaint is utterly devoid of factual allegations that the Cyrus Defendants acted with the requisite subjective bad faith or intent, let alone allegations that would meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b), made applicable here by Rule 7009 of the Federal Rules of Bankruptcy Procedure.  *Sharp Int'l Corp. v. State St. Bank & Trust Co.,* 403 F.3d 43, 56 (2d Cir. 2005) (intentional fraudulent transfer claims must be pleaded with particularity).   Under New York law, plaintiff must "allege facts that give rise to a strong inference of intent."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).   At a minimum, a complaint must plead "badges of fraud" sufficient to give rise to an "inference of intent," such as "the lack or inadequacy of consideration"; "the family, friendship or close associate relationship between the parties"; or "the financial condition of the party sought to be charged both before and after the transaction in question."  *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809

(Bankr. S.D.N.Y. 2005).   The Amended Complaint alleges no facts that give rise to such an

inference.

*First*, the Amended Complaint fails to allege any facts suggesting that Cyrus acted with

fraudulent intent or subjective bad faith in connection with the Cyrus Sale.   The Amended

Complaint does not, and cannot, allege that the Cyrus Sale lacked adequate consideration.   To the

contrary, Cyrus sold the 2016 SUNs for 68% of their par value, and there is no allegation that this

was anything other than the prevailing market price at the time.   Am. Compl. ¶ 125.   There is also

no allegation that Cyrus or GSO had any "friendship or close associate relationship."   Rather, the

Amended Complaint admits that these are two separate entities that operated independently at all

relevant times.   Am. Compl. ¶¶ 8-27.

*Second*, the Amended Complaint does not, and cannot, allege that Cyrus acted with

fraudulent intent in connection with the alleged "Upstreaming."   Am. Compl. ¶ 121.   Cyrus is not

even alleged as a party to the Upstreaming.   And the parties that are alleged to have conducted the

Upstreaming – NSAS and Norske ASA – are not alleged to have acted with fraudulent intent.   *Id.*

*Third*, the "Transfer" is not alleged to have been carried out with fraudulent intent.   Am.

Compl. ¶ 121.   Again, the Amended Complaint pleads nothing about Cyrus's intent, given that

Cyrus was not a recipient of the Transfer.   Nor does the Amended Complaint allege any fraudulent

intent on behalf of Norske ASA in connection with the Transfer.   Am. Compl. ¶ 121.   The Transfer

is alleged as the repayment, to non-insiders, of Norske ASA's existing liability under the June

2016 SUNs.   As this Court has recognized, "[p]ast consideration is good consideration.   An

'antecedent debt' satisfies the requirement of fair consideration and reasonably equivalent value,

and putting aside transfers to insiders, the payment of an existing liability is not fraudulent."   *In re*

*Trace Int'l Holdings, Inc.*, 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003), *vacated on other grounds*, No. 04 CIV. 1295 (KMW), 2009 WL 1810112 (S.D.N.Y. June 25, 2009).

### B.   The Amended Complaint Fails to State a Fraudulent Transfer Claim Based on the Cyrus Sale.

Even putting aside the issue of intent, the Cyrus Sale cannot be a "fraudulent transfer" because it was not even a transaction with the Debtor, let alone a transfer from the Debtor.   As explained in the Ro Declaration, under Norwegian law, a transfer of bonds between two creditors "cannot constitute a violation of § 5-9, since transfers of claims from one creditor to another creditor will not inflict any loss on the estate."   Ro Decl. ¶ 25.   The same would be true under New York law, which requires that the challenged transfer must have been made *by the debtor*.   *See In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 675 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) (New York's fraudulent transfer laws "avoid transactions which have the purpose or effect of removing property from a debtor's estate which should properly be used to repay creditors."); *see also In re King Ctr. Corp.*, 573 B.R. 384, 399 (Bankr. E.D.N.Y. 2017) ("To avoid the transfer of the Property as constructively fraudulent under NY DCL Sections 273 and 274, [debtor] must allege an element that is common to both grounds for relief — that it made the Conveyance.").

The Cyrus Sale is not and cannot be alleged to have had any impact on the Debtor.   It did not increase any liability of the Debtor.   It did not impose any new liability.   It simply was a sale between two third-parties of the Company's existing bonds.   Such a transaction cannot form the basis of a fraudulent transfer claim under any applicable law.   *See In re King Ctr. Corp.*, 573 B.R. at 400 (denying constructive fraudulent transfer claims where transfer was not made by the debtor).

