**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | FOR PUBLICATION |
| THE BANKRUPTCY ESTATE OF NORSKE SKOGINDUSTRIER ASA, | Chapter 15 |
| Debtor in a Foreign Proceeding. | Case No. 18-13571 (MG) |
| THE BANKRUPTCY ESTATE OF NORSKE SKOGINDUSTRIER ASA, | |
| Plaintiff, | |
| vs. | Adv. Pro. No. 18-01846 (MG) |
| CYRUS CAPITAL PARTNERS, L.P., *et al.* | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**

*A P P E A R A N C E S:*

HOLLAND & KNIGHT LLP
*Attorneys for the Bankruptcy Estate of Norske Skogindustrier ASA*
31 W 52nd Street
12th Floor
New York, New York 10019
By:    Warren E. Gluck, Esq.

          -and-

150 North Riverside Plaza
Suite 2700
Chicago, Illinois 60606
By:    Richard A. Bixter, Jr., Esq.

BOIES SCHILLER FLEXNER LLP
*Attorneys for the Cyrus Defendants*
55 Hudson Yards
New York, New York 10001
By:     Anastasia Cembrovska, Esq.
        Duane L. Loft, Esq.

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
*Attorneys for the GSO Defendants*
7 Times Square
28th Floor
New York, New York 10036
By:     Anne E. Beaumont, Esq.
        Andrew Englander, Esq.
        Eric Seiler, Esq.

## Table of Contents

I.   BACKGROUND ...............................................................................................................4

    A.   PROCEDURAL BACKGROUND ...................................................................................5

        1.   *The Norwegian Bankruptcy* ...............................................................................5

        2.   *The Chapter 15 Proceeding* ...............................................................................5

        3.   *The Adversary Proceeding* ...............................................................................6

    B.   FACTUAL BACKGROUND ...........................................................................................6

        1.   *The First Restructuring* ...............................................................................7

        2.   *The Defendants' Positions in the Norske Enterprise Following the First Restructuring* ...........................8

        3.   *The Second Restructuring* ...............................................................................9

        4.   *The "Upstreaming and Transfer" and the Defendants' Positions in the Norske Enterprise Following the Second Restructuring* ...............................................................................12

II.   STANDARD OF REVIEW ...............................................................................................14

III.   CHOICE OF LAW ...............................................................................................17

    A.   APPLICABLE CHOICE OF LAW RULES ...................................................................................18

    B.   THE ALLEGED CONDUCT ...........................................................................................21

    C.   THE INTERNAL AFFAIRS DOCTRINE ...................................................................................23

    D.   CONCLUSION ...........................................................................................24

IV.   TIMELINESS ...............................................................................................25

    A.   THE PLAINTIFF'S AVOIDANCE CLAIMS ARE TIMELY UNDER SECTION 108(A) OF THE BANKRUPTCY CODE ..25

    B.   THE PLAINTIFF'S SECTION 17-1 CLAIMS ARE TIMELY ...........................................................30

    C.   EVEN IF SECTION 108 DID NOT APPLY TO THE AVOIDANCE CLAIMS, THE TIMELINESS OF THE AVOIDANCE CLAIMS UNDER THE RECOVERY ACT PRESENTS A DISPUTED ISSUE OF FACT THAT PRECLUDES GRANTING DISMISSAL ...........................................................31

        1.   *Section 5-15* ...........................................................................32

        2.   *Relation Back* ...........................................................................37

V.      THE RECOVERY ACT CLAIMS ...........................................................................40

  A.    SECTION 5-9 LEGAL STANDARD..........................................................................40

    1.    Improper Transaction..............................................................................41

    2.    Intentional Fraud and Rule 9(b).............................................................42

  B.    THE PLAINTIFF FAILS TO ADEQUATELY PLEAD A SECTION 5-9 CLAIM AGAINST GSO .................................44

    1.    The 5-9 Claim Against GSO Does Not Meet the Pleading Requirements of Rule 9(b) ...........44

    2.    Whether the Plaintiff Has Sufficiently Alleged the Elements of Section 5-9...........47

    3.    Conclusion .............................................................................................50

  C.    THE PLAINTIFF FAILS TO ADEQUATELY PLEAD A SECTION 5-9 CLAIM AGAINST CYRUS .................50

  D.    THE FAC PROPERLY PLEADS A SECTION 5-5 CLAIM AGAINST GSO .................................51

    1.    Payment of a Debt ..................................................................................52

    2.    Ordinary/Non-Ordinary Payments..........................................................54

    3.    Related Party .........................................................................................55

VI.     THE SECTION 546(E) SAFE HARBOR.............................................................56

  A.    THE REQUIREMENTS OF SECTION 546(E) ...........................................................58

    1.    Qualifying Transaction...........................................................................58

    2.    Qualifying Participant.............................................................................59

    3.    The Qualifying Transaction Is Made by or to (or for the Benefit of) a Qualifying Participant................59

  B.    THE SAFE HARBOR IN THE CONTEXT OF A MOTION TO DISMISS ...........................60

  C.    THE EXCEPTION ................................................................................................62

VII.    THE COMPANIES ACT CLAIM .......................................................................68

  A.    SECTION 17-1 LEGAL STANDARD.......................................................................68

    1.    Section 17-1(1) – Primary Liability........................................................69

    2.    Section 17-1(2) – Secondary Liability ....................................................70

    3.    Preemption .............................................................................................71

  B.    THE PLAINTIFF ADEQUATELY STATES A SECTION 17-1 CLAIM AGAINST THE DEFENDANTS .................72

    1.    The Plaintiff States a Claim Under Section 17-1(1) ...............................75

iv

   *2. The Plaintiff States a Claim Under 17-1(2)* ............................................................. 75

   *3. The Plaintiff is Permitted to Allege Damages Generally* ...................................... 76

**VIII. UNJUST ENRICHMENT UNDER NORWEGIAN LAW** ....................................................**78**

 A. Norwegian Caselaw ....................................................................................................... 79

 B. Legal Scholarship ........................................................................................................... 81

 C. Conclusion ........................................................................................................................ 82

**IX. CONCLUSION** ........................................................................................................................**83**

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding arises out of alleged fraudulent transfers totaling over 30 million euros from Norske Skogindustrier ASA ("Norske Skogindustrier," "Norske ASA," or the "Debtor"), a Norwegian limited liability company, to the Defendants (defined below). Specifically, the Defendants allegedly pressured Norske ASA to effectuate a scheme that included Norske ASA repurchasing notes held by the Defendants and that, by doing so, Norske ASA and other creditors of Norske ASA were harmed.[1]  The Bankruptcy Estate of Norske ASA (the "Estate" or the "Plaintiff") seeks avoidance of the alleged fraudulent transfers, damages for the Defendants' alleged violations of Norwegian statutory and non-statutory law, and damages under a theory of unjust enrichment.

Pending before the Court are two motions to dismiss the FAC.  The first is the motion of defendants Crescent I, L.P., CRS Master Fund, L.P., Cyrus Capital Partners, L.P., Cyrus Opportunities Master Fund II, Ltd., and Cyrus Select Opportunities Master Fund, Ltd. (collectively, the "Cyrus Defendants" or "Cyrus").  ("Cyrus Motion," ECF Doc. # 27.)  The Cyrus Motion is supported, *inter alia*, by a memorandum of law (the "Cyrus Memo," ECF Doc. # 45) and the declaration of Knut Ro ("Ro"), the Cyrus Defendants' Norwegian law expert ("Ro Decl.," ECF Doc. # 47).  The second is the motion of defendants GSO Aiguille Des Grands Montets Fund I LP, GSO Aiguille Des Grands Montets Fund II LP, GSO Aiguille Des Grands Montets Fund III LP, GSO Cactus Credit Opportunities Fund (Cayman) LP, GSO Capital Partners LP, GSO Churchill Partners LP, GSO Coastline Credit Partners (Cayman) LP, GSO Credit Alpha Trading (Cayman) LP, GSO Credit-A Partners (Cayman) LP, GSO Oasis Credit

---

[1]    The operative complaint (the "First Amended Complaint" or "FAC," ECF Doc. # 42) is not entirely clear whether Norske ASA or the "Norske Enterprise" (which is defined below and includes Norske ASA and its subsidiaries and affiliates) was harmed by the transactions in question.

1

Partners (Cayman) LP, GSO Palmetto Opportunistic Investment Partners (Cayman) LP, GSO

Special Situations Master Fund LP, and Steamboat Credit Opportunities Master Fund LP

(collectively, "GSO" or the "GSO Defendants" and, with the Cyrus Defendants, the

"Defendants," and, with the Plaintiff, the "Parties"). ("GSO Motion," ECF Doc. # 32, and, with

the Cyrus Motion, the "Motions.") The GSO Motion is supported, *inter alia*, by a memorandum

of law (the "GSO Memo," ECF Doc. # 32-1) and the declaration of Kristoffer Aasebø

("Aasebø"), the GSO Defendants' Norwegian law expert ("Aasebø Decl.," ECF Doc. # 32-2).

The Motions seek dismissal of the FAC, filed on January 30, 2020,[2] which asserts the

following five counts:

- Count I: avoidance action under the Norwegian Recovery Act of 8 June 1984 No.
  59 (the "Recovery Act") § 5-9 ("Section 5-9") against the GSO Defendants and
  John Does 1-100 (FAC ¶¶ 152–67);

- Count II: avoidance action under Recovery Act § 5-5 ("Section 5-5") against the
  GSO Defendants and John Does 1-100 (*id.* ¶¶ 168–80);

- Count III: avoidance action under Section 5-9 against the Cyrus Defendants (*id.*
  ¶¶ 181–96);

- Count IV: a claim for damages under the Norwegian Public Limited Liability
  Companies Act of 13 June 1997 (the "Companies Act") § 17-1 ("Section 17-1")
  and similar "Norwegian non-statutory law" against the Defendants (*id.* ¶¶ 197–
  205); and

---

[2]    The FAC was originally filed on September 6, 2019 (ECF Doc. # 13); however, certain exhibits to the FAC
were filed under seal at that time and were later filed in unredacted form. This opinion refers to the later-filed
version of the FAC that includes unredacted exhibits, filed on ECF on January 30, 2020 at ECF Doc. # 42. For
purposes of analyzing the Defendants' timeliness defenses, September 6, 2019, remains the relevant date of filing
for the FAC.

- Count V (pled in the alternative): unjust enrichment, against the Defendants (*id.*
  ¶¶ 206–14).

The FAC and the Motions raise issues of choice of law, timeliness, sufficiency of the pleadings, and the applicability of the section 546(e) safe harbor and section 561(d).

The Plaintiff filed an opposition brief to the Motions (the "Opposition," ECF Doc. # 51), as well as the declaration of Egil Horstad (the "Horstad Decl.," ECF Doc. # 50). The GSO Defendants filed a reply memorandum of law. ("GSO Reply," ECF Doc. # 53.) The GSO Reply is supported by the reply declaration of Kristoffer Aasebø. ("Aasebø Reply," ECF Doc. # 54.) The Cyrus Defendants filed a reply in support of their motion to dismiss. ("Cyrus Reply," ECF Doc. # 55.) The Cyrus Reply is supported by the supplemental declaration of Knut Ro. ("Ro Supplement," ECF Doc. # 56.)

On December 10, 2020, this adversary proceeding and the chapter 15 case were reassigned to me. Thereafter, the Cyrus Defendants filed a notice of the motion and refiled the Cyrus Memo and the Ro Declaration. (ECF Doc. ## 66, 67, 69.) The Plaintiff filed a supplemental opposition brief (the "Supplemental Opposition," ECF Doc. # 71) and the Defendants filed a joint supplemental memorandum of law (the "Supplemental Memorandum," ECF Doc. # 72) in support of their Motions; both the Supplemental Opposition and the Supplemental Memorandum address a recent decision in *Fairfield Sentry Limited v. Theodoor GGC Amsterdam (In re Fairfield Sentry Limited)*, Adv. Proc. No. 10-03496 (SMB), 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020), *reconsideration denied*, No. 10-13164 (SMB), 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021). The Parties also filed extensive exhibits. (ECF Doc. # 79 (the "Estate Exhibits"); ECF Doc. # 94 (the "GSO Exhibits"); ECF Doc. ## 95 & 96 (the "Cyrus Exhibits").)

3

Shortly before the scheduled February 3 hearing, an issue arose of a potential conflict involving Plaintiff's Norwegian law expert, Egil Horstad; the hearing was adjourned to allow the Plaintiff to replace its Norwegian law expert. The Plaintiff then withdrew the Horstad Declaration and submitted the declaration of Bjørn Åge Hamre ("Hamre"). ("Hamre Decl.," ECF Doc. # 90.) The Defendants' experts then provided supplemental declarations responding to the Hamre Declaration. ("Second Ro Supplement," ECF Doc. # 92; "Aasebø Supplement," ECF Doc. # 93.)

On March 24, 2021, the Court held a hearing on the Motions (the "Hearing"). After nearly eight hours of cross examination of expert witnesses and argument by the Parties, the Court took the matter under submission.

For the reasons discussed below, the Court **GRANTS** the Motions in part as to Counts I, III, and V, and **DISMISSES** those counts.[3] The Court **DENIES** the Motions in part as to Counts II and IV. The Court **GRANTS** the Plaintiff leave to amend the complaint within 21 days of the filing of this opinion.

## I.    <u>BACKGROUND</u>

This case has a substantial and complex factual and procedural history with relevant events occurring in at least four different countries and proceedings taking place before several different judges and courts. The facts below are taken from the FAC and are accepted as true for the purpose of resolving the Motions.

---

[3]       As the Court concludes that Norwegian law applies to the unjust enrichment claim, Count V is dismissed without prejudice to the extent it is asserted under New York law, and the Plaintiff may reassert the claim should the Court later determine that New York law applies. At this stage, the Court's choice of law analysis is performed in light of what has been alleged. Accordingly, the Court's choice of law determination is limited only to its evaluation of the Motions, and the Court reserves final decision regarding the applicable law.

To the extent Count V is asserted under Norwegian law, Count V is dismissed with prejudice, as the Court concludes that a standalone claim for unjust enrichment does not currently exist under Norwegian law.

### A. Procedural Background

#### 1. The Norwegian Bankruptcy

On December 19, 2017 (the "Norwegian Petition Date"), the Norske ASA board of directors (the "Norske Board") filed a voluntary petition in Norway (the "Norwegian Petition") on behalf of Norske ASA. (FAC ¶ 146.) The Estate is a Norwegian bankruptcy estate under the supervision of the Oslo County Court, Case No. 17-198212KON-OBYF/1 (the "Norwegian Bankruptcy"). (*Id.* ¶ 7.) Tom Hugo Ottesen (the "Trustee" or the "Foreign Representative") was appointed bankruptcy trustee of the Estate. (*Id.* ¶ 148.) On December 20, 2017, four of Norske ASA's Norwegian subsidiaries also filed voluntary petitions for liquidation. (*Id.* ¶ 147.) Those subsidiaries are: (1) Norske Skog Holding AS ("NSH"), (2) Norske Treindustrier AS ("NTAS"), (3) Lysaker Invest AS, and (4) Norske Skog Eiendom AS. (*Id.*) On the Norwegian Petition Date, Norske ASA listed approximately €924 million in liabilities and €287 million in assets, with the majority of those assets being "pledged intra-group receivables." (*Id.* ¶ 149.)

#### 2. The Chapter 15 Proceeding

On November 16, 2018 (the "Chapter 15 Petition Date"), the Trustee, in his capacity as foreign representative of the Debtor, filed a chapter 15 petition for recognition of the foreign proceeding. ("Chapter 15 Petition," Case No. 18-13571, ECF Doc. # 1.) The chapter 15 case was originally assigned to Judge Stuart M. Bernstein, who granted recognition of the Norwegian Bankruptcy as a foreign main proceeding on December 18, 2018. ("Recognition Order," Case No. 18-13571, ECF Doc. # 12.) On December 10, 2020, the chapter 15 case and this adversary proceeding were reassigned to me. ("Notice of Case Reassignment," Case No. 18-13571, ECF Doc. # 17; Adv. Proc. No. 18-10846, ECF Doc. # 62.)

5

3.  <u>The Adversary Proceeding</u>

On December 18, 2018, the same date that recognition was granted, the Plaintiff filed this

adversary proceeding against the Defendants.  ("Original Complaint," ECF Doc. # 1.)  On

September 6, 2019, the Debtor filed the FAC.  (ECF Doc. # 13.)

**B.  Factual Background**

Norske ASA is a Norwegian limited liability company and was the parent entity of

"various paper production subsidiaries," comprising "one of the largest producers of newsprint

and magazine paper in the world."  (FAC ¶¶ 37–38.)  The FAC refers to Norske ASA and its

subsidiaries collectively as the "Norske Enterprise."  The Norske Enterprise consists of several

tiers of subsidiaries, including NTAS, NSH, Norske Skog AS ("NSAS"), and various local

operating entities (the "Norske Business Units"), which operated paper mills primarily in Europe

and Australia.  (*Id.* ¶ 39.)  As noted above, NTAS and NSH also filed bankruptcy petitions in

Norway.  (*Id.* ¶ 147.)  The following chart depicts the structure of the Norske Enterprise:



(*Id.* ¶ 40.)  Before commencement of the Norwegian Bankruptcy, financing and operational

decision-making for the Norske Enterprise was at the direction of the Norske Board.  (*Id.* ¶ 41.)

6

Due to decreasing demands for paper products, the Norske Enterprise has "faced extraordinarily poor financial performance." (*Id.* ¶¶ 42–43.)

        1.   <u>The First Restructuring</u>

The Norske Enterprise experienced financial distress as early as 2012, and in February 2015 it underwent a series of refinancing transactions (the "First Restructuring"). (*Id.* ¶¶ 42, 45, 66.) Before the First Restructuring, the Norske Enterprise was financed by "certain minor factoring facilities" and subordinated unsecured notes (the "SUNs") issued by Norske ASA. (*Id.* ¶ 67.) The SUNs were due to mature in 2015, 2016, 2017, and 2033. (*Id.*) The First Restructuring involved an exchange offer (the "First Exchange Offer") whereby SUN holders were given an opportunity to exchange SUNs "for a less than nominal value consideration consisting partly of (i) new unsecured debt instruments structurally senior to the SUNs and (ii) cash." (*Id.* ¶ 68.) These new, structurally senior instruments (the "Prior Exchange Notes" or the "PENs") were issued by NSH and were set to mature in 2021 and 2023. (*Id.* ¶¶ 69–70.) The PENs were guaranteed by Norske ASA and NTAS and had subordinated guarantees from NSAS and other Norske Enterprise entities. (*Id.* ¶ 71.) The PENs were senior to the SUNs but junior to the newly created SSNs (defined below). (*Id.* ¶ 72.)

The First Restructuring also involved the issuance by NSAS of €290 million in new 2019 senior secured notes (the "SSNs"), some of the proceeds of which satisfied cash payments to SUN holders participating in the First Exchange Offer. (*Id.* ¶¶ 74–75.) NSAS was created as part of the First Restructuring, and it "acquired—with the remaining cash from the SSNs— Norske Skogindustrier's ownership interests in the Norske Business Units." (*Id.* ¶ 76.) The SSNs were secured by the share capital of certain Norske Enterprise operating companies, as well as by the assets of Norske ASA, NSH, and NSAS, and they were guaranteed by Norske ASA, NSH, and certain operating companies. (*Id.* ¶¶ 78–79.) Thus, both the PENs and the

7

SSNs were guaranteed by Norske ASA and certain other Norske Enterprise entities; the FAC

refers to these guarantees collectively with respect to the PENs and the SSNs as the "Guarantee

Obligations." (*Id.* ¶ 80.) Following the First Restructuring, the Norske Enterprise had three

classes of debt securities: SUNs, PENs, and SSNs (listed in increasing seniority). (*Id.*)

> 2. <u>The Defendants' Positions in the Norske Enterprise Following the First
> Restructuring</u>

Following the First Restructuring, the Cyrus Defendants were invested in every level of

the Norske Enterprise capital structure. (*Id.* ¶¶ 47–54.) As of February 2016, the Cyrus

Defendants held 2016 SUNs with a face value of €31.69 million and 2017 SUNs with a face

value of €1.05 million. (*Id.* ¶ 48.) The Cyrus Defendants also held newly issued SSNs with a

face value of €17.9 million and €30.71 million in PENs. (*Id.* ¶¶ 50–51.) In addition to their debt

position, the Cyrus Defendants held 6.2 million shares (3.3%) of Norske ASA's equity as of

December 2015, with that number increasing to 25.2 million shares (9.96%) by March 2016. (*Id.*

¶¶ 52, 54.)

