**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE BANKRUPTCY ESTATE OF NORSKE SKOGINDUSTRIER ASA,<br><br>       Debtor in a<br>       Foreign Proceeding. | **FOR PUBLICATION**<br><br>Chapter 15<br><br>Case No. 18-13571 (MG) |
| THE BANKRUPTCY ESTATE OF NORSKE SKOGINDUSTRIER ASA,<br><br>       Plaintiff,<br><br>  vs.<br><br>CYRUS CAPITAL PARTNERS, L.P., *et al.,*<br><br>       Defendants. | Adv. Pro. No. 18-01846 (MG) |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**

*A P P E A R A N C E S :*

HOLLAND & KNIGHT LLP
*Attorneys for the Bankruptcy Estate of Norske Skogindustrier ASA*
31 W 52nd Street
12th Floor
New York, New York 10019
By: Warren E. Gluck, Esq.
   Robert J. Burns, Esq.
   Phillip W. Nelson, Esq.

   -and-

150 North Riverside Plaza
Suite 2700
Chicago, Illinois 60606
By: Richard A. Bixter, Jr., Esq.

BOIES SCHILLER FLEXNER LLP
*Attorneys for the Cyrus Defendants*
55 Hudson Yards
New York, New York 10001
By:    Anastasia Cembrovska, Esq.
       Duane L. Loft, Esq.

CRAVATH, SWAINE & MOORE LLP
*Attorneys for the GSO Defendants*
825 Eighth Avenue
New York, NY 10019
By:    Lauren Moskowitz, Esq.
       Omid H. Nasab, Esq.
       Jenny Zhang, Esq.
       Paul H. Zumbro, Esq.

# Table of Contents

I.     BACKGROUND ........................................................................................................................3

    A.    THE SECOND RESTRUCTURING AND UPSTREAMING ...........................................................4

    B.    THE CYRUS SALE ..............................................................................................................5

    C.    THE GSO TRANSFER AND THE BOND REPURCHASE SCHEME .........................................7

II.    PARTIES' CONTENTIONS & SUPPORTING DECLARATIONS .........................................10

    A.    THE CYRUS MEMO AND THE FOURTH RO DECLARATION ...........................................10

    B.    THE OPPOSITION AND THE SECOND HAMRE DECLARATION .......................................12

    C.    THE CYRUS REPLY AND THE RO SUPPLEMENT .........................................................15

    D.    THE FIRST HAMRE DECLARATION .................................................................................17

III.    STANDARD OF REVIEW .................................................................................................19

    A.    PLEADING STANDARD ......................................................................................................19

    B.    CHOICE OF LAW RULES ..................................................................................................23

IV.    DISCUSSION ....................................................................................................................24

    A.    SECTION 5-9 LEGAL STANDARD ....................................................................................24

    B.    THE PLAINTIFF ADEQUATELY PLEADS A SECTION 5-9 CLAIM AGAINST CYRUS .............25

    C.    CHOICE OF LAW REQUIRES DISMISSAL OF COUNT V FOR UNJUST ENRICHMENT ...........32

    D.    COUNT V FAILS TO STATE A CLAIM .............................................................................34

V.    CONCLUSION...................................................................................................................35

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

On May 20, 2021, the Bankruptcy Estate of Norske Skogindustrier ASA (the "Estate" or

the "Plaintiff") filed its second amended complaint (the "Second Amended Complaint" or

"SAC," ECF Doc. # 108) in response to the Court's Memorandum Opinion and Order Granting

in Part and Denying in Part Motions to Dismiss (the "April 2021 Memorandum Opinion," ECF

Doc. # 97), whereby the Court dismissed Counts I, III, and V of the first amended complaint (the

"First Amended Complaint" or "FAC," ECF Doc. # 42) and gave the Plaintiff leave to amend the

complaint within twenty-one days. The SAC reasserts the previously dismissed Counts I, III,

and V.

Pending before the Court are two motions to dismiss the SAC. The first is the motion of

defendants Crescent I, L.P., CRS Master Fund, L.P., Cyrus Capital Partners, L.P., Cyrus

Opportunities Master Fund II, Ltd., and Cyrus Select Opportunities Master Fund, Ltd.

(collectively, the "Cyrus Defendants" or "Cyrus"). ("Cyrus Motion," ECF Doc. # 111.) The

Cyrus Motion is supported by (i) a memorandum of law (the "Cyrus Memo," ECF Doc. # 111-

1), (ii) Knut Ro's ("Ro") declaration (the "Fourth Ro Decl.," ECF Doc. # 111-2),[1] and (iii) two

translations from a Norwegian legal text (ECF Doc. ## 111-3, 111-4). The second is the motion

of defendants GSO Aiguille Des Grands Montets Fund I LP, GSO Aiguille Des Grands Montets

Fund II LP, GSO Aiguille Des Grands Montets Fund III LP, GSO Cactus Credit Opportunities

Fund (Cayman) LP, GSO Capital Partners LP, GSO Churchill Partners LP, GSO Coastline

Credit Partners (Cayman) LP, GSO Credit Alpha Trading (Cayman) LP, GSO Credit-A Partners

(Cayman) LP, GSO Oasis Credit Partners (Cayman) LP, GSO Palmetto Opportunistic

---

[1] This is the fourth declaration by Ro that has been filed in this case. The first three declarations were filed in connection with the Cyrus Defendants' motion to dismiss the First Amended Complaint. (*See* ECF Doc. ## 47, 69, 92.)

Investment Partners (Cayman) LP, GSO Special Situations Master Fund LP, and Steamboat Credit Opportunities Master Fund LP (collectively, "GSO" or the "GSO Defendants" and, with the Cyrus Defendants, the "Defendants," and, with the Plaintiff, the "Parties"). ("GSO Motion," ECF Doc. # 113, and, with the Cyrus Motion, the "Motions.") The GSO Motion is supported by the Joinder in the Memorandum of Law in Support of the Cyrus Defendants' Motion to Dismiss the Second Amended Complaint (the "GSO Joinder," ECF Doc. # 113-1).[2]

The Cyrus Motion seeks to dismiss Counts III and V of the SAC. The GSO Motion seeks to dismiss Count V of the SAC. The Motions do not seek dismissal of Counts I, II and IV. Count III seeks avoidance and clawback of certain transfers made from Norske Skogindustrier ASA ("Norske Skogindustrier," or the "Debtor") indirectly to the Cyrus Defendants pursuant to the Norwegian Recovery Act of 8 June 1984 No. 59 (the "Recovery Act") § 5-9 ("Section 5-9"). Count V pleads unjust enrichment under New York law against the Defendants. Count V is pled in the alternative to Counts I–III of the SAC.[3]

The Plaintiff filed an opposition brief to the Motions (the "Opposition," ECF Doc. # 116), which is supported by Bjørn Åge Hamre's ("Hamre") declaration ("Second Hamre Decl.," ECF Doc. # 117).[4] The Cyrus Defendants filed a reply in response to the Opposition. ("Cyrus Reply," ECF Doc. # 118.) The Cyrus Reply is supported by (i) Ro's supplemental declaration ("Ro Supp.," ECF Doc. # 118-1), (ii) a translation of a Norwegian statute (ECF Doc. # 118-2), (iii) a translation of a Norwegian Supreme Court opinion (ECF Doc. # 118-3), (iv) the

---

[2]   GSO notes that its joinder with Cyrus's arguments is in response to the Court's request "that counsel for the GSO Defendants coordinate with the Cyrus Defendants on any further briefing in response to the SAC." (GSO Joinder at 2.)

[3]   The Plaintiff also pleads the unjust enrichment claim as "supplementary claims against both the [Defendants]," although it is not clear what the Plaintiff means by supplementary claim. (SAC ¶ 281.)

[4]   This is the second declaration by Hamre that has been filed in this case. His first declaration was filed in connection with the Plaintiff's opposition to the Defendants' motions to dismiss the First Amended Complaint. ("First Hamre Decl.," ECF Doc. # 90.)

2

declaration of Duane Loft in support of the Cyrus Motion (ECF Doc. # 118-4), and (v) an

excerpt of the transcript from the March 24, 2021 hearing on the motion to dismiss the FAC

(ECF Doc. # 118-5).  The GSO Defendants filed a joinder to the Cyrus Reply.  (ECF Doc. #

119.)

On September 9, 2021, the Court held a hearing on the Motions (the "Hearing").  Prior to

the Hearing, the Cyrus Defendants filed a witness list (ECF Doc. # 121), a list of exhibits and

demonstratives (ECF Doc. # 122), and an amended list of exhibits and demonstratives (ECF

Doc. # 126).  The Plaintiff filed a witness list (ECF Doc. # 123) and an exhibit list (ECF Doc. #

124).  After hearing the cross examination of expert witnesses and argument by the Parties, the

Court took the matter under submission.[5]  (*See* "Hr'g Transcript," ECF Doc. # 130.)