**C.      The Amended Complaint Fails to State a Fraudulent Transfer Claim Based on the Upstreaming.**

The "Upstreaming" – an alleged transfer from NSAS to Norske ASA – cannot support a fraudulent transfer claim for the simple reason that Cyrus was not a party to that alleged transaction.  Am. Compl. ¶ 121.  Norwegian law allows recovery under § 5-9 only against the "other party" to the alleged fraudulent transfer.  If the defendant was not a party to the alleged transfer, then the defendant cannot be liable for any damages under Norwegian law.  Ro Decl. ¶¶ 26, 33.  Similarly, New York fraudulent transfer law imposes liability only on alleged "transferees."  *See Villoldo v. BNP Paribas S.A.*, 2015 WL 13145807, at *3 (S.D.N.Y. July 21, 2015), *aff'd,* 648 F. App'x 53 (2d Cir. 2016); *see also Roselink Inv'rs, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 226 (S.D.N.Y. 2004).  Here, Cyrus is not alleged to be a party or transferee of the Upstreaming.  As alleged in Amended Complaint, the only parties to the Upstreaming were NSAS and Norske ASA, with Norske ASA as the only alleged transferee.  Am. Compl. ¶ 121.

The Amended Complaint also does not allege that Cyrus was a subsequent transferee of any proceeds from the alleged Upstreaming.  The Amended Complaint alleges that proceeds of the Upstreaming were used to redeem certain 2016 SUNs in April 2016 and eventually to repay the remainder at maturity in June 2016.  Am. Compl. ¶¶ 121, 123, 130.  However, Cyrus did not hold the 2016 SUNs at either of those times.  As admitted in the Amended Complaint, Cyrus sold its holdings in the 2016 SUNs on March 18, 2016.  Am. Compl. ¶ 125.

Finally, any fraudulent transfer claim based on the Upstreaming fails for the additional reason that the Upstreaming is not alleged to have harmed Norske ASA or its creditors. The Ro Declaration explains that to support a claim under Norwegian law, the Upstreaming must have harmed the debtor, Norske ASA, either by increasing its liabilities, preventing its assets from being used to repay its own creditors, or preferring one set of Norske ASA's creditors over the other

Norske ASA creditors.  Ro Decl. ¶¶ 31-32.  Under Norwegian law, "the debtor" is the "company under insolvency proceedings, not any of its parents, subsidiaries, or affiliates."  Ro Decl. ¶ 23. Similarly, under New York law, Plaintiff must allege that the debtor transferred its own property to the detriment of the creditors of the debtor.  *See In re Churchill Mortg. Inv. Corp.,* 256 B.R. at 675.

Here, the Amended Complaint fails to allege any facts suggesting that the Upstreaming was in any way detrimental to Norske ASA or its creditors.  As alleged, it was a transfer *to*, not from, Norske ASA.  Am. Compl. ¶ 121.  The Amended Complaint alleges that the Upstreaming was done "[o]ver the objection" of certain secured creditors of NSAS.  *Id.*  But, as the Ro Declaration points out, any alleged harm to the creditors of NSAS is "irrelevant" and cannot form the basis of a claim under Norwegian law because NSAS is not the debtor.  Ro Decl. ¶ 23.  The same is true under New York law.  *See In re Churchill Mortg. Inv. Corp.*, 256 B.R. at 675.

### D.    Amended Complaint Fails to State a Fraudulent Transfer Claim Based on the Transfer.

Finally, the alleged "Transfer" – the repayment of the 2016 SUNs – cannot support a fraudulent transfer claim against Cyrus because Cyrus is not alleged to have been a party to, or recipient of, the Transfer.  Am. Compl. ¶ 121.  Again, the Cyrus Defendants no longer held the 2016 SUNs when those securities were repaid by Norske ASA in June 2016 (the alleged "Transfer").  As admitted in the Amended Complaint, Cyrus sold all of its 2016 SUNs to GSO under the Cyrus Sale months prior, in March 2016.  Am. Compl. ¶ 125.  Because Plaintiff does not and cannot allege that Cyrus was a party to the Transfer or received any proceeds of the Transfer, Plaintiff may not seek avoidance of the Transfer from Cyrus under any applicable fraudulent transfer law.  *See* Ro Decl. ¶¶ 35-36; *Villoldo*, 2015 WL 13145807, at *3 (dismissing

fraudulent conveyance claims where complaint did not establish that defendants were beneficiaries of challenged transactions).