The GSO Defendants were also invested at the SUN, SSN, and equity levels, although

they did not hold any PENs as of February 2016. (*Id.* ¶¶ 55–61.) As of February 2016, the GSO

Defendants held 2016 SUNs with a face value of €11.864 million, 2017 SUNs with a face value

of €148.567 million, 2033 SUNs with a face value of €2.00 million, and 2019 SSNs with a face

value of €35.4 million. (*Id.* ¶¶ 56, 58.) The GSO Defendants held 20.1 million Norske ASA

shares (10.59%) as of December 2015, with that number increasing to 64.5 million shares

(25.47%) as of March 2016. (*Id.* ¶¶ 59, 61.)

In December 2015, the GSO Defendants and the Cyrus Defendants were the largest and

second-largest shareholders of Norske ASA, respectively, and remained so through at least

March 2016.  (*Id.* ¶¶ 52, 54, 59, 61.)  As of March 2016, the third-largest shareholder of Norske

ASA held 2.84% of the outstanding shares.  (*Id.* ¶ 54.)

The Plaintiff also alleges that, in addition to their direct investments in the Norske

Enterprise, the Defendants were invested indirectly in the Norske Enterprise through credit

default swaps ("CDS").  (*Id.* ¶ 62.)  The Plaintiff alleges that the Defendants were sellers of CDS

protection, such that a default by Norske ASA on the 2016 SUNs would harm not just the

Defendants' direct investment in the 2016 SUNs but would also leave the Defendants liable to

their CDS counterparties for any such default.  (*Id.* ¶ 63.)  The Plaintiff alleges that the

"Defendants orchestrated the Second Restructuring to avoid a large payout to its CDS

counterparties if the Norske Enterprise defaulted on the 2016 SUNs, while at the same time

receiving a payout on these junior debt obligations."  (*Id.* ¶ 64.)  The Parties have not provided

evidence showing the extent of the Defendants' CDS exposure.

### 3.  The Second Restructuring

Following the First Restructuring, it became apparent that the Norske Enterprise was still

in a precarious position and would not be able "to cover the upcoming maturities of the 2015,

2016[,] and 2017 SUNs."  (*Id.* ¶ 81.)  In the summer of 2015, the Norske Board began working

on a second set of restructuring transactions (the "Second Restructuring").  (*Id.* ¶ 84.)  GSO and

Cyrus were the Norske Enterprise's two largest creditors and were highly involved in the

negotiation process for the Second Restructuring.  (*Id.* ¶ 85.)  The Second Restructuring went

through two initial failed exchange offer iterations, finally culminating in a third and final

"March 2016 Exchange Offer" (defined below).  (*Id.* ¶¶ 81–120.)

#### a.  *November 2015 Exchange Offer*

On November 17, 2015, the Norske Board offered an exchange of outstanding SUNs for

new unsecured notes due in June 2019 and June 2026 (the "November 2015 Exchange Offer").

(*Id.* ¶ 93.)  The Plaintiff alleges that the Defendants refused to support the November 2015

Exchange Offer as it would have left them exposed to liability with respect to their alleged CDS

interests.  (*Id.* ¶ 94.)  The November 2015 Exchange Offer failed to generate sufficient interest

and its deadline was pushed back from December 11, 2015, to January 12, 2016.  (*Id.* ¶ 95.)

While the November 2015 Exchange Offer was pending, the Defendants increased their equity

positions in Norske ASA to become its two largest shareholders.  (*Id.* ¶ 96.)  On December 7,

2015, the Defendants submitted a letter to Norske ASA calling for an "extraordinary general

meeting" of the Norske Board for three purposes: (1) removal and replacement of three Norske

Board members, (2) "[a]mendment of composition of the election committee," and (3)

presentation of the Defendants' financing proposal.  (*Id.* ¶¶ 98–99; FAC, Ex. 5, ECF Doc. # 42-1

at 387–89.)  On December 22, 2015, the Defendants and Norske ASA entered into a

restructuring support agreement, pursuant to which Norske ASA agreed to terminate the

November 2015 Exchange Offer.  (FAC ¶ 101.)

> ### b.  *January 2016 Exchange Offer*

With the November 2015 Exchange Offer terminated, the Debtor sought to engage in a

new exchange offer (the "January 2016 Exchange Offer"), "which offered materially improved

terms to the holders of [2016 and 2017 SUNs], at the expense of the holders of remaining SUNs

and the Guarantee Obligations."  (*Id.*)  According to the Plaintiff, the January 2016 Exchange

Offer would allow holders of 2016 and 2017 SUNs to exchange their holdings for secured notes

maturing in 2019, violating the SSN indenture.  (*Id.* ¶ 102.)

On January 6, 2016, two new members were elected to the Norske Board—Ms. Joanne

Owen ("Owen") and Mr. Nils Ingemund Hoff ("Hoff," and together with Owen, the "Cyrus/GSO

Board Members").[4]  (*Id.* ¶¶ 103–05.)  At the time of their election, Owen was a partner with

DLA Piper and Hoff was a consultant and CFO of Bergen Group ASA.  (FAC, Ex. 7, ECF Doc.

# 42-2 at 7–8.)  The Plaintiff alleges that the Defendants sought this change in board composition

to "elevate the interests of holders of the SUNs, with an attendant decrease in their CDS

exposure."  (*Id.* ¶ 106.)

      The January 2016 Exchange Offer and Second Restructuring faced resistance from an *ad*

*hoc* group of creditors holding more than 50 percent of the SSNs (the "Secured Ad-Hoc Group"),

"who recognized that the Defendants were attempting to obtain a superior position to the SSNs

and the PENs holders by . . . exchanging the structurally junior [SUNs] for secured debt

instruments."  (*Id.* ¶ 109.)  The Secured Ad-Hoc Group sent letters to the Norske Board arguing

against the January 2016 Exchange Offer and, acting through Citibank, N.A. ("Citibank"), as

indenture trustee, sought to enjoin consummation of the January 2016 Exchange Offer in the

United States District Court for the Southern District of New York (the "Citibank Action").  (*Id.*

¶¶ 110–11; *see Citibank, N.A. v. Norske Skogindustrier ASA*, No. 16-cv-850 (RJS), 2016 WL

1052888 (S.D.N.Y. Mar. 8, 2016) (denying motion to enjoin January 2016 Exchange Offer).)

      *c.  March 2016 Exchange Offer and Consummation of Second Restructuring*

      In the wake of the Citibank Action, the January 2016 Exchange Offer was abandoned in

favor of a new offer (the "March 2016 Exchange Offer").  (FAC ¶¶ 112–13.)  The March 2016

Exchange Offer proposed an exchange of 2017 SUNs for a package that included (1) 47% 2026

SUNs, (2) 36% perpetual notes maturing in 2115, and (3) 17% par value write-off.  (*Id.* ¶ 114.)

---

[4]      The term "Cyrus/GSO Board Members" is a defined term that both the Plaintiff and the Defendants use.
While the control exerted by the Defendants over the Norske Board or any of its individual members remains a
disputed issue of fact that the Court need not resolve at this stage, the defined term "Cyrus/GSO Board Members"
will be used for the sake of convenience and clarity to refer to Owen and Hoff.

This solution did not deal with the soon-to-mature 2016 SUNs. Thus, as part of the Second Restructuring, the 2016 SUNs would "be refinanced by borrowing money from the Cyrus and GSO Defendants by issuing various secured debt instruments, senior to the SSNs and PENs." (*Id.* ¶ 115.) To that end, the Second Restructuring involved the issuance by NSAS (which had also issued the SSNs as part of the First Restructuring) to the Defendants of a new Norwegian Securitization Facility bond (the "NSF") for €110 million,[5] secured by inventory, receivables and bank accounts of certain Norske Business Units. (*Id.* ¶¶ 116–17.) The NSF was "senior both to the SSNs and PENs for all practical matters, as well as the SUNs." (*Id.* ¶ 118.) The Second Restructuring involved three transactions in addition to the NSF: (1) €10 million issued under the SSN indenture maturing in 2016, (2) €20 million bridge loan in connection with sale of a power plant, and (3) issuance of share capital in Norske ASA for €15 million. (*Id.* ¶ 119.) According to the Plaintiff, the NSF allowed the Defendants to accomplish the goals of the January 2016 Exchange Offer. (*Id.* ¶ 120.)

    4.   The "Upstreaming and Transfer" and the Defendants' Positions in the Norske Enterprise Following the Second Restructuring

The Plaintiff alleges that the cash proceeds of the NSF (approximately €100 million) were "upstreamed, either directly or indirectly," to Norske ASA to repay the 2016 SUNs; the FAC defines this as the "Upstreaming and Transfer." (*Id.* ¶ 121.)

On March 18, 2016, the Cyrus Defendants agreed to sell substantially all of their interests in 2016 SUNs to the GSO Defendants at 68% of par value plus accrued interest (the "Cyrus Sale"). (*Id.* ¶ 125; FAC, Ex. 14, ECF Doc. # 42-3 at 18.) The Cyrus Sale occurred on the same day that the Norske Board resolved to issue the NSF. (FAC ¶ 127.) The Plaintiff alleges that the

---

[5]    The FAC states that the NSF was issued for €100 million; however, the March 2016 Exchange Offer indicates that the amount was €110 million. (FAC, Ex. 12 at 6; *see also* GSO Memo at 13.)

Defendants "knew that the Norske Enterprise would raise sufficient liquidity to redeem the 2016 SUNs, and that the Norske Board was determined to do so." (*Id.* ¶ 128.)

The Plaintiff alleges that, "[o]n April 11, 2016, the Norske Board, now acting under the direct influence of the Defendants, resolved . . . to begin repurchasing 2016 SUNs in the market." (*Id.* ¶ 130.) On April 13, 2016, a GSO executive emailed a Norske Enterprise executive to discuss the language that would be used in a public announcement relating to the purchase of the 2016 SUNs. (*Id.* ¶ 131.) The Plaintiff highlights additional communications between the GSO Defendants and the Norske Enterprise relating to the settlement date (the "Settlement Date") for the transfer of 2016 SUNs from the Cyrus Defendants to the GSO Defendants. (*Id.* ¶¶ 132–33.)

The Plaintiff further alleges the occurrence of the "GSO Transfer," a term the Plaintiff defines parenthetically in paragraph 134 of the FAC as follows:

> Contemporaneously with the Settlement Date, a broker acting at the direction of the GSO Defendants caused Norske Skogindustrier to buy back the 2016 SUNs at par value plus accrued interest, for an amount of approximately EUR 30 Million, to the detriment of Norske Skogindustrier's other creditors (the "GSO Transfer").

(*Id.* ¶ 134.)[6]

As of June 15, 2016, Norske ASA had paid off or purchased approximately €108 million in 2016 SUNs. (*Id.* ¶ 123.) The Plaintiff alleges that the purchases were done "with full knowledge that such transfers would severely deteriorate [Norske ASA's] financial condition, and leave the Norske Enterprise with no realistic chance to repay the SSNs and the [PENs] at

---

[6]    It appears ambiguous whether the term "GSO Transfer" encompasses only an alleged Norske-broker transaction or an alleged Norske-broker-GSO transaction. In addition, the FAC often refers to multiple "GSO Transfers" (*id.* ¶¶ 136, 137, 154, 162, 173, 191, 201, 202), without explanation for why the defined term is in the singular, while several references are in the plural. These ambiguities are noted in this opinion where relevant, and the Plaintiff must clarify these ambiguities upon repleading.

13

maturity." (*Id.*)  The Plaintiff further alleges that the "use of the NSF funds to pay the GSO

Defendants and the other holders of the 2016 SUNs left Norske Skogindustrier and its

subsidiaries with insufficient cash to continue operations in the long term." (*Id.* ¶ 139.)  In June

2017, the Norske Enterprise defaulted on a €17 million SSN interest payment.  (*Id.* ¶ 140.)

Attempts at a third restructuring failed, leading to Norske ASA's bankruptcy cases, enforcement

of the SSN holders' security interests, and a forced sale of all outstanding NSAS shares (the

"Forced Sale").  (*Id.* ¶¶ 141–43.)  According to the Plaintiff, "[t]he purchase price in connection

with the Forced Sale was approx. EUR 231 million and assumption of secured liabilities of EUR

180 million, including the NSF." (*Id.* ¶ 144.)  The Forced Sale proceeds failed to provide full

recovery for the SSN holders, and the PEN holders and remaining SUN holders have received no

recovery.  (*Id.* ¶ 145.)

## II.    <u>STANDARD OF REVIEW</u>

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, made applicable here by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a

complaint must allege "enough facts to state a claim for relief that is *plausible* on its face."

*Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis in original)

(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Courts use a two-prong approach when considering a motion to dismiss.  *Pension Benefit*

*Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that the

motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo working

principles'" (quoting *Iqbal*, 556 U.S. at 678–79)); *McHale v. Citibank, N.A. (In re 1031 Tax*

*Grp., LLC)*, 420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009).

First, the court must accept all factual allegations in the complaint as true, discounting

legal conclusions clothed in factual garb. *See, e.g.*, *Iqbal*, 556 U.S. at 677–78 (noting that courts

"are not bound to accept as true a legal conclusion couched as a factual allegation"); *Kiobel v.*

*Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must

"assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true")

(citing *Iqbal*, 556 U.S. at 678). "A pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.*

Second, the court must determine if these well-pleaded factual allegations state a

"plausible claim for relief." *Iqbal*, 556 U.S. at 679. Courts do not make plausibility

determinations in a vacuum; rather, it is a "context-specific task that requires the reviewing court

to draw on its judicial experience and common sense." *Id.*

> A claim has facial plausibility when the pleaded factual content
> allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged. The plausibility standard is not
> akin to a probability requirement, but it asks for more than a sheer
> possibility that a defendant has acted unlawfully. Where a
> complaint pleads facts that are merely consistent with a defendant's
> liability, it stops short of the line between possibility and plausibility
> of entitlement to relief.

*Id.* at 678 (internal quotation marks and citations omitted). "The pleadings must create the

possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption*

*Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the

nonmoving party and must limit their review to facts and allegations contained in (1) the

complaint, (2) documents either incorporated into the complaint by reference or attached as

exhibits, and (3) matters of which the court may take judicial notice. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).

Rule 9(b) of the Federal Rules of Civil Procedure, made applicable in an adversary proceeding by Bankruptcy Rule 7009, applies to pleadings alleging fraud: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). When Rule 9(b) applies, to survive a motion to dismiss, a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). A plaintiff can establish this strong inference of fraud "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). "Due to the difficulty of proving intent, plaintiffs may rely on badges of fraud—circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*, 617 B.R. 442, 472 (Bankr. S.D.N.Y. 2020) (internal quotation marks omitted) (quoting *Techno-Comp. Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 745 (E.D.N.Y. 2015)). Badges of fraud can include:

> a close relationship between the parties to the conveyance; inadequacy of consideration received; retention of control of the property by the transferor; suspicious timing of the conveyance after the debt was incurred; the use of fictitious parties; information that the transferor was insolvent as a result of the conveyance; the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; the general chronology of the events and transactions under inquiry; a

> questionable transfer not in the usual course of business; and the
> secrecy, haste, or unusualness of the transaction.

*Official Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 554 (Bankr. S.D.N.Y. 2015).

"When a trustee in bankruptcy pleads a claim of fraud, cases have held that the Rule 9(b) requirement of particularity is relaxed." 10 COLLIER ON BANKRUPTCY ¶ 7009.03 (16th ed. 2021) (citing cases). "The less stringent standard for pleading fraud with particularity in a bankruptcy proceeding involving a trustee is predicated upon the fact that it is often the trustee, a third party, who is pleading fraud on second-hand information." *In re O.P.M. Leasing Servs., Inc.*, 35 B.R. 854, 862 (Bankr. S.D.N.Y. 1983). In any event, general allegations are insufficient when pleading fraud, and the party asserting the claim must plead facts, "including time and place and content of the misrepresentations, . . . [and] facts with respect to the consequences of the fraud." 10 COLLIER ON BANKRUPTCY ¶ 7009.03.

Where a trustee's complaint is dismissed for failure to comply with the requirements of Rule 9(b), it is often dismissed with leave to amend. *Id.*; *see also, e.g.*, *Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 430–31 (Bankr. S.D.N.Y. 1998).

### III.    <u>CHOICE OF LAW</u>

The Plaintiff and the Defendants dispute whether New York law or Norwegian law should govern the claims alleged. The Plaintiff argues that Norwegian law applies to its claims under Sections 5-5 and 5-9 of the Recovery Act and Section 17-1 of the Companies Act (and the related claim under Norwegian non-statutory law), while New York law applies to its claim for unjust enrichment.[7] The Defendants, conversely, argue that New York law applies to the claims

---

[7]    The Plaintiff suggests that the Court need not conduct a choice of law inquiry under the circumstances of this case, essentially arguing that, where the foreign-law claw-back provisions are the only claw-back provisions

under Sections 5-5 and 5-9 of the Recovery Act and Section 17-1 of the Companies Act (and the

related claim under Norwegian non-statutory law), and that Norwegian law applies to the claim

for unjust enrichment.  The Defendants' preferred choice of law would conveniently (for the

Defendants) lead to the dismissal of all of the claims asserted in the FAC, as the Norwegian

statutory law claims do not apply under New York law, and, as the Court later concludes, there is

no standalone unjust enrichment claim under Norwegian law.

From the analysis that follows, the Court concludes that Norwegian law applies to all

claims except for the claim to avoid the Cyrus Sale, to which New York law applies.  However,

the Court's choice of law determination is limited only to its evaluation of the Motions, and the

Court reserves final decision regarding the applicable law.

### A.  Applicable Choice of Law Rules

The first step in the choice of law analysis is to determine whether federal or New York

choice of law rules apply.  "[F]ederal choice of law rules are a species of federal common law,"

and "[b]efore federal courts create federal common law, 'a significant conflict between some

federal policy or interest and the use of state law must first be specifically shown.'"  *Bianco v.*

*Erkins (In re Gaston & Snow)*, 243 F.3d 599, 605–06 (2d Cir. 2001) (quoting *Atherton v. FDIC*,

---

available, they should automatically apply.  (*See* Opposition at 14 ("That the insolvency law of Norway, and
particularly the claw-back provisions therein, should govern in this Chapter 15 adversary proceeding, under
circumstances where the Bankruptcy Code's claw-back provisions are expressly unavailable is not a controversial
proposition.") (citing 11 U.S.C. § 1521(a)(7)).)  However, no authority supports such an automatic choice of law
trigger.

Contrary to the Plaintiff's suggestions, the Second Circuit has made clear that the jurisdiction with the
primary interest in the administration of the estate does *not* necessarily have the primary interest in all matters
related to the insolvency proceeding.  *See In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 351 (2d Cir. 1992)
(finding that "the interests of the competing jurisdictions should be bifurcated in choice-of-law analysis," and
conducting a separate analysis to determine (i) the jurisdiction with the primary interest in the administration of the
estate and (ii) the jurisdiction with the primary interest "in defining and protecting the property interests of its
citizens and those who do business there").

519 U.S. 213 (1997)).  As no such conflict has been shown, the Court applies New York choice

of law rules.[8]

"Under New York choice of law rules, the Court must first determine whether there is an

'actual conflict' between the relevant laws of the implicated jurisdictions."  *Hosking v. TPG Cap.*

*Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 535 B.R. 543, 573 (Bankr. S.D.N.Y. 2015).