For the reasons discussed below, the Court **DENIES** the Cyrus Motion as to Count III

and **GRANTS** the Motions as to Count V.[6]

## I.    BACKGROUND

The facts below are taken from the SAC and are accepted as true for the purpose of

resolving the Motions.  In contrast to Count III of the FAC, which sought to avoid the Cyrus Sale

(defined below), Count III of the SAC seeks to avoid a fraudulent scheme ("Bond Repurchase

Scheme"), consisting of an allegedly contemporaneous Cyrus Sale and GSO Transfer (defined

below).  While the FAC also alleged the Cyrus Sale and GSO Transfer occurred

---

[5]    Cross-examination of expert witnesses on foreign law is permissible on a motion to dismiss that requires
the Court to determine issues of foreign law.  *See* Fed. R. Civ. P. 44.1.

[6]    The Court again concludes that Norwegian law still applies to the unjust enrichment claim.  As stated
before, a standalone claim for unjust enrichment does not currently exist under Norwegian law.

After discovery has been completed, the Plaintiff may reassert the claim should the Court determine that
New York law applies.  At this stage, the Court's choice of law analysis is performed in light of what has been
alleged.  Accordingly, the Court's choice of law determination is limited only to its evaluation of the Motions, and
the Court reserves final decision regarding the applicable law.

contemporaneously (*see* FAC ¶¶ 133–134, 172), the SAC adds further details for why these seemingly separate transactions should be considered a single "disposition" that may be avoided under Norwegian law.

### A.    The Second Restructuring and Upstreaming

The SAC refers to Norske Skogindustrier and its subsidiaries collectively as the "Norske Enterprise." (SAC ¶ 38.). The Norske Enterprise consists of several tiers of subsidiaries, including Norske Skog Holding AS ("NSH"), Norske Treindustrier AS ("NTAS"), Norske Skog AS ("NSAS"), and various local operating entities (the "Norske Business Units"), which operated paper mills primarily in Europe and Australia. (*Id.*)

During the summer of 2015, Norske Skogindustrier's board (the "Norske Board") began work on a second refinancing scheme, named Carra II (the "Second Restructuring"). (*Id.* ¶ 93.) In March 2016, an exchange offer (the "March 2016 Exchange Offer") was consummated in connection with the Second Restructuring. (*Id.* ¶ 147.) The March 2016 Exchange Offer also included a revised secured financing component called the Norwegian Securitization Facility ("NSF"). (*Id.* ¶ 149.) The NSF would be issued by NSAS—the direct parent of the Norske Business Units—in the amount of €110 million, with the Defendants serving as secured lenders. (*Id.*)

Between the funding of the NSF in March 2016 and maturity of the 2016 SUNs (defined below) on June 15, 2016, the executive management of Norske Skogindustrier, acting at the direction of the Norske Board, caused the Norske Enterprise to upstream approximately €108 million of the Norske Enterprise's available liquidity to Norske Skogindustrier (the "Upstreaming"). (*Id.* ¶ 161.) It is alleged that the cash made available to Norske Skogindustrier

through the Upstreaming was used to pay off or repurchase all of the 2016 SUNs ("2016 SUNs Redemptions"). (*Id.* ¶ 162.)

### B.    The Cyrus Sale

As of February 2016 and prior to the Second Restructuring, the Cyrus Defendants had invested more than €80 million in the NorsKe Enterprise through various debt instruments and equity purchases. (*Id.* ¶ 48.) As of February 2016, the Cyrus Defendants were the holder of €31.69 million face value of 2016 unsecured notes (the "2016 SUNs") and €1.05 million face value of 2017 unsecured notes. (*Id.* ¶ 49.) Norske Skogindustrier was the primary obligor of these unsecured debt instruments, and no other entity affiliated with the Norske Enterprise had guaranteed their payment. (*Id.* ¶ 51.)

On March 18, 2016, the Defendants executed an agreement (the "Cyrus Sale Agreement," SAC Ex. 17), whereby the Cyrus Defendants agreed to sell substantially all of their interests in the 2016 SUNs to the GSO Defendants at 68% of par value, plus accrued interest (the "Cyrus Sale"). (SAC ¶ 165.) The Defendants executed the Cyrus Sale Agreement in connection with the larger agreement that would enable the "sale" of these same 2016 SUNs to Norske Skogindustrier. (*Id.*) The SAC alleges that the Defendants believed that this alternate form of payout would assist GSO in defending clawback litigation given what was alleged to be Norske's inevitable bankruptcy. (*Id.*)

That same day, the Norske Board formally passed the resolution to issue the NSF, and the other secured debt instruments in connection with the Second Restructuring. (*Id.* ¶ 164; Ex. 16.) On March 18, 2016, the Defendants also obtained a confirmation from Norske Skogindustrier that Norske Skogindustrier "has no objection to Cyrus and GSO transacting with each other in the Company's 2016 bond whilst both Cyrus and GSO" are in possession of potentially non-

public information provided by Norske Skogindustrier.  ("March 18 Confirmation Letter," SAC
Ex. 19.)  According to the SAC, the Norske Board and Norske Skogindustrier's management not
only knew that the Cyrus Defendants and the GSO Defendants were transacting with each other
in connection with the 2016 SUNs, Norske Skogindustrier knew that the Defendants intended to
complete the Cyrus Sale as an essential part of their overall scheme to avoid a CDS default and
the high potential for clawback of the €31 million payout on the 2016 SUN "buyback."  (SAC ¶
168.)

The Cyrus Sale was allegedly part of the Defendants' and the Norske Board's efforts to
shield the repurchase of the Defendants' 2016 SUNs from challenges by Norske Skogindustrier's
creditors or its bankruptcy estate.  (*Id.* ¶ 169.)  According to the SAC, the Cyrus Defendants
believed that the Cyrus Sale allowed the Cyrus Defendants to offload the risk of clawback to
GSO and in turn attempt to lessen the risk of clawback from GSO.  (*Id.* ¶ 170.)  At the time the
Cyrus Sale was executed, both the Cyrus Defendants and the GSO Defendants believed and had
"arranged" for Norske Skogindustrier to use the liquidity generated by way of the NSF to
complete the 2016 SUNs Redemptions in violation of fiduciary responsibility, and knew that the
Norske Board, controlled by the Defendants, would accede to Defendants' will and do so, even
though there was no provision in the March 2016 Exchange Offer requiring that to occur, and in
fact the same provision had been ostensibly removed.  (*Id.* ¶ 171.)

In short, the Cyrus Defendants were the "mediate transferees" of the proceeds from the
Bond Repurchase Scheme, and beneficiaries of the Norske Board's commitment to the same.
(*Id.* ¶ 172.)  According to the SAC, but for the knowledge that Norske Skogindustrier had agreed
to engage in an "open market" bond buyback for the intended purpose of damaging the Estate's
future clawback actions, the GSO Defendants would not have entered into the Cyrus Sale.  (*Id.*)

### C.      The GSO Transfer and the Bond Repurchase Scheme

With the Cyrus Sale completed, the Defendants and Norske Skogindustrier took steps to structure the repayment of the Defendants' 2016 SUNs as open-market bond repurchases.  (*Id.* ¶ 173.)  After the Cyrus Sale, Norske Skogindustrier then repurchased approximately €31.69 million in 2016 SUNs from the GSO Defendants through a series of "open-market" transactions involving separate brokers for Norske Skogindustrier and the GSO Defendants to conceal the GSO Defendants' involvement in an attempt to make it more difficult for Norske Skogindustrier's creditors (or a bankruptcy trustee) to bring claims against the Defendants on account of these transactions (the "GSO Transfer" and collectively with the Cyrus Sale, the "Bond Repurchase Scheme").  (*Id.* ¶ 162.)

The Norske Board and the Defendants are alleged to have conducted "the repurchase of the GSO Defendants' 2016 SUNs acquired through the Cyrus Sale in a manner which would conceal the GSO Defendants as the counterparties to [Norske Skogindustrier's] bond repurchases" to disguise the GSO Transfer as open-market repurchases of the 2016 SUNs.  (*Id.* ¶ 175.)  It would also provide the GSO Defendants a basis to argue that open-market transactions involving a broker could never satisfy the provisions of the Recovery Act.  (*Id.*)

Hence, the Cyrus Defendants on their own, and via the GSO Defendants pursuant to the Cyrus Sale Agreement, with actions and influence directed toward Norway and Norske Skogindustrier to effectuate the Bond Repurchase Scheme, and under circumstances where cash and bank balances are ultimately fungible, was an "atemporal but 'mediate' transferee" of the 68% of the €31 million transferred from Norske Skogindustrier's Norwegian bank account in connection with the surreptitious 2016 SUNs "buyback." (*Id.* ¶ 176.)