### E.    The Cyrus Sale, the Upstreaming, and the Transfer Cannot Be Collapsed.

The Amended Complaint alleges, in conclusory fashion, that the Upstreaming and Transfer "includes" the Cyrus Sale. Am. Compl. ¶ 183. However, the Amended Complaint offers no facts that would support such a conclusion. Under Norwegian law, transactions that involve different companies and occur independently of one another will not be collapsed. Ro Decl. ¶¶ 37-38. Similarly, under New York law, courts will not collapse multiple transactions, unless they "comprise a single integrated scheme" and the defendants had "actual or constructive knowledge of the entire scheme." *See In re Sunbeam Corp.*, 284 B.R. 355, 370-71 (Bankr. S.D.N.Y. 2002).

Here, the Amended Complaint fails to allege facts establishing that the Cyrus Sale, the Upstreaming, and the Transfer were "part of a single scheme." There is no allegation that the Cyrus Sale was linked to, or in any way dependent upon, the Upstreaming or the Transfer. The Amended Complaint attaches the agreement executed in connection with the Cyrus Sale, and it contains no mention of the Upstreaming or the Transfer. Am. Compl. Ex 14. As alleged in the Amended Complaint, the Upstreaming and Transfer took place months after the Cyrus Sale. The Upstreaming and Transfer are alleged as independent decisions of the Norske Board, without any involvement by Cyrus. Am. Compl. Ex. 18 at 2424. Indeed, there is no allegation that Norske even knew of the Cyrus Sale when it decided to undertake the Upstreaming and Transfer.[6]

The Amended Complaint also does not allege facts suggesting that the Cyrus Defendants had knowledge of the "entire scheme" when they entered into the Cyrus Sale. *In re Sunbeam,* 284

---

[6] Given that Plaintiff's initial Complaint mistakenly named the Cyrus Defendants as the recipients of the Transfer, it would appear that Norske had no previous knowledge of the Cyrus Sale.

B.R. at 370-71.  Again, the Cyrus Sale was executed on March 18, 2016, months before any alleged "Transfer."  Am. Compl. ¶¶ 121, 123, 125.  The Amended Complaint baldly asserts – "on information and belief" – that, at the time of the Cyrus Sale, Defendants "knew that the Norske Enterprise would raise sufficient liquidity to redeem the 2016 SUNs."  Am. Compl. ¶ 128.  But it is not plausible to infer that two creditors somehow could see the future – that they could know the state of Norske's liquidity months later, and somehow predict the results of decisions that were up to the Norske Board, not Cyrus or GSO.  The Amended Complaint offers no factual allegations that would make this notion in any way plausible.

## III.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER § 17-1 OF NORWAY'S PUBLIC LIMITED LIABILITY COMPANIES ACT.

Count Four of the Amended Complaint asserts violations of § 17-1 of the Norwegian Public Limited Liability Companies Act.  The statute provides that:

> "(1) The company, shareholders or others may hold the CEO, board member, member of the corporate assembly, independent expert, investigator or shareholder liable for any damage which they, in said capacity, intentionally or negligently have caused such a party.
>
> (2) The company, shareholders or others may also hold a party who, intentionally or negligently, has contributed to damage as mentioned in the first subsection, liable for the damage. Damages can be claimed from the contributor even though the person who caused the damage cannot be held liable because he or she did not act with intent or negligence."

Ro Decl. ¶ 45.  The first paragraph of § 17-1 applies only to defendants acting in their "capacity" as "the CEO, board member, member of the corporate assembly, independent expert, investigator or shareholder."  *Id.*  When it is asserted against defendants in their capacity as shareholder, § 17-1(1) liability can arise only through "active use of the shareholder's powers at the general meeting."  Ro Decl. ¶ 46.  The second paragraph of § 17-1 creates "aiding and abetting" liability.  Ro Decl. ¶ 47.  As under New York law, to state a claim for aiding and abetting corporate malfeasance, a plaintiff must allege an underlying decision by a corporate fiduciary that was

"somehow against the best interest of the company."  *Id.*; *Kolbeck v. LIT Am., Inc*., 939 F. Supp.