The parties do not dispute that there is a conflict between the relevant New York and Norwegian

law.  However, there is no standalone claim for unjust enrichment under Norwegian law (as the

Court concludes below), while there is such a claim under New York law.  Accordingly, the

Court concludes that there is an actual conflict between the relevant New York and Norwegian

law with respect to all of the claims.

Once an actual conflict has been shown to exist, "the law of the jurisdiction having the

greatest interest in the litigation will be applied and . . . the facts or contacts which obtain

significance in defining State interests are those which relate to the purpose of the particular law

in conflict."  *Koreag*, 961 F.2d at 350.  "[T]he interest analysis is applied differently depending

on whether the rules in question are conduct-regulating rules that people use as a guide to

governing their primary conduct, or loss-allocating rules that prohibit, assign, or limit liability

---

[8]    Even if federal choice of law rules were to apply, they would lead to the same results.  As explained in
*Koreag*, the federal and New York choice of law rules are sufficiently similar such that the Court may "apply an
interest analysis consistent with the law of either jurisdiction":

> The federal common law choice-of-law rule is to apply the law of the jurisdiction
> having the greatest interest in the litigation.  The goal of this analysis is to evaluate
> the various contacts each jurisdiction has with the controversy, and determine
> which jurisdiction's laws and policies are implicated to the greatest extent.

> New York law provides that the law of the jurisdiction having the greatest interest
> in the litigation will be applied and that the facts or contacts which obtain
> significance in defining State interests are those which relate to the purpose of the
> particular law in conflict. The federal and New York doctrines invoke similar
> considerations.

*Koreag*, 961 F.2d at 350–51 (internal quotation marks and citations omitted).

19

after the tort occurs." *Licci v. Lebanese Canadian Bank*, 739 F.3d 45, 49 (2d Cir. 2013) (internal

quotation marks omitted).  The New York Court of Appeals has provided examples of each type

of rule, stating that "rules of the road" are conduct-regulating, while "charitable immunity

statutes, guest statutes, wrongful death statutes, vicarious liability statutes, and contribution

rules" are loss-allocating.  *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002–03 (N.Y.

1994) (internal quotation marks and citations omitted).

From the translations provided of the text of the statutes and the expert declarations

submitted on Norwegian law, Sections 5-5 and 5-9 of the Recovery Act appear to be fraudulent

transfer statutes.[9]  As this Court explained in *Hellas*, fraudulent transfer statutes are conduct-

regulating laws, for which "courts generally follow the *lex loci* rule and 'the law of the

jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest

interest in regulating behavior within its borders.'"  *Hellas*, 535 B.R. at 573 (quoting *Drenis v.*

*Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006)).  The Court further explained:

> New York choice of law rules do not require an uncompromising
> adherence to the *lex loci* rule.  But when the allegedly wrongful
> conduct occurs in a place different from the place of injury, the
> Second Circuit dictates that "it is the place of the allegedly wrongful
> conduct that generally has superior interests in protecting the
> reasonable expectation of the parties who relied [on the laws of that
> place] to govern their primary conduct and in the admonitory effect
> that applying its law will have on similar conduct in the future."

*Id.* (quoting *Licci*, 739 F.3d at 50–51).

Section 17-1 similarly appears to be a conduct-regulating rule related to corporate

governance, and a claim under Section 17-1 would specifically be handled under the internal

---

[9]    Fed. R. Civ. P. 44.1 applies to the Court's determination of foreign law and provides that "the court may
consider any relevant material or source, including testimony, whether or not submitted by a party or admissible
under the Federal Rules of Evidence."  Here, the Plaintiff relied on the testimony of one Norwegian law expert,
Bjørn Åge Hamre; Defendants relied on the testimony of two Norwegian law experts, Kristoffer Aasebø and Knut
Ro.  Direct testimony was presented by declarations.  All of the experts were cross-examined during the Hearing.

affairs doctrine under New York choice of law rules, as further discussed below. While the

internal affairs doctrine may not apply to the claim under Norwegian non-statutory law also

asserted as part of Count IV, the non-statutory law claim appears to be a negligence-type claim

that is intended to regulate conduct (i.e., to prevent negligent acts or omissions).

Finally, for unjust enrichment claims based on a fraudulent conveyance, the choice of law

inquiry follows the interest analysis as applied to conduct-regulating rules. *See Gerloff v.

Hostetter Schneider Realty*, 2014 WL 1099814, at *9 (S.D.N.Y. Mar. 20, 2014).

Accordingly, the Court concludes that all of the claims are asserted under conduct-

regulating rules.[10]

## B. The Alleged Conduct

The Second Circuit recently suggested that the choice of law inquiry for avoidance

actions should focus on the location of the debtor's transfer. *See In re Picard*, 917 F.3d 85, 105

(2d Cir. 2019). Although the FAC does not allege the location of the transfer by Norske ASA, at

the Hearing, the Plaintiff's counsel represented that the transfer originated in Norway. While the

Plaintiff must amend the complaint to allege the location of the transfer, the Court relies on the

Plaintiff's counsel's representation for purposes of the present choice of law analysis.

However, the location of the transfer may not necessarily be dispositive of the choice of

law question. The Plaintiff has alleged that

> all or substantially all actions, correspondence, activity, decision
> making, contracting, investment, accounting directions and flow of
> funds directions, correspondence, contact and email and

---

[10]    However, even if the Court were to conclude that the rules in question are loss-allocating, the same result
would follow. As the loss with respect to all of the claims (except the claim to avoid the Cyrus Sale) is alleged to
have occurred in Norway, Norwegian law would apply. With respect to the claim to avoid the Cyrus Sale, which
occurred between Delaware, Cayman, and Canadian (but not Norwegian) entities, all of which have their principal
place of business in New York (FAC ¶¶ 8–27), any alleged loss would have occurred in a place other than Norway.
As Norwegian law would therefore not apply to the claim to avoid the Cyrus Sale, and the only avoidance claim
asserted with respect to the Cyrus Sale is under Norwegian law, that claim would still need to be dismissed.

substantially all commercial activity by the Cyrus Funds and GSO
Funds was executed, directed, effected, ordered and facilitated by
their investment managers, from New York. . . .

all or substantially all of the Defendants' conduct and action
concerning the Norske Skogindustrier investments and loans,
including interactions with Norske Skogindustrier, their receipt of
knowledge concerning the Norske Enterprise's financial condition,
and their knowing, insider receipt of fraudulent and preferential
payouts under Norwegian law occurred, or was carried out from
New York, New York.

(FAC ¶¶ 30–31.)  In short, in the Plaintiff's own words, "all or substantially all of the

Defendants' conduct occurred [in] . . . New York."[11]  (*Id.*)

On the other hand, the Plaintiff argues that the Defendants influenced the actions of the

Norske Board in Norway, such that the Defendants could be considered to have acted in Norway.

(*See id.* ¶¶ 130, 134.)

While "in connection with a Rule 12(b)(6) motion to dismiss, all facts alleged in the

complaint must be accepted as true, . . . a court need not feel constrained to accept as truth

conflicting pleadings that make no sense, or that would render a claim incoherent, or that are

contradicted either by statements in the complaint itself or by documents upon which its

pleadings rely, or by facts of which the court may take judicial notice."  *Rieger v. Drabinsky (In*

*re Livent Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).  Nevertheless,

"specific allegations that directly contradict general allegations will generally control."  *Carson*

*Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016) (citing *Hirsch v. Arthur*

---

[11]    The Plaintiff downplays the significance of these allegations to a choice of law analysis by stating that they
were only intended to "address the basis for this Court's personal jurisdiction, and are not contrary to the FAC's
allegations concerning Defendants' global misconduct or its intended effects in Norway."  (Opposition at 18 n.4.)
The Plaintiff argues that "the FAC alleges a global scheme in which GSO and Cyrus took fraudulent actions in New
York, Oslo, London, Paris, and elsewhere, all of which were intended to have consequences in Norway."  (*Id.* at 18.)
However, an allegation of the locus of conduct for purposes of jurisdiction is not otherwise meaningless, and a
plaintiff cannot cherry-pick its own allegations to argue that conduct occurred in one location for purposes of
jurisdiction and another for purposes of choice of law.

*Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995)).  Accordingly, where the Plaintiff's specific allegations contradict more general allegations, the Court considers the Plaintiff's specific allegations to control.

The conduct that is most essential to all of the claims (except the claim to avoid the Cyrus Sale) is alleged to have occurred in Norway, including the transfer by Norske ASA and the Defendants' alleged exercise of influence over the Norske Board.  Accordingly, the Court concludes that Norwegian law applies to all of the claims asserted in the FAC, except for the claim to avoid the Cyrus Sale.

With respect to the claim to avoid the Cyrus Sale, the Plaintiff asserts that "[a]greements evidencing the Cyrus Sale were negotiated and executed by authorized signatories of the GSO Defendants and the Cyrus Defendants from their offices in New York, New York."  (FAC ¶ 126; FAC Ex. 14.)  Exhibit 15 to the FAC indicates that the Cyrus Sale involved various GSO and Cyrus entities, but does not indicate where the transfers originated.  (FAC Ex. 15.)  Considering the GSO and Cyrus entities are Delaware, Cayman, and Canadian (but not Norwegian) entities, all of which have their principal place of business in New York (FAC ¶¶ 8–27), it is highly unlikely that any part of the transfers occurred in Norway.  Accordingly, the Court concludes that New York law applies to the claim to avoid the Cyrus Sale.[12]

### C.  The Internal Affairs Doctrine

Finally, the Section 17-1 claim is likely subject to a more specific choice of law analysis under the internal affairs doctrine.  "Generally, New York law requires that claims related to corporate affairs . . . are governed by the internal affairs doctrine."  *In re BP p.l.c. Derivative*

---

[12]    Despite the Plaintiff's requests for the Court to consider the Cyrus Sale and the GSO Transfer as one transaction, the claim to avoid the Cyrus Sale is asserted as a separate claim from the claim to avoid the GSO Transfer, rather than the Plaintiff asserting a single claim to avoid the alleged overall transaction.  (*Id.* ¶¶ 181–96.)

*Litig.*, 507 F. Supp. 2d 302, 307 (S.D.N.Y. 2007); *see also Kingdom 5-KR-41, Ltd. v. Star*

*Cruises PLC*, 2003 WL 262507, at *4 n.2 (S.D.N.Y. Feb. 7, 2003) ("Under New York choice of

law principles, the law of NCL's state of incorporation (Norway) determines the extent of Star's

and/or Arrasas' liability—as shareholders—for the obligations of NCL."). As explained by the

Supreme Court:

> The internal affairs doctrine is a conflict of laws principle which
> recognizes that only one State should have the authority to regulate
> a corporation's internal affairs—matters peculiar to the relationships
> among or between the corporation and its current officers, directors,
> and shareholders—because otherwise a corporation could be faced
> with conflicting demands.

*Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982).

Norske ASA is a Norwegian limited liability company. (FAC ¶ 37.) Accordingly, the

internal affairs doctrine makes Section 17-1, which regulates governance and related liability for

Norwegian business enterprises, applicable in this case. However, even if the internal affairs

doctrine did not apply, Norwegian law and Section 17-1 would still apply, as the conduct that is

most essential to the claim is alleged to have occurred in Norway.

### D. Conclusion

The Court's analysis is performed in light of what has been alleged. However, the Court

notes that, once more factfinding has occurred, certain conduct may be found to have occurred in

places other than those alleged, or not to have occurred at all. It therefore may be necessary for

the Court to later revisit its choice of law analysis in light of where the conduct *in fact* occurred,

once that is determined. Accordingly, the Court's choice of law determination is limited only to

its evaluation of the Motions, and the Court reserves final decision regarding the applicable law.

For purposes of the Court's evaluation of the Motions, the Court concludes that

Norwegian law applies to all of the claims except for the claim to avoid the Cyrus Sale, to which

New York law applies.  Accordingly, Count III, for avoidance of the Cyrus Sale under Section 5-9 of the Norwegian Recovery Act, is **DISMISSED**.  Count V, for unjust enrichment, is also **DISMISSED** to the extent it is asserted under New York law.

## IV.    TIMELINESS

### A.  The Plaintiff's Avoidance Claims Are Timely Under Section 108(a) of the Bankruptcy Code

The Plaintiff argues that section 108(a) of the Bankruptcy Code tolled the relevant limitations period for its avoidance claims against GSO under Section 5-5 and Section 5-9 because those claims would have been timely when recognition was first granted in this case. (*See* Opposition at 22–23.)  GSO argues that section 108(a) does not apply to the Plaintiff's Section 5-5 and Section 5-9 claims against GSO because these claims arise under the Recovery Act, which "is part of Norway's bankruptcy regime."  (GSO Reply at 15–16.)  For the reasons discussed below, the Court concludes that section 108(a) of the Bankruptcy Code applies to the claims under Section 5-5 and Section 5-9 and renders them timely.  Accordingly, the GSO Motion is **DENIED** to the extent that it seeks dismissal of Counts I and II on timeliness grounds. And as explained below in Section IV.C, the GSO Motion would be denied at this stage of the proceeding on timeliness grounds even if section 108(a) does not apply.

Section 108(a) of the Bankruptcy Code provides:

> If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) two years after the order for relief.

11 U.S.C. § 108(a).

"[W]hether [s]ection 108 relief is automatically applicable in . . . chapter 15 cases . . . is squarely addressed by section 103(a) of the Code, which incorporates [s]ection 108 into a chapter 15 proceeding." *In re Fairfield Sentry Ltd.*, 452 B.R. 52, 57 (Bankr. S.D.N.Y. 2011). Section 103(a) of the Bankruptcy Code provides that "this chapter, sections 307, 362(o), 555 through 557, and 559 through 562 apply in a case under chapter 15." 11 U.S.C. § 103(a). The reference to "this chapter" is, of course, a reference to chapter 1 of the Bankruptcy Code, which includes section 108. Section 108's tolling provision therefore "appl[ies] in a [c]hapter 15 case by virtue of § 103(a)." *Fairfield Sentry*, 452 B.R. at 61 (quoting Alesia Ranney-Marinelli, *Overview of Chapter 15 Ancillary and Other Cross-Border Cases*, 82 AM. BANKR. L.J. 269, 313 (2008)); *see also Hosking v. Hellas Telecomms. (Lux.) II SCA (In re Hellas Telecomms. (Lux.) II SCA)*, 524 B.R. 488, 534–35 (Bankr. S.D.N.Y. 2015) (applying two-year period under section 108(a) to state law unjust enrichment claim).

Caselaw has also clarified that a foreign representative is afforded the benefits of section 108, and that entry of a recognition order is equivalent to an order for relief for purposes of section 108. Section 108 "allow[s] a trustee additional time, upon stepping into the shoes of the debtor, to discover and evaluate potential causes of action or perform other acts required to preserve the debtor's rights." *Fairfield Sentry*, 452 B.R. at 58 (citation omitted). The court in *Fairfield Sentry* noted that the term "trustee" "broadly encompasses trustees and debtors-in-possession alike[,]" and that the foreign representatives were "indistinguishable from trustees with respect to the purpose of Section 108 to provide the entity stepping into the shoes of the debtor additional time to evaluate and preserve a debtor's rights." *Id.* at 59–60. The court also found that the date of recognition was "properly deemed the date of the 'order for relief' for purposes of calculating . . . time under Section 108, as recognition allowed the Foreign

26

Representatives to avail themselves of the rights and remedies under the Code." *Id.* at 62; *see also In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 87 (Bankr. S.D.N.Y. 2011) ("The thorough and convincing analysis in [*Fairfield Sentry*] is adopted here."), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012).

While it is clear that section 108 applies generally in chapter 15 cases, the question remains whether it applies to claims arising under the Recovery Act.[13]  Section 108(a) operates where "applicable nonbankruptcy law . . . fixes a period within which the debtor must commence an action."  11 U.S.C. § 108(a).  Therefore, the analysis turns on whether the Recovery Act, which fixes the period within which the Avoidance Claims must be commenced, is "nonbankruptcy law."  Clearly, avoidance actions created by the Bankruptcy Code are not "nonbankruptcy law."  Avoidance claims under the Bankruptcy Code do not arise before the entry of an order for relief.  State law avoidance claims are entitled to extension under section 108(a).  And this Court has held that section 108(a) applies to toll the statute of limitations of an unjust enrichment claim under New York law.  *Hellas*, 524 B.R. at 534–35.  The status of claims arising before the filing of a chapter 15 petition but created by foreign insolvency law is less clear.  At least one court has applied section 108(a) to toll the limitations period for claims arising under foreign bankruptcy law.  *See Laspro Consultores LTDA v. Alinia Corp. (In re Massa Falida Do Banco Cruzeiro Do Sul S.A.)*, 567 B.R. 212, 227–29 (Bankr. S.D. Fla. 2017) (holding that section 108(a) applied to toll Brazilian "[c]laims arising under Article 130 of the Bankruptcy and Judicial Reorganization Law") (citing *Fairfield Sentry*, 452 B.R. at 57–58).

---

[13]     The Parties have not addressed whether the Recovery Act is available to a claimant outside of a bankruptcy case, or whether a bankruptcy filing is a condition precedent to seeking a remedy under the Recovery Act.

The Plaintiff essentially argues that any claim that arose (and for which the time to file

has not already expired) before entry of the Recognition Order receives the benefit of section

108(a)'s two-year limitations period.  (Opposition at 22–23.)  GSO responds that "[i]t makes no

sense to apply [section 108(a)] to toll a period which only began to run upon bankruptcy because

the limitations period for such a claim could *never* expire before the bankruptcy filing."  (GSO

Reply at 16.)  GSO cites one case that purportedly supports its position, *Glob. Crossing Estate*

*Rep. v. Winnick*, No. 04 Civ. 2558 (GEL), 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006), but the

estate representative in *Global Crossing* was attempting to use section 108(a) to import a longer

state-law limitations period to a claim under section 544 of the Bankruptcy Code, which is

already time-limited under the Bankruptcy Code.  *Id.* at *18–19; 11 U.S.C. § 546(a) (providing

limitations period for claims under section 544).

The Plaintiff cites a long list of cases[14] for the proposition that section 108(a) applies to

toll limitations periods for actions brought by foreign representatives in chapter 15 proceedings.

(Opposition at 22–23.)  While not all stand precisely for the proposition that a foreign insolvency

statute can be considered "nonbankruptcy law" for purposes of section 108(a), the clear thrust of

the decisions is that section 108(a) applies broadly and automatically in chapter 15 cases to

extend limitations periods that have not yet run, in order to provide the foreign representative an

opportunity to pursue claims in the American bankruptcy proceeding.  In a footnote, GSO

acknowledges the cases that the Plaintiff cites, stating only that they "are not to the contrary" of

---

[14]    *Massa Falida*, 567 B.R. at 228–29 (applying Section 108(a) tolling to Brazilian claims); *In re Sanjel (USA)
Inc.*, No. 16-50778-CAG, 2016 WL 4427075, at *5 (Bankr. W.D. Tex. July 29, 2016); *Am. Pegasus SPC v. Clear
Skies Holding Co.*, LLC, No. 1:13-CV-03035-ELR, 2015 WL 10891937, at *24 (N.D. Ga. Sept. 22, 2015) (applying
Section 108(a) in a case involving Cayman law avoidance claims, although unclear whether timeliness of Cayman
claims was specifically at issue); *In re Hellas Telecomms. (Lux.) II SCA*, 524 B.R. 488, 534–35 (Bankr. S.D.N.Y.
2015), *adhered to*, 526 B.R. 499 (Bankr. S.D.N.Y. 2015); *In re Millennium Glob. Emerging Credit Master Fund
Ltd.*, 458 B.R. at 87; *In re Fairfield Sentry Ltd.*, 452 B.R. 52 (Bankr. S.D.N.Y. 2011); *In re Bancredit Cayman Ltd.
(In Liquidation)*, No. 06-11026 (SMB), 2007 WL 3254369, at *3 (Bankr. S.D.N.Y. Nov. 2, 2007*), aff'd sub nom. In
re Bancredit Cayman Ltd. (In Liquidation)*, No. 07 CIV. 11338 (LAK), 2008 WL 919533 (S.D.N.Y. Mar. 31, 2008.)