7

On April 11, 2016, the Norske Board, now allegedly acting under the direct influence of the Defendants, resolved for Norske Skogindustrier to begin repurchasing 2016 SUNs in the market.  (*Id.* ¶ 177; Ex. 20.)

On April 13, 2016, Michael Mount ("Mount"), Assistant Vice President of GSO Capital, sent an email to Norske executive Lars Sperre, requesting that GSO Capital and Norske work in tandem to prepare a public announcement relating to the payment of the 2016 SUNs, because of the importance of words such as "redeem" and "repay" under the indenture for the 2019 senior secured notes.  (SAC ¶ 178; Ex. 21.)  The SAC alleges that Mount conducted business on behalf of GSO Capital and the GSO Defendants in connection with Norske Skogindustrier from GSO Capital's offices in London, England, and did so in furtherance of the agreement between the GSO Defendants and the Cyrus Defendants to complete the Bond Repurchase Scheme, and therefore on the Cyrus Defendants' behalf.  (SAC ¶ 179.)

On April 14, 2016, Linda Hoff-Igharo, the head of Norske Skogindustrier's treasury department ("Hoff-Igharo"), had lunch with GSO representatives in Paris, France.  (*Id.* ¶ 180.)  A few hours later, Hoff-Igharo received an email from Zachary Crump of GSO stating "I caught up with [Norske employee] and he informed me that you will be intouch [sic].  I am on my cell for the rest of the afternoon."  (SAC Ex. 22.)  Hoff-Igharo responded by stating she was "trying to organize a settlement date that works for us."  (*Id.*)

By April 19, 2016, under the terms of the Cyrus Sale Agreement, all of the 2016 SUNs in the Cyrus Defendants' possession had been transferred to the GSO Defendants and the Cyrus Defendants had received the entire bargained-for payment.  (SAC ¶ 181; Ex. 23.)

On April 15, 2016, Hoff-Igharo received an email from Norske's broker Svein Erik Nordang stating in Norwegian "Hi, you bought 9.587.000 and 7.500.000 of NSINO 11,75 16

both blocks at 97,75.  Thanks for the orders and have a nice weekend."  (SAC ¶ 186; Ex. 24.)
With this response, Nordang was indicating to Hoff-Igharo that Norske had purchased a total of
approximately €17 million of the 2016 SUNs at 97.75% of their face value.  (SAC ¶ 186.)

After the GSO Transfer was completed, Hoff-Igharo had the following email exchange
with Tom Rogn, head of investor relations for Norske Skogindustrier, in Norwegian: "Tom, We
have bought back EUR 17 million on friday [sic] (two blocks from separate sellers) and we were
offered a block today for EUR 12.5million.  Have you had any contact with GLG and know if
they're selling?  Linda."  Rogn responded: "Good.  No contact."  (SAC ¶ 187; Ex. 25.)

According to the SAC, this email exchange confirms Norske Skogindustrier's knowledge
of the GSO Defendants as the counterparty to the GSO Transfer: Rogn's confirmation that there
was "no contact" from GLG meant that the counterparty on the repurchases must be GSO, whom
they knew to be the only other significant holder of 2016 SUNs at that time.  (SAC ¶ 188.)  In
other words, the "public offer" by Norske Skogindustrier to repurchase the 2016 SUNs at a slight
discount from their face value, just two months before they matured, was intended to only be a
repurchase from GSO.  (*Id.* ¶ 189.)  And, according to the Plaintiff, the plan succeeded: all other
holders of the 2016 SUNs were aware of the Second Restructuring that had been publicly
announced and were told or determined that the 2016 SUNs would be paid in full at the maturity
date, therefore the 5% discount was a strong disincentive to participation.  (*Id.*)

## II.   PARTIES' CONTENTIONS & SUPPORTING DECLARATIONS

### A.   The Cyrus Memo and the Fourth Ro Declaration

The Cyrus Defendants argue that the Plaintiff's updated versions of Count III and Count V must be dismissed under FRCP 12(b)(6). [7]  (Cyrus Memo at 5–6.)

With respect to Count V, the Cyrus Defendants submit that (i) Count V must be dismissed on choice of law grounds as Norwegian law still applies to the Plaintiff's unjust enrichment claim because the same underlying conduct forms the basis for the claim, and the Court has already conducted a choice of law analysis based on this conduct and concluded that Norwegian law applies,[8] and (ii) because Norske Skogindustrier was not a party to either the Cyrus Sale or to any potential CDS contract between the Cyrus Defendants and a third party, Count V must fail even if New York law were to apply.  (*Id.* at 6.)  The Cyrus Defendants argue that the addition of unsupported "conclusory allegations that the CDS contracts 'were made by Defendants from New York with counterparties from New York'" are not enough "to overcome the Court's prior choice-of-law determination," and, moreover, that it is not even the CDS contracts that are alleged to be unjust, but rather the Defendants' influence over Norske Skogindustrier in causing the repurchase of 2016 SUNs.  (*Id.* at 16.)

As to Count III, the Cyrus Defendants argue that "[t]he SAC still does not seek to avoid any transaction between Cyrus and [Norske Skogindustrier]," and that it is nonsensical to seek to hold the Cyrus Defendants liable for the GSO Transfer.  (*Id.* at 6.)  The Cyrus Defendants also

---

[7]     The Cyrus Defendants also contend that the Plaintiff was given leave to amend only certain claims asserted in the FAC and that such leave did not extend to Count III and Count V.  (Cyrus Memo at 5.)  This Opinion addresses the merits of the amendments in the SAC, and does not focus on Cyrus's procedural argument that the Plaintiff was not granted explicit permission to further amend Count III and/or Count V.  Cyrus's counsel acknowledged during the Hearing that the Court could permit the amendment of those counts even if explicit permission was not previously granted.  (Hr'g Transcript at 9:1–10:22.)

[8]     The Court concluded in the April 2021 Memorandum Opinion that Norwegian law lacks a standalone claim for unjust enrichment.  Thus, if Norwegian law applies to Count V, the Plaintiff's unjust enrichment claim must fail.

argue that Count III must be dismissed on choice of law grounds because the Cyrus Sale (i.e., the transfer sought to be avoided by the Plaintiff in Count III) occurred entirely in New York.  (*Id.* at 13.)  Although the SAC includes new language describing "a broader 'Bond Repurchase Scheme,'" Cyrus contends that "the SAC still seeks avoidance of only one transaction involving Cyrus—the Cyrus Sale."  (*Id.* at 13–14 (quoting SAC ¶ 262).)  The Cyrus Defendants also assert that the Plaintiff would receive a double recovery if it were able to avoid both the GSO Transfer and the Cyrus Sale.  (*Id.* at 16–17.)

The Cyrus Defendants refute the argument that the SAC's characterization of the Cyrus Defendants as a "mediate transferee" of the GSO transfer creates grounds for liability under the Recovery Act.  (*Id.* at 18; *see also* Fourth Ro Decl. ¶ 7 ("The term 'mediate transferee' has no meaning under Norwegian bankruptcy law.").)  The Cyrus Defendants argue that there is no such term as "mediate transferee" recognized in Norwegian law and that Section 5-12 of the Recovery Act[9] only allows recovery from a third-party transferee where the "other party" to the alleged

---

[9]    The full text of Section 5-12 provides as follows:

Section 5-12. Effect of avoidance pursuant to Section 5-9.

If the conditions are fulfilled pursuant to Section 5-9, the estate can demand that the other party compensate the estate for the loss incurred as a result of the voidable transaction.  If the estate demands it, the settlement must be made by each of the parties returning the assets received, insofar as this is available and the repayment can be made without unreasonable loss of value.  The estate can then also demand that the other party compensate further losses the estate incurs as a result of the voidable transaction.

If the other party has only shown negligence, their liability to the estate can be reduced or possibly entirely eliminated if payment of full compensation given the other party's circumstances would be unreasonably burdensome or there are other special grounds for this.  Neither can the other party be more favored than the person in question would have been pursuant to Section 5-11.

If the other party has transferred the received assets to a third party that knew or should have known of the conditions of the other party's acquisition of rights that could lead to avoidance, the first and second subsection also apply to the third party.

(Section 5-12, ECF Doc. # 47-2 at 3.)

transfer by the debtor "has transferred the received assets to a third party that knew or should have known of the conditions of the other party's acquisition of rights that could lead to avoidance." (Cyrus Memo at 18 (quoting Section 5-12, ECF Doc. # 47-2 at 3); *see also* Fourth Ro Decl. ¶ 9 ("To recover from a third party, the estate must show that the third party received assets that originated with the debtor.").) .").) According to the Cyrus Defendants, Count III must fail because the Cyrus Defendants were neither the "other party" nor a third-party transferee of the "received assets." (Cyrus Memo at 18.) Finally, Ro submits that, under Norwegian law, if the transfer to the "other party" does not violate Section 5-9, the transfer to the third party also cannot violate Section 5-9. (Fourth Ro Decl. ¶ 13.)