240, 245 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) (to state a claim for aiding and

abetting breach of fiduciary duty, plaintiff must first establish that the primary violation, a breach

of fiduciary duty, occurred).  Finally, to state a claim under § 17-1, "the estate bringing the action"

must show that it "incurred damages as a result of the challenged transaction."  Ro Decl. ¶ 55.

Plaintiff claims that Cyrus violated § 17-1 by "orchestrating" the Second Restructuring.

Am. Compl.  ¶ 201.  The Second Restructuring was allegedly comprised of an exchange offer

between Norske ASA and the holders of its 2017 SUNs (the March 2016 Exchange Offer); an NSF

transaction in which NSAS received a €100 million credit facility (the NSF) from Cyrus and GSO;

issuance by NSAS of an additional €10 million of 2019 SSNs; a €20 million bridge loan from

Cyrus and GSO to Norske ASA for the purchase of a power plant in New Zealand; and the issuance

of €15 million shares by Norske ASA.  Am. Compl. ¶ 112, 116, 119.  As discussed below, the

Amended Complaint does not state a claim under either section of § 17-1 or under any New York

law equivalent.

## A.    The Amended Complaint Fails to State a Claim Under § 17-1(1).

As explained in the Ro Declaration, Cyrus cannot be liable under paragraph one of § 17-1.

Ro Decl. ¶¶ 50-55.  The Amended Complaint points to the financing agreement dated March 18,

2016, as evidence of Cyrus's involvement in the Second Restructuring. [7]   Am. Compl. ¶ 101 &

Ex. 12 at 41 of 54.  However, the Amended Complaint does not allege that Cyrus executed this

agreement in its capacity as a "CEO, board member, member of the corporate assembly,

independent expert, investigator, or shareholder" as required under § 17-1(1).  Rather, the

---

[7] Under Norwegian law, Plaintiff is not permitted to assert a claim under § 17-1 based on the
Cyrus Sale, the Upstreaming, or the Transfer because those are the basis of the claim under § 5-
9.  If a § 5-9 claim is asserted, § 17-1 cannot be asserted based on the same conduct.  Ro Decl. ¶
44.

allegations in the Amended Complaint establish that Cyrus negotiated and entered into the financing agreement in its capacity as a *creditor* of Norske.  Am. Compl. Ex. 3 ("Norske Skog has for a period discussed possible terms for a refinancing transaction for upcoming bond maturities with two material holders of its 2016 and 2017 bonds."); Am. Compl. Ex. 1 at 33 of 364 ("[W]e engaged in discussions with certain material holders of the 2016 Notes and the 2017 Notes (GSO and Cyrus) . . . .").  Section 17-1(1) does not apply to creditors.  Ro Decl. ¶ 46.

Although it contains allegations about Cyrus's "shareholding" in Norske, the Amended Complaint does not allege that the Second Restructuring was the result of any action by Cyrus in its capacity as shareholder, let alone any action at a general meeting.  Am. Compl. ¶¶ 50-51.  Ro Decl. ¶¶ 50-52.  According to the Amended Complaint, it was the Norske Board that decided to undertake the Second Restructuring.  Am. Compl. ¶ 127 ("[T]he Norske Board formally passed the resolution to issue the NSF, and the other secured debt instruments in connection with the Second Restructuring.").  And even if a relevant shareholder meeting were alleged, the Amended Complaint does not establish that Cyrus had the requisite number of shares to "effectuate any decisions at such a meeting."  Ro Decl. ¶ 52.  When the final version of the Second Restructuring was announced on March 18, 2016, Cyrus only held 3.3% of the shares outstanding at the time.  Am. Compl. ¶ 52.

Finally, Plaintiff's conclusory allegations with respect to Cyrus and GSO's alleged "influence" over the Norske Board do not establish a claim.  Am. Compl. ¶¶ 4, 85, 208.  The factual allegations in the Amended Complaint show that Cyrus and GSO merely suggested certain board candidates to Norske's remuneration and compensation committee, but that this board committee "unanimously" nominated the directors to the Norske Board.  Am. Compl. Ex. 7 at 1.  These directors were then duly elected by approximately 90% of the outstanding shares at the

27

Norske shareholder meeting on January 6, 2016.[8]  As explained in the Ro Declaration, these facts

cannot support a claim against the Cyrus Defendants under § 17-1(1).  Ro Decl. ¶ 54.  Similarly,

any claim under New York law based on Cyrus's capacity as a shareholder would fail because

Cyrus would not be deemed a "controlling shareholder" based on the facts alleged.  *See Sager*

*Spuck Statewide Supply Co. Inc. v. Meyer*, 710 N.Y.S.2d 429, 433 (2000) (denying breach of

fiduciary duty claim against shareholder who did not participate in the "control and management"

of the company).