28

its assertion that section 108(a) tolls limitations for claims that could have been asserted

prepetition and that are created by nonbankruptcy law.  (GSO Reply at 16 n.8.)

Here, the avoidance claims against GSO arose before filing of the Chapter 15 Petition,

and those claims had not yet expired under the Recovery Act limitations period[15] when the

Plaintiff filed the Chapter 15 Petition.  The avoidance claims arose upon the filing of the

Norwegian Bankruptcy on December 19, 2017.  They would have still been timely less than a

year later on December 18, 2018, the date of the Recognition Order, or on November 16, 2018,

the date of filing the Chapter 15 Petition.[16]  Thus, section 108(a) would have extended the

limitations period to December 18, 2020, and the FAC naming GSO was therefore timely filed in

September 2019.

While the claims arise under the Recovery Act, they do not derive their limitations period

from the Bankruptcy Code.  The goal of section 108(a) is to allow a trustee to step into the shoes

of a debtor and have access to the remedies available to the debtor at the time of filing the

petition.  The tolling was triggered by the filing of the Chapter 15 Petition.  And the chapter 15

proceeding should be considered as distinct from the Norwegian Bankruptcy, such that the

Trustee should be afforded an opportunity to file a petition and have the foreign bankruptcy

recognized, and not risk losing its non-Bankruptcy Code claims to a foreign limitations period

that would have expired after the chapter 15 case was filed.

Accordingly, section 108(a) renders the avoidance claims asserted against GSO timely, as

they would have been timely filed at the time of filing the Chapter 15 Petition, and entry of the

---

[15]    Section 5-15 of the Recovery Act, which provides the limitations period for claims under Section 5-5 and Section 5-9, is discussed in greater detail below.

[16]    In the Opposition, the Plaintiff seems to say that it is the date of recognition that tolls the limitations period, but it is the date of recognition that begins section 108(a)'s two-year limitations period, and it is the petition date that tolls the nonbankruptcy limitations period.  Regardless of which date is used in this case, the timing requirements of section 108(a) are satisfied, and section 108(a) renders the avoidance claims against GSO timely.

order for relief triggered section 108(a)'s two-year time limit.  The GSO Motion is therefore

**DENIED** to the extent that it seeks dismissal of Counts I and II on timeliness grounds.

### B.  The Plaintiff's Section 17-1 Claims Are Timely

The Plaintiff and GSO agree that timing with respect to the Plaintiff's claim under

Section 17-1 is governed by the Norwegian Limitations Act of 1979 (the "Limitations Act"),

which provides a three-year limitations period.[17]  (*See* GSO Memo at 37–39; Opposition at 49–

50.)  The Plaintiff and GSO disagree, however, when that three-year limitations period began to

run.

GSO argues—as it did with respect to the avoidance claims—that Norske ASA knew that

GSO was the counterparty to the GSO Transfer at the time of that transfer.  (GSO Memo at 38.)

Thus, GSO argues that by April 18, 2016, the time began to run on the Section 17-1 claim, and

the claim became time-barred three years later, in April 2019, before the filing of the FAC and

before the Parties entered into the Tolling Agreement (defined below).  (*Id.* at 38–39.)  The

Plaintiff argues that, because the Section 17-1 claim is asserted by the Estate on behalf of Norske

ASA's creditor body, the Section 17-1 claim could not be asserted before the opening of

bankruptcy proceedings in Norway.  (Opposition at 49–50; *see also* Hamre Decl. ¶ 196; Aasebø

Reply ¶ 35.)  Therefore, the Plaintiff argues, the time that it had to file a claim against GSO

under Section 17-1 did not begin to run until 2017, making claims asserted in the FAC, filed in

2019, timely.  (Opposition at 49–50.)

---

[17]      Section 2 of the Limitations Act provides that "[t]he general limitation period is 3 years."  (Limitations Act,
ECF Doc. # 32-6 at 6.)  Section 3 of the Limitations Act provides, in relevant part: "The limitations period is
counted from the date on which the claimant is first entitled to claim fulfillment."  (*Id.*)  Section 9 of the Limitations
Act provides, in relevant part: "Liability claims . . . are time-barred 3 years after the date on which the injured party
obtained or should have obtained sufficient knowledge of the injury and the party responsible."  (*Id.*)

The timeliness analysis of the Section 17-1 claim under Norwegian law requires a determination whether such a claim, based on events that occurred pre-bankruptcy but asserted by a Norwegian bankruptcy estate, accrues at the time of events giving rise to the claim or at the opening of bankruptcy when a trustee is first appointed. As there are other grounds on which the Section 17-1 claims are rendered timely, the Court declines to embark on this analysis.

Neither GSO nor the Plaintiff has addressed the application of section 108(a) of the Bankruptcy Code to Section 17-1. But section 108(a) plainly applies—and with less room for controversy than in the Recovery Act context. Even if the Section 17-1 claim accrued and time began to run as early as April 18, 2016—as GSO submits is the case—the Section 17-1 claim would still have been timely on the Chapter 15 Petition Date. There can be no argument that claims under the Companies Act (or limitations periods under the Limitations Act) are not "nonbankruptcy law," and the Court concludes that the Section 17-1 claim is timely. Thus, for largely the same reasons discussed above with respect to Counts I and II, the GSO Motion is **DENIED** to the extent that it seeks dismissal of the Section 17-1 claim on timeliness grounds.

## C.  Even if Section 108 Did Not Apply to the Avoidance Claims, the Timeliness of the Avoidance Claims Under the Recovery Act Presents a Disputed Issue of Fact that Precludes Granting Dismissal

GSO argues that the Plaintiff's claims against GSO under Section 5-5 (Count II) and Section 5-9 (Count I) are time-barred under the Recovery Act's limitations period. (GSO Memo at 20–25.) As discussed above, the Court concludes that section 108(a) of the Bankruptcy Code extends the Recovery Act's limitation period. Even if it did not, however, and there were no extension of the Recovery Act's limitations period, there remain open questions of fact that would preclude dismissal of the Plaintiff's avoidance claims against GSO on timeliness grounds.

At the outset, GSO argues that, for choice of law purposes, non-New York limitations periods are considered substantive, rather than procedural, where the statute that creates the

31

cause of action also provides for its limitations period, and thus Section 5-15 of the Recovery

Act ("Section 5-15") provides the applicable limitations period.  (*Id.* at 20 (citing *Hausman v. Buckley*, 299 F.2d 696, 701 (2d Cir. 1962)).)  The Plaintiff does not appear to dispute that

Section 5-15 applies but argues that Section 5-15's "discovery rule" renders its Norwegian law

avoidance claims timely against GSO.  (Opposition at 22.)  For the reasons discussed below, the

application of Section 5-15 involves a fact-intensive inquiry, which cannot be concluded absent

further discovery on what the Trustee knew or should have known with respect to the Plaintiff's

Avoidance Claims.

Accordingly, the GSO Motion is **DENIED** to the extent it seeks to dismiss the avoidance

claims on timeliness grounds under Norwegian law.

    1.  Section 5-15

Pursuant to Section 5-15, claims governed the Recovery Act must be "initiated within

one year from the commencement of the Norwegian proceeding."[18]  (GSO Memo at 21.)  The

Norske Board filed the Debtor's Norwegian Petition on December 19, 2017.  (FAC ¶ 146.)  Less

---

[18]    Section 5-15 of the Recovery Act provides:

> § 5-15.  Limitation period for implementation of avoidance.

> The estate's right to demand avoidance becomes time-barred one year from initiating bankruptcy proceedings or compulsory debt composition proceedings. The limitation period is counted from the initiation of negotiations on compulsory debt composition and also where negotiations have transitioned into bankruptcy according to Section 57 of the Bankruptcy Act.  The right to avoidance is, however, at the earliest time-barred six months from the time when the estate or debt settlement committee became or should have become aware of the circumstances which form the basis for the avoidance claim, limited to 10 years from the initiation of bankruptcy or debt settlement negotiations.  The counterparty's right pursuant to Section 5-13 first subsection is time-barred six months from the date when the counterparty became aware that avoidance would be enforced against the person in question.

> The rules in the first subsection do not apply when the estate invokes an avoidance as a claim against a lodged debt claim or other claim against the estate.

(Beaumont Decl., Ex. A, ECF Doc. # 32-4 at 2.)

than a year later, on December 18, 2018, the Recognition Order was entered, and the Plaintiff

commenced this adversary proceeding. (*Id.* ¶ 151; Original Complaint, ECF Doc. # 1.) Thus,

the Plaintiff filed its avoidance claims against GSO one day before Section 5-15's one-year

period ended, but it filed those claims against Cyrus only, excluding GSO. (GSO Memo at 21.)

In June 2019,[19] the Plaintiff and GSO entered into a tolling agreement (the "Tolling

Agreement"), but GSO claims that the one-year period had already expired before the Tolling

Agreement was entered into, and that the Tolling Agreement did not revive the claims. (*Id.*) No

party has provided a copy of the Tolling Agreement, and the Court has not reviewed it. It was

not until September 6, 2019, that the Plaintiff filed the FAC and named GSO as a defendant.

(*See* ECF Doc. # 13.)

However, the one-year time limit is not the sole consideration under Section 5-15.

Section 5-15 also provides a six-month period from the time the estate became aware or should

have become aware of the existence of a claim. (Section 5-15.) Thus, if the Trustee was not

aware of circumstances giving rise to a Recovery Act claim against GSO and should not have

been aware of such circumstances, the six-month period would not begin to run until the Trustee

actually became aware of the circumstances or the situation was such that the Trustee should

have been aware. (*See* Hamre Decl. ¶¶ 26–29.) Determining whether a bankruptcy estate

(through its trustee or administrator) should have known of circumstances giving rise to a

Recovery Act claim is a fact-intensive inquiry that depends on the unique situation of each case.

(*Id.* ¶¶ 31–38 (examining Norwegian caselaw interpreting Section 5-15).)

---

[19]    The parties' submissions differ on the date of the Tolling Agreement. (*Compare* GSO Memo at 16 ("On or about June 5, 2019, the Estate signed a tolling agreement with GSO . . . .") *with* Opposition at 24 ("Plaintiffs entered into a tolling agreement with GSO on June 7, 2019 . . . .").)

GSO argues that the FAC's allegations demonstrate that as of April 18, 2016, the Debtor was aware that GSO was the counterparty to the GSO Transfer.  (GSO Memo at 22.)  GSO also argues that the Estate should have been aware of GSO's 2016 SUN position (which was disclosed in February 2016 in connection with the Citibank Action), that GSO (along with Cyrus) funded the NSF in March 2016, and that GSO held CDS interests in the Debtor.  (*Id.* at 22–23.)  GSO submits, therefore, that the Norske ASA's depth of knowledge was such that "the Estate cannot plausibly claim it had no notice of a potential claim against the GSO Defendants until after March 2019."  (*Id.* at 23.)

The Plaintiff responds that it first "discovered the existence of the GSO-Cyrus agreement[20] in March 2019, when the Trustee began to receive documents . . . after the filing of the original complaint."  (Opposition at 24.)  Since the Plaintiff could not commence an avoidance action against an unidentified transferee, the six-month period began to run in March 2019, and it was tolled pursuant to the Tolling Agreement in June 2019.  (*Id.*)  The Plaintiff submits that while the Debtor and its management "perhaps knew of GSO's receipt of transfers prior to its insolvency proceeding . . . , under Norwegian law, the knowledge of Norske Skogindustrier and the Norske Board ***is not to be imputed*** to the Trustee."  (*Id.*)  The Plaintiff also argues that since the Debtor's bankruptcy is one of the largest and most complex bankruptcies (if not the most complex) ever administered in Norway, "no Norwegian court would find on these facts that the limitations period had expired."  (Hamre Decl. ¶ 41.)  At the Hearing, Hamre remarked repeatedly on the complexity of this case.

---

[20]    Presumably the "GSO-Cyrus agreement" is in connection with the Cyrus Sale, as that term is defined in the FAC.  However, the Opposition does not define the term "GSO-Cyrus agreement."

GSO's argues that the Estate either knew or should have known that GSO was the Debtor's counterparty in the GSO Transfer more than six months before the filing of the FAC. At the Hearing, GSO's counsel elicited testimony on the information about GSO's identity available to and known by the Plaintiff at the time of filing the Original Complaint. Specifically, GSO pointed to paragraph 45 of the Original Complaint, which states, *inter alia*:

> Attached as **Exhibit 3** is a copy of a November 12, 2015 email exchange initiated from a representative of the holder of Senior Secured Notes, describing Defendants' CDS Interests as a "large steepener [sic] trade which incentivizes [a party holding a CDS Interest] to ensure the company moves along for 2-3 years and then goes bust."

(Original Complaint ¶ 45 (alterations in original) (citing "BlueCrest Email," ECF Doc. # 1-3, at 3).) The Original Complaint only named the Cyrus Defendants (and omitted GSO). GSO highlighted the BlueCrest Email attached to the Original Complaint, but that email does *not* in fact mention Cyrus; it refers only to GSO. (*See id.*) The second alteration in the quoted passage is a substitution for "GSO." (*Compare id. with* Original Complaint ¶ 45.) At the Hearing, GSO also highlighted many references to "GSO and Cyrus" in the Debtor's Offering Memorandum for the January 2016 Exchange Offer. (Original Complaint, Ex. 1, ECF Doc. # 1-1.) Finally, GSO questioned Hamre about two declarations submitted in the Citibank Action that depict the holdings of both GSO and Cyrus in a format similar to the charts contained in the FAC. (*Declaration of Akshay Shah in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction* (the "Shah Decl."), ECF Doc. # 94-22 ¶ 3 (showing GSO position); *Declaration of Lucien Farrell in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction* (the "Farrell Decl."), ECF Doc. # 94-23 ¶ 4 (showing Cyrus position).)

The Plaintiff disputes GSO's argument about what the Plaintiff knew when it filed the Original Petition. Even if the Plaintiff "knew" about the specific documents highlighted by GSO

(pulled from the vast universe of material that comprises this unprecedented—by Norwegian

standards—bankruptcy case), the charts contained in the Shah Declaration and the Farrell

Declaration show the positions of Cyrus and GSO before the Cyrus Sale.  When the Original

Petition was filed, the available information showed that Cyrus still held €31.69 million face

value of 2016 SUNs (Farrell Decl. ¶ 4); and GSO held only €11.864 million face value of 2016

SUNs (Shah Decl. ¶ 3).  Therefore, when the Plaintiff sought to avoid a transfer of

approximately €30 million in 2016 SUNs, Cyrus appeared to be the most likely counterparty.  It

was not until the Plaintiff received discovery from Cyrus in March 2019 that it became aware of

GSO's role.  (Opposition at 24.)

GSO sought to show that the Trustee had at least constructive knowledge of GSO's

involvement in the events leading to the Second Restructuring and to the GSO Transfer.  GSO

has shown that information about its position in the Debtor's capital structure in early 2016 was

available.  GSO also pointed to documentary evidence showing the close relationship between

GSO and Cyrus during the negotiations of the Second Restructuring.  But GSO has not shown

that the Trustee knew GSO's identity as the counterparty to the GSO Transfer.  GSO also argued

that a Trustee was obligated to investigate transfers such as the GSO Transfer.

On the other hand, the Plaintiff provided scant evidence showing any steps the Trustee

took investigating the GSO Transfer to determine the identity of the Debtor's counterparty.  The

Plaintiff's expert made repeated reference to the size and complexity of the case.  But a large and

complex case would not excuse dereliction by a trustee.  The Plaintiff insinuated that the

Debtor's management—allegedly facing breach of duty litigation in Norway—was not

forthcoming during the Trustee's investigation.  But the Plaintiff has not provided evidence

showing management's purported stonewalling.  It is unclear at this stage what precisely a

reasonably diligent trustee would have discovered about the GSO Transfer or the Cyrus Sale, or whether the Trustee should have known sufficient facts giving rise to potential avoidance claims against GSO.

Whether the Trustee knew or should have known facts giving rise to the Trustee's claims against GSO more than six months before filing the FAC raises disputed issues of fact. The Court cannot conclude as a matter of law that the Trustee knew or should have known the facts giving rise to the claims against GSO before March of 2019. Therefore, dismissal at this stage is not appropriate. In any event, as explained above in Section IV.A, Plaintiff's claims are timely under section 108(a) of the Bankruptcy Code, whether or not Section 5-15's six-month discovery accrual limitations period applies.

### 2.  Relation Back

The Plaintiff also argues that Rule 15 of the Federal Rules of Civil Procedure allows the FAC to relate back to the Original Complaint, making the avoidance claims timely against GSO.[21]  (Opposition at 25–28.)  Rule 15(c)(1), made applicable to this adversary proceeding by Bankruptcy Rule 7015, provides:

> An amendment to a pleading relates back to the date of the original pleading when:
>
> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the

---

[21]   The Plaintiff also argues that Section 16-5 of Norway's Dispute Act, which permits a claimant to rectify or supplement the description of a party, allows relation back.  (Opposition at 25; Hamre Decl. ¶ 53.)  However, relation back under Rule 15(c)(1)(A) requires that the law providing the applicable limitations period allow relation back.  The Dispute Act is separate from the Recovery Act (which provides the limitations period for the Avoidance Claim).  Therefore, Section 16-5 is inapplicable.

> summons and complaint, the party to be brought in by
> amendment:
>
>> (i) received such notice of the action that it will not be
>> prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have
>> been brought against it, but for a mistake concerning the
>> proper party's identity.

Fed. R. Civ. P. 15(c)(1).

For an amendment that names a new party to properly relate back to the original

pleading, the relevant

> question under Rule 15(c)(1)(C)(ii) is not whether [the plaintiff]
> knew or should have known the identity of [the later named
> defendant] as the proper defendant, but whether [the later named
> defendant] knew or should have known that it would have been
> named as a defendant but for an error. Rule 15(c)(1)(C)(ii) asks
> what the prospective *defendant* knew or should have known during
> the Rule 4(m) period, not what the *plaintiff* knew or should have
> known at the time of the filing of her original complaint.

*Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 548 (2010). "The Second Circuit . . . does not

allow the relation back of 'John Doe' defendants, as that has been determined to indicate a lack

of knowledge, rather than a mistake." *Enron Corp. v. J.P. Morgan Secs. Inc. (In re Enron

Corp.)*, 357 B.R. 257, 270 (Bankr. S.D.N.Y. 2006); *see also* 10 Collier on Bankruptcy ¶

7015.06 (16th ed. 2021).

GSO argues that this is not a case of mistaken identity with a later substitution for the

proper defendant, but rather an addition of a second defendant, GSO, while retaining the original

defendant, Cyrus, all while Plaintiff was aware of GSO's identity and its role in the facts and

circumstances giving rise to this case. (GSO Memo at 23–25; GSO Reply at 19.) Thus, GSO

argues, relation back under Rule 15(c)(1)(C) is inapplicable and cannot resuscitate the claims.

(GSO Memo at 23–25.)

The Plaintiff disputes GSO's characterization of relation-back law under Rule 15. (Opposition at 25–28.)  The Plaintiff argues that the types of mistakes that permit relation-back under Rule 15 are not as limited as GSO asserts; they can "include[] cases where a plaintiff 'harbor[s] a misunderstanding about [the prospective defendant's] status or role in the events giving rise to the claim at issue and . . . mistakenly choose[s] to sue a different defendant based on that misimpression."  (*Id.* at 26 (second, third, and fourth alterations in original) (quoting *Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 289 F.R.D. 401, 406 (S.D.N.Y. 2013)).) The Plaintiff submits that the purpose of naming Doe defendants in its Original Complaint was to acknowledge that it did not have sufficient facts to name all defendants at the original time of filing.  (*Id.* at 28.)