### B.    The Opposition and the Second Hamre Declaration

The Plaintiff argues that Norwegian law should apply to new Count III as "[t]he three-party agreement that constituted the Bond Repurchase Scheme was negotiated in Norway, was given express blessing by Norske's executives from Norway, was the result of the Defendants' domination and control of the Norske's [sic] Norwegian Board, and involved funds originating from a Norwegian bank account." (Opposition. at 7.) The Plaintiff also makes clear that it is not seeking double recovery. (*Id.* ("Plaintiff's economic loss under Section 5-9 will be determined and apportioned at trial among the Defendants.").)

The Plaintiff submits that unlike the FAC, Count III of the SAC seeks to avoid not only the Cyrus Sale, but the entire Bond Repurchase Scheme, which it describes as a "concerted effort by the Norske Board, Cyrus and GSO to cause Norske to repurchase 2016 SUNs held by Cyrus by way of two contemporaneous and overlapping transactions: the Cyrus Sale and the GSO Transfer, which was funded by the NSF." (*Id.* at 13–14.) The Plaintiff also states that "[t]he Cyrus Sale closed concurrently with the GSO Transfer and, but for the knowledge that Norske

12

would repurchase the bonds, would not have been completed." (*Id.* at 14.)  Essentially, the

Plaintiff is arguing that all of the conduct that indicates that Norwegian law applies to the Section

5-9 claim against GSO, also applies to the Section 5-9 claim against the Cyrus Defendants in

light of the new allegations regarding the Bond Repurchase Scheme.

The Plaintiff advances two arguments that the SAC properly pleads a claim against the

Cyrus Defendants under Section 5-9.  First, in response to the Cyrus Defendants' argument that

it was not a party to the GSO Transfer, the Plaintiff submits that it seeks to avoid the entire Bond

Repurchase Scheme, "of which the Cyrus Sale was only a part," and that the "Cyrus Sale was

contemporaneous with the GSO Transfer and would not have occurred but for Cyrus's and

GSO's cooperation with the Norske Board to ensure that Norske would repurchase the 2016

SUNs and the Norske [sic] would agree to the NSF." (*Id.* at 18–19.)  The Plaintiff

acknowledges, however, that the Cyrus Sale "offloaded the risk to GSO (in exchange for a

reduced purchase price for the 2016 SUNs for which GSO knew it would receive near par

value)." (*Id.* at 19.)  Nevertheless, the Plaintiff argues that

> [e]ach step in the Bond Repurchase Scheme was dependent on the
> other:  (i) but for the NSF conceived by the Defendants, Norske
> would have insufficient liquidity to repurchase the 2016 SUNs; and
> (ii) GSO would never have agreed to purchase the 2016 SUNs as
> part of the Cyrus Sale but for its insider knowledge that Norske
> would repurchase those same 2016 SUNs as part of the GSO
> Transfer, which occurred contemporaneously with the Cyrus Sale.

(*Id.*)

Second, in response to the Cyrus Defendants' arguments that it cannot be liable as it was

not a direct party to a contract with Norske Skogindustrier, the Plaintiff argues that recovery is

possible against Cyrus because the Bond Repurchase Scheme was in fact a three-party agreement

involving Cyrus and Norske Skogindustrier with GSO as an intermediary.  (Opposition at 19.)

The Plaintiff submits that "Cyrus is nothing more than a subsequent transferee, and avoidance as

to subsequent transferees is available under . . . Section 5-12(3)." (*Id.* at 20.)  For this proposition, the Plaintiff relies on the Second Hamre Declaration, which states that "[i]t cannot be read into [Section 5-9] that the 'preference' must be the proceeds of a direct transfer between the debtor and the transferee," citing the example of a guarantor released from liability on account of a payment from the debtor to a creditor.  (Second Hamre Decl. ¶ 9.)  Hamre also submits that "an agreement between creditors to which the debtor is not a party, could, in principle, be avoided pursuant to Section 5-9.  It is the actual effects of the transactions on the debtor and the other party that is of relevance when determining whether a Section 5-9 claim has merit." (*Id.* ¶ 11 (citing NOU 1972:29 s. 298; Andenæs s. 353)[10].)  In Hamre's opinion the proceeds of the Cyrus Sale constituted a "preference," and

> [t]he technicalities such as the Cyrus Defendants not being a party to the GSO Transfer, Norske not being a party to the Cyrus Sale and the Cyrus Sale taking place prior to the GSO Transfer, would not bar an avoidance claim pursuant to Section 5-9 against the Cyrus Defendants as a matter of Norwegian law.

(*Id.* ¶ 12.)  While agreeing with Ro that the term "mediate transferee" has no meaning under Norwegian bankruptcy law, Hamre contends that the Cyrus Defendants must nevertheless be considered a third party as to which there can be liability under Section 5-12(3).  (*Id.* ¶ 14.) Finally, Hamre submits that, although the Estate would not be entitled to double recovery from the GSO Defendants and the Cyrus Defendants, "the Defendants would be jointly and severally liable." (*Id.* ¶ 15.)

---

[10]    While the NOU passage cited in the Second Hamre Declaration is available at ECF Doc. # 81-19, the page cited in the Andenæs source does not appear to have been provided to the Court.  Hamre states that this was "material[] [he] previously submitted." (Second Hamre Decl. ¶ 11.)  But the only material that he previously submitted was his earlier declaration (ECF Doc. # 90), which contains several excerpts from Andenæs, but none of these are the particular page referenced here.  The page in question was also not provided as part of the submission of exhibits by the Plaintiff before Hamre's retention.

### C.    The Cyrus Reply and the Ro Supplement

The Cyrus Defendants respond that the SAC merely "reshuffles the same factual

allegations and adds labels and legal conclusions in the hopes of mustering a cognizable claim."

(Cyrus Reply at 4.)  The Cyrus Defendants reiterate their position that, "[w]ithout seeking to

avoid any transaction between Cyrus and Norske, the SAC still cannot state an avoidance claim

against Cyrus and still cannot allege any 'enrichment' of Cyrus that came at Norske's expense."

(*Id.*)  Cyrus highlights the fact that the SAC does not introduce new facts, "and instead adds

merely 'more clarity and specificity,'" and argues that this makes the Plaintiff's amendment

futile.  (*Id.* at 7 (quoting Opposition at 3).)  The Cyrus Defendants continue to focus on the

absence of new operative facts, arguing that, "no matter how Plaintiff tries to dress it up with

labels and legal conclusions, . . . 'the same operative facts' as the FAC . . . require application of

New York law to any avoidance claim against Cyrus."  (*Id.* at 8 (quoting Opposition at 8).)

In response to the assertion in the Second Hamre Declaration that the Defendants could

be jointly and severally liable, the Cyrus Defendants point to Hamre's testimony at the March

24, 2021 hearing, where he testified as follows:

> Q. Are you here to offer to this court under oath an opinion that the
> Cyrus defendants who are not a party to the G.S.O. transfer
> nevertheless can be held liable for that G.S.O. transfer under
> Norwegian Law, yes or no?
>
> A. And no, not under that.

(*Id.* at 10–11 (quoting ECF Doc. # 118-5, March 24, 2021 Hr'g Tr. at 167:23–168:3).)

The Cyrus Defendants also argue that the Section 5-9 claim must fail for two reasons.

(*Id.* at 11–12.)  First, the Cyrus Defendants reiterate that "Section 5-9 does not permit liability

against Cyrus where . . . Cyrus was not party to any allegedly improper transfer from Norske."

(*Id.* at 11.)  Moreover, the Cyrus Defendants argue that the guaranty release example cited by

15

Hamre as an instance where a debtor can recover from a non-creditor would not be covered by Section 5-9 at all and is instead "exhaustively regulated by § 5-13." (*Id.* (quoting Ro Supp. ¶ 6).) Second, the Cyrus Defendants argue that the theory "that Cyrus may be liable as a 'Subsequent transferee'" in a transaction where Norske purchased 2016 SUNs from Cyrus with GSO as an intermediary is "at odds with the sequence of events alleged in the SAC, which continues to suggest that GSO completed the Cyrus Sale with its own funds before the GSO Transfer, rather than with funds originating from Norske after the GSO Transfer." (*Id.* at 11 (quoting Opposition at 15–16); *see also* SAC ¶ 181 ("By April 19, 2016, . . . all of the 2016 SUNs in the Cyrus Defendants' possession had been transferred to the GSO Defendants and the Cyrus Defendants had received the entire bargained-for payment.").)