> **B.**      **The Amended Complaint Fails to State a Claim Under § 17-1(2).**

The second paragraph of § 17-1 imposes liability on parties that "contributed" to an action

that was against the best interests of the company.  Ro Decl. ¶¶ 45, 47.  The provision, as the Ro

Declaration explains, is meant to cover "aiding and abetting."  Ro Decl. ¶ 47.  As under New York

law, there can be no liability for aiding and abetting a decision that allegedly harmed a company,

without an allegation that the underlying decision-maker acted against the best interests of the

company.  Ro Decl. ¶¶ 47, 56-57; *Kolbeck*, 939 F. Supp. at 245.

The Amended Complaint makes no such allegation.  To the contrary, the facts alleged in

the Amended Complaint uniformly suggest that the Norske Board believed in good faith that the

Second Restructuring was in the best interests of Norske ASA.[9]  For example, in the announcement

---

[8] As explained above, Cyrus did not hold a majority of the shares present at the meeting.  *See supra* at note 5.

[9] To the extent Plaintiff were to recast its allegations as asserting bad faith or wrongdoing by the Norske Board, such a claim would be precluded by the *Wagoner* Rule.  Under the *Wagoner* Rule, a bankruptcy estate lacks standing to sue a third party for conspiring with corporate management to defraud the corporation.  This is based on "the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation."  *See In re Grumman Olson Industries, Inc*., 329 B.R. 411, 423-24 (Bankr. S.D.N.Y. 2005).  Thus, a trustee, which "stands in the shoes of the corporation," is prohibited from suing to "recover for a wrong he himself essentially took part in."  *Id.* (dismissing a claim for aiding and abetting a breach of fiduciary duties by the company's president and CEO); *see*

of the Second Restructuring attached to the Amended Complaint, the Company is quoted as

follows:

> We believe that the successful completion of the Exchange Offer and Consent
> Solicitations will protect value for all of our stakeholders and position us to take
> advantage of a cyclical improvement in the publication paper industry cycle . . . A
> successful completion of the proposed equity and liquidity initiatives and the
> exchange offer to 2017 note holders would significantly improve cash balances and
> equity level for the group. The contemplated transactions, if completed, would also
> directly enhance liquidity through reduced cash interest payments.

Am. Compl. Ex. 12 at 5, 7.

The Amended Complaint offers nothing to suggest that this belief was unfounded.  To the

contrary, the Amended Complaint attaches financial projections from March 2016 stating that "the

market balance for newsprint and magazine paper in Europe [was] continuing to improve, . . .

prices for publication paper in Europe ha[d] improved year-to-date from the level experienced in

2H2015," and "[t]he growth initiatives announced last year [were] expected to start to contribute

to gross operating earnings this year and [were] expected to reach full run-rate within a timeframe

of 3-4 years."  Am. Compl. Ex. 12 at 6-7.

The Amended Complaint does not allege that any member of the Norske Board breached

a fiduciary duty in arriving at these conclusions.  There is no allegation of a failure of due care or

loyalty, no allegation of any conflict of interest, and no alleged self-dealing.  To the contrary, all

negotiation of the Second Restructuring is described as just that: a "negotiation," and one that was

at arms-length at all relevant times.  Am. Compl. ¶¶ 85, 90, 93, 95, 101.  The Norske Board also

was advised by Linklaters LLP, Advokatfirmaet Wiersholm AS, and Houlihan Lokey, all highly

reputable and experienced legal counsel and advisors.  Am. Compl. Ex. 1 at 34, 363 of 364 & Ex.

---

*also In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997) (holding that entity standing in the
shoes of corporate debtor could not bring claim for aiding and abetting breach of fiduciary duty
against third party).