While the general rule in the Second Circuit is that naming Doe defendants is not a "mistake" for purposes of Rule 15, the present situation is different.  At the time of filing the Original Complaint, the Plaintiff was aware of GSO's existence, and was aware that it played a role in the events surrounding Norske ASA's restructuring efforts in 2015 and 2016.  It was also aware of GSO's involvement in funding the NSF, for example.  But, the Plaintiff argues, it was unaware that GSO was the counterparty to the GSO Transfer and therefore the recipient of an allegedly avoidable transfer.  Thus, the naming of Doe defendants notwithstanding, it appears plausible that failure to name GSO was due to a mistake, not a lack of knowledge.  The question then becomes whether (within the relevant Rule 4(m) period) GSO received notice of the action and knew or should have known that, but for the Plaintiff's mistake, it would have been named.  This requires a factual determination of what GSO knew (or should have known) and when, which cannot be resolved in ruling on a motion to dismiss.  However, because the avoidance

claims are timely under section 108(a), it is not necessary to resolve the relation-back issue under

Rule 15.

## V.   <u>THE RECOVERY ACT CLAIMS</u>

The FAC asserts three counts under the Recovery Act.  Counts I and III are avoidance

actions under Section 5-9 against GSO (Count I) and Cyrus (Count III).  (FAC ¶¶ 152–67, 181–

96.)  Count II is an avoidance action under Section 5-5 against GSO.  (*Id.* ¶¶ 168–80.)  For the

reasons discussed below, the Court concludes that Count I and Count III fail to state a claim.

Accordingly, the GSO Motion is **GRANTED** with respect to Count I, with leave to amend, and

the Cyrus Motion is **GRANTED** with respect to Count III.  The GSO Motion is **DENIED** with

respect to Count II.

### A.   Section 5-9 Legal Standard

Count I seeks avoidance of the GSO Transfer under Section 5-9.  (FAC ¶¶ 152–67.)

Section 5-9 provides as follows:

> Transactions which improperly give preference to one creditor at the
> expense of the others, or prevent the debtor's assets from being used
> to pay off the creditors, or increase the debtor's liabilities in a
> manner detrimental to the creditors, may be voided if the debtor's
> financial situation was weak or was seriously weakened by the
> transaction, and the other party to the transaction knew or should
> have known of the debtor's financial difficulties and the
> circumstances that made the transaction improper.
>
> Transactions executed more than ten years prior to the time limit
> (i.e., the filing of bankruptcy) cannot be voided.

(*Id.* ¶ 153.)  A properly asserted claim under Section 5-9 must plead five elements.  First, the

claim must allege that the transaction that the claimant seeks to avoid is one of the covered

transaction types (i.e., a transaction that (1) gives preference to one creditor at the expense of

others, (2) prevents the debtor's assets from being used to pay creditors, or (3) increases the

debtor's liabilities in a manner detrimental to creditors).  Second, it must allege that the

transaction was improper. Third, it must allege that the debtor's financial situation was weak or seriously weakened by the transaction. Fourth, it must allege that the transferee knew of the debtor's difficulties. Fifth, it must allege that the transferee knew that the transaction was improper.

### 1. Improper Transaction

Aasebø submits that determining whether a transaction is improper is a "dynamic rule," and only those transactions that "can be criticized based on a moral assessment of what should and should not be accepted in normal market practice" are improper. (Aasebø Decl. ¶ 42.) Aasebø states that improper transactions "are those that are 'disloyal' to the body of creditors as a whole." (*Id..*) Aasebø also submits that a purchase or sale of debt on the open market and at market price cannot be improper. (*Id.*) The use of broker-intermediaries in a transaction, he asserts, is an indication that the transaction conforms to normal market practice and is not avoidable under Section 5-9. (*Id.* ¶ 43.)

Hamre quotes from Norwegian legislative commentary (known as a preparatory work) for the proposition that "[a] payment . . . that by its nature is reversable by the objective rules [e.g., Section 5-5], will—provided that the subjective conditions are met—normally also be [improper]." (Hamre Decl. ¶ 154 (quoting NOU 1972:20 p. 298).) Thus, if there is a "payment of a debt—which falls under § 5-5—then this disposition will . . . also fall under the 'improper' requirement in Section 5-9." (*Id.* ¶ 155.) Hamre submits, however, that Section 5-9 is broader than that and "is intended as a residuary provision that captures dispositions that, in their content and effect, will be improper and therefore should be reversed and deemed void." (*Id.*) Where the requirements of Section 5-5 are met but Section 5-5's shorter limitations has expired, Section 5-9 will be available provided that the subjective element (i.e., the transferee was aware that the transaction was improper) is met. (*Id.* ¶ 158.)

41

With respect to whether a transaction is "improper," Hamre provides a list of elements, which he analogizes to "badges of fraud," that includes:

- The nature of the transaction
- The degree of the debtor's financial difficulties
- Whether the defendant is aggressively seeking coverage
- Who is the beneficiary? A transaction is more likely to be "*improper*" if the defendant is closely related, in particular if the debtor is a company and its principal shareholder or management receives settlement of its own claims against the company at the expense of other creditors.
- Whether the payment has been made with the debtor's ordinary means of payment or obtained by way of an irregular sale of assets
- How the defendant's claim arose
- At what time the payment was made – a payment is more likely to be avoided when made close upon the date of bankruptcy

(*Id.* ¶ 157.)

Hamre also disagrees with Aasebø's assessment that the "nature" of a transaction is dispositive of whether it is "improper" such that a debtor's open-market repurchase of its own debt cannot be improper, arguing instead that "[t]he *nature* of the GSO Transfers[22] are not that they are an open-market transaction at commercial terms, but that they provide the GSO Defendants with close to full recovery on the 2016 SUNs; [sic] an outstanding junior debt item that should not have been repaid at all."  (*Id.* ¶ 161.)  Hamre therefore argues that the "GSO Transfers are . . . payments of debt with amounts that significantly impaired the debtor's ability to meet its remaining obligations, a transaction type that is clearly avoidable under Section 5-5 . . ., provided that the transaction does not appear as 'ordinary.'"  (*Id.*)

### 2.  Intentional Fraud and Rule 9(b)

Section 5-9 is unlike typical American fraudulent transfer provisions, whether under the Bankruptcy Code or state law, in that its subjective components look to the subjective knowledge

---

[22]    This is yet another example of the inconsistency in the use of the term "GSO Transfer" (singular) and "GSO Transfers" (plural) from the Plaintiff's side.

of the *transferee* rather than that of the transferor.  According to Hamre, however, Section 5-9 is similar to an intentional fraudulent transfer statute.  Hamre notes:

> Section 5-9 is an avoidance rule of a slightly different nature than the other avoidance rules due to its subjective nature.  It contains an additional requirement that "the other party to the transaction knew or should have known of the debtor's financial difficulties and the circumstances that made the transaction improper."

(*Id.* ¶ 147 (quoting Section 5-9).)  Hamre submits that it is "[t]he 'improper' nature of Section 5-9 . . . [that] makes this avoidance rule similar to intentional fraudulent transfer laws in other jurisdictions, . . . including the United States."  (*Id.* ¶ 150.)  Hamre appears to assert that Section 5-9 is analogous to section 548(a)(1)(A) of the Bankruptcy Code.  (*Id.* ¶ 11(a) ("Due to the intentional acts alleged and the improperness required to be shown, Section 5-9 is Norway's analogue to intentional fraudulent transfer statutes assumed to also be found within the United States and the United States Bankruptcy Code.").)  The "improper" element of the Section 5-9 claim does most closely equate to the intent element of a section 548(a)(1)(A) claim, but section 548(a)(1)(A) requires a showing of intent of the *transferor*, not of the *transferee*.  However, the Plaintiff's counsel argued at the Hearing that Norske ASA's fraudulent intent can be imputed from the Defendants' intent.

If Section 5-9 is analogous to an intentional fraudulent transfer statute, then it must conform to Rule 9(b).  Accordingly, a pleading alleging a Section 5-9 claim must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, and "set forth the who, what, when, where and how of the alleged fraud."  *United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014) (quoting *United States. ex rel. Polansky v. Pfizer, Inc.*, No. 04 Civ. 704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997))).

## B.  The Plaintiff Fails to Adequately Plead a Section 5-9 Claim Against GSO

### 1.  The 5-9 Claim Against GSO Does Not Meet the Pleading Requirements of Rule 9(b)

As a threshold matter, due to the many inconsistencies and ambiguities in the FAC, the

Plaintiff has failed to clearly identify the who, what, when, where, and how of the alleged fraud,

as required by Rule 9(b).

### a.  The FAC Is Inconsistent with Respect to Who Caused the GSO Transfer

The FAC contains several allegations that directly contradict each other with respect to

whether a broker or the Cyrus/GSO Board Members "caused" Norske ASA to complete the

allegedly fraudulent transfer, and whether the broker was independent or acting at the direction

of GSO.  The Plaintiff alleges that "a broker acting at the direction of the GSO Defendants

caused Norske Skogindustrier to buy back the 2016 SUNs."  (FAC ¶ 134.)  However, the

Plaintiff alleges in the very next paragraph that an "independent broker" contacted a Norske

employee to confirm Norske ASA's purchase of a block of 2016 SUNs that was allegedly part of

the GSO Transfer.  (*Id.* ¶ 135.)

Other allegations in the FAC state that it was the Defendants, rather than the broker, who

caused the purchase of the 2016 SUNs.  One of the central allegations of Count I states that "the

Defendants, by and through the Cyrus/GSO Board Members, caused Norske Skogindustrier to

intentionally pay 108 Million EUR to holders of Subordinated Unsecured Notes."  (*Id.* ¶ 158.)

The Plaintiff similarly alleges elsewhere that "the Norske Board, now acting under the direct

influence of the Defendants, resolved for Norske Skogindustrier to begin repurchasing 2016

SUNs in the market."  (*Id.* ¶ 130.)

If the Norske Board had already resolved for Norske ASA to repurchase the 2016 SUNs

as alleged in paragraph 130, it appears inconsistent to allege that, presumably to effectuate this

44

resolution, a broker "caused" Norske ASA to buy back the 2016 SUNs, as alleged in paragraph

134.  In addition, it is not clear how a broker could "cause" Norske ASA to purchase the 2016

SUNs, as the usual practice is for an entity to make a purchase *through* a broker, rather than for

the broker to *cause* the entity to make a purchase.

      *b. The FAC Is Ambiguous with Respect to the Parties to the GSO Transfer*

The Plaintiff seeks avoidance specifically of the "GSO Transfer."  (FAC ¶ 167.)

However, the allegations in the FAC are inconsistent to the point that this crucial term is

ambiguous.  The Plaintiff defines the "GSO Transfer" in paragraph 134 of the FAC, as follows:

> Contemporaneously with the Settlement Date, a broker acting at the
> direction of the GSO Defendants caused Norske Skogindustrier to
> buy back the 2016 SUNs at par value plus accrued interest, for an
> amount of approximately EUR 30 Million, to the detriment of
> Norske Skogindustrier's other creditors (the "GSO Transfer").

(FAC ¶ 134.)  This definition states only that "a broker . . . *caused* Norske Skogindustrier to buy

back the 2016 SUNs."  (*Id.* (emphasis added).)  The definition curiously and conspicuously does

*not* state that the broker, or GSO, *sold* the 2016 SUNs to Norske ASA.  It would have been

simple enough for the Plaintiff to allege that Norske ASA *purchased* the 2016 SUNs *from* GSO

*through* one or more brokers.[23]  However, the Plaintiff did not make this allegation, and chose

instead to leave out the identity of the seller in the GSO Transfer.  Accordingly, the definition of

the GSO Transfer is susceptible to at least two different interpretations.

One interpretation of the GSO Transfer is that it is a transaction involving Norske ASA

and GSO on each end, with one or more brokers in between.  Indeed, if this were not the correct

---

[23]    It is unclear whether more than one broker is alleged to have been involved—one unidentified broker in
New York to whom GSO transferred its SUNs and received cash in return, and a different broker (Fearnley) in
Norway to whom Norske ASA transferred cash and from whom it purchased the SUNs.

reading of the GSO Transfer, the avoidance claims would have to be dismissed against GSO, as it would not have been a party to the transaction the Plaintiff seeks to avoid.

Another possible reading is that the only transaction encompassed in the GSO Transfer is one between Norske ASA and a broker. Support for this definition is found in several of the Plaintiff's own statements in its Opposition, in which the Plaintiff makes several references to "the GSO Transfer and the *subsequent repayment* of the 2016 SUNs." (Opposition at 32, 37, 44 (emphasis added); *see also id.* at 41 (stating that the appropriate analysis under the Recovery Act "is to consider what the GSO Defendants would have received if *neither the GSO Transfer nor the repayment of the 2016 SUNs* would have taken place") (emphasis added).) These statements imply that the GSO Transfer is a distinct transaction that encompasses only the purchase of the SUNs by Norske ASA from a broker, and does not include the repayment of the SUNs (i.e., the payment of funds to GSO).

Finally, the FAC often refers to multiple "GSO Transfers" (FAC ¶¶ 136, 137, 154, 162, 173, 191, 201, 202), without explanation for why the defined term is in the singular, while several references are in the plural. This only further exacerbates the ambiguity.

### c. Conclusion

Rule 9(b) requires the Plaintiff to plead with particularity the who, what, when, where, and how of the allegedly fraudulent transfer. Due to the many inconsistencies and ambiguities in the FAC, the Court cannot readily identify the details surrounding the transfer the Plaintiff seeks to avoid, or even identify the parties to the transfer.

Accordingly, the requirements of Rule 9(b) have not been met, and the GSO Motion is **GRANTED** with respect to Count I, with leave to amend. Plaintiff's counsel represented during the Hearing that counsel could in good faith allege facts sufficient to satisfy Rule 9(b)'s pleading requirement. The dismissal with leave to amend will give counsel an opportunity to do so.

2.  <u>Whether the Plaintiff Has Sufficiently Alleged the Elements of Section 5-9</u>

a.  *Covered Transaction*

To be avoidable under Section 5-9, a transaction must fit within one of the Section 5-9's three covered transaction types.  The FAC describes the GSO Transfer so that it fits into each of the three covered transaction types.  (*Id.* ¶ 155 ("The GSO Transfer improperly gave preference to the GSO Defendants over the interests of Norske Skogindustrier's other creditors."); *id.* ¶ 156 ("The GSO Transfer was a non-ordinary transfer that severely deteriorated Norske Skogindustrier's ability to continue business or make payments to its other creditors."); *id.* ¶ 159 ("The GSO Transfer prevented Norske Skogindustrier's assets from being used to pay off Norske Skogindustrier's creditors.").)  As Hamre notes, "the series of transfers of the Second Restructuring gives preference to Defendants at the expense of other creditors, notably the holders of the SSNs and the PENs."[24]  (Hamre Decl. ¶ 152.)  Perhaps this is so, and allegations of a global scheme involving, *inter alia*, the Second Restructuring may be indicative of a preferential transfer.  But Count I does not seek to avoid the series of transfers that constitute the Second Restructuring; rather, it seeks to avoid the GSO Transfer only.  (FAC ¶ 167.)  Thus, what the Plaintiff's expert identifies as preferential is not the specific target of the avoidance claim.

However, it is not readily clear, as a matter of Norwegian law, whether it is an overarching preferential (or otherwise improper) transaction—which includes within it a series of component transfers—that a Section 5-9 claim must seek to avoid, or whether a Section 5-9 claim can properly seek to avoid a particular component transfer on the basis that its position in the overarching series of transactions caused it to fit within one of Section 5-9's covered

---

[24]    While holders of the SSNs and PENs are not direct creditors of Norske ASA, which did not issue these instruments, the SSNs and PENs are subject to the Guarantee Obligations (defined above), with Norske ASA as guarantor.

transaction types.[25]  The Plaintiff seeks to define the GSO Transfer as being within Section 5-9's

covered transaction types by virtue of its position within the larger, multi-prong transaction

structure involving the Second Restructuring, issuance of the NSF, and the Upstreaming and

Transfer.  Because the Section 5-9 claim against GSO must be dismissed for failure to comply

with Rule 9(b), the Court need not, and does not, decide this issue of Norwegian law at present.

### b.  Improper Transaction

The FAC alleges facts that fit within the elements that Hamre identifies as indicative of

an improper transaction (and similar to badges of fraud).  The FAC alleges in several places that

GSO is a related party to Norske ASA.  (*Id.* ¶¶ 163, 178.)  While merely stating that GSO is a

related party may be a legal conclusion, the FAC plausibly alleges that GSO was Norske ASA's

largest shareholder, holding 25.47% of its outstanding shares by the end of March 2016.  (*Id.* ¶

61.)  Even before taking such a large equity position, GSO had taken an active role in ongoing

restructuring negotiations, and GSO, along with Cyrus, called an extraordinary general meeting

to discuss refinancing and to remove board members.  (*Id.* ¶¶ 97–99; *id.* Ex. 5 (December 7,

2015, letter from GSO and Cyrus to Norske ASA management).)  These would be sufficient to

plead this element of Section 5-9; however (and as discussed further in Section VI of this

opinion), to the extent that the section 546(e) safe harbor is shown to apply, the Plaintiff may

need to show that what made the transfer improper is the fraudulent intent of the transferor.  If

the Plaintiff attempts to allege that GSO's intent as transferee should be imputed to Norske ASA

---

[25]       The Norwegian legislative commentary does not shed much light on this issue.  (*See* NOU 1972:20, ECF
Doc. # 47-6.)  The examples discussed in the commentary (involving, e.g., home mortgages and individual life
insurance policies) come nowhere near to capturing the complexity of the instant case.  Indeed, the Plaintiff's expert
noted repeatedly at the Hearing that the Norske ASA bankruptcy has been perhaps the largest and most complex
bankruptcy in Norway's history.

as transferor, as was argued at the Hearing, the Plaintiff must allege facts sufficient to support such imputation.[26]

### c. Norske ASA's Financial Difficulties

The FAC does plausibly allege that Norske ASA's financial situation was weak. The FAC states that, "[a]t the time of the GSO Transfer, Norske Skogindustrier's financial situation was weak and was seriously weakened by the GSO Transfer, as Norske Skogindustrier was insolvent or nearing insolvency, with no realistic expectation that Norske Skogindustrier would be able to pay its remaining financial debts at maturity." (*Id.* ¶ 160.) Norske ASA completed significant financial restructurings in little more than a year's time and was apparently engaged in a third restructuring attempt shortly before bankruptcy. (*Id.* ¶ 141.) Moreover, it does not seem to be seriously in dispute that Norske ASA was in a difficult financial position.

### d. Subjective Elements—Transferee's Knowledge[27]

The FAC alleges that GSO knew of Norske ASA's financial condition and of the circumstances that made the GSO Transfer improper due to GSO's "insider and controlling status."[28] (*Id.* ¶ 161.) While the FAC may not have plausibly alleged GSO's actual control, it alleges that GSO was Norske ASA's largest shareholder; it was a substantial creditor; it was heavily involved in the Second Restructuring; along with Cyrus, it engineered the replacement of two of Norske's board members; and it was aware of Norske ASA's financial situation.

---

[26]    As discussed below in Section VI, if the Defendants can establish that the safe harbor contained in section 546(e) of the Bankruptcy Code applies to the GSO Transfer, in order to sustain an avoidance claim, the Plaintiff would be required to show the transferor's intent in order to except the GSO Transfer from the safe harbor.

[27]    While section 5-9 makes the transferee's knowledge an element of the claim on which a trustee has the burden of proof, it is useful to recognize that section 548(c) of the Bankruptcy Code shifts the burden to the transferee to prove a "good faith" affirmative defense.

[28]    An essential part of Plaintiff's theory of the case is that GSO believed that absent another restructuring, Norske ASA would default on the 2016 SUNs at maturity and trigger GSO's substantial obligations on its CDS position.

49

The Second Restructuring appears to have been designed to benefit GSO in two ways: first, it eliminated GSO's substantial exposure on its CDS position; and second, it exchanged GSO's large creditor position in the subordinated unsecured notes (2016 SUNs) in the parent entity with a secured position in a separate Norske subsidiary with substantial collateral. The funds used by Norske ASA to repurchase the SUNs were derived from the funds that GSO essentially recycled by purchasing the secured notes of the subsidiary that were then up-streamed to Norske ASA to enable it to repurchase the 2016 SUNs.