The Cyrus Defendants acknowledge that Norwegian law recognizes an "intermediary" claim under which a debtor can recover but argues that the SAC does not adequately allege such a claim. (Cyrus Reply at 12.) According to the Cyrus Defendants, a successful "intermediary" claim would have to allege that "GSO was not the true owner of the 2016 SUNs that it agreed to purchase from Cyrus" and that GSO did not in fact bear the risks of ownership. (*Id.* (citing Ro Supp. ¶¶ 11–12).) According to Ro, while "[t]he term 'intermediary' has no specific meaning under the Norwegian Recovery Act[,] . . . Norwegian courts recognize a 'strawman' concept, where the party receiving assets from a transfer is simply acting as a conduit for those assets to another party." (Ro Supp. ¶ 11.) But, Ro submits, the strawman does not bear the risks of ownership "and instead is simply a vehicle to pass them on to another party." (*Id.*) Ro contends that the SAC does not allege that GSO was a strawman, as it alleges that GSO owned the 2016 SUNs (*id.* ¶ 12,) and, even if it were to allege that GSO had paid for the 2016 SUNs with funds received from Norske, the SAC still could not allege that GSO acted as a strawman because the

16

SAC alleges that "GSO had to acquire the 2016 SUNs from Cyrus whether or not Norske decided to repurchase them." (*Id.* ¶ 13.) While the Cyrus Defendants acknowledge the Plaintiff's position that "an implicit precondition of the GSO Transfer was that the NSF would be approved" and the Cyrus Sale would occur (Cyrus Reply at 12 (quoting Opposition at 14)), the Cyrus Defendants submit that "the necessary allegation under Norwegian law" would be that "Norske's *repurchase* of the 2016s [sic] was a 'precondition' of the GSO Transfer." (*Id.*)

### D.    The First Hamre Declaration

In the First Hamre Declaration, Hamre describes the "reversal rules," from which the Recovery Act originated. Hamre explains the purpose of the reversal rules is to protect creditors from harmful "dispositions":

> The purpose of the reversal rules in Norwegian law is to protect the ordinary creditors from damaging dispositions on the part of the debtor. The focus is on actions that are *disloyal* to the creditors.[11] Dispositions can be disloyal for two reasons: the disposition can either result in a deterioration of the debtor's financial position; or the disposition may advantage or benefit one creditor to the detriment of other creditors, at a time when it is uncertain whether the debtor will be able to provide all his creditor's [sic] with full recovery.
>
> Consequently, the reversal rules are written with the purpose of protecting creditors from dispositions made by debtors that will impair the value of the debtor's assets. The rules also aim to discourage dispositions that will favour or prioritize individual creditors at the expense of other creditors or the creditor body as a whole.
>
> The reversal rules have roots going back to Roman law and the *actio pauliana* doctrine. Under these rules, transactions may be reversed if the debtor had deliberately acted to the detriment of its creditors, and the counterparty to the transaction had knowledge of the disloyal behaviour. If the transaction concerned gifts, there was no

---

[11]    Brækhus, Sjur, Materiell Konkurs- og eksekusjonsrett – referat av professor Sjur Brækhus' forelesninger [Material Bankruptcy and executor law - minutes of Professor Sjur Brækhus' lectures], Oslo, 76 (1960).

requirement of bad faith on the part of the counterparty.[12]   The consideration behind the provision is the same as current Norwegian reversal rules – namely, to protect creditors from damaging dispositions by the debtor.

(First Hamre Decl. ¶¶ 19–21.)

Hamre also explains how Norwegian law continues to emphasize the reality of the transaction over the form of the transaction:

> Norwegian law is, as already mentioned, largely open to applying a purpose-based and reasonable interpretation of the legal text, meaning that the purpose of the law is often given significant weight in the interpretation and application of the law.   A strict objective interpretation of the wording of the law is not necessarily decisive, especially if there are other legal sources that speak against such a strict interpretation.   One of the leading scholars within the field of insolvency law, Kristian Huser, in his book Gjeldsforhandling og konkurs – omstøtelse [*Debt negotiation and bankruptcy – reversal*], has written the following:
>
> > *"So-called real considerations – i.e., more general legal considerations – will also play an important and central part in a complex and practically important area of law like this, as it is essential that the regulations are interpreted and applied in a holistic way.   The fact that the rules work as a sensible and logical whole is important, to avoid - among other things – loopholes and attempts at "adaptation" to the regulations."*[13]
>
> The use of policy considerations may be important in cases where the debtor and/or creditors try to circumvent the regulations.   An important feature in Norwegian law is that the court would not necessarily emphasize [sic] how a transaction *appears*, but rather its *reality*.   This approach is also pointed out by Huser, Gjeldsforhandling og konkurs – omstøtelse [*Debt negotiation and bankruptcy – reversal*], where he states the following:
>
> > *"There is a tendency in the modern approach to cut through a transactional form and emphasize its*

---

[12]      *Id.* at 77.

[13]      Huser, Kristian, Gjeldsforhandling & konkurs Bind 3 omstøtelse [Debt negotiation and bankruptcy Volume 3 Reversal], Bergen, 127 (1992).

> *reality. This also applies in the doctrine of reversal.*
> *Pure circumvention attempts based on formalism*
> *will thus be cut through."*[14]

When interpreting the reversal rules, the purpose behind the
provision must be emphasized [sic].  In addition, the court will
emphasize the reality of the disposition, and not only how the
transaction appears or the form it takes.

The Recorvery [sic] Act largely continues the reversal rules which
previously were set out in the Bankruptcy Act of 1863, though with
some adjustments.  Therefore, older case law and legal literature in
relation to the Bankruptcy Act of 1863 are still relevant in the
interpretation of the current Recovery Act of 1984 and its provisions
regarding reversal.  In particular, reference is made to the fact that
section 44 of the Bankruptcy Act of 1863 and Section 5-5 of the
Recovery Act both use the condition "payment of debt."  The only
change from the two legal texts relates to the establishment of
cumulative conditions thereon, stating that such payments of debts
must be "with amounts that have significantly impaired the debtor's
ability to pay" its other debts.

> *"On the Norwegian side, the changes are less*
> *extensive.  The rules of the kkl. [Bankruptcy Act of*
> *1863] §§ 44-46 are maintained in full, but are, in*
> *particular for section 44, subject to certain*
> *adjustments, see section 5-7 to 5-10 and section 5-*
> *15"*[15]

(*Id.* ¶¶ 22–25.)

### III.   <u>STANDARD OF REVIEW</u>

#### A.   **Pleading Standard**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure ("Rule 12(b)(6)"), made applicable here by Rule 7012 of the Federal Rules of

Bankruptcy Procedure, a complaint must allege "enough facts to state a claim for relief that is

---

[14]   *Id.* at 260.

[15]   NOU 1972:20 at 283.

*plausible* on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010)

(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Courts use a two-pronged approach when considering a motion to dismiss. *Pension*

*Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that

the motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo working

principles'" (quoting *Iqbal*, 556 U.S. at 678–79)); *see also McHale v. Citibank, N.A. (In re 1031*

*Tax Grp., LLC)*, 420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009).

First, the court must accept all factual allegations in the complaint as true, discounting

legal conclusions clothed in factual garb. *See, e.g.*, *Iqbal*, 556 U.S. at 678 (noting that courts

"are not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Kiobel v. Royal Dutch Petroleum Co.*, 621

F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded,

nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.*

Second, the court must determine if these well-pleaded factual allegations state a

"plausible claim for relief." *Iqbal*, 556 U.S. at 679. Courts do not make plausibility

determinations in a vacuum; rather, it is a "context-specific task that requires the reviewing court

to draw on its judicial experience and common sense." *Id.*

> A claim has facial plausibility when the pleaded factual content
> allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged. The plausibility standard is not
> akin to a probability requirement, but it asks for more than a sheer

> possibility that a defendant has acted unlawfully. Where a
> complaint pleads facts that are merely consistent with a defendant's
> liability, it stops short of the line between possibility and plausibility
> of entitlement to relief.

*Id.* at 678 (internal quotation marks and citations omitted). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).

Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"), made applicable in an adversary proceeding by Rule 7009 of the Federal Rules of Bankruptcy Procedure, applies to pleadings alleging fraud: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). When Rule 9(b) applies, to survive a motion to dismiss, a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). A plaintiff can establish this strong inference of fraud "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). "Due to the difficulty of proving intent, plaintiffs may rely on badges of fraud—circumstances so commonly associated with fraudulent transfers that their presence gives

21

rise to an inference of intent."  *Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*, 617 B.R. 442, 472 (Bankr. S.D.N.Y. 2020) (internal quotation marks omitted) (quoting *Techno-Comp. Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 745 (E.D.N.Y. 2015)).  Badges of fraud can include:

> a close relationship between the parties to the conveyance; inadequacy of consideration received; retention of control of the property by the transferor; suspicious timing of the conveyance after the debt was incurred; the use of fictitious parties; information that the transferor was insolvent as a result of the conveyance; the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; the general chronology of the events and transactions under inquiry; a questionable transfer not in the usual course of business; and the secrecy, haste, or unusualness of the transaction.

*Official Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 554 (Bankr. S.D.N.Y. 2015).