2.  The Amended Complaint establishes that the Norske Board acted independently:  It is alleged to have rejected proposals by GSO and Cyrus, considered alternative proposals from an ad hoc group of SSN holders, and even attempted its own debt exchange.  Am. Compl. ¶¶ 91, 101; Am. Compl. Ex. 1 at 34 of 364 & Ex. 9 at 2 (discussing "alternative proposal of the ad-hoc group."). In short, there is not and cannot be any claim that the Norske Board breached any fiduciary duty.

In the absence of any allegation that the Norske Board failed to act in the best interests of the Company, the Amended Complaint fails to state a claim for aiding and abetting.  Ro Decl. ¶¶ 56-61; *Kolbeck*, 939 F. Supp. 240.

### C.   Any Claim Under § 17-1 Fails for the Additional Reason that the Debtor Is Not Alleged to Have Suffered Any Harm.

The Amended Complaint also fails to allege that, as a result of the Second Restructuring, Norske ASA was harmed in some way.  As explained in the Ro Declaration, this is an essential element of any claim under § 17-1.  Ro Decl. ¶ 55.  None of the transactions comprising the Second Restructuring are alleged to have been detrimental to Norske ASA.  There is no allegation that Norske ASA was harmed in any way by the exchange of the 2017 SUNs, receipt of the €20 million bridge loan, or issuance of €15 million of shares to Cyrus and GSO.  To the contrary, the Amended Complaint alleges that these transactions actually benefitted Norske ASA by infusing cash into the Company and enabling it to avoid default under the 2017 SUNs.  Am. Compl. ¶ 119 & Ex. 12 at 7 ("A successful completion of the proposed equity and liquidity initiatives and the exchange offer to 2017 note holders would significantly improve cash balances and equity level for the group. The contemplated transactions, if completed, would also directly enhance liquidity through reduced cash interest payments.").  The other aspects of the Second Restructuring, the NSF and the issuance of €10 million in SSNs, involved *NSAS*, not Norske ASA.  Under Norwegian law,

any allegation that these transactions resulted in harm to NSAS would be disregarded under
Norwegian law because NSAS is not the plaintiff in this action. Ro Decl. ¶ 55.

## IV.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT.

Plaintiff's unjust enrichment claim is governed by Norwegian law under the "center of
gravity" choice of law analysis. *Margel v. E.G.L. Gem Lab Ltd.*, No. 04 CIV.1514 (PACHBP),
2010 WL 445192, at *7 (S.D.N.Y. Feb. 8, 2010) (applying "center of gravity" test to plaintiff's
unjust enrichment claim). The "center of gravity" analysis looks at the "place of contracting," "the
place of negotiation and performance," and the "location of the subject matter." *Id.* Under this
analysis, Norwegian law applies to Plaintiff's unjust enrichment claim because it is based on a
financing agreement that was negotiated and performed in Norway. Am. Compl. ¶ 212 & Ex. 16
at 2409. The counterparty to that agreement was Norske ASA, a Norwegian company. Ex. 16 at
2409. And Norway is the location of the subject matter and performance of the agreement – *i.e.*,
the financing of Norske ASA and NSAS. Am. Compl. ¶¶ 90, 95, 114-19. As such, Norway is the
"center of gravity" of Plaintiff's unjust enrichment claim.

The claim for "unjust enrichment" fails for the simple reason that "unjust enrichment" does
not exist as a cognizable legal theory under Norwegian law. In Count Six, the Amended Complaint
alleges that "[t]he Cyrus Defendants would be unjustly enriched at the expense of Plaintiff if they
were permitted to receive full benefit of the Second Restructuring, including the proceeds of the
Cyrus Sale." Am. Compl. ¶ 210. But Norwegian law does not recognize such a theory of relief
in the absence of a violation of one of the statutory provisions discussed above. Ro Decl. ¶¶ 62-
64. Accordingly, the claim for unjust enrichment should be dismissed on this basis alone.

Even if New York law were to apply, the claim still would fail. To state a claim for unjust
enrichment under New York, a plaintiff must allege facts plausibly establishing that "(1) the other

31

party was enriched, (2) at that [plaintiff]'s expense, and (3) that it is against equity and good conscience to permit the unjustly enriched party to retain what is sought to be recovered." *In re Stillwater Asset Backed Offshore Fund Ltd.*, 559 B.R. 563, 624 (Bankr. S.D.N.Y. 2016). A complaint must allege facts establishing each element of the claim, rather than rely on mere legal conclusions. *Trinsum*, 460 B.R. at 395–96. Here, the Amended Complaint fails to meet this pleading burden.