3.  Conclusion

While the Court concludes that the Plaintiff has not pled the circumstances of the Section 5-9 claim with sufficient particularity as required by Rule 9(b), it is entitled to a chance to do so. Accordingly, Count I is **DISMISSED** with leave to amend.

### C.  The Plaintiff Fails to Adequately Plead a Section 5-9 Claim Against Cyrus

Count III[29] of the FAC seeks a judgment avoiding the Cyrus Sale and ordering Cyrus to pay an amount equal to the proceeds of the Cyrus Sale to the Estate. (FAC ¶ 196.) While Count III has already been dismissed on choice-of-law grounds, it would still be dismissed if Norwegian law applied to the Cyrus Sale. The FAC alleges that

> [i]n connection with the Upstreaming and Transfer,[30] which includes the Cyrus Sale and the contemporaneous GSO Transfer, the Cyrus Defendants received payment of the 2016 SUNs at 68% of par value plus interest, with the understanding that the 2016 SUNs would contemporaneously be repurchased by Norske Skogindustrier, in detriment to Norske Skogindustrier's other creditors, such as the holders of the Guarantee Obligations and the remaining SUNs.

---

[29]    The Counts are addressed out of order to analyze the two claims under Section 5-9 in order.

[30]    The FAC defines the Upstreaming and Transfer as follows: "Over the objection of certain of the Secured Ad-Hoc Group and other injured creditors, the case received of generated by NSAS on account of the NSF was upstreamed, either directly or indirectly, to Norske Skogindustrier and used to repay the 2016 SUNs ('**Upstreaming and Transfer**')." (FAC ¶ 121.)

(FAC ¶ 183.)

The FAC defines the Cyrus Sale as follows: "To that end [i.e., to orchestrate the Second Restructuring to benefit themselves to the detriment of other creditors], on March 18, 2016, the Cyrus Defendants sold substantially all of their interests in the 2016 SUNs to GSO at 68% of par value, plus accrued interest (the '**Cyrus Sale**')." (*Id.* ¶ 125.)  As defined in the FAC, the Cyrus Sale was a transaction between Cyrus and GSO; it did not involve any transfer from Norske to Cyrus; quite simply, Norske ASA was not a party.  The Plaintiff tries to fit the Cyrus Sale into Section 5-9 by framing it as part of a broader overall scheme involving the Second Restructuring, the Upstreaming and Transfer, and the GSO Transfer, but Count III only seeks to avoid the Cyrus Sale and to recover the proceeds of a sale to which Norske ASA was not party.[31]  Such a transaction cannot be avoided under Section 5-9.  If the Plaintiff can avoid the GSO Transfer— and to the extent the GSO Transfer included the 2016 SUNs that GSO owned before the Cyrus Sale <u>and</u> the 2016 SUNs that GSO purchased from Cyrus[32]—the Plaintiff will be made whole. Accordingly, the Cyrus Motion is **GRANTED** with respect to Count III.

### D.  The FAC Properly Pleads a Section 5-5 Claim Against GSO

Count II asserts a claim against GSO under Section 5-5.  (*Id.* ¶¶ 168–80.)  The Plaintiff seeks to avoid the GSO Transfer and have the amount of the GSO Transfer paid to the Estate. (*Id.* ¶ 180.)

Section 5-5 provides:

> Payment of debt which the debtor has carried out later than three months prior to the date of filing for bankruptcy may be voided if

---

[31]    Despite the Plaintiff's request for the Court to consider the Cyrus Sale and the GSO Transfer as one transaction, the claim to avoid the Cyrus Sale is asserted as a separate claim from the claim to avoid the GSO Transfer, rather than the Plaintiff asserting a single claim to avoid the alleged overall transaction.  (*Id.* ¶¶ 181–96.)

[32]    As noted above, it is ambiguous exactly what is encompassed within the GSO Transfer, which is the transfer the Plaintiff specifically seeks to avoid.

> the payment is made with unusual means of payment, before the
> ordinary time for payment, or with an amount that substantially
> deteriorated the debtor's ability to meet payments, provided that the
> payment in light of the circumstances did not appear to be ordinary.
>
> If a payment mentioned in the first paragraph was made to one of
> the debtor's closely related parties, it may also be voided if it was
> carried out earlier, but later than two years prior to the date of filing
> for bankruptcy, unless it can be proven that the debtor was
> unquestionably solvent when the payment was carried out.

(*Id.* ¶ 169.)  "Section 5-5 is an objective avoidance provision."  (Hamre Decl. ¶ 56.)  There is no

intent requirement, and a payment is voidable if the required elements are present:

(1) there was a payment of a debt,

(2) within three months of bankruptcy (unless the transferee was a related party),

(3) that was made

(a) with unusual means of payment, or

(b) before the ordinary time for payment, or

(c) with an amount that deteriorated debtor's ability to meet payments, and

(4) the payment did not appear to be ordinary.

Hamre submits that the three voidable payment categories (unusual means, before

ordinary time, with an amount that deteriorates debtor's ability to pay) are considered non-

ordinary as a matter of law, but that a debt can fall into one of those categories and still not be

subject to avoidance if it appeared to be ordinary under the circumstances.  (*Id.* ¶ 58.)

### 1. Payment of a Debt

Hamre submits that "the decisive factor for determining whether a transaction must be

considered a 'payment of a debt' is whether the intent or purpose of the transaction has been to

reduce or fulfill an outstanding obligation of the debtor."  (*Id.* ¶ 62.)  This is a broader

interpretation than the Defendants' experts provide, but it appears reasonable and favors

substance over form.  Aasebø argues that "Section 5-5 . . . generally applies only to a payment of

a debt from a debtor directly to a defendant.  It can apply to a payment through an intermediary

only in very limited circumstances where the payment actually or effectively comes from the

debtor."  (Aasebø Decl. ¶ 31.)

Hamre responds that "[c]ase law on payments of debts through intermediaries shows a

clear policy for Norwegian courts to look at the totality of the circumstances of the transfers, and

often [to] find that payments through intermediaries fall within the scope of Section 5-5."

(Hamre Decl. ¶ 82.)  Hamre cites the same case as Aasebø for the proposition that the Norwegian

Supreme Court will "focus on the underlying reality of the transaction," when determining

whether a payment constitutes a payment of a debt by the debtor.  (*Id.* ¶ 84.)  Hamre also submits

that Aasebø is incorrect that only direct payments from debtor to defendant will qualify under

Section 5-5, stating that

> [i]t is irrelevant for the purposes of Section 5-5 that payment is made
> through a third party (such as a broker) where the funds will
> ultimately come from the debtor.  This is because it is not the
> broker's assets that will be expended or dissipated; it is the assets
> and values of the debtor that will be reduced through such a
> payment.

(*Id.* ¶ 85.)

Hamre provides a more complete discussion and the better argument.  Finding that a

transaction is not the payment of a debt merely because it involves a broker-intermediary is a

forced interpretation of Section 5-5.  For purposes of the GSO Motion, the Court adopts Hamre's

explanation of Norwegian law for this element of the Section 5-5 claim against GSO.  The

Plaintiff has sufficiently alleged that the GSO Transfer was a payment of a debt.

53

2.  Ordinary/Non-Ordinary Payments

Hamre submits that "[t]he 'ordinary' exception under Section 5-5 is limited to cases

whereby payments are made as part of the ordinary operational activities of the company."  (*Id.* ¶

91 (quoting HR-2017-370 ("It is the considerations of security and predictability in the business

world that justify that a debtor who is in a difficult financial situation, in certain circumstances

should still be able to continue to pay ordinary running expenses.").)  Hamre states that "[t]he

determining factor is whether the debt consists of ongoing, ordinary expenses, and not older or

long-term debt."  (*Id.* ¶ 92.)

Aasebø submits that "[a]n open-market purchase or sale of a bond through a broker is not

an extraordinary transaction."  (Aasebø Decl. ¶ 32.)  Aasebø notes that early repayment of a debt

that advantages a debtor will be considered "ordinary" and will not be subject to avoidance.  (*Id.*

¶ 33.)  Aasebø states that three factors are relevant in determining whether a payment that

impaired a debtor's ability to make payments is nevertheless "ordinary": whether the debt is only

recently overdue, whether the debt is for an ordinary operating expense, and whether the

defendant-transferee is not a closely related party.  (*Id.* ¶¶ 34–37.)

The FAC adequately alleges that the GSO Transfer was non-ordinary.  In particular, the

FAC alleges:

> In light of . . . the multiple exchange offers proposed during the
> Second Restructuring, the appointment of the Cyrus/GSO Board
> Members at the urging of the Defendants, the objections of Norkse
> Skogindustrier's creditors, and the contemporaneous Cyrus Sale . .
> ., the GSO Transfer was a non-ordinary and irregular transfer . . . .

(FAC ¶ 172.)

While questions remain whether the Plaintiff can prove the allegations about the

Defendants' ability to influence the appointment of board members and whether the Cyrus Sale

can properly be said to involve Norske ASA at all, the allegations show an extraordinary

transaction. The Second Restructuring (and with it the GSO Transfer) was not a routine payment of business expenses; it was a heavily negotiated, multi-part effort to restructure the Norske Enterprise's finances. This is enough to plausibly show that the transaction was non-ordinary.

The FAC also alleges that the GSO Transfer left Norske ASA unable to make payments to other creditors. It is not entirely clear whether the GSO Transfer rises to the level of having "substantially deteriorated the debtor's ability to make payments." (*See* Section 5-5.) With the other extraordinary features of the GSO Transfer, however, the FAC has adequately alleged that the GSO Transfer was not ordinary.

### 3. Related Party

The look-back period to avoid a transfer under Section 5-5 is generally three months. But if the transferee is one of the debtor's closely related parties, the look-back period extends up to two years pre-petition. (*See* Section 5-5.) Whether a person is a related party involves a highly factual analysis that considers the realities of the relationship. (*See* Hamre Decl. ¶ 124.) While Aasebø argues that a shareholder must generally own more than 50% of the debtor's equity to be a related party, Hamre disagrees, instead asserting that "such a general rule of interpretation cannot be established." (*Id.* ¶ 125.)

The FAC alleges that GSO was a closely related party, as GSO was Norske ASA's largest shareholder and largest creditor and influenced Norske ASA by means of the Cyrus/GSO Board Members. (FAC ¶ 178.) As previously noted, the extent to which GSO was able to control any board members has not been plausibly pled. Nevertheless, GSO was a 25.47% shareholder at the time of the Second Restructuring, and this is a large enough equity position to create a factual question whether GSO was a related party. At the motion to dismiss stage, the Court concludes that Hamre's analysis of Norwegian law on this element of the claim is

persuasive.  Therefore, the FAC has sufficiently alleged that GSO was a related party to trigger

the longer, two-year look-back window under Section 5-5.

Accordingly, the Court concludes that the FAC states a claim against GSO under Section

5-5.  One major caveat remains, however—whether the Section 5-5 claim, or for that matter, the

Section 5-9 claim, is barred by the safe harbor provision in section 546(e) of the Bankruptcy

Code, made applicable in a chapter 15 case by section 561(d) of the Bankruptcy Code.  Those

issues are addressed, and the applicability of the 546(e) safe harbor is rejected, at least for now,

as discussed in the next section.  For now, at least, the GSO Motion is **DENIED** with respect to

Count II.

## VI.    THE SECTION 546(e) SAFE HARBOR

The Defendants argue that the GSO Transfer and the Cyrus Sale are protected from

avoidance by the section 546(e) safe harbor.  Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b)
> of this title, the trustee may not avoid a transfer that is a margin
> payment, as defined in section 101, 741, or 761 of this title, or
> settlement payment, as defined in section 101 or 741 of this title,
> made by or to (or for the benefit of) a commodity broker, forward
> contract merchant, stockbroker, financial institution, financial
> participant, or securities clearing agency, or that is a transfer made
> by or to (or for the benefit of) a commodity broker, forward contract
> merchant, stockbroker, financial institution, financial participant, or
> securities clearing agency, in connection with a securities contract,
> as defined in section 741(7), commodity contract, as defined in
> section 761(4), or forward contract, that is made before the
> commencement of the case, except under section 548(a)(1)(A) of
> this title.

11 U.S.C. § 546(e).

"Section 561(d) . . . makes the safe harbor applicable in a chapter 15 case to 'limit

avoidance powers to the same extent as in a proceeding under chapter 7 or 11' of the Bankruptcy

Code." *Fairfield Sentry*, 2020 WL 7345988, at *5 (quoting 11 U.S.C. § 561(d)). Section 561(d) provides:

> Any provisions of this title relating to securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements shall apply in a case under chapter 15, so that enforcement of contractual provisions of such contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of this title or by order of a court in any case under this title, and *to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title* (such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States).

11 U.S.C. § 561(d) (emphasis added).

Section 1521(a)(7) of the Bankruptcy Code prevents a foreign representative from bringing an avoidance claim under section 548, or under section 544(b)(1) of the Bankruptcy Code which otherwise permits a trustee to bring avoidance claims under state law.[33] But courts have recognized that section 1521(a)(7) does not prevent a foreign representative from bringing avoidance claims under foreign law. *See Fogerty v. Petroquest Res., Inc. (In re Condor Ins. Ltd.)*, 601 F.3d 319 (5th Cir. 2010); *Hellas*, 535 B.R. at 568. The issue here is the extent to which sections 546(e) and 561(d) prevent a foreign representative from bringing avoidance claims under Section 5-5 and Section 5-9.[34]

---

[33] Section 1521(a)(7) provides:

> (a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including— . . .
>
> > (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a)(7).

[34] The Section 17-1 claim and related claim under "non-statutory law" are not avoidance claims. The safe harbor is therefore irrelevant to those claims.

### A.  The Requirements of Section 546(e)

"Put simply, the safe harbor applies where two requirements are met: (1) there is a *qualifying transaction* . . . and (2) there is a *qualifying participant*."  *In re Nine West LBO Secs. Litig.*, 482 F. Supp. 3d 187, 197 (S.D.N.Y. 2020) (emphasis in original).  In addition, the qualifying transaction must be "made by or to (or for the benefit of)" a qualifying participant.  11 U.S.C. § 546(e).

#### 1.  Qualifying Transaction

A qualifying transaction is either (i) "a transfer that is a margin payment . . . or a settlement payment," or (ii) "a transfer made . . . in connection with a securities contract . . . , commodity contract . . . , or forward contract . . . ."  11 U.S.C. § 546(e).  The terms "settlement payment" and "in connection with a securities contract" have been interpreted extremely broadly, as discussed below.

##### a.  Settlement Payment

Under the Bankruptcy Code, the term "settlement payment" means "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).  The Second Circuit has held that this term includes a transfer of cash made to complete a securities transaction.  *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011); *see also Nine West*, 482 F. Supp. 3d at 200 (noting "the Second Circuit's capacious interpretation of § 741(8)").

##### b.  In Connection with a Securities Contract

The Second Circuit has held that "[s]ection 741(7) of the Bankruptcy Code, to which § 546(e) refers, defines 'securities contract' with extraordinary breadth" and "expansively includes contracts for the purchase or sale of securities, as well as any agreements that are similar or

related to contracts for the purchase or sale of securities." *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 417–18 (2d Cir. 2014). In the context of the safe harbor, "[t]his concept is broadened even farther because § 546(e) also protects a transfer that is 'in connection' with a securities contract." *Id.* at 418.

### 2. Qualifying Participant

A qualifying participant is "a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency." 11 U.S.C. § 546(e). The Second Circuit recently held that a qualifying participant can also include a customer of a financial institution. *See Deutsche Bank Tr. Co. Ams. v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 946 F.3d 66, 77–80 (2d Cir. 2019) ("*Tribune*"). The Supreme Court denied certiorari of the Second Circuit's decision in *Tribune* on April 19, 2021. *Deutsche Bank Tr. Co. v. Robert R. McCormick Found.*, 2021 WL 1521009 (U.S. Apr. 19, 2021).

### 3. The Qualifying Transaction Is Made by or to (or for the Benefit of) a Qualifying Participant

To be encompassed within the safe harbor, the qualifying transaction must be "made by or to (or for the benefit of)" a qualifying participant. 11 U.S.C. § 546(e).

The Supreme Court recently considered the question of "how the safe harbor operates in the context of a transfer that was executed via one or more transactions, *e.g.*, a transfer from A → D that was executed via B and C as intermediaries, such that the component parts of the transfer include A → B → C → D." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018). The Court unanimously concluded that "[i]f a trustee seeks to avoid the A → D transfer, and the §546(e) safe harbor is invoked as a defense . . . the relevant transfer for purposes of the §546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under

one of the substantive avoidance provisions." *Id.* at 888, 893. The Court explained that section

546(e) "explicitly equates the transfer that the trustee may otherwise avoid with the transfer that,

under the safe harbor, the trustee may not avoid. In other words, to qualify for protection under

the securities safe harbor, §546(e) provides that the otherwise avoidable transfer itself be a

transfer that meets the safe-harbor criteria." *Id.* at 894. The Court also clarified that a

transaction between non-qualifying entities that includes a qualifying participant that participates

only as a "mere conduit" is not covered by the safe harbor. *Id.* at 897. ("The safe harbor saves

from avoidance certain securities transactions 'made by or to (or for the benefit of )' covered

entities. Transfers 'through' a covered entity, conversely, appear nowhere in the statute.").

  *Merit* left open the question of whether the safe harbor would apply where, for example,

A or D is a qualified participant by virtue of being a customer of a financial institution under

section 101(22)(A). *Id.* at 890 n.2 ("We . . . do not address what impact, if any, §101(22)(A)

would have in the application of the §546(e) safe harbor."). After *Merit*, the Second Circuit in

*Tribune* found that the safe harbor does apply in such situations. *Tribune*, 946 F.3d at 77–80.

### B. The Safe Harbor in the Context of a Motion to Dismiss

  "Bankruptcy courts will enforce the safe harbor provisions of the Bankruptcy Code in

appropriate cases by dismissing avoidance actions on the pleadings." *Lehman Bros. Holdings v.*

*JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings)*, 469 B.R. 415, 434 (Bankr.

S.D.N.Y. 2012). The most "appropriate cases" to decide the applicability of the safe harbor on a

motion to dismiss are ones where the facts are not in dispute, or where there is already a

sufficiently detailed factual record to decide whether the applicable statutory definitions are met,

such that "[t]he application of Section 546(e) presents a straightforward question of statutory

interpretation of the type that is appropriately resolved on the pleadings." *In re Tribune Co.*

*Fraudulent Conveyance Litig.*, 2019 WL 1771786, at *7 (S.D.N.Y. Apr. 23, 2019).

This is not such a case. While the terms "settlement payment" and "in connection with a

securities contract" have been interpreted extremely broadly, and it appears beyond dispute that

the transactions in question fit within the broad definition of those terms, the Plaintiff disputes

that GSO and Cyrus are the types of entities that make section 546(e) applicable to the transfers

in question. (Opposition at 48 n.16.)

Cyrus argues that the safe harbor applies because both it and GSO are "financial

participants." (Cyrus Memo at 25 n.5.) The term "financial participant" has specific criteria

under the Code. *See* 11 U.S.C. § 101(22A). Critically, neither Cyrus nor GSO have pointed to

any facts that demonstrate that the criteria for "financial participant"—or the criteria for any

other qualifying participant under section 546(e)—have been met. While the GSO Transfer

involves a broker, the parties dispute the extent to which the broker was involved, and it has not

been shown that the transactions were made "by or to (or for the benefit of) a . . . stockbroker,"

or whether the broker was instead a "mere conduit" in the transaction.[35] The Court notes that,

particularly in light of *Tribune*, it may be relatively easy for the Defendants to show that the

transfers in question were made "by or to (or for the benefit of)" qualifying participants such that

the safe harbor would apply. However, the Defendants have not cited *Tribune*, let alone argued

how it should apply here.