"When a trustee in bankruptcy pleads a claim of fraud, cases have held that the Rule 9(b) requirement of particularity is relaxed."  10 COLLIER ON BANKRUPTCY ¶ 7009.03 (16th ed. 2021) (citing cases).  "The less stringent standard for pleading fraud with particularity in a bankruptcy proceeding involving a trustee is predicated upon the fact that it is often the trustee, a third party, who is pleading fraud on second-hand information."  *In re O.P.M. Leasing Servs., Inc.*, 35 B.R. 854, 862 (Bankr. S.D.N.Y. 1983).  In any event, general allegations are insufficient when pleading fraud, and the party asserting the claim must plead facts, "including time and place and content of the misrepresentations, . . . [and] facts with respect to the consequences of the fraud."  10 COLLIER ON BANKRUPTCY ¶ 7009.03.

Where a trustee's complaint is dismissed for failure to comply with the requirements of Rule 9(b), it is often dismissed with leave to amend.  *Id.*; *see also, e.g.*, *Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 430–31 (Bankr. S.D.N.Y. 1998).

### B.    Choice of Law Rules

The first step in the choice of law analysis is to determine whether federal or New York

choice of law rules apply.  "[F]ederal choice of law rules are a species of federal common law,"

and "[b]efore federal courts create federal common law, 'a significant conflict between some

federal policy or interest and the use of state law must first be specifically shown.'"  *Bianco v.*

*Erkins (In re Gaston & Snow)*, 243 F.3d 599, 605–06 (2d Cir. 2001) (quoting *Atherton v. FDIC*,

519 U.S. 213 (1997)).  As no such conflict has been shown, the Court applies New York choice

of law rules.[16]

"Under New York choice of law rules, the Court must first determine whether there is an

'actual conflict' between the relevant laws of the implicated jurisdictions."  *Hosking v. TPG Cap.*

*Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 535 B.R. 543, 573 (Bankr. S.D.N.Y. 2015)

(quoting *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir.

2006)).  The parties do not dispute that there is a conflict between the relevant New York and

Norwegian law.  However, there is no standalone claim for unjust enrichment under Norwegian

law (as the Court concludes below), while there is such a claim under New York law.

---

[16]    Even if federal choice of law rules were to apply, they would lead to the same results.  As explained in *In re Koreag, Controle et Revision S.A.*, the federal and New York choice of law rules are sufficiently similar such that the Court may "apply an interest analysis consistent with the law of either jurisdiction":

> The federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation.  The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent.

> New York law provides that the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict. The federal and New York doctrines invoke similar considerations.

961 F.2d 341, 350–51 (2d Cir. 1992), *aff'd in part sub nom. Refco F/X Assocs., Inc. v. Mebco Bank, S.A.*, No. 89 CIV. 3071 (WK), 1992 WL 200748 (S.D.N.Y. July 31, 1992) (internal quotation marks and citations omitted).

Accordingly, the Court concludes that there is an actual conflict between the relevant New York and Norwegian law with respect to all of the claims.

Once an actual conflict has been shown to exist, "the law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Koreag*, 961 F.2d at 350 (internal quotations omitted). "[T]he interest analysis is applied differently depending on whether the rules in question are conduct-regulating rules that people use as a guide to governing their primary conduct, or loss-allocating rules that prohibit, assign, or limit liability after the tort occurs." *Licci v. Lebanese Canadian Bank*, 739 F.3d 45, 49 (2d Cir. 2013) (internal quotation marks omitted). The New York Court of Appeals has provided examples of each type of rule, stating that "rules of the road" are conduct-regulating, while "charitable immunity statutes, guest statutes, wrongful death statutes, vicarious liability statutes, and contribution rules" are loss-allocating. *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002–03 (N.Y. 1994) (internal quotation marks and citations omitted).

## IV.    **DISCUSSION**

### A.    **Section 5-9 Legal Standard**[17]

Count III seeks avoidance of the Bond Repurchase Scheme under Section 5-9. (SAC ¶¶ 246–62.) Section 5-9 provides as follows:

> Transactions that in an improper way favor one creditor at the expense of others, or prevent the debtor's assets from being used to pay off creditors, or increase the debtor's debt to their detriment, can be avoided if the debtor's financial position was weak or was seriously weakened by the transaction, and the other party knew or

---

[17]    Section 5-9 is further discussed in the April 2021 Memorandum Opinion. (*See* April 2021 Memorandum Opinion at 45–49.)

> should have known of the debtor's difficult financial situation and
> the circumstances that made the transaction improper.
>
> Transactions that are executed more than ten years before the date
> of filing for bankruptcy cannot be voided.

(Section 5-9, ECF Doc. # 47-2 at 2.)

A properly asserted claim under Section 5-9 must plead five elements. First, the claim must allege that the transaction the claimant seeks to avoid is one of the covered transaction types (i.e., a transaction that (1) gives preference to one creditor at the expense of others, (2) prevents the debtor's assets from being used to pay creditors, or (3) increases the debtor's liabilities in a manner detrimental to creditors). Second, it must allege that the transaction was improper. Third, it must allege that the debtor's financial situation was weak or seriously weakened by the transaction. Fourth, it must allege that the transferee knew of the debtor's difficulties. Fifth, it must allege that the transferee knew that the transaction was improper.

## B.      The Plaintiff Adequately Pleads a Section 5-9 Claim Against Cyrus

Count III of the SAC seeks a judgment avoiding all aspects of the Bond Repurchase Scheme, including but not limited to the Cyrus Sale. (SAC ¶ 262.)

The Court previously dismissed Count III of the FAC because it only sought to avoid the Cyrus Sale, to which Norske Skogindustrier was not a party:

> Despite the Plaintiff's requests for the Court to consider the Cyrus
> Sale and the GSO Transfer as one transaction, the claim to avoid the
> Cyrus Sale is asserted as a separate claim from the claim to avoid
> the GSO Transfer, rather than the Plaintiff asserting a single claim
> to avoid the alleged overall transaction.

(April 2021 Memorandum Opinion at 56 n.31(citation omitted).)

In response to the Court's concerns, the SAC pleads new facts regarding the Bond Repurchase Scheme that support finding the GSO Transfer and the Cyrus Sale to be a single disposition. As explained by both parties' experts at the Hearing, the purpose of Section 5-9 is to

25

avoid dispositions and a disposition has a meaning which is broader than a single transaction. (Hr'g Transcript at 71:4–13; 77:14–79:8.) Thus, a single disposition may encompass complex set ups. (*Id.*) A relaxed standard considering multiple factors is used to determine what constitutes a disposition. (*Id.* at 88:24–89:7.) Therefore, according to Hamre, a single disposition may consist of multiple transactions and multiple counterparties. (*Id.* at 82:10–83:13.) Hamre also stated on the record that even though the Cyrus Defendants were not a direct counterparty to the GSO Transfer, the Cyrus Defendants can nevertheless be held liable for the GSO Transfer under Norwegian law. (*Id.* at 83:19–84:24.) Hamre clarified that for Cyrus to be held liable for the GSO Transfer, the Court must view the GSO Transfer in light of the whole transaction. (*Id.* at 85:5–86:5.)

The Cyrus Defendants concede that Norwegian law recognizes the theory of a strawman purchaser, where an actual seller or buyer cannot evade liability simply by placing a straw buyer between themselves and their true counterparty. (*See* Ro Supp. ¶¶ 11–13.) The strawman analysis is described as a stricter version of the relaxed disposition standard. (*Id.* at 88:24–89:7.) Thus, if the Cyrus Sale were found to be a straw transaction, then the Court may find the Bond Repurchase Scheme to be a single disposition. (*Id.* at 88:1–88:23.) If the Bond Repurchase Scheme were considered a single disposition, then Norske Skogindustrier may be considered a party to the Bond Repurchase Scheme, thus alleviating the Court's previous concerns. (*See* April 2021 Memorandum Opinion at 56.)

An order of the Supreme Court of Norway, *DeXWVche Bank AG v. EUik MaUWin Vik*, HR-2018-1265-A (June 28, 2018) ("*DeXWVche Bank*"), provides further explaination. (ECF Doc. ## 118-3, 122-6). In *DeXWVche Bank*, the court examined the rules on pro forma transactions. It explained that pro forma is a ground for invalidity under Norwegian law. (*Id.* ¶

26

70.)  The *DeXWVche Bank* court explored the question whether the pro forma rule is objective or

subjective, and the differences in those approaches:

> The objective approach to pro forma may be briefly described as an
> overall assessment of the asserted transfer, where the level or
> formality, possible motive for pro forma, any absence of other
> motives for the transaction, and—often decisive—the factual and
> legal effects it has had for the parties, are particularly important to
> decide whether the transfer is genuine.  With a subjective approach,
> the question is what the parties themselves have intended with the
> transfer.  One may well rely on the same facts as in an objective
> approach to identify this intention, but with a subjective pro forma
> rule, they become aspects of the assessment of evidence, and not
> aspects of a legal assessment as such.