*First*, there is no plausible allegation that the alleged "benefit of the Second Restructuring, including the proceeds of the Cyrus Sale," constituted some form of "enrichment" of Cyrus. The "proceeds of the Cyrus Sale" consisted of 68% of the bonds' par value plus accrued interest, and there is no allegation that this was anything other than the prevailing market price of the bonds at the time of the transaction. Am. Compl. ¶ 125. Despite reference to the "benefit of the Second Restructuring," the transactions comprising the Second Restructuring are not alleged to have "enriched" Cyrus. Am. Compl. ¶ 210. Cyrus provided a €100 million loan to NSAS and €20 million bridge loan to Norske ASA in exchange for additional securities and security interests in the companies, and purchased €15 million of newly-issued shares in Norske ASA. Am. Compl. ¶ 119. The Amended Complaint does not allege that these transactions were somehow an unfair exchange or that they resulted in Norske ASA receiving less than reasonably equivalent value. To the contrary, Norske ASA had the express ability to "shop" the new loans to other lenders and failed to obtain more favorable terms from any alternative counterparty. Am. Compl. ¶¶ 93, 95, 101 & Ex. 9 at 2 & Ex. 1 at 34 of 364.

*Second*, even if there were some benefit to Cyrus, the Amended Complaint does not show how this could have come at Plaintiff's "expense." Again, the Plaintiff here is the Bankruptcy Estate of Norske ASA. Am. Compl. ¶ 7. As described above, Norske ASA was not involved in

the Cyrus Sale in any way.  Am. Compl. ¶ 125.  The transaction's only effect – to transfer the 2016

SUNs from Cyrus to GSO – cannot constitute a detriment to Norske ASA.  And, as described

above, the Second Restructuring is not alleged to have caused any detriment to Norske ASA.  *See*

*supra* at pp. 7-9.  Any alleged detriment to other entities in the Norske Enterprise, such as NSAS,

is irrelevant, as those entities are not the Plaintiff in this matter.

Finally, Plaintiff's unjust enrichment claim is precluded because the Cyrus Sale and the

Second Restructuring are governed by contracts.  Unjust enrichment is unavailable "[w]here the

parties executed a valid and enforceable written contract governing" the subject matter of the

claim.  *In re Tronox Inc.*, 429 B.R. 73, 108-09 (Bankr. S.D.N.Y. 2010); *see also Stillwater,* 559

B.R. at 623–24 (dismissing unjust enrichment claims where challenged transfers were governed

by contracts).  The Amended Complaint admits that the Cyrus Sale was governed by contract, and

indeed attaches a copy of the relevant agreement "evidencing the Cyrus Sale."  Am. Compl. ¶ 125

& Ex. 14.  And the exhibits to the Amended Complaint establish that the Second Restructuring

was governed by a "financing agreement" among "GSO and Cyrus and the Parent."  Ex. 12 at 6.

Where, as here, "the Amended Complaint makes clear that all of the challenged transfers were

governed by written agreements, [Plaintiff]'s remedies must lie in fraudulent transfer claims or

other theories, and not in claims alleging unjust enrichment."[10]  *Stillwater,* 559 B.R. at 24

(emphasis added).

---

[10] As explained in fn. 5, *supra*, § 546(e) is a bar to claims based on the alleged Cyrus Sale and
this would apply equally to Plaintiff's unjust enrichment claim.  If the Court determines that the
Plaintiff's claim under Count Three can proceed without alleging actual fraudulent intent, then
Plaintiff's unjust enrichment claim must also fail because it is seeks to recover the "same
payments . . . held . . . unavoidable under § 546(e)," namely the "proceeds of the Cyrus Sale."
*AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012).

## **CONCLUSION**

For the foregoing reasons, the Cyrus Defendants respectfully request that the Court dismiss

Plaintiff's claims against the Cyrus Defendants with prejudice.

Dated: December 13, 2019
New York, NY

By:  /s/ Duane L. Loft
  Duane L. Loft (dloft@bsfllp.com)
  Anastasia Cembrovska
   (acembrovska@bsfllp.com)
  BOIES SCHILLER FLEXNER LLP
  55 Hudson Yards
  New York, New York 10001
  Telephone:  (212) 909-7606
  Facsimile:  (212) 446-2350

  *Attorneys for the Cyrus Defendants*