"The section 546(e) safe harbor is an affirmative defense as to which the Defendants bear

the burden of proof." *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry*

---

[35]     That is, unless the "GSO Transfer" is interpreted to mean only the alleged *Norske to broker* transaction, in
which case the GSO Transfer would clearly be "to . . . a . . . stockbroker." 11 U.S.C. § 546(e). However, this
interpretation would require dismissal of the claim against GSO to avoid the GSO Transfer even before reaching the
issue of the safe harbor, because GSO was not a party to that transaction.

*Ltd.)*, 596 B.R. 275, 307 (Bankr. S.D.N.Y. 2018).  As the relevant facts are in dispute and the

Defendants have not met their burden to show that the transfers are protected from avoidance by

the safe harbor, the Court concludes that the safe harbor does not apply to require dismissal of

the avoidance claims at this stage.

### C.  The Exception

If the safe harbor does apply, the Court would be faced with the issue of the scope of the

exception to the safe harbor in a chapter 15 case, which raises an unsettled issue of statutory

interpretation.

Section 546(e) excepts from safe protection avoidance claims "under section

548(a)(1)(A)."  11 U.S.C. § 546(e).  Section 548(a)(1)(A) provides:

> (a)   (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. § 548(a)(1)(A).

Section 561(d) provides that section 546(e) "shall apply in a case under chapter 15 . . . to

limit avoidance powers *to the same extent* as in a proceeding under chapter 7 or 11 of this title . .

. ."  11 U.S.C. § 561(d) (emphasis added).  Section 1521(a)(7) provides that the court may not

grant relief to a chapter 15 foreign representative "under sections 522, 544, 545, 547, 548, 550,

and 724(a)."  11 U.S.C. § 1521(a)(7).  Accordingly, "foreign representatives under chapter 15[]

62

cannot assert a claim under Bankruptcy Code § 548(a)(1)(A)." *Fairfield Sentry*, 2020 WL

7345988, at *8.

The interpretive question raised by the interaction of sections 546(e), 561(d), and

1521(a)(7) can be summarized by the comparison of two possible readings:

Reading One:

(1) Section 546(e) provides the extent of the safe harbor and the exception to the safe harbor.

(2) Section 561(d) states that section 546(e) applies in a chapter 15 case "to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11." Therefore, the only exception to the safe harbor in a chapter 15 case is also a claim "under 548(a)(1)(A)."

(3) Section 1521(a)(7) prevents a chapter 15 foreign representative from making a claim under, *inter alia*, section 548, so a foreign representative is foreclosed from the only exception to the safe harbor.

(4) Therefore, there is effectively no exception to the safe harbor in a chapter 15 case.

Reading Two:

(1) Section 546(e) provides the extent of the safe harbor and the exception to the safe harbor.

(2) Section 1521(a)(7) prevents a chapter 15 foreign representative from making a claim under, *inter alia*, section 548.

(3) *Despite* section 1521(a)(7), section 561(d) states that section 546(e) applies in a chapter 15 case "to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11." As the scope of avoidance powers is defined not only by the scope of the safe harbor (i.e., what goes into it), but also by the scope of the *exception* to the safe harbor (i.e., what goes out of it), foreign-law avoidance claims for intentional fraudulent transfers are excepted from the safe harbor in a chapter 15 case, "to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11."

(4) Therefore, there remains an exception to the safe harbor in a chapter 15 case.

63

The Plaintiff essentially argues for the Court to adopt the latter reading, such that foreign-law fraudulent transfer claims that are analogous to claims under section 548(a)(1)(A) would be excepted from the safe harbor.  The Plaintiff also argues that the Section 5-9 claim is sufficiently analogous to a claim under section 548(a)(1)(A) to fall within the exception to the safe harbor.[36]

The court dealt with the scope of the exception to the safe harbor with respect to foreign-law avoidance claims in a chapter 15 case in *Fairfield Sentry*, 2020 WL 7345988.  The court rejected the foreign representative's argument that avoidance claims under BVI law were excepted from the section 546(e) safe harbor:

> Nevertheless, the Liquidators assert that the Intentional Fraud Exception is not limited to claims brought under section 548(a)(1)(A), and applies to claims under BVI law to avoid transfers made with the intent to defraud creditors irrespective of the label attached to a claim. . . . .  They further argue that the BVI Avoidance Claims fall within the Intentional Fraud Exception because Citco Administrator's knowledge is imputable to the Funds, and the *Citibank Complaint* alleges conscious misbehavior or recklessness by Citco Administrator as well as a motive and opportunity to commit fraud in connection with the redemptions. . . . .
>
> The Liquidators' argument lacks merit.  First, the Intentional Fraud Exception only applies to intentional fraudulent transfer claims under Bankruptcy Code § 548(a)(1)(A); the Safe Harbor still bars state law intentional fraudulent transfer claims that a U.S. bankruptcy trustee could assert through 11 U.S.C. § 544(b)(1).  The Liquidators, as foreign representatives under chapter 15, cannot assert a claim under Bankruptcy Code § 548(a)(1)(A).  Instead, they assume that their BVI intentional fraudulent transfer claim is sufficiently analogous to a bankruptcy fraudulent transfer claim for purposes of 11 U.S.C. § 561(d) and therefore comes within the Intentional Fraud Exception.  If true, it is also sufficiently analogous to a state law fraudulent transfer claim that is barred.  The Liquidators fail to articulate any rationale for equating their BVI intentional fraudulent transfer claim to a U.S. bankruptcy law claim rather than a state law fraudulent transfer claim.

---

[36]    Section 5-5 is described by the Plaintiff's own expert as "an objective avoidance provision."  (Hamre Declaration ¶ 56.)  A claim under such a provision would not be excepted from the safe harbor even under the broadest reading of the exception.

*Id.* at \*8

I respectfully disagree with the analysis in *Fairfield Sentry*. It sets up a strawman that is wholly inapposite when considering foreign law avoidance claims, explaining that section 546(e) bars state law avoidance claims that are analogous to section 548(a)(1)(A) claims, so that even analogous foreign law avoidance claims must be barred too. State law avoidance claims are barred because section 546(e) preempts state law avoidance claims. *See Tribune*, 946 F.3d at 81–83. Preemption does not apply to foreign law claims. Section 561(d) states that section 546(e) applies in a chapter 15 case "to limit avoidance powers *to the same extent* as in a proceeding under chapter 7 or 11." If Congress intended to bar assertion of foreign law avoidance claims in chapter 15 cases, or to require that foreign statutes use the same language contained in section 548(a)(1)(A), it could have said so simply and clearly. It did not.[37] Reading section 561(d) to effectively bar any exception to the section 546(e) safe harbor in a chapter 15 case would limit avoidance powers *to a broader extent* than in a case under chapter 7 or 11.

*Fairfield Sentry* also implies that an avoidance claim that does not "require proof of an intent to 'hinder, delay, or defraud,' the critical element of an intentional fraud claim," would not

---

[37]     Permitting a foreign representative to assert avoidance claims under foreign law involves a well-recognized exercise of comity under chapter 15. In *Condor*, the Fifth Circuit held that while a foreign representative could not bring an avoidance action under U.S. law in a chapter 15 case, the foreign representative could bring an action under applicable foreign law. *Condor*, 601 F.3d 319. *Condor* did not create a new legal principle, as the Fifth Circuit recognized that a foreign representative could bring a foreign law avoidance action under former section 304, *see, e.g.*, *In re Metzeler*, 78 B.R. 674, 677 (Bankr. S.D.N.Y. 1987), and Congress did not change that result when it adopted chapter 15. 601 F.3d at 328–29. This Court's *Hellas* decision, applying the doctrine of comity, followed *Condor*, permitting a foreign representative to assert avoidance claims under foreign law. *Hellas*, 535 B.R. at 568. But it is important to recognize that comity is a doctrine of judicial discretion. Congress may explicitly limit the court's discretion to grant relief through comity in a foreign proceeding. *See Maxwell Commc'n Corp. plc v. Societe Generale (In re Maxwell Commc'n Corp. plc)*, 93 F.3d 1036, 1047 (2d Cir. 1996) ("Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise.") (citing *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959)). In section 561(d), applying section 546(e) in chapter 15 cases, Congress limited comity in chapter 15 cases by limiting avoidance powers to the same extent as in cases under chapter 7 or 11 even if foreign avoidance claims would otherwise permit recovery on different terms.

be sufficiently analogous to section 548(a)(1)(A). *Fairfield Sentry*, 2020 WL 7345988, at *9

(quoting 11 U.S.C. § 548(a)(1)(A)). But section 561(d) does not state that only foreign law that

uses language substantially identical to section 548(a)(1)(A) is excepted from the section 546(e)

safe harbor. In *Lehman Brothers*, 469 B.R. 415, and in *Hellas*, 526 B.R. 499, the courts

permitted unjust enrichment claims that sought recovery of transfers to go forward so long as the

unjust enrichment claims alleged actual intent of the transferor, even though actual intent was not

an element of the unjust enrichment claims. While the question presented in those cases was

whether section 546(e) preempted the unjust enrichment claims, and preemption is not applicable

to foreign law claims, the broader principle stated in those cases—that claims that "have more in

common with claims grounded in actual fraudulent intent" are not barred by the safe harbor—is

nonetheless equally applicable here. *Lehman Bros.*, 469 B.R. at 451; *Hellas*, 526 B.R. at 510.

The inquiry whether the foreign statute is sufficiently analogous to section 548(a)(1)(A) must

therefore be a flexible one, taking into account not only the language of the statute but also the

broader context of the foreign legal regime, rather than a rigid comparison of the language in the

foreign statute and our own.

Of equal or greater importance are the allegations in the pleading of the claim that a

defendant seeks to dismiss. While the Plaintiff fails to plead fraud with the particularity required

by Rule 9(b), the Plaintiff's counsel represented that he can in good faith amend the complaint to

allege facts demonstrating that the transferor acted with the required intent, either directly or by

imputation—the standard ordinarily required by section 548(a)(1)(A). The Court has granted the

Motions but with leave to amend. The Plaintiff will have the opportunity to cure the

deficiencies. As already explained, under Section 5-9, the Plaintiff must plead and prove that the

transfer was "improper," which GSO's expert Aasebø describes as showing that the transaction

"can be criticized based on a moral assessment," and which the Plaintiff's expert Hamre states

can be analogized to "badges of fraud," which is an accepted way of establishing the requisite

intent under section 548(a)(1)(A) of the Bankruptcy Code.  (Aasebø Declaration ¶ 42; Hamre

Declaration ¶ 157.)  Therefore, while Section 5-9 does not in express terms require a showing of

fraudulent intent on the part of the transferor, Section 5-9 is sufficiently analogous to section

548(a)(1)(A) to fall within the exception to the safe harbor if the Plaintiff adequately alleges

transferor intent, either directly or by imputation.

Barring foreign law avoidance claims or imposing an impossibly high standard for the

exception to the safe harbor to apply in chapter 15 cases would mean that there is effectively no

exception to the safe harbor in such cases, contrary to the language of section 561(d), which

makes section 546(e) applicable "to limit avoidance powers *to the same extent as*" (not *to a*

*broader extent than*) "in a proceeding under chapter 7 or 11."  11 U.S.C. § 561(d).  Accordingly,

the Court declines to adopt a rigid rule barring foreign law avoidance claims or requiring the

foreign statute to use language virtually identical to section 548(a)(1)(A) to except the

challenged transaction from the section 546(e) safe harbor.[38]

---

[38]     The Defendants arguments, if adopted, risk the U.S. not just providing a safe harbor for qualifying
transactions involving qualifying participants, but providing a safe haven for looters and fraudsters of foreign
company assets that are transferred to the U.S. and who use banks or brokers to help carry out their schemes.
Tracing and recovery of fraudulently transferred assets has been identified as a world-wide problem.  UNCITRAL
Working Group V held a "Colloquium on Civil Asset Tracing and Recovery" on December 6, 2019.  In undertaking
this work,

> [t]he Commission was of the view that the colloquium should consider the
> elements of a possible toolkit on civil asset tracing and recovery and collect more
> information on civil law jurisdictions practices.  The colloquium should also: (a)
> examine both criminal and civil law tracing and recovery with a view to better
> delineating the topic while benefitting from available tools; (b) consider tools
> developed for insolvency law and for other areas of law; and (c) discuss proposed
> asset tracing and recovery tools and other international instruments (A/74/17,
> para. 203).  That decision followed the consideration by the Commission of the
> proposals submitted by the United States of America (A/CN.9/996) and
> (A/CN.9/WG.V/WP.154).

Of course, unless the Defendants can show that the transfers in question were "made by

or to (or for the benefit of)" one or more entities covered under section 546(e)—something they

have not done so far—the Court will not have to reach these additional questions.

## VII.    THE COMPANIES ACT CLAIM

### A.  Section 17-1 Legal Standard

Count IV asserts a claim against all Defendants under Section 17-1 of the Companies Act

and under related non-statutory law.  (FAC ¶¶ 197–205.)  Section 17-1 provides:

> [(1)] The company, a shareholder or others may hold the general
> manager, a member of the board of directors, member of the
> corporate assembly, independent expert, investigator or shareholder
> liable for any damage which they, in the capacity mentioned, have
> intentionally or negligently caused such party.

> [(2)] The company, a shareholder or others may also hold a party
> who, intentionally or negligently, has contributed to damage as
> mentioned in the first paragraph, liable for the damage.  Damages
> can be claimed from the contributor even though the person who
> caused the damage cannot be held responsible because he or she did
> not act with intent or negligence.

(*Id.* ¶ 198).

Section 17-1 codifies Norway's non-statutory rule relating to negligent or intentional acts

or omissions that damage a public company.[39]  (*Id.* ¶¶ 199–200; Aasebø Decl. ¶ 50.)  Hamre

---

*UNCITRAL Colloquium on Civil Asset Tracing and Recovery*, UNCITRAL, https://uncitral.un.org/en/assettracing
(last visited April 27, 2021).

[39]    The Plaintiff lists the three conditions under Norwegian non-statutory law that a claimant must show to
recover for a loss caused by a third party:

> (i) the damage was caused by an intentional or negligent act or omission . . . ; (ii)
> the negligent or intentional act or omission must have caused a loss that is legally
> recognized as a loss, and could be measured economically; and (iii) there has to
> be a causal connection between the negligent or intentional act of omission and
> the loss suffered by the aggrieved party.

(FAC ¶ 200.)  GSO argues that the FAC "identifies no relevant difference" between the statutory and non-statutory
claim and therefore submits that the arguments in the GSO Memo with respect to Section 17-1 "should be
understood to apply to Norwegian non-statutory law as well."  (GSO Memo at 17 n.6.)  Because the elements of the
non-statutory claim are substantially similar to those under Section 17-1 (although less rigorous), the Court's

submits that Section 17-1 "is the general damages provision of the Companies Act and codifies the rule of negligence within the scope of the Companies Act." (Hamre Decl. ¶ 177.)  As a general negligence provision, Section 17-1 is not subject to the heightened pleading standard of Rule 9(b).

Section 17-1 is broken down into two paragraphs: Section 17-1(1) provides for primary liability for the covered categories of persons, and Section 17-1(2) provides for secondary liability for a party that contributes to primary liability.

### 1.   Section 17-1(1) – Primary Liability

Breaking down Section 17-1, Hamre lists five conditions that must be satisfied: "1) 'the company, shareholder or others' may claim compensation for 2) losses that 3) the 'general manager, board member, member of the corporate assembly, investigator or shareholder' has 4) in 'said capacity' 5) 'intentionally or negligently' caused to the person or entity in question." (*Id.* ¶ 178.)

A creditor is not among the covered parties that a claimant may hold liable.  Aasebø notes that someone who is both a shareholder and a creditor will not be covered under the statute when acting specifically in the capacity of creditor.  (Aasebø Decl. ¶ 57)  Aasebø submits that Section 17-1 only compensates for a loss to the estate, not to a creditor or creditors.  (*Id.* ¶ 58.)  However, the legislative commentary to section 17-1 states that "[t]he word 'other' [in paragraph (1) of section 17-1] will typically include the company's creditors, but is not limited to them." (Ot.prp. no. 55 (2005–2006) Ro Decl. Ex. 9, ECF Doc. # 47-9, at 2.)  It appears that while a creditor cannot seek to hold another creditor liable, a creditor *can* seek to hold a shareholder

---

analysis with respect to statutory and non-statutory claims is essentially the same, the FAC states a claim under either, and the Motions are denied as to both statutory and non-statutory claims.  The Court does not make a finding on any potential Norwegian preemption issue at this time.

liable for its negligent or intentional actions that harmed the creditor, provided that the

shareholder was acting in its capacity as shareholder.  Included as an exhibit to the Ro

Declaration (and cited by both Ro and Hamre) is also an academic commentary on Section 17-1.

("Section 17-1 Commentary, ECF Doc. # 47-9 at 4–7.)  The Section 17-1 Commentary indicates

that liability for shareholders under Section 17-1 is typically "rooted in the shareholder's use of

his voting rights at the general meeting, if it leads to the meeting adopting decisions in violation

of the law," and it "may also be rooted in voting in connection with general meeting resolutions

which adopt the board's proposal, . . . but that [the shareholder] understood, or should have

understood, would be detrimental to the company."  (*Id.* at 4.)  The Section 17-1 Commentary

also suggests that shareholder liability will "be important particularly for the large, influential

shareholders, including those who have influence by virtue of mutual collaborations.  A clear

liability situation will exist when the company's assets are used in the interest of the shareholder,

but not in the interest of the company."  (*Id.* at 4–5.)

2.  <u>Section 17-1(2) – Secondary Liability</u>

The same entities (the company, shareholders, others) that can bring a claim under

section 17-1(1) can also bring a claim under section 17-1(2) against a party that negligently or

intentionally contributes to the same types of harm found in section 17-1(1), even where the

party that is the primary cause of the harm lacks the requisite negligence or intent to be found

liable.  (*See* Hamre Decl. ¶ 188.)  It is possible to have a claim for damages against an

"accomplice" to a claim covered by Section 17-1(1), even though the "covered party" (i.e., a

general manager, member of the board of directors, member of the corporate assembly,

independent expert, investigator, or shareholder) lacked the requisite negligence or intent.  (*Id.*)

Where actions taken by the board—even though the board is not negligent—damage the

claimant, the claimant can recover from the third party that negligently or intentionally contributed to the damage.

The Parties agree that Section 17-1(2) is an "aiding and abetting" statute.  The Section 17-1 Commentary makes clear that, under Section 17-1(2), "liability must also include situations where the shareholder has aided and abetted in another way than by formal execution of his voting right, such as in cases of actual influence outside the general meeting."  (Section 17-1 Commentary at 5.)  The Section 17-1 Commentary also notes that "what is required in order to trigger complicit liability[] may be particularly important in corporate groups, where the liability rule may cause tension with the parent company management board, and their desire to apply the group's collective resources in the common interest of the group."  (*Id.* at 6.)  Moreover,

> where . . . [a] dominant or major shareholder, outside the general meeting, instructs or otherwise incites the management to perform a culpable action[,] [t]he fact that the instruction was not legally binding on the person it was aimed at, cannot in and of itself be decisive if, by its nature, it appears to be an order or an incitement.

(*Id.* at 7.)

### 3.  Preemption

Ro submits that Section 17-1 is inapplicable when brought on the same facts as a claim under Section 5-9, because "[a prior iteration of Section 5-9] must in fact be said to contain an exhaustive regulation of the compensation liability that a creditor incurs by acting to the detriment of the debtor's other creditors."  (Ro Decl. ¶ 44 (quoting NOU 1972:20, Ro Decl. Ex. 6, ECF Doc. # 47-6, at 3).)  It is worth noting, however, that this quote included in the Ro Declaration appears in a 1972 legislative commentary to the Recovery Act sections, does not refer explicitly to the Public Companies Act (which had not yet been enacted), and is in the particular context of limitations periods for avoidance claims.  (NOU 1972:20.)  Aasebø cites to the same NOU 1972:20 for the proposition that "Section 5-9 is an exhaustive regulation of the

liability of a creditor in relation to actions that are considered negligent and harmful to the debtor," arguing that "an estate cannot seek both avoidance under Section 5-9 and damages under Section 17-1, where the claims concern the same transaction." (Aasebø Decl. ¶ 52.)