(*Id.* ¶ 73.)

The court determined that there are compelling reasons for applying an objective

approach, finding that "it does not suffice only to ask whether the parties subjectively intended

that the transaction would be pro forma—one must make an objective assessment."  (*Id.* ¶ 85.)

Under this approach, no one factor alone is sufficient to establish pro forma.  (*Id.* ¶ 89.)

However, it is a "composite assessment" in which one single aspect may be decisive if there are

other strong arguments in both directions.  (*Id.*)  The court ruled that the Court of Appeal's order

must be set aside because it was "based on a too narrow assessment when one assumes that an

objective pro forma rule must be applied."  (*Id.* ¶ 92.)  Thus, according to allegations Ro, the

motives of the parties in signing the agreement and the subsequent effect of that agreement are

both important in assessing whether a transaction is pro forma.  (*See* Hr'g Transcript 53:22–

55:17)

Here, Count III is supported by multiple paragraphs detailing the Bond Repurchase

Scheme sought to be avoided.  (SAC ¶¶ 175, 177, 178, 186, 187, 188, 189.)  Specifically, the

SAC alleges that "[b]y April 19, 2016, under the terms of the Cyrus Sale Agreement, all of the

2016 SUNs in the Cyrus Defendants' possession had been transferred to the GSO Defendants

27

and the Cyrus Defendants had received the entire bargained-for payment," and that

"[c]ontemporaneously with the Cyrus Sale Settlement Date, Norske Skogindustrier and the GSO

Defendants completed the GSO Transfer." (SAC ¶¶ 181–82.) The "Cyrus Sale Settlement

Date" is defined as April 19, 2016. (*Id.* ¶ 181.) The SAC also alleges that "[o]n March 18, 2016,

the Norske Board formally passed the resolution to issue the NSF" and, on "[t]he same day, the

Defendants executed an agreement memorializing the Cyrus Sale, pursuant to which the Cyrus

Defendants agreed to sell substantially all of their interests in the 2016 SUNs to the GSO

Defendants." (*Id.* ¶¶ 164–65.)

Still, the Cyrus Defendants argue the claim must fail since the SAC has not alleged that

the Cyrus Defendants received assets originating with the debtor. The Cyrus Defendants explain

that GSO must have settled the Cyrus Sale with its own funds before the GSO Transfer, rather

than with funds originating from Norske after the GSO Transfer. However, a fair reading of the

allegations in the SAC supports the Plaintiff's argument that what was actually completed was

not a true sale, but rather a sham transaction labeled as a sale, whereby the Cyrus Defendants

attempted to avoid the risk of clawback by transferring the 2016 SUNs to GSO without receiving

payment until after the GSO Transfer occurred.[18] *See Blue Tree Hotels Inv. (Canada), Ltd.*, 369

F.3d at 217 ("In ruling on the sufficiency of the complaint, we must accept as true the allegations

contained in the complaint and draw all reasonable inferences in favor of the nonmoving

party."). Unlike the FAC, the SAC effectively seeks to collapse the Cyrus Sale and GSO

---

[18]    The Cyrus Defendants argue that to successfully plead a strawman transaction, the Plaintiff must allege that
GSO did not bear the risk of owning the 2016 SUNs. (Cyrus Reply at 12.) The Cyrus Defendants contend that the
Plaintiff has not alleged such an arrangement. (*Id.*). While the SAC alleges that the Cyrus Defendants attempted to
transfer the risk of clawback to GSO, that risk does not require a finding that GSO bore the risk of ownership. Here,
the Plaintiff has argued there to be no risk of ownership because GSO would have been obligated to purchase the
Cyrus Defendants' position only if Norske Skogindustrier had in fact repurchased the 2016 SUNs.

Transfer and avoid the Bond Repurchase Scheme.  At this stage, the Court assumes that all facts alleged are true.  *See, e.g.*, *Iqbal*, 556 U.S. at 678.

As stated above, the SAC alleges that "[b]y April 19, 2016, under the terms of the Cyrus Sale Agreement, all of the 2016 SUNs in the Cyrus Defendants' possession had been transferred to the GSO Defendants and the Cyrus Defendants had received the entire bargained-for payment."  (SAC ¶ 181.)  Although the precise time when payment was received by the Cyrus Defendants remains unclear, the SAC alleges that on April 14, 2016, a GSO representative was communicating with the head of Norske Skogindustrier, who confirmed by email that they were "trying to organize a settlement date that works for us."  (*Id.* ¶ 180.)  The SAC also alleges that on April 15, 2016, four days earlier than the Cyrus Defendants are alleged to have received payment, confirmation was received in connection with the purchase by Norske Skogindustrier of GSO's 2016 SUNs.  (*Id.* ¶ 186.)  It is a reasonable inference based on the SAC's factual allegations that the Cyrus Defendants could have "received assets," thereby potentially triggering Section 5-12's third paragraph.  (Section 5-12(3).)[19]

Furthermore, at the Hearing, Plaintiff's counsel and Cyrus's counsel confirmed that at this time neither counsel had information on when the Cyrus Defendants received payment. (Hr'g Transcript at 16:18–19:7; 47:17–48:22.)  Even if the facts regarding the Cyrus Sale remain unclear, the Court finds the Plaintiff has pled a Section 5-9 claim with sufficient particularity given the Plaintiff has limited access to information regarding the Cyrus Sale at this stage.  *See*

---

[19]    As both Hamre and Ro point out in their declarations, Section 5-12 (titled "Effect of avoidance pursuant to Section 5-9") clearly contemplates, in its third paragraph, recovery by a bankruptcy estate from a third party to a transaction between the debtor and the "other party."  (Section 5-12(3) ("If the other party has transferred the received assets to a third party that knew or should have known of the conditions of the other party's acquisition of rights that could lead to avoidance, the first and second subsection also apply to the third party.")  Thus, while Hamre is correct that avoidance under Section 5-9 does not require in all cases that recovery be sought from a debtor's direct counterparty, the extension of liability to a third party appears to be narrower than Hamre contends: the third party in question must have been the recipient of "the received assets," meaning the assets that the "other party" received from its counterparty, the debtor.

*Rieser v. Milford (In re Chari)*, 276 B.R. 206, 213–14 (Bankr. S.D. Ohio 2002) (concluding that

trustee pled fraud with sufficient particularity, even with respect to speculative claims of

additional transactions between debtors and defendant-transferees; although claims of additional

transactions were vague, trustee had limited ability to access information at the pleading stage,

and would not be required to include in his pleadings information only available from defendants

through discovery).

   While the written terms of the Cyrus Sale Agreement do not explicitly state that the

closing of the Cyrus Sale was dependent on Norske's actual repurchase of GSO's 2016 SUNs

position, it *was* dependent on the closing of the NSF.  The Cyrus Sale Agreement defines "Trade

Date" as "the date on which [Norske Skogindustrier] could first submit a valid drawdown or

utilisation notice under the New Securitization Facility."  (Cyrus Sale Agreement at 2.)  The key

provision of the Cyrus Sale Agreement is section 3, concerning the "Securities Sale," which

provides, in relevant part:

> (a)   Cyrus agrees to sell . . ., and GSO . . . agrees to buy,
> €29,587,000 in principal amount of the Company's senior notes due
> 2016 ("2016 Notes"), currently held by Cyrus (via an Affiliate or
> Related Fund), for a purchase price of 68.0% (the "2016 Notes
> Sale") "with accrued interest."  The 2016 Notes Sale shall occur on
> the Trade Date.  Each of GSO and Cyrus agree that in respect of the
> 2016 Notes Sale, on the date hereof and on such Trade Date, they
> each make and agree, for the benefit of the other Party or other
> express beneficiaries, to the representations, warranties and
> agreements as set forth in Schedule 1.  The 2016 Notes will be traded
> on the terms set forth in Schedule 2 and will be transferred to such
> Relevant Funds as identified by GSO to Cyrus.

> (b)   For the avoidance of doubt, if no date falls to be the
> Trade Date (under its definition), then the 2016 Notes Sale shall not
> proceed.

(*Id.* at 4–5.)

30

Thus, if there was no date on which Norske could begin using the NSF, then there would have been no Cyrus Sale. Therefore, the Cyrus Sale, appears to have been conditioned on the closing of the NSF transaction, but it was not expressly conditioned on the occurrence of the *GSO Transfer*. With this condition effectively requiring Norske to have cash available to complete a buyback, it is reasonable to infer that the Cyrus Sale was far less risky for GSO. As the SAC states:

> Although the revised terms of the Second Restructuring would not require Norske Skogindustrier to upstream the funds loaned by the Defendants, or require the repurchase or payoff of the 2016 SUNs, it was understood by Defendants and the Board members they controlled that the Norske Board would nevertheless use the new liquidity generated by the secured credit facility funded by the Defendants to repurchase or payoff all of the 2016 SUNs by the June 2016 maturity date, providing Defendants with a recovery on their 2016 SUNs and avoiding the triggering of their CDS obligations.