Hamre submits, however, that a bankruptcy estate is not preempted from bringing claims under Section 17-1. (Hamre Decl. ¶ 179 (quoting Rt. 2008 p. 833 ("[I]t must be clearly within the tasks of the bankruptcy estate to pursue such claims [for compensation that accrue to the company's creditor community]. [The court] do[es] not see that at this point there can be any difference between a claim for damages under § 17-1 and a claim under [another statute not at issue here].").) According to Hamre, the Recovery Act is not the exclusive source for a bankruptcy estate's claims on behalf of the estate's creditors, and "[u]nder Norwegian law, there is no uncertainty on this position." (*Id.* ¶ 180.) Hamre submits that Aasebø's analysis ignores that an entity can be both a creditor and a shareholder, "and thus claims under the avoidance rules and Section 17-1 of the Companies Act may both be available to a Norwegian bankruptcy trustee." (*Id.* ¶ 182.) Hamre acknowledges that the Recovery Act may fully address the liability of a creditor, but Hamre notes that it does not address that same creditor's liability for actions taken while acting as a shareholder. (*Id.*) Hamre's argument is persuasive, and the Court concludes that a Section 17-1 claim is not preempted by the Recovery Act.

### B. The Plaintiff Adequately States a Section 17-1 Claim Against the Defendants

Count IV seeks a judgment against all Defendants awarding the Plaintiff "compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate." (FAC ¶ 205.) Plaintiff alleges that

> [b]y orchestrating the Second Restructuring, which led to the Upstreaming and Transfer and the GSO Transfers, the Defendants intentionally and negligently cause Norske Skogindustrier to engage in a series of actions that reduced Norske Skogindustrier's other

72

creditors [sic], and in particular the holders of the Guarantee
Obligations, outlook for recovery.

(*Id.* ¶ 201.)  The FAC goes on to allege that the outlook for other creditor recoveries

"deteriorated" because of these actions while the Defendants received a significant recovery, and

these actions "inflicted economical losses on Norske Skogindustrier's other creditors as

redemption and payment of the 2016 SUNs . . . reduced the outlook for recovery for Norske

Skogindustrier's other creditors and negatively impacted Norske [sic] long-term financial

viability."  (*Id.* ¶¶ 202–03.)

Hamre argues that the "action" or "actions" that are relevant for the Plaintiff's Section

17-1 claim involve "the decision to compel the Norske Board, through extraordinary general

meetings, replacement of board members, demand letters sent to the Norske Board, to effectuate

the Second Restructuring for the sole benefit of the GSO and Cyrus Defendants and their CDS

obligations." (Hamre Decl. ¶ 186.)  Moreover, Hamre argues that it is necessary to consider all

the capacities in which the Defendants acted, not just their capacity as self-interested creditors,

but also as "shareholders, and even more relevant, as entities with in-depth knowledge of how

the contemplated transactions would deteriorate the outlook for recovery of the remaining body

of creditors."  (*Id.* ¶ 191.)

GSO argues that the FAC does not allege any wrongdoing by GSO that would be covered

by Section 17-1.  (GSO Memo at 40–41.)  GSO submits that only certain parties can be liable

under Section 17-1: CEO, board member, member of corporate assembly, independent expert,

investigator, or shareholder.  (*Id.* at 40.)  The only enumerated category that GSO fits is

shareholder, and "a defendant that is a shareholder can be liable for only those damages that it

has caused in its capacity as a shareholder, *i.e.*, by voting a particular way at a general meeting of

the company."  (*Id.*)  GSO argues that, since Plaintiff is suing GSO only in its capacity as

creditor and does not allege wrongful conduct by GSO in its shareholder capacity, the claim

under Section 17-1 must fail.  (*Id.* at 40–41.)

GSO also argues that Section 17-1 only allows a plaintiff to seek damages for its own

loss, and the Estate, standing in the shoes of the Debtor, cannot seek damages for "harm to

individual creditors or subsets of the company's creditors as a whole."  (*Id.* at 41.)  GSO is

correct that the FAC does mainly state its Section 17-1 claim in terms of losses to the Debtor's

other creditors.  (*See* FAC ¶¶ 201–03.)  However, the FAC does state that "[t]here is a causal

connection between the . . . acts of the Defendants and the losses suffered by Norske

Skogindustrier and its creditors."  (*Id.* ¶ 204.)  Thus, while this allegation is sparse, there is an

allegation asserted by the Estate that the Defendants caused harm to the Debtor itself.

Cyrus argues that the FAC "does not allege that the Second Restructuring was the result

of any action by Cyrus in its capacity as shareholder, let alone any action at a general meeting."

(Cyrus Memo at 34.)  Cyrus submits that it was the Norske Board that resolved to undertake the

Second Restructuring, and, even if there had been a shareholder meeting, Cyrus lacked the equity

stake to "effectuate any decisions at such a meeting."  (*Id.* (quoting Ro Decl. ¶ 52.))  Cyrus

argues that the Plaintiff has failed to establish control or influence over the Norske Board.  (*Id.* at

34–35.)  Cyrus also argues that a claim under Section 17-1(2) fails because, "without an

allegation that the underlying decision-maker acted against the best interests of the company,"

there is no primary liability by an actor covered in Section 17-1(1).  (*Id.* at 35.)  Cyrus submits

that the Norske Board acted in good faith, believing that the Second Restructuring was in the

best interests of the Norske Enterprise, and thus, "[i]n the absence of any allegation that the

Norske Board failed to act in the best interests of the Company, the [FAC] fails to state a claim

74

for aiding and abetting." (*Id.* at 37.)  Finally, Cyrus argues that the FAC fails to show any harm

to the Debtor. (*Id.* at 37–38.)

      1.   The Plaintiff States a Claim Under Section 17-1(1)

The FAC states a claim under both Section 17-1(1) and Section 17-1(2) as to both GSO

and Cyrus.  Drawing all inferences in favor of the Plaintiff, the FAC adequately pleads negligent

or intentional action resulting in damage to Norske ASA and its creditor community.  However,

for the claim to ultimately succeed under Section 17-1(1), the Plaintiff must prove that the harm

was caused by actions taken by the Defendants in their capacity as shareholders.  The Section

17-1 claim relies on the FAC's allegation that the Defendants orchestrated the Second

Restructuring, the Upstreaming and Transfer, and the GSO Transfer.  But without the status of

controlling shareholder, it is difficult to see how the Defendants alone could have orchestrated

this set of transactions.  Nevertheless, the Section 17-1 Commentary makes clear that conduct by

large, influential shareholders that are able to *influence* corporate decision-making through

mutual collaboration—even, apparently, without exercising formal control—can lead to liability

under Section 17-1, particularly where the company's assets are used to benefit such

shareholders.  Accordingly, the Court **DENIES** the Motions with respect to Count IV.  That said,

the Plaintiff still has a significant hurdle to clear if it is to succeed in proving primary liability by

the Defendants as shareholders under Section 17-1(1).

      2.   The Plaintiff States a Claim Under 17-1(2)

The FAC makes a stronger case under Section 17-1(2).  If the Norske Board, without

negligence or intent, took action that damaged the Debtor, and the Defendants, acting negligently

or intentionally, contributed to that damage, the Debtor can maintain a claim for aiding and

abetting liability against the Defendants under Section 17-1(2).  This requires the FAC to

properly allege that the Defendants contributed to the damage (and that the Debtor did suffer

75

damage). The Plaintiff may be able to successfully prove this contribution by showing action by the Defendants that impermissibly influenced the Norske Board's decision-making, even where such influence does not rise to the level of control. Thus, if taken as true that the Defendants contributed to the Norske Board's decision to effectuate the Second Restructuring and its associated transactions, that those transactions damaged the Debtor, and that the Defendants were at least negligent in contributing to those damaging transactions, then the claim under Section 17-1(2) survives.

Regardless of the Defendants' specific role (i.e., shareholder versus creditor) at each stage in the pre-bankruptcy facts, the FAC alleges that the Defendants were involved in negotiating the Second Restructuring and encouraging the Norske Board to effectuate it. Provided that the Plaintiff can prove the requisite harm, it may also prove that the Defendants aided and abetted such harm. And while GSO argues that the FAC impermissibly seeks damages for losses suffered not by Norske ASA itself or its creditors, but rather by holders of the SSNs and the PENs (for which Norske ASA was not the issuer), Norske ASA *was* an obligor on both the SSNs and PENs under the Guarantee Obligations. (*See* FAC ¶ 80 (defining Guarantee Obligation); *see also* GSO Memo at 41.) GSO ignores the fact that, in the event of a default on the SSNs and/or PENs, unpaid holders of SSNs and PENs would have guarantee claims against Norske ASA as obligor. Accordingly, the Court concludes that the Plaintiff may proceed with its claims for aiding and abetting liability against the Defendants under Section 17-1(2).

### 3.   The Plaintiff is Permitted to Allege Damages Generally

The FAC vaguely alleges that there is a connection between the Defendants' actions and "losses suffered" by Norske ASA and its creditors (FAC ¶ 204) and that Norske ASA's losses will be "determined at the trial of this action." (*Id.* ¶ 205.) The FAC spends more time describing how the Second Restructuring harmed Norske ASA's other creditors. In its

Opposition, the Plaintiff once again asserts that "[t]he Defendants' use of their standing as shareholders to further their scheme, to the detriment of Norske [ASA's] *other creditors*, is more than adequate to state a statutory claim pursuant to Section 17-1." (Opposition at 50–51 (emphasis added).) But Section 17-1 seems quite clear that it allows a claimant to assert a claim for damages on its *own* behalf. The Defendants do not appear to dispute that the Estate can assert a claim on behalf of Norske ASA, but they do dispute that the Estate can assert a claim on behalf of other creditors. Without a plausible claim that the Defendants caused (or contributed to) damage to Norske ASA (and not just its creditors), any claim under Section 17-1 would fail. The FAC does, however, allege that Norske ASA's "use of the NSF funds to pay the GSO Defendants and the other holders of the 2016 SUNs left Norske Skogindustrier and its subsidiaries with insufficient cash to continue operations in the long term." (FAC ¶ 139.) But this claim is not without shortcomings. First, it includes subsidiaries, i.e., other entities within the Norske Enterprise, although the Plaintiff represents only the estate of Norske ASA. Second, it ignores that without the Second Restructuring (and the Defendants' participation in it) there would have been no NSF funds, and that NSAS, not Norske ASA, was the "primary and sole obligor" on the NSF. (*Id.* ¶ 116.) Finally, it also ignores that the 2016 SUNs were about to mature. Presumably, continued operations by Norske ASA required some solution to the impending maturity of the 2016 SUNs. Again, the Plaintiff has its work cut out for it to actually prove compensable damages and thus prove a claim under either paragraph of Section 17-1. But at this stage, where the Plaintiff is permitted to plead damages generally, the Section 17-1 claim may stand. Accordingly, the Court **DENIES** the Motions with respect to Count IV.

## VIII.    UNDER ENRICHMENT UNDER NORWEGIAN LAW

Count V of the FAC asserts a claim for unjust enrichment against the Defendants.  (FAC

¶¶ 206–214.)  The Plaintiff and Defendants dispute whether Norwegian law recognizes unjust

enrichment as a standalone claim.  The Court concludes that it does not.

The Defendants' experts argue that, "[i]n Norwegian law, there is no generally accepted

legal principle of unjust enrichment."  (Aasebø Declaration ¶ 60; *see also* Ro Declaration ¶ 64

("There is no equivalent to an unjust enrichment claim under Norwegian law.").)  Observing that

Norwegian law is primarily based on legislation (including preparatory works) and Supreme

Court decisions, the Defendants' experts submit that there is no Norwegian legislation

supporting or creating a general principle of unjust enrichment.  (Aasebø Declaration ¶ 62; Ro

Declaration ¶ 62.)  However, Aasebø notes that the legislature has recognized an unjust

enrichment-type claim "in the limited context of intellectual property law, typically copyright

infringement or similar misuse of the property of others."  (Aasebø Declaration ¶ 61.)  While Ro

points out that some lower courts have considered unjust enrichment on the basis of arguments

made by the parties (Ro Declaration ¶ 62), Aasebø explains that, "while the Supreme Court may

in certain instances establish legal principles as an alternative to governmental legislation, the

decisions of lower courts, including intermediate appellate courts, generally do not."  (Aasebø

Declaration ¶ 62.)  Moreover, Ro submits that "[t]he issue has only been raised in the lower

courts as a theory of damages, not as a standalone claim for liability."  (Ro Declaration ¶ 62.)

The Plaintiff's expert admits that there is no Norwegian legislation creating a general

principle of unjust enrichment, and that no Supreme Court judgment to date has granted relief on

the basis of an unjust enrichment claim.  (Hamre Declaration ¶ 203.)  However, the Plaintiff's

expert notes that no Norwegian court decision, from the Supreme Court or otherwise, has

rejected the existence of an unjust enrichment claim under Norwegian law, and that several

decisions "speak[] favorably about such claims under Norwegian law (even if, based upon the

specific facts of some of those cases, an unjust enrichment remedy was denied)." (*Id.* ¶ 204.)

### A.    Norwegian Caselaw

The Plaintiff's expert points to several cases that he believes supports the Plaintiff's

position that an unjust enrichment claim exists under Norwegian law.  The Plaintiff's expert

notes that, in Rt-2007-817, the first-voting judge declared:

> I have come to the conclusion that there are no basis [sic] for an
> enrichment claim in this case.  Such a claim is characterized by the
> fact that attention is shifted from the injured party's loss—as in the
> law of damages—to the perpetrator's gain from the wrongful act.  I
> do not disregard that, according to the circumstances, there may be
> [a] basis for such enrichment claims for breach of competition
> clauses.  Case law does not provide a firm basis, but some decisions
> provide some support for such a jurisprudence, *cf.*, especially Rt-
> 1966-305.

(*Id.* ¶ 207.)  This is hardly a ringing endorsement of the existence of an unjust enrichment claim.

Instead, the judge states that there is "some support" for such a claim, although there is not "a

firm basis."  It also seems that the judge was only observing that, even if such a claim did exist,

the elements were not met in that case.

The Plaintiff's expert also points to LB-2015-18361-2, a Norwegian intermediate court

case involving Tom Hugo Ottesen (the foreign representative-plaintiff in this case).  The

Plaintiff's expert argues that the court "acknowledge[d] the existence of 'unjust enrichment' as a

general legal principle," although the court found that no unjust enrichment had occurred in that

case.  (*Id.* ¶ 212.)  However, Aasebø notes that, in addition to this being a judgment issued by an

intermediate court, which generally does not establish a legal principle under Norwegian law, the

parties had agreed on the conditions for an unjust enrichment claim.[40]  (Aasebø Declaration ¶ 66.)  Aasebø argues that, pursuant to Norwegian civil procedural law, the court was required to evaluate the claim under the legal standard that was agreed upon by the parties.  (*Id.* ("[A]ccording to Norwegian civil procedural law, the court there was bound by the submissions of the parties, meaning that if the parties were in agreement on a legal or factual issue, the court has to assume these legal or factual submissions as considerations on which the court bases its judgment.").)  Aasebø emphasizes that the court had

> expressly, though unnecessarily, stated that the conditions for applying "unjust enrichment" were based on the parties' agreement, meaning it was not based on generally applicable legal principles. If the court had wanted its judgment to be a case that established the concept of "unjust enrichment" in this context, the court would have merely stated the conditions related to applying unjust enrichment in such cases.  Because the court deliberately did not do that, it can be interpreted as a sign that the court was not comfortable establishing such a rule on its own accord, thus highlighting the absence of a generally applicable principle of "unjust enrichment" under Norwegian law.

(*Id.*)

The Plaintiff's expert replies that "the court expressed no disagreement with the parties' apparent agreement on the state of Norwegian law, as it would have been required to do had the parties inaccurately stated the law."  (Hamre Declaration ¶ 212.)  However, as the state of the law appears unclear, it may have been reasonable and permissible for the court to evaluate the facts applied to the parties' agreed formulation of the law.

---

[40]  Those conditions were stated as: "(i) there must be an enrichment on the part of the 'tortfeasor,' while there is no corresponding claim for financial loss on the part of the 'injured party'; (ii) there must have been a violation of the law or an unjustified act; (iii) there must be a causal link between the violation of the law and the enrichment; and (iv) there must be a degree of guilt on the part of the 'tortfeasor.'"  (ECF Doc. # 81-24 at 5.)

While the Plaintiff cites other cases in support of its position, these cases seem only to use "enrichment" as a measure of damages, rather than considering it as a standalone claim for liability. (*See id.* ¶¶ 209–211, 213.)

### B. Legal Scholarship

The Defendants' experts acknowledge that legal scholars have discussed the concept of unjust enrichment with respect to Norwegian law. (Aasebø Declaration ¶ 63; Ro Declaration ¶ 62.) However, Aasebø submits that the academic discussion is "limited to specific contexts not relevant here," and that he is "not aware of a legal expert who has argued for the establishment of unjust enrichment as a generally applicable principle of law." (Aasebø Declaration ¶ 63.) Ro states similarly that the concept of unjust enrichment has not been discussed in the insolvency context, nor has it been discussed as a standalone claim. (Ro Supplement ¶ 27.)

The Plaintiff's expert references the writings of the legal scholar Erik Monsen, who has observed:

> As I read recent case law, it is quite clear that the Supreme Court has not rejected the possibility of recognizing a non-statutory principle of unjust enrichment. It is common for non-statutory law to develop step by step. The remark in Rt-2007-817 that Rt-1966-305 was a claim for unjust enrichment, together with the statement that the court, according to circumstances, would not disregard the existence of claims for unjust enrichment, can be considered as a step towards recognition of a non-statutory principle of unjust enrichment.

(Hamre Declaration ¶ 216.) However, the translation provided of Rt-2007-817 does not indicate that Rt-1966-305 was a claim for unjust enrichment, but only that Rt-1966-305 "provide[s] some support" for an unjust enrichment claim "for breach of competition clauses." (*Id.* ¶ 207.) Moreover, the quote from Monsen states that there have only been "step[s] towards recognition of a non-statutory principle of unjust enrichment." (*Id.* ¶ 216.) This clearly suggests that such a claim is not yet recognized, although it may be approaching recognition.

81

### C.  Conclusion

It does not appear that any Norwegian court has found liability on a standalone unjust enrichment claim, and it seems far from certain that such a claim actually exists.  As Judge Cote observed in another case, "[t]he best support that can be offered for the recognition of the [unjust enrichment] claim in Norway is that Norwegian law is evolving and may offer such a cause of action in the future."  *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, 2004 WL 1944457, at *3 (S.D.N.Y. Aug. 31, 2004).  This observation continues to be accurate.

To paraphrase this Court's opinion in *Lyondell*, "it is not the role of the Court to extend [Norwegian] law where [Norwegian] statutes and case law have not done so.  The Court will apply [Norwegian] law as far as it is developed by [Norwegian] statutes and courts, but no further."  *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 567 B.R. 55, 127 (Bankr. S.D.N.Y. 2017).

As the Court concludes that Norwegian law does not currently recognize a standalone claim for unjust enrichment, the Motions are **GRANTED** with respect to Count V and the claim is **DISMISSED**.

82

## IX.   <u>CONCLUSION</u>

For the reasons discussed above, the Court **GRANTS** the Motions in part as to Counts I,

III, and V, and **DISMISSES** those counts.  The Court **DENIES** the Motions in part as to Counts

II and IV.  The Court **GRANTS** the Plaintiff leave to amend the complaint within 21 days of the

filing of this opinion.

**IT IS SO ORDERED.**

Dated:  April 29, 2021
        New York, New York

*Martin Glenn*
_____
MARTIN GLENN
United States Bankruptcy Judge

83