(SAC ¶ 144.v.) This "understanding" that Norske Skogindustrier would repurchase the 2016 SUNs is a factor in evaluating whether this was indeed a pro forma transaction. Accordingly, the Plaintiff has alleged sufficient facts such that, if true, the Bond Repurchase Scheme may constitute a single disposition under Norwegian law in which Cyrus is liable as Norske's true counterparty. The Court is not required at this stage to conduct a complex multifactor analysis.

Lastly, regarding Ro's statement that additional recovery would be improperly duplicative (Fourth Ro Decl. ¶ 12), the SAC limits recovery to the greater amount of (i) the total amount received by the Cyrus Defendants through the Bond Repurchase Scheme; and (ii) the economic loss suffered by the Estate, pursuant to the Recovery Act Section 5-12 (SAC ¶ 262). Thus, recovery from the Cyrus Defendants would not be duplicative.

Accordingly, the SAC cures the previous deficiencies in the FAC explained by the Court. The Plaintiff has adequately articulated how the Cyrus Defendants may have received the assets of the Debtor and how GSO bore no risk of ownership of the Cyrus Defendants' 2016 SUNs as a

mere strawman.[20]  The Court concludes that the Plaintiff has thus sufficiently stated a claim

against the Cyrus Defendants in Count III.  Therefore, the Cyrus Motion to dismiss Count III is

**DENIED.**

### C.    Choice of Law Requires Dismissal of Count V for Unjust Enrichment

The Plaintiff argues that New York law applies because "the CDS contracts were made

by Defendants in New York with counterparties from New York."  (Opposition at 18.)  But these

CDS contracts are not the conduct that the SAC alleges to be "unjust."  Instead, the Plaintiff's

unjust enrichment claim remains based on Defendants' alleged influence over the Norske Board.

(*See* SAC ¶ 281.)  According to the SAC, that alleged influence over the Norske Board is the

conduct that "unjustly" caused Norske to repurchase and repay the 2016 SUNs.  (*Id.* ¶ 177.)  For

unjust enrichment claims that, as here, are based on fraudulent conveyance, the Court has already

ruled that it will apply the law of the jurisdiction where the allegedly wrongful conduct occurred.

(*See* April 2021 Memorandum Opinion at 25–26.)  As pled, and as this Court has already

determined, that conduct occurred in Norway.  (*See id.* at 28.)

The Plaintiff seeks to avoid this result by claiming that "the 'windfalls and lessened

obligations' in connection with the CDS Interests were received by Defendants in New York"

and that "where the unjust windfalls received by Defendants was predicated on contracts

negotiated in New York and windfalls received in New York, the law of New York should

apply."  (Opposition at 18.)  But as the Court recognized in the April 2021 Memorandum

Opinion, the jurisdiction with the "greatest interest in the litigation" is the "place of the allegedly

---

[20]       However, the Court rejects the Plaintiff's argument that "mediate transferee" as used throughout the SAC
has the same meaning as "strawman" and "pro forma transaction."  (Hr'g Transcript at 57:7–11.)  The Plaintiff has
failed to provide any support for this argument.  Indeed, Ro stated on the record that he does not personally
understand the terms to mean the same thing.  (*Id.*).  Despite the repeated use of the phrase "mediate transferee,"
which has no meaning under Norwegian law (*see id.* at 66:11–21,) the Court nonetheless concludes that the SAC
contains sufficient facts of the pro forma transaction, which if true, satisfy the pleading requirements of Rule 9(b).

wrongful conduct." (April 2021 Memorandum Opinion at 25–26 (quoting *Hellas*, 535 B.R. at 573) (internal quotations omitted).) The Plaintiff cites *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 71 (N.Y. 1993), but that case did not involve an unjust enrichment claim or a claim where the location of the alleged "enrichment" determined the choice of law.

Furthermore, the Plaintiff's attempt to amend Count V is improper. The Plaintiff asserts a New York version of its unjust enrichment claim effectively as a placeholder based on whatever facts later emerge. (*See* Opposition at 17 ("Plaintiff reasserts its unjust enrichment claim in the event that this Court later finds that New York law applies to the above conduct").) However, leave to amend is proper only if a plaintiff has factual allegations now that support a viable claim. Indeed, the Court stated that "the Plaintiff may reassert the claim should the Court later determine that New York law applies." (April 2021 Memorandum Opinion at 9 n.3.) Yet, the Plaintiff has failed to assert any new facts.

The Plaintiff claims that "[t]his type of pleading is permitted under the Federal Rules and this Court's prior decisions." (Opposition at 18 (citing this Court's decision in *Hellas*, 535 B.R. at 573, and Judge Rakoff's decision in *Trott v. Platinum Mgmt. (NY) LLC (In re Platinum-Beechwood Litigation)*, No. 18-cv-6658, 2019 U.S. Dist. LEXIS 62745, at *39 (S.D.N.Y Apr. 11, 2019).) But those cases only support that a plaintiff may plead unjust enrichment in the alternative to fraudulent transfer claims where the facts alleged indicate the plaintiff could ultimately recover under either theory. *See Hellas*, 535 B.R. at 585; *Platinum-Beechwood*, 2019 U.S. Dist. LEXIS 62745, at *39. Those cases do not support the idea that a plaintiff may assert a placeholder unjust enrichment claim for choice of law purposes, without pleading any new facts that might support the alternative choice of law.

Accordingly, the Court **FINDS** and **CONCLUDES** that choice of law requires dismissal.

33

### D.    Count V Fails to State a Claim

Count V also fails to state a claim.  The Plaintiff cites allegations that "influencing" Norske to complete the Second Restructuring "allowed the Defendants to realize on their 2016 SUN claims at a level far above what they would have seen if Norske had defaulted on those bonds."  (Opposition at 21.)  But whatever the Cyrus Defendants were able to "realize" on its 2016 SUNs could not have come at the expense of the Plaintiff because the Cyrus Defendants are alleged to have sold its 2016 SUNs to GSO, not to Norske Skogindustrier.

*Platinum-Beechwood*, 2019 U.S. Dist. LEXIS 62745, which is cited by the Plaintiff, is distinguishable from the case before the Court.  In *Platinum-Beechwood*, the "millions of dollars" of alleged enrichment were transferred, as the Plaintiff concedes, "directly from [the debtor] to [the defendants]."  (Opposition at 22 (internal citation omitted).)  Here, by contrast, the SAC does not allege any unjust transfer "directly" from Norske Skogindustrier to the Cyrus Defendants.  Instead, in the Second Restructuring, it was the Cyrus Defendants that transferred millions of dollars to Norske and its subsidiaries, in a manner that, as alleged, was designed to help Norske "avoid a default."  (SAC ¶ 65.)  That is not enrichment at all, let alone enrichment at Norske's expense.  Nor do Plaintiff's allegations of CDS contracts save its unjust enrichment claim.  Norske is not alleged to be a counterparty to any of those CDS contracts.  To the contrary, according to the SAC, the alleged CDS contracts were with counterparties outside of Norway.  (*See id.* ¶ 283.)  Any gain under the CDS contracts would be at the expense of those counterparties, not Norske.  The Plaintiff does not deny this in its Opposition.  Additionally, the Plaintiff does not address the cases cited by the Defendants (*see* Cyrus Memo at 19–20) for the proposition that an unjust enrichment claim must be dismissed where, as with the CDS contracts at issue here, a plaintiff fails to allege that the unjust enrichment was at the plaintiff's expense.

*See In re Stillwater Asset Backed Offshore Fund Ltd.*, 559 B.R. 563, 623 (Bankr. S.D.N.Y. 2016); *see also Edelman v. Starwood Cap. Grp., LLC*, 892 N.Y.S.2d 37, 40 (2009) (stating that an unjust enrichment claim "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly *at the expense of another*" and "the general rule is that the plaintiff *must have suffered a loss* and an action not based upon loss is not restitutionary") (internal citations omitted); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–16 (2007) (affirming dismissal of unjust enrichment claim where plaintiff was a purchaser of tires and defendants sold allegedly price-fixed chemicals to tire manufacturers because "the connection between the purchaser of tires and the producers of chemicals used in the rubber-making process is simply too attenuated" to support an unjust enrichment claim).

Accordingly, the Court **GRANTS** the Motions as to Count V.

## V.   <u>CONCLUSION</u>

For the reasons discussed above, the Cyrus Motion is **DENIED** as to Count III.  The Motions are **GRANTED** as to Count V.  Count V is thus dismissed, and the Plaintiff may only reassert Count V if discovery later supports a determination that New York law applies to the claim.

**IT IS SO ORDERED.**

Dated:  October 4, 2021
        New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge